## UNITED STATES DISCTRICT COURT

## WESTERN DISCTRICT OF LOUISIANA

## LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **IFG PORT HOLDINGS LLC.** | : | **CIVIL ACTION NO:** _____ |
| **VERSUS** | : | **JUDGE** _____ |
| **LAKE CHARLES HARBOR &** | : | **MAGISTRATE JUDGE** _____ |
| **TERMINAL DISTRICT d/b/a THE** | | |
| **PORT OF LAKE CHARLES** | | |

## <u>COMPLAINT</u>

NOW INTO COURT, through undersigned counsel, comes IFG PORT HOLDINGS LLC, which respectfully represents as follows:

### THE PARTIES

1.

Plaintiff IFG PORT HOLDINGS LLC [hereinafter referred to as "IFG" or "Tenant"] is a New York Limited Liability Company with its principal place of business located in New York, New York.

2.

Made defendant herein is LAKE CHARLES HARBOR & TERMINAL DISTRICT d/b/a THE PORT OF LAKE CHARLES [hereinafter referred to as the "Port", the "District" or "Landlord"], a political subdivision of the State of Louisiana, located in Calcasieu Parish, Louisiana

3.

Based in New York, New York, IFG constructed, operates and maintains an export grain terminal at the Port.

## JURISDICTION AND VENUE

4.

This court has subject matter jurisdiction over the claims made in this matter based on diversity of citizenship as set forth in 28 U.S.C.A. § 1332. Complete diversity exists because the Plaintiff and the sole Defendant to those claims share no common state of incorporation or principal place of business and Plaintiff's claims in this matter exceed $75,000.

5.

Venue is proper under 28 U.S.C.A. §1391 as the judicial district in which the sole defendant resides.

## THE LEASE AND THE FACILITY

6.

IFG, as Tenant, and the Port, as Landlord, entered into a Ground Lease Agreement [the "Lease"] effective August 15, 2011. A copy of the Lease with Exhibits is attached hereto as Exhibit A.

7.

Pursuant to the Lease, IFG was to construct, maintain and operate a state of the art grain export terminal [the "Facility"] on the leased premises.

8.

Construction of the Facility was completed and the Facility opened for business on July 15, 2015, and the first ship commenced loading shortly thereafter on September 30, 2015.

9.

To date, over $50 Million dollars has been invested in the Facility and the market value of the Facility is substantially greater.

10.

The Lease has an initial term of ten (30) years and successive renewal terms of twenty (20) and ten (10) years.

11.

Currently, IFG is six (6) months into the initial Lease term with ends on July 31, 2045 [Thirty (30) years from the Rent Commencement date of July 15, 2015], and therefore, potentially has over fifty-nine and half (59 ½) years remaining on its Lease.

12.

Both parties to the Lease negotiated its terms with the benefit of advice from their attorneys.  IFG's CEO & General Counsel Kabir Ahmad executed the Lease on behalf of IFG. The Port's Executive Director Bill Rase executed the Lease on behalf of the Port, once all the terms of the Lease were approved by the Port's General Counsel Michael K. Dees.

13.

As stated in the first Whereas provision in the Lease:

"WHEREAS, the District is a deep water port and political subdivision of the State of Louisiana (the 'State') exercising governmental powers of the State as delegated and authorized pursuant to the Louisiana Constitution and other statutory supplemental authorities thereof, acting by and through the Port Director of the District and the President, Board of Commissioners of the District, having its office and domicile at the Port of Lake Charles, Lake Charles, Louisiana; and"

*See Lease Pg. 1; Exhibit A.*

14.

Section 8.4 of the lease provides:

"8.4   Exclusivity.   The District grants to the Tenant the exclusive right to operate a Grain Terminal at City Docks and no Person other than Tenant and its

successors and assigns (subject to Section 14) will be permitted to operate a Grain Terminal at City Docks during the Initial Term or any Extended Term."

*See Lease Pg. 14, Par. 8.4; Exhibit A.*

15.

The Lease contains the following provision related to dredging:

"8.9    Dredging.  The Tenant will arrange for and complete the initial dredging of the marine area alongside the Berth No. 8 Servitude Area and the vicinity connecting the Calcasieu ship channel to this area (see the map attached as Exhibit 6 which shows the specific areas to be dredged) to a depth of no less than forty-two (42') feet below the low water line as measured at mean low Gulf tide. The Tenant will only arrange for and complete this dredging one (1) time prior to the Expected Completion Date.  To offset the cost of this initial dredging the District will pay the Tenant one-half of the cost of this initial dredging up to a maximum payment of two hundred and fifty thousand dollars ($250,000).  The District will pay the Tenant this amount immediately upon completion of the dredging and the Tenant reasonably documenting the amount paid for such dredging work and upon the Tenant giving the District an invoice from the contractor performing the dredging work.  The Tenant or its contractor will deposit the spoil from the initial dredging, subject to the guidelines and requirements of the United States Corps of Engineers and all applicable laws, rules and regulations, at the District's dredge spoil site that is closest in proximity to the area dredged and which is available for use.  The District will not assess or charge Tenant any fee for use of the District's disposal sites.  After this initial dredging is complete, the District will at its sole cost, arrange for and complete dredging of the areas indicated in Exhibit 6 for the entire Initial and Extended Terms of the Ground Lease to ensure that the depth is maintained at forty-two (42) feet and provide semi-annual surveys to the Tenant to show that the required depth is being maintained; provided, however, at any time the depth is forty-one (41) feet or less, the Port will promptly commence and diligently pursue the process to maintenance dredge to return the depth back to forty-two (42) feet within a reasonable time.  After the initial dredging, all future dredging and surveys of the areas indicated in Exhibit 6 will be at no cost to the Tenant.

*See Lease Pg. 15, Par. 8.9; Exhibit A.*

16.

The Lease contains the following provision related to default of the tenant:

"15.1(b)        Breach of Covenant.  If default shall be made by the Tenant in the performance of or compliance with in a material respect of the covenants, agreements, terms, or conditions contained in this Ground Lease other than those referred to in the foregoing Section 15.1(a), and such default shall continue for a

period of sixty (60) days after written notice thereof from District to the Tenant specifying the nature of such default and the acts required to cure the same, or, in the case of a default which cannot with due diligence be cured within such period of sixty (60) days, the Tenant fails to proceed with all due diligence within such period of sixty (60) days, to commence cure of the same and thereafter to prosecute the curing such default with all due diligence (it being intended that in connection with a default not susceptible of being cured with due diligence within sixty (60) days that the time of the Tenant within which to cure same shall be extended for such period as may be necessary to complete the same with all due diligence)."

*See Lease Pg. 23 & 24, Par. 15.1(b); Exhibit A.*

17.

The Lease also contains these pertinent provisions:

"19.1   Quiet Enjoyment.   Subject to the terms and conditions of this Ground Lease, the Tenant, upon paying the ground rent and all additional rent, Impositions, and other charges herein provided for and observing and keeping all covenants, agreements, and conditions of this Ground Lease on its part to be kept and performed in all material respects, shall quietly have and enjoy the Project Site during the term of this Ground Lease, without hindrance or molestation by the District or anyone claiming under or through the District.  This Ground Lease shall be construed as a covenant running with the land.  Nothing in this Section or any other section herein shall constitute a waiver of the District's exercise of its police powers under the law applicable to third Parties generally.

As long as this Ground Lease is in effect, the District shall only allow compatible use of the remainder of its property adjacent to the Project Site and will not create or allow the creation of a visual, olfactory or auditory nuisance on said remainder of its property."

*See Lease Pg. 27, Par. 19.1; Exhibit A.*

18.

The Lease also contains these pertinent provisions:

"24.10   Litigation.   In case of any litigation between the Parties hereto regarding the subject matter hereof, the losing Party shall pay all reasonable costs and expenses (including reasonable attorneys' fees) of the prevailing Party."

*See Lease Pg. 31, Par. 24.10; Exhibit A.*

19.

The Lease also contains these pertinent provisions:

"24.12 <u>Sovereign Immunity; Statutory Authority</u>. The District represents and warrants that it has the statutory authority to enter into this Ground Lease, that, when executed, this Ground Lease shall be binding and enforceable in accordance with its terms, and that it is not immune from suit or judgment resulting from any claim or action brought against it by the Tenant pursuant to the express terms of this Ground Lease."

*See Lease Pg. 31, Par. 24.12; Exhibit A.*

## THE ALLEGED DREDGING DEFAULT

20.

The Lease requires IFG to dredge in the vicinity of Berth No. 8 one (1) time [more specifically described in Exhibit 6 to the Lease and hereinafter referred to as the "Dredging Area"] to an initial depth of no less than 42 feet. *See Lease Pg. 15, Par. 8.9 & Exhibit 6 to Lease; Exhibit A.*

21.

Dredging required by IFG must occur pursuant to the Port's dredging permit as issued and approved by the United States Army Corps of Engineers ["USACE"].

22.

At the time the Lease was executed and up until January 2015, the Port maintained that that the Port's maintenance dredging permit would allow IFG to dredge the Dredging Area to 42 feet as required by the Lease.

23.

During early discussions related to dredging, IFG agreed with the Port's recommendation that dredging should not occur too far in advance of the completion of IFG's new Facility because the berth areas at City Docks would "silt-up" without regular vessel traffic.

24.

In May of 2013, IFG arranged a meeting with the Port to discuss, among other things, the planning and coordination for dredging the Dredging Area [see copy of May 13-14 emails attached hereto as Exhibit B].

25.

Thereafter, and throughout 2013, IFG and the Port engaged in extensive discussions related to dredging the Dredging Area.

26.

In December 2013, the Port demanded that the Dredging Area originally defined in the Lease be modified and this modification must be addressed in a Lease Amendment to reduce the width of the Dredge Area.  IFG ultimately agreed to redefine the Dredging Area as demanded by the Port and an Amendment redefining the Dredging Area was executed December 18, 2013 [copy of the December 18, 2013 First Amendment to Ground Lease is attached hereto as Exhibit C].

27.

Following the Port's modification of the Dredging Area, in March of 2014, with construction of the Facility progressing, IFG notified the Port that IFG was working on dredging the Dredging Area and request dredging coordinates.

28.

In April of 2014, IFG:

a.    transmitted to the Port a proposed maintenance dredging map indicating a 42 feet depth;

b.      asked the Port if that map "meets the Port's approval and if the "Port has any comments"; and

c.      advised the Port that it would like to get the dredging scheduled for September or October 2014, which provided the Port with over six months' notice to have the proposed dredging approved under its permit by the USACE.

[a copy of IFG's April 17, 2014 email with attachment to the Port is attached hereto as Exhibit D.]

29.

From April 2014 until December 2014, the Port claimed to be working on the Permit required for IFG to commence dredging.  During this time IFG regularly and diligently followed up with the Port on the status of the Port's dredging permit, and received constant assurances from the Port that everything necessary to get the required dredging timely approved by the USACE was being done by the Port.

30.

Finally, on December 5, 2014, the Port advised IFG that the permit was approved and that "dredging can begin." At that time, the Port did not inform IFG of any issue or concern raised by the USACE about the required 42 feet dredging depth. [A copy of the Port's December 5, 2014 email is attached hereto as Exhibit E.]

31.

With the Port's permitting issues seemingly resolved, IFG arranged for dredging contractors to complete their specific dredging plan, prepare a survey of the area, and assess the various dredge spoil areas, which had become a source of some confusion (see section 34 below).

32.

On January 5, 2015, IFG advised the Port that it planned to dredge "in February", that is, the next month.  [A copy of IFG's January 5, 2015 email is attached hereto as Exhibit F.]

33.

On January 26, 2015, the Port advised IFG that it had supposedly just discovered that the permit was NOT adequate to allow for dredging to a depth of 42 feet. This was the first time [from the execution of the Lease and the lengthy ongoing work throughout 2014 related to the permit approval] that the Port disclosed any concern or issue related to dredging to a depth of 42 feet as is required by the Lease. [A copy of the Port's January 26, 2015 email is attached hereto as Exhibit G.]

34.

Thereafter, IFG and the Port discussed a two stage dredging approach wherein an initial dredging could be performed to the maximum depth currently allowed by the Port Permit followed by a second dredging once the Port's permit was amended to allow for the 42 foot depth as required by the Lease.  However due to ongoing uncertainty relating to dredge spoil areas and allowable dredge depth [the Port staff was unclear as to where dredge spoils were to be deposited and whether the allowable permitted depth was 37.98 feet, 39.78 feet or some other depth] it was determined that it was more appropriate to work on formally amending the Port's dredging permit so that an allowable depth of 42 feet was clear and could be achieved with one (1) dredging as indicated in the Lease.

35.

For the first time the Port also requested that IFG retain a consultant to aid in the Port's efforts to secure an amendment of its USACE permit to allow for a dredging depth of 42 feet.

The Port provided IFG the names of three engineers/consultants pre-qualified by the Port with the requisite experience to perform sampling required for the amendment of the Port's USACE permit.

36.

IFG immediately reached out to the engineers/consultants provided by the Port, procured a detailed proposal from AECOM (also known as URS), one of the Port's pre-qualified engineers/consultants, and directly retained AECOM at the specific request of the Port, to perform the required sampling work required to amend the Port's permit.

37.

AECOM proceeded with the sampling work and submitted the results to the Port.  At this time, the discussion of possibly using the Port's "214 agreement" first arose.  The bearing of that subject on the status of the required dredging permit is addressed in detail in Paragraphs 49-51 below and in the attached Appendix regarding same.

38.

When AECOM's test results showed unexpected contaminants, on July 7, 2015, the Port informed IFG that:

a.    no dredging would be permitted because of potential contaminants; and

b.    given the potential contaminants the Port was concerned that, if it permitted any dredging now [with the sample showing contaminants], the Port would be required to perform the same type of arduous dredging in the future to maintain the 42 feet depth, which would be at the Port's expense, as provided by the Lease.

[A copy of the Port's July 7, 2015 email is attached hereto as Exhibit H.]

39.

The Port took the position that the AECOM test results were defective.  On its own initiative and without even consulting IFG, the Port decided to redo the sampling and testing

work with another engineer/consultant and subsequently demanded that IFG pay for this for this second sampling and testing work.

41.

In this Context, through its attorney, in an August 6, 2015 letter, IFG informed the Port that a *force majeure* was in effect as per Section 23 of the Lease. [A copy of the August 6, 2015 letter to the Port is attached hereto as Exhibit I.]

41.

Almost two months later on September 30, 2015 the Port inexplicably sent IFG an alleged "default" letter which contained numerous blatantly false statements and stated that:

    a.    IFG is in default of its Lease obligations related to dredging; and

    b.    The Port "will proceed with that necessary permit amendment upon payment by IFG of $66,000 incurred to disprove the erroneous AECOM test results" and "the agreement of IFG to proceed with the necessary work to amend the existing USACE permit and the agreement of IFG to pay all costs associated with amending the existing dredging permit."

[A copy of the Port's September 30, 2015 letter to IFG is attached hereto as Exhibit J.]

42.

Despite the factual inaccuracies contained in the Port's alleged default letter, making the Port's position clearly unfounded, in a letter dated October 9, 2015, IFG clearly explained the actual facts, corrected the Port's inaccurate statements and further offered to "directly engage in good faith discussions to quickly address this matter so that the required dredging can be accomplished."  [A copy of the IFG's October 9, 2015 letter is attached hereto as Exhibit K.]

43.

Instead of participating in good faith discussions or even responding to IFG, on October 27, 2015, counsel for the Port, Mathew M. Mize, sent a notice enclosing the same factually

inaccurate default letter to Capital Farm Credit, IFG's bank, via certified mail stating that IFG is in default of Section 8.9 of the Lease and, to the extent the default was not cured in accordance with the Lease, the Port "intends to move forward with cancelling the Ground Lease and initiating legal proceedings to evict IFG from its premises."  [A copy of Mize's October 27, 2015 letter is attached hereto as Exhibit L.]

44.

The Port issued this alleged default notice related to dredging even though:

a.    IFG could not have possibly dredged in 2013 or prior because the District required that the Dredge Area be modified to reduce its width. This modification was finalized in a Lease Amendment dated December 18, 2013 [see Exhibit C].

b.    The Port did not give IFG approval to dredge until December 5, 2014 [see Exhibit E], despite the fact that IFG submitted a proposed dredging map [indicating a 42 feet depth in accordance with the Lease] for approval to the Port on April 17, 2014 [see Exhibit D];

c.    Unbeknownst to IFG, the Port's dredging permit did not allow the required depth of 42 feet. The Port knew or should have known of this limitation but chose not to timely inform IFG of same.  Problems with the Port's permit in relation to dredging to 42 feet were first raised by the Port on January 26, 2015 [see Exhibit G];

d.    IFG's sole role in the initial sampling, which the Port found to be defective, was to engage AECOM at the behest of the Port, and IFG was originally connected to AECOM from a pre-qualified list controlled by the Port;

e.    IFG repeatedly tried to work with the Port to commence and complete the required dredging;

f.    In July of 2015, the Port mandated that NO dredging was to occur; and

g.    Since the commencement of the Lease, the Port has never had a dredging permit that would have allowed: (1) IFG to complete the dredging to 42 feet as required by the Lease; or (2) the Port to meet its obligations in the Lease to maintain a depth of 42 feet in the Dredge Area.

45.

Thereafter, despite the fact that the Port's September 30, 2015 letter is replete with factual inaccuracies and is based on the false premise that IFG was purportedly somehow responsible for <u>the Port's defective or deficient permit</u>, which resulted in IFG not being able to perform the initial dredging to a depth of 42 feet as required by the Lease, in an effort to move the Port's amended permit along, IFG satisfied the Port's demands set forth in the Port's September 30, 2015 letter by:

a.      Paying the Port the cost of retesting AECOM sampling of $66,000.00;

b.      Paying the Port an additional $11,460.74 it demanded before it would allow results of the second sampling & testing results to be used for the Port's own dredging permit amendment; and

c.      Agreeing to pay all costs associated with amending the existing dredging permit.

46.

In order to help the Port amend the Port's own permit so that IFG could finally dredge, at the behest of the Port, IFG also engaged Anchor QEA, LLC, which is another one of the group of engineers/consultants on the Port's list of pre-qualified consultants that the Port provided to IFG on October 31, 2015.  The Port insisted that IFG must select the next consultant from that list.

47.

Dredging cannot commence until the Port obtains an amendment to its permit, which by the Port's own admission could be 3 months, or 6 months or more.   Approval of such an amendment is totally subject to the Port's initiative in diligently pursuing the amendment and then still subject to the USACE's discretion to grant the amendment or not.  Nevertheless, IFG

has taken several other steps to diligently work toward being able to perform the initial dredging, including:

      a.      Tendering the payments which the Port demanded before it would release any information to amend its own dredging permit.

      b.      Retaining engineers/consultants to work on amending the Port's own dredging permit from a pre-qualified list of consultants provided by the Port.

      c.      Diligently arranging and attending conference calls with the Port staff and various engineers/consultants to coordinate meetings and submissions to the USACE to assist in amending the Port's own dredging permit.

48.

As a clear example of bad faith, abuse of power and intimidation, the Port has refused to withdraw the alleged default or to even engage in meaningful good faith settlement negotiations related to dredging even though:

      a.      The Port is well aware that it caused the alleged default related to dredging and has been in control of this permitting process all along;

      b.      IFG has satisfied all of the Port's demands as set forth in the Port's September 30, 2015 letter;

      c.      The Port cannot determine when it will have the amended permit, which is a prerequisite to dredging; and

      d.      The Port is well aware that IFG has been working diligently towards achieving initial dredging, despite the fact the Port still does not have the required permit and has not cleared IFG to dredge.

49.

Recently, the Port has reopened questions as to possible use of the Port's "214 agreement", as part of securing the required amendment of the Port's own dredging permit. However, the full background of that subject makes it clear that with or without use of the 214 agreement, the Port has created obstacles to securing the required amendment to the permit that have delayed IFG's ability to accomplish dredging in the Dredge Area to a depth of 42 feet.  For

-14-

additional details on this subject, see the chronology provided in the "214 Agreement Issues" Appendix.

50.

When the Port makes reference to the whole subject of whether IFG should have capitulated to use of the Port's 214 agreement, as early as mid-2015, that whole argument is nothing more than construction of a straw man.  The fact remains that, dating back to 2013, for more than two and a half years, the Port has caused the whole process of securing the required permit amendment to be unduly delayed and complicated, beginning with assuring IFG for most of that time that everything regarding the required permit was being handled with all due diligence.  To the contrary, the Port falsely led IFG to believe that the Port already had a permit that would allow IFG to dredge to 42 feet or even 44 feet.

51.

When addressing whose position is more credible on this subject, common sense points to IFG.  IFG has the most interest in having the deeper berth, so that it can dock larger and more fully loaded ships.  IFG has no interest, economic or legal, in causing any delay in having a 42 foot deep berth and the ability to exercise its rights to be in a position to load larger ships.

**THE UNRELATED LEASE DEMANDS**

52.

After the Port sent IFG the improper and factually inaccurate default letter related to dredging and while IFG was diligently working to satisfy the Port's demands set forth in its alleged default letter and doing everything within its power to accomplish the ultimate goal of

achieving a dredging depth of 42 feet, the Port contacted IFG and presented a long list of demands that have nothing to do with dredging.

53.

The Port's demands are mostly related to contrived and purported issues that are premised on little or no factual or legal support.

54.

The Port's demands do not in any way relate to dredging or any other alleged Lease default of IFG.

55.

In totality, the Port's demands on these unrelated issues are a bad faith attempt to try and extract money/concessions from IFG and to try and force unwarranted re-writes or amendments of portions of the Lease.

## THE PORT LINKS THE ALLEGED DREDGING DEFAULT TO THE UNRELATED LEASE DEMANDS

56.

IFG was not the first to draw a connection or link between the Port's agenda of trying to renegotiate unrelated terms of the Lease and the means of curing the unfounded purported "default" related to dredging.

57.

On November 3, 2015 in an email related to the Lease demands which were totally unrelated to dredging, exposing its true motives behind not withdrawing the unfounded default notice, the Port itself boldly states:  **"Once these issues can be mutually resolved, agreed upon and confirmed by written agreement, the Port will suspend the current default notice."** [A copy of the Port's November 3, 2015 email is attached as Exhibit M.]

-16-

58.

Based on the Port's position as articulated in the November 3, 2015 email, even if IFG:

a.   continued to do everything in its power to help the Port amend its dredging permit including paying all associated costs;

b.   worked diligently with its contractors to commence and complete the dredging; and

c.   completed the initial dredging to a depth of 42 feet in accordance with the Lease, dredging, the Port would still <u>not</u> withdraw the alleged default notice.

59.

The Port's plan is clearly to hold the concocted default notice on dredging and threat of eviction over IFG's head in order to exert pressure and gain leverage and an unfair advantage on IFG so that IFG will be forced to capitulate to the Port on the unrelated Lease issues.

60.

The Port has also recently tried, in various written correspondence, to rewrite history and concoct the false narrative that IFG supposedly is and always has been in complete control of dredging the Dredging Area, and that the Port's involvement related to dredge permitting issues was simply gratuitous.  However, the Port is well aware that this position is untrue and cannot be supported.

61.

Despite the continuous bad faith actions by the Port, IFG has continued to act with all due diligence to push the Port to fulfill its obligations by securing the required amendment of its own dredging permit, so that dredging can commence.

62.

As of the date on which IFG is filing this Complaint, IFG is still waiting on the Port to amend its dredging permit with the USACE.

## THE ELECTRICAL TRANSFORMER DEFAULT NOTICE

63.

During the construction of the Facility, an electrical transformer <u>pad</u> may have been damaged by IFG's contractors.   That pad was the foundation for an electrical transformer <u>removed by the Port.</u>   The transformer previously provided electrical service to the Bag House that has not been used by the Port for several years and appears to be defunct.

64.

IFG's contractors were in the midst of repairing this transformer pad and already located the transformer pad area and conduit and poured a temporary concrete base to preserve the location.

65.

On September 18, 2015, the Port requested that the re-constructed pad [which was merely intended as a temporary marker of the conduit transformer pad's location] be redone by IFG according to Port specifications.  Importantly, the Port stated that the electrical service was "<u>not critically needed</u>" by the Port. [A copy of the Port's September 18, 2015 email is attached as Exhibit N.]

66.

Prior to September 18, 2015, IFG had already agreed to reconstruct the transformer pad.

67.

 Since September 18, 2015, IFG has been actively working with the Port, Entergy Corp., and its contractors to assess and to commence the requested work.

68.

Even though the Port had requested repairs according to their specifications, at the time the repair was requested, the Port was uncertain as to what transformer they wanted installed, which delayed the repair.

69.

On November 19, 2015 the Port finally transmitted the necessary drawing that allowed IFG's contractor to understand the details of the transformer pad.   [A copy of the Port's November 19, 2015 email is attached hereto as Exhibit N].

70.

On November 30, 2015 Entergy had already scheduled to visit the site with contractor MMR for December 3, 2015 in order to review the specifications provided by the Port on November 19, 2015.

71.

On December 2, 2015, less than 2 weeks later [inclusive of the Thanksgiving holiday in between], the Port, through attorney Mathew M. Mize sent out another factually inaccurate default letter to IFG and its bank, Capital Farm Credit, demanding the transformer pad be built or the Port will "terminate the lease." [A copy the Port's December 2, 2105 letter is attached hereto as Exhibit P.

72.

 The Port sent this default letter even though:

a.    The transformer that would eventually sit on the pad in need of repair was removed by the Port in 2012 or 2013 for the Port's own reasons.  Any restoration of electrical service from the transformer, which has long been out of service, still leads to a non-operating and defunct bagging plant;

b.      The Port had a few weeks earlier advised IFG that the repair of transformer pad and the electrical service was "<u>not critically needed</u>."

c.      IFG had already agreed to complete the repair according to the Port's initial specification and was diligently working with Entergy and its contractors to assess and make the repairs;

d.      The Port had delayed the repair by not being certain as to which transformer pad the Port wanted IFG to install and had also caused delays in providing the final drawings and specifications for the transformer pad;

e.      The Port was in constant communication with IFG, MMR, and Entergy on this issue and was aware that IFG was diligently working with all parties to complete the repair.

73.

The alleged default on the transformer pad re-construction issue was concocted by the Port in bad faith, is not supported by the facts or the terms of the Lease, and has amounted to another blatant attempt to harass, abuse, and to exert undo pressure IFG in order to extract concessions and renegotiate the terms and conditions of the Lease.

74.

After sending this second default letter, in a blatant act of hypocrisy and bad faith, the Port has taken various steps to intentionally stall the work of Entergy and IFG's contractors, including:

a.      Sending the Port Police to remove IFG contractors who were on site conducting some preliminary excavations and probing to assess the work that needed to be performed in order to get site information back to Entergy so that the work could be detailed. This conduct occurred despite the fact that this very same contractor was working on this site performing this type work a few weeks earlier with the direct knowledge and consent of the Port;

b.      Demanding that all work on the transformer pad be stopped;

c.      Making onerous requirements for the commencement of work on IFG, its contractors, and Entergy [never before required by the Port during years of construction on the Port's premises] including an additional, unnecessary, and redundant indemnity requirement for IFG contractors;

d.      Failing to give final approval of Entergy's proposed drawings, requiring Entergy provide an undefined "comprehensive plan," [a demand that the Port had never previously required of Entergy] and being generally uncooperative and/or unresponsive to Entergy's requests;

e.      Requiring information be provided that cannot possibly be known until the Port approves Entergy's plan;

f.      Rejecting the indemnity language from its own tariff when IFG submitted that exact language to the Port for an indemnity agreement for Entergy and IFG's contractors to sign for the repair; and

g.      Attempting to expand the scope of IFG's repairs by erroneously claiming at various times that IFG damaged or removed a transformer, electrical poles or other electrical equipment, other than just the transformer pad.

75.

The Port's post default letter actions show a clear intent to delay IFG past the 60 day default cure period so that it can hold IFG in alleged default and then either attempt to terminate the Lease or use the threat of termination of the Lease and eviction in an effort to force an unwarranted renegotiation of unrelated terms in the Lease.

76.

Despite the efforts of the Port to stall progress on the transformer pad repair, on January 18, 2016, the cement for the new transformer pad was poured.

77.

Currently, additional work remains to satisfy all the Port's demands related to the transformer pad.  However, much of this work is largely outside of IFG's control, specifically:

a.      AT&T needs to connect telephone service to the bag house, which is under the control of the Port;

b.      Entergy needs to install the transformer on the completed pad, which is beyond the control of IFG; and

c.       IFG's contractors need to complete relatively minor work which cannot be completed until after AT&T and Entergy complete their work.

78.

IFG continues to act diligently to cure the alleged default despite the bad faith and unfair actions of the Port and IFG has clearly and repeatedly confirmed that it intends to complete this work diligently and in accordance with the Lease.  Nevertheless, as with the dredging matters, the Port has without just cause persisted in its bad faith refusal to withdraw the default notice on these matters.

## IFG'S CLAIMS AGAINST THE PORT

### COUNT I

The allegations of Paragraphs 1 – 78 are incorporated herein, *in extenso.*

79.

The Port has breached the Lease with IFG in various respects, including:

a.       Failing to have or not obtaining the required dredging permit so that IFG could timely satisfy its dredging obligations;

b.       Failing to sufficiently review its own dredging permit;

c.       Failing to notifying IFG of the fact the existing permit would not allow dredging to 42 feet as required by the Lease;

d.       Failing to diligently work with the USACE to amend its dredging permit;

e.       Erroneously attempting to put IFG in default of the Lease even though it has failed to perform and/or is not ready to perform its own obligations;

f.       Issuing erroneous default notices to IFG and sending those notices to IFG's Bank;

g.       Demanding that IFG make payments, repairs, and/or reimbursements to the Port when those payments, repairs, and/or reimbursements were not owed;

h.       Actively preventing IFG from curing alleged defaults or taking actions which stall, delay, or hinder IFG's attempts to cure alleged defaults timely in accordance with the Lease;

i.      Intentionally making misrepresentations to IFG in order to mislead and gain an unfair advantage over IFG;

j.      Attempting to rewrite the Lease by using default notices to pressure on IFG;

k.      Committing various other acts of bad faith and willful misconduct; and

l.      Other breaches which may be proven at trial.

COUNT II

The allegations of Paragraphs 1 – 79 are incorporated herein, *in extenso*.

80.

The Port has been negligent in its handling of significant matters, including:

a.      Failing to have or not obtaining the required dredging permit so that IFG could timely satisfy its dredging obligations;

b.      Failing to sufficiently review its own dredging permit;

c.      Failing to notifying IFG of the fact the existing permit would not allow dredging to 42 feet as required by the Lease;

d.      Failing to diligently work with the  USACE to amend its dredging permit; and

e.      Other negligent acts which may be proven at trial.

COUNT III

The allegations of Paragraphs 1 – 80 are incorporated herein, *in extenso*.

81.

In violation of the Louisiana Unfair Trade Practices Act ["LUTPA"], under La. R.S. 51:1401 et seq., the Port has knowingly engaged in and is attempting to continue to engage in unfair and deceptive methods, acts and practices against its tenant IFG, in order to:

a.      Unjustly terminate the Lease;

b.      Evict IFG and appropriate IFG's state of the art grain terminal; and/or

      c.     Create duress and exert unwarranted pressure on IFG in order to gain an unwarranted advantage in efforts to gain concessions from IFG and re-writes or revisions of the Lease in favor of the Port.

82.

The Port's objective of trying to fabricate some unfounded tenant "defaults" under the Lease as an excuse for wrongfully evicting IFG in an effort to allow the Port on its own or in combination with others to operate the subject grain export terminal and/or related facilities satisfies the element of business competition in Louisiana trade or commerce required under the LUTPA to provide IFG with standing to make these claims.

83.

On information and belief, IFG maintains that the Port on its own or in combination with others is attempting to exert undue influence on IFG to persuade IFG to agree to a Lease and contractual modification including the waiver of its right to be the exclusive grain export terminal on the Port's City Docks property pursuant to Section 8.4 of the Lease.  Capitulating to such a waiver would be significantly contrary and harmful to IFG's best interests.

84.

The conduct at issue does not qualify for any exemption under R.S. 51:1406.

85.

In knowingly asserting the subject unfounded "defaults," as an unfair and deceptive method of trying to gain some advantage, and by informing IFG's lender of same to apply pressure on IFG, the Port is causing IFG to expend significant sums of money to attempt to resolve bogus issues, which efforts have not produced any satisfactory resolution, leading to the filing of this suit, and satisfying the requirements of R.S. 51:1409.

86.

In compliance with R.S. 51:1409.B, IFG is mailing a copy of this Complaint to the Louisiana Attorney General.

<u>COUNT IV</u>

The allegations of Paragraphs 1 – 86 are incorporated herein, *in extenso*.

87.

The Port has committed an Abuse of Rights against its tenant IFG.  IFG can establish the elements of this cause of action by proof of the facts noted above confirming that:

a.  The Port's predominant motive for appearing to exercise its alleged "rights" under the Lease related to any purported defaults by IFG is to do IFG harm and to create a benefit for the Port, to which the Port is not actually entitled to secure, under the Lease;

b.  There is no serious, legitimate motive for the manner in which the Port is attempting to assert its "rights" to give notice of the subject purported defaults;

c.  The manner in which the Port is proposing to exercise those "rights" to assert the alleged defaults violates moral rules, good faith and elementary fairness;

d.  The Port is proposing to exercise those "rights" for purposes other than any legitimate objectives for which those "rights" were granted to the Port, in the Lease; and

e.  The Port's campaign to misuse or abuse those "rights" has been continuing and ongoing without interruption for more than two years, and it is still continuing today.

<u>COUNT V</u>

**DETRIMENTAL RELIANCE AND/OR FRAUDULENT INDUCEMENT**

The allegations of Paragraphs 1 – 87 are incorporated herein, *in extenso*.

88.

During 2012 and 2013 IFG and Port representatives engaged in ongoing and detailed discussions relating to dredging the relevant areas in accordance with the Ground Lease. It was

discussed and agreed that it was imprudent to dredge the relevant area too soon before regular vessel traffic because the berth areas at City Docks will "silt-up" again.

89.

Nevertheless an IFG representative continued to follow-up diligently with the Port on the dredging of the relevant areas. In fact on May 13, 2013, the Chief Executive Officer of IFG sent an email to the Executive Director of the Port to arrange a meeting with an agenda for discussions which included "Dredging @ Berth #8 Planning and Coordination". [See Exhibit B] This is totally contrary to the Port's default letter dated September 30, 2015 wherein the Ports falsely claims that IFG took "no action" or failed to "even discuss" dredging until January 2015. **This is a gross and egregious fabrication by the Port intended to justify and manufacture their 1st invalid default letter.**

90.

In fact during a meeting on May 16, 2013 extensive discussions were had relating to the dredging area. The Port's Director of Navigation stated that he had some concern about the width and the dredging area as defined in the Ground Lease as 300 feet and the possible impact this width could have on the road opposite Contraband Bayou. The Port's Executive Director and Director of Navigation then suggested that to eliminate this concern, the width of the dredging area should be reduced to 250 feet.

91.

After the May 16, 2013 meeting, the Port insisted that this modification of the width of the dredging area be memorialized in a Lease Amendment.   IFG and IFG Lease Counsel diligently and repeatedly followed up with the Port on this Lease Amendment the Port required. After constant follow up by IFG, the Port finally agreed to the wording of a Lease Amendment to

finalize and redefine the dredging area and narrowed the width to 250 feet. This Lease amendment was executed on December 18, 2013, approximately 6 months after the meeting arranged by IFG to discuss dredging [see Exhibit C]. **Obviously prior to the Port agreeing to the newly redefined dredging area, no dredging could have possibly taken place** (<u>assuming</u> the Port was in possession of a dredging permit to allow for a dredging to a depth of 42 feet MLG, which it was not).

92.

Subsequent to the execution of the Lease Amendment to modify and redefine the dredging area and during practically all of 2014, the Port stated repeatedly that IFG could not perform any dredging because <u>the Port was independently working to arrange</u> the approval and finalization of the <u>Port's dredging permit</u>.

93.

At that time in 2014, the Port maintained that the Port's pending dredging permit would allow IFG to dredge to a depth of -42 feet MLG in the relevant area IFG was to dredge in accordance with their Ground Lease (the "Dredge Area"). IFG was <u>relying</u> on the Port to arrange for its own dredging permit to allow IFG to perform the relevant dredging.

94.

It is important to note that <u>at no time in 2014</u> did the Port inform IFG that it was IFG's obligation to seek the approval, modification or otherwise participate in the approval and finalization of the Port's dredging permit.

95.

It was very clear by the statements and actions of the Port that it was arranging for the approval of its own dredging permit <u>at its own cost</u> and that such permit would allow IFG to

dredge to a depth of -42 feet MLG.  Neither in 2014 nor in early 2015 did the Port ever claim that the cost associated with seeking the approval of the Port's dredging permit was an obligation of IFG or a cost that was ever to be reimbursed by IFG.

**THE PORT'S 180° CHANGE**

96.

On January 26, 2015 the Port's staff suddenly and to its purported surprise discovered that the dredging permit it was working on for the better part of one year was "not adequate for" IFG's use because it would not permit IFG to dredge to a depth of -42 feet MLG [see Exhibit G]. This is after IFG detrimentally relied on the Port to arrange for its dredging permit for almost 1 year.

97.

The very next day the Port began sending emails to IFG informing IFG of the cost of amending the Port's own permit. This is the first time the Port began to demand that IFG pay for arranging the Port's dredging permit.

98.

Consider that, in accordance the Ground Lease, the Port has an ongoing obligation for up to 59 years (after IFG performs the initial dredging) to perform maintenance dredging in the Dredge Area to a depth of -42 feet MLG which the Port could not accomplish without the appropriate dredging permit.

99.

The Port sent IFG a list of pre-qualified consultants ( from which AECOM was ultimately retained) to arrange for the amendment of the Port's own dredging permit which the

Port demanded must be NOW be done at IFG's cost. The AECOM test results ultimately indicated certain contaminates in the Dredge Area.

100.

On September 30, 2015, the Port sent IFG a default notice demanding that IFG pay the cost associated with certain new sediment sampling the Port performed (on its own with no prior consent or notice to IFG) in the Dredge Area [see Exhibit J]. The Port decided on its own to perform the new sediment sampling because it did not want to submit AECOM's test results to the USACE, because the Port was concerned that its permit would then mandate future costly disposal of dredge spoils, which the Port is obligated to handle for 59 years in accordance with the Ground Lease. These decisions were made independently by the Port and further delayed the dredging.

**THE PORT'S NEW POSITION ON DECEMBER 29, 2015**

101.

In a letter from the Port's General Counsel Michael K. Dees dated December 29, 2015 he states:

> "To accommodate IFG, the District will, **as merely a gratuitous accommodation IFG**, continue to assist IFG in amending the District's permit  . . ."

> "However, please bear in mind that the obligation to obtain the [the District's] permit amendment  . . . falls solely on IFG. IFG may not and should not rely upon the District or actions, inactions or recommendations of District representatives to achieve any particular result relating to the permit, permit amendment or completion of the dredging."

> [A copy of the Port's December 29, 2015 letter is attached hereto as Exhibit Q.]

102.

This is a 180 degree different view from 2014 when the Port was solely, independently and incompetently arranging for its own dredging permit (at its own cost) to allow IFG to dredge

-29-

to -42 feet MLG.  The Dees statement is also bizarre because IFG is completely and totally reliant on the Port allowing for, authorizing, amending, modifying, submitting or in any way using the Port's permit to perform the dredging.

103.

IFG executed the Lease on August 15, 2011. Section 8.9 of the Ground Lease specifically states that IFG will "arrange for and complete" the relevant dredging to a depth of "no less than forty two (42) feet".  There is no indication or any representation that achieving this depth may not be possible or is questionable.  In fact Section 8.9 of the Ground Lease further states that after IFG's initial dredging the Port will "arrange for and complete dredging  .  .  .  to ensure that the depth is maintained at forty-two (42) feet".

104.

The Port was fully aware that IFG intended to design its terminal to handle large Panamax vessels which are require a depth alongside Berth #8 of -42 feet MLG. Loading Panamax vessels is absolutely critical to IFG's business.

105.

The Port itself prepared a map of the Dredge Area which the Port inserted into the Ground Lease as Exhibit 6. On this map the Port goes even further than -42 feet MLG and indicates **-44 feet MLG**. Giving IFG the added confidence that -42 feet MLG was not a problem from a soil stability stand point, berth stability stand point of permitting stand point. IFG relied on these promises and representations made by the Port and was induced to invest in this project based on this information supplied by the Port.

106.

Throughout the entirety of 2011, 2012, 2013, 2014 and early 2015 the Port expressed absolutely no concern relating to achieving a depth of -42 feet MLG despite that fact that IFG and the Port had extensive discussions on dredging and the Dredging Area.

107.

In fact as recently as September 30, 2015, the Port sent IFG a formal notice by Certified Mail stating in pertinent part:

> "For your information, the District has determined that there are no geotechnical restrictions related to the wharf and dock facilities adjacent to the area to be dredged and, upon issuance of the required Corps permit amendment allowing for dredging to a depth of -42 feet MLG, the dredging IFG is required to perform can proceed." [see Exhibit J (emphasis supplied).]

108.

The Port's letter of December 29, 2015 tries to completely shift responsibility for the permitting, dredging, dock stability, road stability (opposite Contraband Bayou) and tries to water down the Port's express promises, obligations, agreements, representations in the:

- Ground Lease
- Letters
- Statements
- Inducements

COUNT VI

The allegations of Paragraphs 1 – 108 are incorporated herein, *in extenso*.

109.

IFG is entitled to declaratory relief, confirming that it is not in breach or in default as to any provisions of the Lease.

**REQUESTED RELIEF**

110.

Based upon the foregoing, IFG is entitled to and seeks the following relief:

1.    Declaratory relief finding that the alleged dredging default and the alleged transformer default were issued by the Port to IFG in error;

2.    A mandatory injunction ordering the Port to withdraw all outstanding default notices against IFG and IFG's bank Capital Farm Credit;

3.    A mandatory injunction ordering the Port to proceed diligently to obtain the required amended dredging permit allowing IFG to dredge to 42 feet as required by the Lease;

4.    Injunctive relief strictly prohibiting the Port from engaging in the following acts:

    a.    Issuing default notices which are factually inaccurate;

    b.    Issuing default notices where IFG's alleged default was caused, totally or in part, by the Port's own actions, representations, failures to perform, negligence or bad faith.

    c.    Failing to withdraw alleged default notices and/or recognize that alleged defaults have been cured when IFG has satisfied all the demands stated in an alleged default notice in accordance with the Lease;

    d.    Using default notices to attempt to create duress and/or to gain leverage on IFG for issues unrelated to alleged defaults;

    e.    Attempting to or threatening to terminate the Lease or evict IFG based on erroneously issued defaults, or based on alleged defaults which has been cured or are being cured by IFG in accordance with the Lease;

    f.    Preventing IFG from curing alleged defaults or taking actions which stall, delay, or hinder IFG's attempts to cure alleged defaults timely in accordance with the Lease;

    g.    Disturbing IFG's quite enjoyment of the Leased premises;

    h.    Hindering or interfering with IFG's operations.

5.    All monetary damages as may be appropriate and proven at trial including treble damages and attorney fees.

WHEREFORE, IFG PORT HOLDINGS LLC prays that, after due proceedings are had, there be judgment herein in favor of Plaintiff, IFG PORT HOLDINGS LLC and against Defendant, LAKE CHARLES HARBOR & TERMINAL DISTRICT d/b/a THE PORT OF LAKE CHARLES, on all claims asserted herein, granting the relief requested above, at the costs of Defendant.

PRAYS FURTHER for all orders and decrees necessary in the premises and for full, general and equitable relief.

Respectfully submitted,

STOCKWELL, SIEVERT, VICCELLIO,
 CLEMENTS & SHADDOCK, L.L.P.


BY:    s/William B. Monk
          WILLIAM B. MONK (#09551)
          STEPHEN D. POLITO (#32638)
          KATHLEEN T. DEANDA (#35746)
          127 W. BROAD ST.
          CHASE BANK BLDG., 4TH FL.
          LAKE CHARLES, LA  70601
          PHONE: (337) 436-9491
          FAX: (337) 493-7210

# UNITED STATES DISCTRICT COURT
# WESTERN DISCTRICT OF LOUISIANA
# LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **IFG PORT HOLDINGS LLC.** | : | **CIVIL ACTION NO:** _____ |
| **VERSUS** | : | **JUDGE** _____ |
| **LAKE CHARLES HARBOR &** | : | **MAGISTRATE JUDGE** _____ |
| **TERMINAL DISTRICT d/b/a THE** | | |
| **PORT OF LAKE CHARLES** | | |

| | | |
|---|---|---|
| **STATE NEW YORK** | : | |
| | : | <u>**VERIFYING AFFIDAVIT**</u> |
| **COUNTY OF NEW YORK** | : | |

BEFORE ME, the undersigned Notary Public, duly commissioned in and for the aforesaid County and State, personally came and appeared **KABIR AHMAD**, duly authorized Chief Executive Officer of IFG PORT HOLDINGS LLC, who upon being duly sworn did depose and say:  That he has read the foregoing Complaint and is familiar with the allegations and assertions made therein; and that he declares the allegations to be true and correct to the best of his knowledge, information and belief; and that all Exhibits attached to the Complaint are true copies of the original documents, are what they purport to be, and that all information presented in the Exhibits is true and correct to the best of his information, knowledge and belief.

KABIR AHMAD
Chief Executive Officer
IFG Port Holdings LLC

SWORN TO AND SUBSCRIBED before me, Notary Public, at my office in New York, New York on this _29_ day of January, 2016.

Notary Public

_Ana T Keynoso_
[Printed Name of Notary Public and Notary ID Number]

ANA J. REYNOSO
Notary Public, State of New York
Qualified in Bronx County
Reg. No. 01RE608424
My Commission Expires 10-28-20__