# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

IFG PORT HOLDINGS, LLC.        :        **DOCKET NO. 16-cv-00146**

**VERSUS**        :

**LAKE CHARLES HARBOR &**        :
**TERMINAL DISTRICT, d/b/a**        **MAGISTRATE JUDGE KAY**
**THE PORT OF LAKE CHARLES**        :        **(by Consent)**

## <u>MEMORANDUM RULING</u>

This litigation involves a contractual dispute between IFG Port Holdings, LLC, (hereafter "IFG") and Lake Charles Harbor & Terminal District, d/b/a The Port of Lake Charles, (hereafter "the Port"). Plaintiff alleges that the basis of our jurisdiction is diversity of citizenship as set forth in 28 U.S.C.A. § 1332. Doc. 1, p. 2, ¶ 4.

Before the court are five Motions for Partial Summary Judgment filed by the Port and one Motion for Partial Summary Judgment filed by IFG.[1] Docs. 280, 285, 286, 288, 289, 291. Each motion is opposed. Docs. 300, 301, 302, 303, 304, 315.

For the following reasons we conclude that the Port's Motion for Partial Summary Judgment on Claims Related to MAG Charges (doc. 285) should be **GRANTED**, the Port's Motion for Partial Summary Judgment Regarding the Dredging Permit (doc. 289) should be **DENIED**, the Port's Motion for Partial Summary Judgment Regarding Costs to Elevate DMPF 3 (doc. 288) should be **DENIED**, the Port's Motion for Partial Summary Judgment on Breach Of Warranty and Fraudulent Inducement Claims (doc. 291) should be **DENIED**, the Port's Motion for Partial

---

[1] Two of the motions [docs. 280, 286] are essentially cross-motions for partial summary judgment as the respective parties seek judgment on and/or dismissal of IFG's claims filed under the Louisiana Unfair Trade Practices Act.

Summary Judgment on LUPTA Claims (doc. 286) should be **DENIED**, and IFG's Motion for Partial Summary Judgment on LUPTA Claims (doc. 280) should be **DENIED**.

# I.
## BACKGROUND AND PROCEDURAL HISTORY

This suit was initiated by a complaint filed by IFG on January 19, 2016.[2] Doc. 1. The disputed contract is a Ground Lease Agreement ("the Lease") between the parties effective August 15, 2011. Doc. 341, att. 26, pp. 158-211, [D49][3]. That Ground Lease Agreement was the end result of protracted and detailed negotiations between the two parties and stipulated the terms under which IFG would construct a grain terminal on property owned by the Port. The Lease also described certain dredging activity that was to occur in the waterway adjacent to the property being improved. *Id*. at p. 172, § 8.9.

In its Amended, Supplemental, and Restated Complaint IFG alleges multiple instances of breach of contract by the Port, violations of the Louisiana Unfair Trade Practices Act ("LUTPA"), fraudulent inducement or detrimental reliance, and asserts claims for declaratory and injunctive relief. Doc. 236. IFG seeks monetary damages in connection with its breach of contract claims, reimbursement of sums it paid under protest, and injunctive and declaratory relief. *Id.* at p. 15, ¶ 20, p. 16, ¶¶ 22, 23, p. 22 ¶ 27, p. 27, ¶ 35, p. 28, ¶ 28, p. 29, ¶ 37.

In Answer to the Amended, Supplemental, and Restated Complaint [doc. 254] the Port acknowledged the existence of the contract but denied or recast much of the nefarious conduct of

---

[2] IFG subsequently filed a First, Second, and Third Amended Complaint, and most recently, an Amended, Supplemental, and Restated Complaint which combines and sets forth all of IFG's claims, defenses, and counterclaims in one pleading. See docs. 98, 121, 136, 236. IFG's claims in its original complaint and its multiple amendments and supplements were ultimately incorporated into its Amended, Supplemental, and Restated Complaint to eliminate any confusion caused by the multiple filings.

[3] Throughout this opinion we will refer to exhibits submitted by IFG and the Port. Throughout this litigation, multiple copies of exhibits were filed and attached to various pleadings, memoranda, etc., until the parties were instructed to put ALL exhibits together and file as one document. These exhibits are now filed at Document #341 and are referenced as P##, and D##.

which it was accused in the original complaint.[4]  It asserts seventeen affirmative defenses to IFG's complaint.  *Id.* at ¶¶ 38-70.  The Port also asserted several counterclaims against IFG seeking declaratory relief and attorney fees and expenses incurred defending against the claims brought by IFG.  Doc. 37, pp. 40-42, ¶¶ VI-XIII, Doc. 84, pp. 14-16, ¶¶ XIV-XVIII, Doc. 131.

### A.  Events leading up to the execution of the Lease

The execution of the lease was the culmination of several years of negotiations between IFG and the Port.  In order to be competitive in the market IFG expressed its desire to service large vessels known as Panamex vessels which would require a marine depth at the Port's docks to be at least 42 feet.  Doc. 341, att. 24, p. 26-27 [D4].

On January 16, 2008, IFG and the Port executed a Letter of Intent ("LOI") which summarized the parties' understanding of terms and conditions regarding a future lease agreement.  Doc. 341, att. 1, pp. 174-76 [P25].   Briefly, IFG sought to develop an export grain terminal which would service large vessels on property owned by the Port and which would be subject to a long-term lease.  *Id.*  The LOI indicates that Berth No. 8, which would be the site of the terminal, was at that time being redeveloped by the Port.  *Id.* at p. 175.  The LOI states that the water depth alongside Berth No. 8 was 37 feet when it was dredged in 2004 and that the Port will "take reasonable steps" to work with the United States Army Corps of Engineers ("USACE") to deepen and maintain the depth to 40 feet or more.  *Id.*  At the time IFG understood that the USACE might not permit such deepening and it expressed its desire to work with the Port to ensure that the dredging would take place.  Doc. 341, att. 1, pp. 285-287 [P35].

The LOI provided that IFG would conduct a study by a licensed engineering firm to assure that its ship loader can be placed on Berth No. 8.  Doc. 341, att. 1 p. 175 .  The study, according to

---

[4] Virtually everything that occurred between the two parties is documented in some form or fashion and has been docketed at Document #341, but the import of each is vociferously debated between the two parties.

the LOI, must also include that the concrete pilings beneath Berth No. 8 are at a depth sufficient to withstand dredging to at least 40 feet. *Id.* Other issues addressed in the LOI but not necessarily pertinent to issues herein are railroad service to the Port and IFG's right of exclusivity pertaining to the export of grain at the Port.

The Lease, which incorporated some but not all conditions listed in the LOI, was ultimately executed by parties on August 15, 2011.

## B. IFG Grain Terminal Facility

Under the lease IFG was to begin construction of its facility within twelve months of the effective date of the lease (August 15, 2011) and the facility was to be completed within twenty-four months of commencing construction. Doc. 341, att. 26, p. 168, § 6.3 [D49]. There were several extensions of the expected completion date and the IFG facility ultimately opened on July 15, 2015. Doc. 1, ¶ 8. This date, July 15, 2015, is referred to as the Rent Commencement Date under the Lease. Doc. 341, att. 26, p. 163 [D49]. Pursuant to Section 4 of the Lease, IFG was to begin paying rental payments, or Minimum Annual Guarantee ("MAG") throughput charges, beginning on the Rent Commencement Date in accordance with a schedule set forth in Exhibit 3 of the Lease. *Id.* at pp. 166-167, 203-204.

On July 31, 2016, the Port sent an invoice to IFG for $359,167.63 representing MAG charges for the first year of the lease. Doc. 341, att. 10, p. 61 [P285]. IFG contends that pursuant to the *force majeure* provisions of the Lease it is not obligated to pay these MAG charges. Doc. 236, pp. 18-23, ¶¶26-27. However, according to IFG, in order to mitigate damages, it paid the Port the amount invoiced plus interest under protest and sought reimbursement of this amount in its amended complaint. Doc. 341, att. 11, pp. 257-59 [P300]. On July 31, 2017, the Port sent another invoice to IFG in the amount of $44,958.03 representing MAG charges due for the second

lease year. Doc. 341, att. 15, pp. 29-30 [P323].   Again IFG paid the amount due under protest and

the parties, rather than file another amended pleading, entered into a stipulation providing that the

court's determination regarding the MAG charges for the first year will be applied and handled in

the same way for the second year MAG charges.  Doc. 341, att. 15, pp. 87-91 [P325].

## C.  The Default Letter

After the Lease was executed, the parties' attention turned to preparations for dredging.

The marine area alongside Berth No. 8 needed to be at least 42 feet in order for IFG to attract

larger vessels and increase shipping traffic.  The Port's 2004 maintenance dredging permit from

the USACE only allowed dredging to a depth of 37 feet.  Doc. 341, att. 24, p. 1-21 [D1].  Therefore,

the permit needed to be amended.  Section 8.9 of the Lease, which is the subject of much of this

litigation, provides:

> 8.9 <u>Dredging</u>. [IFG] will arrange for and complete the initial dredging of the
> marine area alongside the Berth No. 8 Servitude Area and the vicinity connecting the
> Calcasieu ship channel to this area (see the map attached as <u>Exhibit 6</u> which
> shows the specific areas to be dredged) to a depth of no less than forty-two
> (42') feet below the low water line as measured at  mean low Gulf tide. [IFG]
> will only arrange for and complete this dredging one (1) time prior to the
> Expected Completion Date. To offset the cost of this initial dredging the [Port] will
> pay [IFG] one-half of the cost of this initial dredging up to a maximum
> payment of two hundred and fifty thousand dollars ($250,000). The [Port]
> will pay [IFG] this amount immediately upon completion of the dredging
> and [IFG] reasonably documenting the amount paid for such dredging work
> and upon [IFG] giving the [Port] an invoice from the contractor performing the
> dredging work.  [IFG] or its contractor will deposit the spoil  from the initial
> dredging, subject to the guidelines and requirements of the United States Corps
> of Engineers and all applicable laws, rules and regulations, at the [Port's] dredge
> spoil site that is closest in proximity to the area dredged and which is available
> for use. The [Port] will not assess or charge [IFG] any fee for use of the [Port's]
> disposal sites. After this initial dredging is complete, the [Port] will at its sole
> cost, arrange for and complete dredging of the areas indicated in <u>Exhibit 6</u> for
> the entire Initial and Extended Terms of the Ground Lease to ensure that the
> depth is maintained at forty-two (42) feet and provide semi-annual surveys to
> [IFG] to show that the required depth is being maintained; provided, however,
> at any time the depth is  forty-one (41) feet or less, the Port will promptly
> commence and diligently pursue the process to  maintenance dredge to return

> the depth back to forty-two (42) feet within a reasonable time. After the initial
> dredging, all future dredging and surveys of the areas indicated in Exhibit 6 will be
> at no cost to [IFG].

Doc. 341, att. 26, p. 172, § 8.9 [D49].

The parties agree that IFG was to initially undertake the dredging of the area alongside Berth No. 8 with the Port reimbursing IFG one half of the cost up to $250,000. What the parties do not agree upon is who was to obtain the amendment to the Port's permit that would allow IFG to dredge to 42 feet. The Port maintains that Section 8.9's language that states IFG "will arrange for and complete the initial dredging" required IFG to obtain the necessary amendment from the USACE. *See generally,* doc. 293. IFG argues that it was the understanding between the parties from the beginning of negotiations that the Port was either solely responsible for securing the necessary permit or that the responsibility was shared by the Port and IFG with the Port taking the lead in working with the USACE. *See generally,* doc. 301. Documents in the record indicate that both prior to the effective date of the Lease and after the Port communicated with engineers, consultants, and the USACE regarding dredging or deepening of the marine area alongside Berth No. 8. *See, e.g.,* Doc. 341, att. 2, pp. 166-71 [P62], Doc. 341, att. 2, pp. 172-73 [P63], Doc. 341, att. 2, pp. 225-48 [P70-P78], Doc. 341, att. 2, p. 250 [P79], Doc. 341, att. 5, pp. 29- 33 [P175-176], Doc. 341, att. 5, pp. 34-39 [P177-179].

On January 5, 2015, IFG informed the Port that it was scheduling dredging at Berth No. 8 beginning in February. Doc. 341, att. 29 p. 95 [D76]. On January 21, 2015 Port officials met with the USACE to discuss, among other items, IFG's grain elevator project. Doc. 341, att. 5, pp. 16-20 [P171-173]. After this meeting, on January 26, 2015, the Port informed IFG that the USACE advised that the Port's dredging permit was not adequate for IFG's dredging project. Doc. 341, att. 5, pp. 44 [P182]. The Port noted that it was "addressing the issue" and that it was "quickly

gathering the information needed to amend the dredging permit," but that it would take three months at the earliest for the USACE to issue the amendment. *Id.*

On March 4, 2015, the Port, through its general counsel, sent an email detailing the process it proposed for obtaining the amendment. Doc. 345, att. 5, p. 109 [P198]. The Port informed IFG that it would apply for the amendment to its permit and IFG, at its cost, would be responsible for engaging any contractors to perform any work necessary to obtain the amendment and to perform the dredging. *Id.* IFG hired AECOM to perform sediment samplings required by the USACE and on July 7, 2015, the Port informed IFG that the results of that testing gave them concern that the USACE would not allow the dredged material to be placed in its existing disposal areas. Doc. 341, att. 5, pp. 205-06 [P203]. Because of the potential expense of disposing of the dredged material in a landfill designated for contaminated material, the Port decided to contract for a second sampling and testing process which it explained would be somewhat "time consuming." *Id.*

On August 6, 2015, counsel for IFG sent correspondence to the Port invoking the "Force Majeure" provision under the Lease.[5] Doc. 341, att. 6, p. 35 [P217]. The letter explained that, due to the potential presence of contaminants in the dredging area, IFG was informed that the Port would not allow dredging. *Id.* Counsel wrote that the Port's resultant decision to undertake further testing and the ensuing delays attributed thereto were events beyond the control of IFG. *Id.* Further, the letter stated, since IFG's grain facility was designed to accommodate large vessels, and the dredging cannot commence, its throughput volumes would be substantially limited, an event also beyond IFG's control. *Id.*

---

[5] The term "Force Majeure" is specifically defined in the Lease. Doc. 341, att. 26, p. 160 [D49].

On September 30, 2015, the Port, disagreeing that an event of "Force Majeure" had occurred, sent a letter to IFG notifying it that it was in default of Section 15.1(b) of the Lease.[6][7] Doc. 341, att. 29, pp. 134-36 [D85]. The Port stated that IFG was free to begin dredging the area alongside Berth No. 8 as early as January 1, 2012, the date of the Ground Lease Commencement Date but waited until January 2015 to begin discussing dredging. *Id.* While IFG indicated that it would begin dredging in February of 2015, the letter states, no explanation was given for IFG's failure to do so. *Id.* The Port further stated that IFG should have "acted expeditiously after the Ground Lease Commencement Date to move forward with dredging under the [Port's] current Corps permit and to move forward with sampling so that dredging to -42 feet MLG could have occurred well in advance of the Expected Completion Date and the Rent Commencement Date." *Id.* at p. 135. The letter noted that the "erroneous" testing results by AECOM, the contractor IFG selected, prevented amendment to the permit and, in turn, dredging. *Id.*

The Port wrote that it would proceed with the permit amendment upon IFG paying the sum it incurred to disprove the AECOM results. *Id.* It additionally asked that IFG agree to proceed with the necessary work to amend the existing permit and to pay all costs associated with amending the existing dredging permit. *Id.* Finally, the letter stated that "there are no geotechnical restrictions related to the wharf and dock facilities adjacent to the area to be dredged and, upon issuance of the required Corps permit amendment allowing for dredging to a depth of -41 feet MLG, the dredging IFG is required to perform can proceed." *Id.* at p. 135.

On November 30, 2015, counsel for IFG sent a response to the Port's letter. Doc. 341, att. 29, pp. 139-141 [D87]. The letter stated that IFG would pay for, and in fact it enclosed a check

---

[6] Under Section 15.1(b) of the Lease IFG had 60 days to "cure" the default. Doc. 341, att. 26, pp. 180-81 [D49].
[7] A copy of the September 30, 2015 default letter was also sent to IFG's creditors. Doc. 341, att. 29, pp. 137-38 [D86].

for, the sum incurred by the Port to disprove the AECOM results. *Id.* at p. 141. IFG also agreed

to proceed with "the necessary work to amend the existing Corps permit and agrees to pay all costs

associated with amending the existing dredging permit, per the Lease." *Id.* at p. 139. In closing,

counsel asked that the Port withdraw its September 30, 2015 letter. *Id.* at p. 140.

A January 19, 2016, letter from the Port to IFG confirmed its position that IFG was in

default of the lease for failing to complete the initial dredging on or before the Expected

Completion Date (July 15, 2015). Doc. 341, att. 9, pp. 134-139 [P270]. IFG filed this lawsuit on

January 29, 2016. Doc. 1.

IFG and the Port entered into a Cooperative Endeavor Agreement ("CEA") on February

15, 2016 whereby the parties agreed to use the Port's 214 agreement with the USACE to expedite

the USACE's review of the Port's permit amendment. Doc. 341, att. 29, pp. 164-172 [D91]. The

CEA provided that the Port, at IFG's cost, would agree to obtain the necessary permit for dredging.

*Id.* On March 14, 2016, the Port submitted the application to the USACE to amend its permit to

allow for dredging to a depth of 42 feet. Doc. 341, att. 29, pp. 176-78 [D93]. On the same date

counsel for the Port issued a letter stating that it understands that IFG cannot take any action

relating to dredging until the USACE approves the application. Doc. 341, att. 29, pp. 179-81

[D94]. It also informed IFG that it had "no intention and shall not issue the second notice of

default pursuant to Section 15.3 of the Lease at this time or hereafter so long as IFG continues to

work diligently in arranging for and completing the Initial Dredging." *Id.* at p. 180.

On February 16, 2017, the USACE issued its permit modification letter to the Port's

existing maintenance permit to allow IFG to dredge to a depth of 42 feet. Doc. 341, att. 31, pp.

96-102 [D107]. The USACE also determined that Dredged Material Placement Facility ("DMPF")

3 was the site that could be used to dispose of the dredge material. Doc. 341, att. 31, pp. 91-95 [D106].

### D. DMPF 3 Containment Dikes

Section 8.9 of the Lease provides, in pertinent part,

> [IFG] or its contractor will deposit the spoil from the initial dredging, subject to the guidelines and requirements of the United States Corps of Engineers and all applicable laws, rules and regulations, at the [Port's] dredge spoil site that is closest in proximity to the area dredged and which is available for use. The [Port] will not assess or charge [IFG] any fee for use of the [Port's] disposal sites.

Doc. 341, att. 26, p. 172, § 8.9 [D49]. In a February 7, 2017 letter from the USACE to the Port the USACE determined that, as a condition for approval of the permit modification, the containment dikes at DMPF 3 had to be expanded, elevated, and/or built-up in order to handle the dredge material from Berth No.8. Doc. 341, att. 31, pp. 91-95 [D106]. The USACE proposed two options to undertake the raising of the dikes. *Id.* The first option allowed the "requester" to utilize the dredging contractor that was already performing maintenance work at the disposal site on behalf of the USACE. *Id.* The second option allowed the "requester" to choose its own dredging contractor, but work could not begin until after the USACE's maintenance was complete. *Id.*

IFG's dredging consultant notified the Port by correspondence dated February 20, 2017, of its plan to proceed with dredging and noted, "[a]fter the Port has notified IFG that DMPF 3 is available to receive dredge material from Berth 8 deepening, IFG will give the selected dredging contractor notice to proceed." Doc. 341, att. 11, pp. 289-90 [P303]. In response to this letter the Port wrote on February 23, 2017 that the "obligation to complete the dredging and disposal work … lies with IFG. …" Doc. 341, att. 11, p. 293 [P304]. The Port stated that option one or two was a decision for IFG to make and IFG would be responsible for all costs associated with raising the containment dikes at DMPF 3. *Id.*

On March 17, 2017, IFG informed the Port that, while it disagreed with the Port's demands, "in the interest of moving forward as quickly as possible" the Port was authorized by IFG to work with the USACE to perform the dike work. Doc. 341, att. 31, p. 106 [D110]. IFG also informed the Port that it agreed to pay for the work.[8] *Id.*

The USACE informed IFG that the work to expand the DMPF 3 containment dikes was completed on June 20, 2017. Doc. 341, att. 31, p. 136 [D118].

### E. Slope Stability of Berth No. 8

In September 2017 IFG received documents through discovery requests issued to Gahagan & Bryant Associates ("GBA"), one of the Port's dredging consultants, that referenced potential slope stability issues at Berth No. 8. *See, e.g.* Doc. 341, att. 2, p. 47, Doc. 341, att. 11, pp. 217-18, Doc. 341, att. 5, pp. 219-230, Doc. 341, att. 6, pp. 1-16, Doc. 341, att. 6, pp. 30-31. IFG contends that, until these issues are resolved, it cannot conduct the initial dredging. Doc. 280, att. 1, p. 25. The documents received from GBA are a series of emails exchanged between the Port, its engineering consultants Myer & Associates ("Myer"), and GBA ranging in date from February 2011 to August 2015. *Id.*

In sum, the substance of the emails is whether Berth No. 8 can be dredged to 42 feet and whether the dock structural design can withstand such dredging. In February 2011 the Port emailed Myer in reference to Berth No. 8's design and future dredging. Doc. 341, att. 2, p. 47 [P50]. Myer informed the Port that the "rehabilitated portion of Berth 8 was designed for 40 foot draft. The standard template would apply achieving a depth of -40 approximately 10 feet away from face of fender." *Id.* In a May 2011 reply email to the Port from GBA, after examining dock improvement plans for Berth No. 8, GBA's engineer expressed concern because no geotechnical

---

[8] IFG paid the Port $510,000 under protest. IFG's complaint seeks reimbursement of this amount. Doc. 236, pp.23-27, ¶¶ 28-35.

data was provided. Doc. 341, att. 2, p. 179 [P68]. She wrote, "[i]f the design depth for the structure is only -40 feet then we may have some issues here. …" *Id.*

On July 16, 2015, the Port wrote that it did not "know if Berth 8 will structurally accommodate that depth [-42 feet MLG]." Doc. 341, att. 6, pp. 1 [P212]. It also noted that Meyer's position "is that dredging should not take place within 10 feet of the dock to protect the fender system." *Id.* On August 4, 2015 Meyer advised the Port that dredging along Berth No. 8 "will accommodate a dredge elevation of 39.1 MLG." Doc. 341, att. 6, p. 30 [P214].

Notwithstanding the information contained in the emails from Meyer and GBA regarding dredging depth, on August 5, 2015, the Port's general counsel wrote to IFG's attorney "we have the geo-tech engineers that worked to develop the details of the upgrade of Berth 8 in the late 1990's re-looking at calculations and numbers and there may well be a determination that the 42 mean low gulf standard of the lease can be met without a safety concern to the dock." Doc. 341, att. 6, p. 32 [P215]. Further, the September 30, 2015, default letter issued by the Port stated, "the [Port] has determined that there are no geotechnical restrictions related to the wharf and dock facilities adjacent to the area to be dredged and, upon issuance of the required Corps permit amendment allowing for dredging to a depth of -42 feet MLG, the dredging IFG is required to perform can proceed." Doc. 341, att. 29, pp. 135 [D85]. The Port maintains that this statement is based on a series of calculations performed by its in-house engineer on a dry erase board, which calculations were subsequently erased. Doc. 341, att. 15, p. 435 [P340], Doc. 341, att. 15, pp. 448 [P342].

Both the Port and IFG have hired engineers to perform slope stability analyses for the proposed dredging at Berth No. 8. The Port employed Michael Hasen of HVJ Associates who prepared reports dated January 19, 2018 and December 26, 2018. Doc. 341, att. 15, pp. 494-559

[P344], Doc. 341, att. 20, pp.1-101 [P390]. IFG retained Timothy Stark of Stark Consultants who prepared reports dated November 20, 2018 and January 10, 2019. Doc. 341, att. 17, pp. 1-63 [P368], Doc. 341, att. 23, pp. 1-22. [P402]. Hasen and Stark reach conflicting conclusions on the safety of dredging to 42 feet at Berth No. 8.

## II.
### APPLICABLE LAW

**A. Summary Judgment Standard**

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the motion for summary judgment if the movant fails to meet this burden. *Id*.

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505, 2511 (1986) (quotations omitted). This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 106 S.Ct. at 2511 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 120 S.Ct. 2097, 2110 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268,

-13-

270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

## B. Substantive Law Regarding Contract Interpretation

Because our subject matter jurisdiction is based on diversity of citizenship as found in 28 U.S.C. § 1332, we must apply the substantive law of the state in which we sit. *Erie v. Thompkins*, 58 S.Ct. 817 (1938). Also the contract at issue provides that it "shall be governed by and construed in accordance with the laws of the State of Louisiana." Doc. 1, att. 3, p. 31.

Section 24.8 of the lease provides that Louisiana law governs the terms of the lease. Under Louisiana law,

> [i]nterpretation of a contract is the determination of the common intent of the parties. The reasonable intention of the parties to a contract is to be sought by examining the words of the contract itself, and not assumed. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. Common intent is determined, therefore, in accordance with the general, ordinary, plain and popular meaning of the words used in the contract.

*Prejean v. Guillory*, 38 So. 3d 274, 279 (La. 2010) (citations omitted).

When examining a contract on a motion for summary judgment, the interpretation can be either a question of law or fact depending on whether the contract is ambiguous. While questions of law in regard to contract interpretation are appropriate to decide during a motion for summary judgment, questions of fact should only be decided if there is no material issue of fact. *See LFI Fort Pierce, Inc. v. Acme Steel Buildings, Inc.*, 200 So. 3d 939, 946 (La. App. 3 Cir 2016). "The determination of whether a contract is clear or ambiguous is a question of law." *Sims v. Mulhearn Funeral Home, Inc.*, 956 So. 2d 583, 590 (La. 2007). Under Louisiana law, the interpretation of an unambiguous contract is a question of law that can be decided on a motion for summary

judgment. *Greenwood 950, L.L.C. v. Chesapeake La., L.P.,* 683 F.3d 666, 668 (5th Cir. 2012) (citing *Sims v. Mulhearn Funeral Home, Inc.*, 956 So. 2d at 590). "However, if a court determines as a matter of law that a contract is ambiguous, then extrinsic (parol) evidence may be used to determine the true intent of the parties, and determining the intent of the parties becomes, in part, a question of fact." *LFI Fort Pierce, Inc.*, 200 So. 3d at 946 (citing *Carter v. BRMAP*, 591 So.2d 1184, 1188–89 (La. App. 1 Cir. 1991)). Because the intent of the parties in an ambiguous contract is a question of fact, the court should only grant summary judgment if there is no material issue of fact as to the parties' intent. *Id.*

### III.
### MERITS OF THE PENDING MOTIONS

#### A. Motion for Partial Summary Judgment on Claims Related to MAG Charges

In this motion the Port moves for partial summary judgment declaring that IFG was required to pay the MAG charges under Section C of Exhibit 3 of the Lease and dismissing IFG's claims that it does not owe MAG charges and is entitled to recover funds that it paid under protest, as pled in Count VI of IFG's Amended, Supplemental, and Restated Complaint. Doc. 285.

Pursuant to Section 4 of the Lease, IFG was to begin paying rental payments, or Minimum Annual Guarantee ("MAG") throughput charges, beginning on the Rent Commencement Date in accordance with a schedule set forth in Exhibit 3 of the Lease. Doc. 341, att. 26, pp. 166-167, 203-204. [D49]. The IFG grain facility opened on July 15, 2015 and this date is referred to as the Rent Commencement Date under the Lease. Doc. 1, ¶ 8, Doc. 341, att. 26, p. 163 [D49]. IFG shipped its first cargo through its facility on September 30, 2015. Doc. 1, ¶ 8.

Under Section C of Exhibit 3 of the Lease IFG is obligated to pay a MAG charge each lease year when the total amount of cargo shipped through its facility does not exceed 400,000

metric tons.[9]  Doc. 341, att. 26, p. 204 [D49].  During the first lease year, IFG shipped 87,680.32 tons of cargo through its facility.  Doc. 341, att. 10, p. 61[P285].  At the end of the first lease year, on July 31, 2016, the Port sent an invoice to IFG for $359,167.63 representing MAG charges it alleges were owed for the first year of the Lease. *Id.*

IFG contends that pursuant to the *force majeure* provisions of the Lease it is not obligated to pay the MAG charges.  Doc. 236, pp. 18-23, ¶¶26-27.  On August 6, 2015, IFG sent a letter to the Port invoking the *force majeure* provision in the Lease and explaining that circumstances beyond its control have prevented it from dredging the area around its berth to a depth of 42 feet.  Doc. 341, att. 6, p. 35 [P217].  It stated that its facility was designed with a plan to accommodate large Panamax vessels and the depth restrictions will limit its ability to service large vessels and achieve throughput volumes and attain business targets.  *Id.*  While IFG eventually paid the MAG charges the Port alleges were due, it did so under protest and seeks reimbursement of this payment.  Doc. 341, att. 11, pp. 257-59 [P300].

The Lease contains the following relevant provisions.  Under the section of the Lease titled "Rent," Section 4.2(c) states:

> The Minimum Annual Guarantee, if any, set forth in <u>Exhibit 3, Subsection C</u>, shall be calculated commencing as of the Rent Commencement Date and shall be payable no later than sixty (60) days from the end of each Lease Year.

Doc. 341, att. 26, p. 167 [D49].  Exhibit 3 to the Lease is entitled "Rental" and Section C contains the following provision regarding MAG charges:

> <u>Minimum Annual Guarantee.</u>  [IFG] shall be obligated each Lease Year to pay Throughput charges based on a minimum Throughput of 400,000 metric tons of Cargo, hereafter called the Minimum Annual Guarantee ("MAG"). For purposes of the MAG, "metric ton" is defined as 2,205 pounds.  The number of

---

[9] The MAG charge is calculated as the difference between 400,000 metric tons and the amount of cargo actually shipped through IFG's facility during a lease year multiplied by $1.15 per metric ton.  Doc. 341, att. 26, pp. 203-04 [D49].

metric tons shall be determined from the manifest weight of all such Cargo which is confirmed by [IFG] and the [Port]. Accordingly, if the actual Throughput for a given Lease Year is less than 400,000 metric tons, [IFG] shall pay, within sixty (60) days after the end of the Lease Year, the difference between the Throughput charge as calculated pursuant to Section B based on actual Throughput and the Throughput charge calculated on the MAG of 400,000 metric tons. In the event of Force Majeure, [IFG] shall receive a pro rata (365 days divided by number of days delayed) credit only for the period of time for which the Force Majeure event causes an actual interruption of the operation of the Facility.

*Id.* at p. 204. Section 1 of the Lease defines specific terms used in the Lease. *Force Majeure* is defined as follows:

"Force Majeure" means any cause not reasonably within the control of the Party claiming suspension, and shall include, but not be limited to, the following: (i) physical events such as acts of God, landslides, lightning, earthquakes, fires, storms or storm warnings, such as hurricanes, which result in evacuation of the· affected area, droughts, floods, washouts, explosions, breakage or accident or necessity of repairs to machinery or equipment or lines of pipe; (ii) weather related events affecting an entire geographic region; (iii) acts of others such as strikes, lockouts or other industrial disturbances, riots, sabotage, terrorism, insurrections or wars; provided that the settlement of strikes, lockouts or other industrial disturbances shall be within the sole discretion of the Party claiming such suspension; (iv) the failure or interruption of performance by the Tenant's engineering, procurement and construction contractor or any of subcontractors of such contractor to the extent caused by an event of Force Majeure under this Ground Lease; (v) the failure or interruption of performance by the Tenant's suppliers by reason of such supplier's valid declaration of an event that would constitute an event of force majeure under the Tenant's contract with such supplier, or in the case of a contract for the supply of grains, rice or other agricultural products to the Tenant, any non-delivery of grains, rice or other agricultural products other than as a result of a breach of contract by the Tenant; (vi) governmental actions such as necessity for compliance with any court order, law, statute, ordinance, regulation, or policy having the effect of law promulgated by a Governmental Authority having jurisdiction, or that restrict the Tenant's ability to construct the Facility or any delay in issuance or effectiveness of any Governmental Approval that has been properly applied for by the Tenant that is required to construct the Facility; and (vii) litigation commenced by any Person with respect to the Facility, involving injunctive relief or relief which, if adversely determined, would likely have a material adverse effect on the Tenant's performance of its obligations under this Ground Lease.

*Id.* at p. 160. Section 23 of the Lease contains the following provision related to *Force Majeure*:

Provided that notice is given within fifteen (15) days of an occurrence of an event of Force Majeure by the Party seeking to invoke and utilize the provisions of this Section, either Party hereto shall be excused from performing any of its respective obligations or undertakings provided in this Ground Lease, excepting any of its respective obligations or undertakings to pay any sum of money under the applicable provisions hereof, for so long as the performance of such obligations is prevented or significantly delayed, retarded or hindered by any event of Force Majeure.

*Id.* at pp. 186-87.

The Port argues that the plain and unambiguous terms of the Lease require IFG to pay MAG charges and that the *force majeure* provisions do not excuse IFG's obligation. The Port asserts that IFG's attempt to invoke the *force majeure* provisions fail for three reasons; 1) *force majeure* is inapplicable to MAG charges, 2) IFG was the cause of the delays in completing dredging; and 3) even if a *force majeure* existed, IFG's letter attempting to invoke it was untimely. Doc. 285, att. 1, p. 11.

Under Section C of Exhibit 3, the provision setting forth the MAG obligation, it states, "[i]n the event of Force Majeure, [IFG] shall receive a pro rata (365 days by number of days delayed) credit only for the period of time for which the Force Majeure event causes an actual interruption of the operation of the Facility." Doc. 341, att. 26, p. 204 [D49]. The Port argues that since IFG has never ceased operating the facility there has been no "actual interruption" in the operation of IFG's facility and the *force majeure* provision is inapplicable.[10]

IFG maintains that the circumstances surrounding the failure to dredge and its resultant failure to achieve MAG throughput volumes are wholly attributable to the failure of the Port to obtain a dredging permit, to provide a useable spoil disposal site, and uncertainty of the integrity of the dock at Berth 8 to accommodate a dredge to 42 feet. Doc. 304, pp. 6-7. These events, IFG

---

[10] In the second lease year IFG shipped 360,906.66 tons of cargo through its facility. Doc. 341, att. 11, pp. 29-30 [P323].

claims, constitute events of *force majeure* as contemplated by the Lease. IFG asserts that its facility has been only "partially open" due to the limitations imposed by a lack of dredging. *Id.* at 24-25.

While we agree with IFG that these are events that may be considered *force majeure,* we find that the specific MAG provisions in the Lease nevertheless require payment of MAG charges. Specifically, Section 23 of the Lease which is entitled "Force Majeure" provides that any party to the Lease invoking its provisions "shall be excused from performing any of its respective obligations or undertakings … excepting any of its respective obligations or undertakings to pay any sums of money under the applicable provisions hereof … ." Doc. 341, att. 26, pp. 186-87 [D49]. Further, under Section C of Exhibit 3, the provision setting forth the MAG obligation, the Lease allows for a pro rata reduction in payment for the number of days that there is an "actual interruption" in the operation of the facility. *Id.* p. 204. We note here that there has been no "actual interruption" of IFG's facility and find that under the terms of the Lease MAG charges are due. The Port's motion for partial summary judgment on this issue will be granted.

**B. Motion for Partial Summary Judgment Regarding Dredging Permit**

In this motion the Port moves for partial summary judgment dismissing IFG's claims regarding the dredging permit obligation as pled in Counts III and IV of IFG's Amended, Supplemental, and Restated Complaint and dismissing its requests for declaratory and injunctive relief as pled in Counts VIII and IX of IFG's Amended, Supplemental, and Restated Complaint. Doc. 289.

The language in the Lease pertaining to dredging and obligations associated with dredging is found in Section 8.9 and it states in pertinent part:

> [IFG] will arrange for and complete the initial dredging of the marine area
> alongside the Berth No. 8 Servitude Area and the vicinity connecting the Calcasieu

> ship channel to this area (see the map attached as <u>Exhibit 6</u> which shows the specific areas to be dredged) to a depth of no less than forty-two (42') feet below the low water line as measured at mean low Gulf tide.

Doc. 341, att. 26, p. 172. [D49]. The Port contends that the language "arrange for and complete" in Section 8.9 required IFG to secure a dredging permit from the USACE to complete the initial dredging. Doc. 293, p. 7. IFG, on the other hand, vehemently denies that it was ever its obligation to secure the USACE permit. *See generally* doc. 301. To this end, IFG points out that the Lease is completely silent as to who is obligated to secure the initial dredging permit and that documents exchanged between the parties show that the Port was "either acting upon its own responsibility to secure necessary USACE permitting or, at the very least, the Port was recognizing that the responsibility was shared." *Id.* at p. 5.

We find that the language in Section 8.9 which states "arrange for and complete" is not clear and explicit and is subject to different interpretations of exactly what duties were imposed on IFG. Since we determine, as a matter of law, that Section 8.9 is ambiguous, we may look to parol evidence to attempt to determine the true intent of the parties. Determining the intent of the parties becomes a question of fact and in order to grant summary judgment on this issue, we must find that there is no genuine dispute as any material fact. *LFI Fort Pierce, Inc.*, 200 So. 3d at 946 (citing *Carter v. BRMAP*, 591 So.2d 1184, 1188–89 (La. App. 1 Cir. 1991)).

Here, we cannot say that there is no genuine dispute as to any material fact on this issue. The issue of who was responsible for obtaining the initial permit from the USACE to begin the initial dredging is a matter that is fiercely contested and not appropriate for summary judgment. The Port's motion for partial summary judgment on this issue will be denied.

**C. Motion for Partial Summary Judgment Regarding Costs to Elevate DMPF 3**

In this motion the Port moves for partial summary judgment declaring that IFG is responsible for all costs and expenses incurred in complying with its obligation to arrange for and complete the initial dredging and dismissing IFG's claim in Count VII of its Amended, Supplemental, and Restated Complaint wherein it seeks reimbursement of the money it paid under protest to raise the containment dikes at DMPF 3. Doc. 288.

We again turn to Section 8.9 of the Lease which provides in pertinent part:

> [IFG] or its contractor will deposit the spoil from the initial dredging, subject to the guidelines and requirements of the United States Corps of Engineers and all applicable laws, rules and regulations, at the [Port's] dredge spoil site that is closest in proximity to the area dredged and which is available for use. The [Port] will not assess or charge [IFG] any fee for use of the [Port's] disposal sites.

Doc. 341, att. 26, p. 172 [D49]. The Port argues that the Lease states that IFG was responsible for arranging for and completing the initial dredging and depositing the spoil at a dredge spoil site. Doc. 288, p. 11. According to the Port, this necessarily includes any costs incurred as a result of any requirements imposed by the USACE. *Id.* Since the USACE required that the dikes at DMPF 3 be raised, it contends that IFG is responsible for this expense. *Id.*

IFG argues that the Lease requires the Port to provide a dredge spill area "available for use" and without charging IFG any fee for using the site. Doc. 303, p. 2. IFG maintains that the Port provided an area that was not useable without significant modification. IFG contends that the language "subject to the guidelines and requirements of the United States Corps of Engineers and all applicable laws, rules and regulations" does not require IFG to expand the Port's dredge spoil site but rather required IFG to properly, in accordance with USACE methods, deposit the spoil. *Id.* at 10.

We agree with IFG.  The phrase "available for use" is clear and explicit and coupled with the language that "the [Port] will not assess or charge [IFG] any fee for use of the [Port's] disposal sites" required the Port to provide a dredge spoil site that IFG was able to use to deposit the spoil from the initial dredging without any cost to IFG.  The Port's motion for partial summary judgment on this issue will be denied.

### D.  Motion for Partial Summary Judgment on Breach of Warranty and Fraudulent Inducement

In this motion the Port moves for partial summary judgment dismissing IFG's claims for breach of warranty and fraudulent inducement as set forth in Counts I and II of IFG's Amended, Supplemental, and Restated Complaint.  Doc. 291.

IFG claims that the Port, as lessor, violated its warranty against vices and defects (La. C.C. Arts. 2696, 2697), failed to provide Berth No. 8 in a condition suitable for its purpose (La. C.C. Art. 2682), and failed to deliver Berth No. 8 at the agreed time and in good condition suitable for the purpose for which it was leased (La. C.C. Art. 2684).  Doc. 236, pp. 6-15, ¶¶ 1-20.

The Port argues that the lease warranty obligations that IFG relies on in Count I of its Amended, Supplemental, and Restated Complaint are inapplicable because the Port granted a servitude rather than a lease over Berth No. 8 to IFG.

Section 2 of the Lease, entitled "Ground Lease Premises" provides at Section 2.4:

> Servitudes.  As set forth below, the [Port] hereby grants to [IFG] and [IFG] accepts from the [Port], without additional charge or rent for use in connection with the construction, operation, maintenance, repair and replacement of the Facility, a servitude and right of use consisting of the following:
>
> ***
>
> (d)  For Berth #8.  The [Port] grants to [IFG] non-exclusive rights to the Berth No. 8 Servitude Area for the purpose of constructing, installing, operating, maintaining, repairing and replacing improvements and

equipment at the cost of [IFG], in accordance with plans and specifications subject to the approval of the [Port], which approval shall not be unreasonable withheld, for the loading and unloading of vessels. The [Port] shall at its cost maintain Berth #8 (but not any of [IFG's] improvements and equipment) in reasonable good condition and repair throughout the Initial Term and any Extended Term. The use of Berth #8 granted herein shall be in accordance with the Tariff and generally applicable operating procedure of the [Port]. The [Port] shall retain all use and rights to Berth #8 which do not unreasonable interfere with the rights of [IFG] granted herein.

Doc. 341, att. 26, pp. 164-65 [D49].

The Port maintains that the Lease granted a non-exclusive servitude over Berth No.8 to IFG and the Port's only obligation under the Lease with respect to Berth No. 8 is to maintain it in good condition and repair. Doc. 291, att. 1, pp. 7-8. The Port further argues, citing La. CC. Art. 651, that it, as the servient estate owner, has no obligation whatsoever unless assumed by contract. *Id.* at p. 10. Consequently, the Port maintains that IFG's claims for breach of lease warranty obligations are inapplicable.

IFG argues that the provision in the Lease which grants the servitude over Berth No. 8 to IFG is clearly a right derived from the Lease. Doc. 302, p. 5. It maintains, citing *Hawthorne Land Co. v. Equilon Pipeline Company., LLC*, 309 F.3d 888 (5th Cir.2002), that a servitude can be expressly included in a commercial lease. In *Hawthorne* a property owner donated a servitude to the United States Department of Energy to construct pipelines for the Strategic Petroleum Reserve ("SPR"). When the Government's use of the pipelines for the SPR declined it leased the servitude to Shell (Equilon's predecessor-in-interest) to transport crude oil. The property owner sued claiming that the servitude was exclusively grated for the management and maintenance of the SPR. The court, in reasoning not pertinent to our opinion here, determined that the donation of the servitude did not "restrict the Government's ability to lease the servitude for commercial purposes." *Id.* at p. 892.

IFG, therefore contends that the servitude granted in this case is a right granted under the Lease and as such the Civil Code articles regarding lease warranties and obligations are applicable. Whether or not the Port has lived up to its obligations under the Lease, according to IFG, is factually disputed and not ripe for summary judgment. Doc. 302, p. 10.

We agree. The servitude over Berth No.8 is a part of and included within the Lease signed by the parties. The Civil Code imposes certain warranties and obligations on a Lessor. Whether or not these warranties and obligations have been breached is genuinely disputed and summary judgment will not be granted on this issue.

Next, the Port argues that IFG's claim that it was fraudulently induced into executing the Lease as alleged in Count II of its Amended, Supplemental, and Restated Complaint should be dismissed. It contends, in sum, that the undisputed facts show that IFG failed to conduct its own due diligence and obtain engineering studies that it agreed to secure relative to dredge depth and the stability of Berth No. 8. Doc. 291, att. 1, p. 19. Had IFG conducted its own study, according to the Port, it would have learned of any issues or concerns it now raises. Doc. 323, p. 14.

Under Louisiana law, in order to establish fraud involving a contract IFG must prove; "(1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim's consent to (a cause of) the contract." *Koerner v. CMR Constr. & Roofing, LLC*, 910 F.3d 221, 228 (5th Cir.2018)(citing *Shelton v. Standard/700 Associates*, 798 So.2d 60, 64 (La.2001)). Additionally, the claims will not survive if the party against whom the fraud was directed could have "ascertained the truth without difficulty, inconvenience, or special skill." *Id.* (citing La. C.C. art. 1954).

IFG submits that the Port knew from the outset that its intention was to service large Panamax vessels at its Facility which would require a dredge depth of at least 42 feet. Doc. 302, pp. 10-11. In its brief IFG sets forth a litany of facts which it suggests that the Port had knowledge of but did not inform IFG of prior to signing the Lease. *Id.* at pp. 12-18. These facts are relative to issues concerning dredge depth and slope/stability at Berth No. 8. According to IFG, the Port intentionally omitted certain information and fraudulently induced IFG into signing the Lease.

The court has reviewed the facts presented by both parties. At this time, we cannot say that there is no genuine dispute as to any material fact on this issue. Exactly what information the Port knew and whether or not its intent was to obtain any unjust advantage is not clear and is not appropriate for summary judgment. The Port's motion for partial summary judgment on this issue will be denied.

### E. Cross-Motions for Partial Summary Judgment on LUPTA Claims

The Port moves for partial summary judgment dismissing IFG's claims under the Louisiana Unfair Trade Practices Act ("LUPTA") as found in Count V of IFG's Amended, Supplemental, and Restated Complaint. Doc. 286. IFG has also moved for partial summary judgment asking the court to grant its LUPTA claims against the Port. Doc. 280.

LUPTA forbids "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. R.S. 51:1405. LUPTA does not specifically identify any prohibited types of conduct and the Louisiana Supreme Court has stated that "[i]t has been left to the courts to decide, on a case-by-case basis, what conduct falls within the statute's prohibition." *Cheramie Services, Inc. v. Shell Deepwater Prod., Inc.*, 35 So.3d 1053, 1059 (La. 2010). In order to establish a LUPTA claim the plaintiff must show that "the alleged conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious." *Id.*

Accordingly, "the range of prohibited practices under LUPTA is extremely narrow, as LUPTA prohibits only fraud, misrepresentation, and similar conduct, and not mere negligence." *Quality Envtl. Processes, Inc. v. I.P. Petroleum Co., Inc.*, 144 So.3d 1011, 1025 (La.2014)(citing *Cheramie* 35 So.3d at 1059).

IFG alleges that the Port is liable under LUPTA for its "deceptive and misleading communications that it was properly, lawfully and timely securing adequate dredge permitting," and its "deceptions, concealment and substantially fraudulent conduct" it employed in "connection with hiding evidence that it was fully aware of its role in obtaining an amended permit … knowing that the concealed records would directly contradict legal positions advanced" before and during the lawsuit. Doc. 280, pp. 1-2. IFG also alleges that the Port violated LUPTA by employing "a series of misrepresentations, deceptions, concealments and substantially fraudulent conduct … in connection with hiding extensive records confirming that there were substantial concerns about slope/dock stability and dredge depth issues that were not being contemporaneously shared with IFG …." *Id.* at p. 2.

In opposing IFG's motion and in support of its own motion the Port first asserts that IFG lacks standing to bring an action under LUPTA. Doc. 286, att. 1, pp. 13-15, Doc. 315 pp. 7-10. It maintains, citing *Orthopedic & Sports Injury Clinic v. Wang Labs, Inc.*, 922 F.2d 220, 226 (5th Cir.1991), that LUPTA provides a cause of action only to business competitors and those injured by transactions involving consumers buying for personal, family, or household use. Since IFG is neither a consumer nor business competitor of the Port it argues that it is entitled to summary judgment as a matter of law because IFG does not have standing to bring a LUPTA action.

IFG calls our attention to a recent opinion written by Chief Judge S. Maurice Hicks, Jr., *Caldwell Wholesale Company, LLC v. R.J. Reynolds Tobacco Co.*, 2018 WL 2209165 (W.D. La

5/11/2018), wherein the court found that LUPTA provides a private right of action to plaintiffs other than direct consumers and business competitors. Doc. 300, pp. 6-7. In *Caldwell* the court addressed standing in the context of a LUPTA claim filed by someone other than a consumer or business competitor. The court noted that, following the plurality opinion of the Louisiana Supreme Court in the case of *Cheramie Serv., Inc. v. Shell Deepwater Prod., Inc,* 35 So.3d 1053 (La. 2010), which expanded LUPTA to allow anyone harmed by prohibited unfair or deceptive practices to file a private right of action to bring a claim, a number of Louisiana appellate and federal district courts have followed that plurality opinion and found that private parties have a right of action under LUPTA.[11] *Caldwell* at *6. The court found *Cheramie* instructive on the issue of standing and in accordance with the other court decisions determined that a private right of action exists and that the plaintiff had standing to bring the LUPTA claim. *Id.*

Following the reasoning of Chief Judge S. Maurice Hicks, Jr., we too find that IFG has standing to bring its LUPTA claims against the Port; however, we find that genuine issues of material fact remain regarding the Port's alleged violations of LUPTA that preclude summary judgment.

LUPTA necessarily entails a finding of "immoral, unethical, oppressive, or unscrupulous" conduct with an intent to deceive and or defraud. We do not take these serious allegations lightly. The parties have presented hundreds of documents containing a myriad of facts most of which are

---

[11] *See Jones v. Americas Ins. Co*., 2016-0904 (La. Ct. App. 1st Cir. 8/16/17), 226 So.3d 537, 544; *Bogues v. Louisiana Energy Consultants, Inc*., 46-434 (La. Ct. App. 2nd Cir. 8/10/11), 71 So.3d 1128, 1132; *J. A. Davis Properties, LLC v. Martin Operating P'ship, LP*, 2017-449 (La. Ct. App. 3rd Cir. 6/21/17), 224 So.3d 39, 43; *Prime Ins. Co. v. Imperial Fire & Cas. Ins. Co*., 2014-0323 (La. Ct. App. 4th Cir. 10/1/14), 151 So.3d 670, 678; *Hurricane Fence Co., Inc. v. Jensen Metal Products, Inc.*, 12-956 (La. Ct. App. 5th Cir. 5/23/13), 119 So.3d 683, 688; *Rockwell Automation, Inc. v. Montgomery*, Civil Action No. 17-415, 2017 WL 2294687, at *2–3, 2017 U.S. Dist. LEXIS 80820, at *7 (W.D. La. May 24, 2017); *Swoboda v. Manders*, Civil Action No. 14-19-EWD, 2016 WL 1611477, at *5, 2016 U.S. Dist. LEXIS 53377, at *18 (M.D. La. Apr. 21, 2016); *Max Access, Inc. v. Gee Cee Co. of LA*, Civil Action No. 15-1728, 2016 WL 454389, at *4, 2016 U.S. Dist. LEXIS 14166, at *13 (E.D. La. Feb. 5, 2016). *Caldwell,* at *6.

disputed.  At this juncture the court is not able to determine intent and this necessarily precludes granting either motion for summary judgment on IFG's LUPTA claims.

## IV.
### CONCLUSION

For the reasons stated, the Port's Motion for Partial Summary Judgment on Claims Related to MAG Charges (doc. 285) is **GRANTED**, the Port's Motion for Partial Summary Judgment Regarding the Dredging Permit (doc. 289) is **DENIED**, the Port's Motion for Partial Summary Judgment Regarding Costs to Elevate DMPF 3 (doc. 288) is **DENIED**, the Port's Motion for Partial Summary Judgment on Breach Of Warranty and Fraudulent Inducement Claims (doc. 291) is **DENIED**, the Port's Motion for Partial Summary Judgment on LUPTA Claims (doc. 286) is **DENIED**, and IFG's Motion for Partial Summary Judgment on LUPTA Claims (doc. 280) is **DENIED**.

THUS DONE AND SIGNED in Chambers this 6th day of March, 2019.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE