UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION


| | | |
|---|---|---|
| LAKE CHARLES HARBOR & TERMINAL DISTRICT | : | CIVIL ACTION NO. 16-cv-146 |
| VERSUS | : | |
| IFG PORT HOLDINGS, LLC | : | MAGISTRATE JUDGE KAY (By Consent) |


<u>WRITTEN REASONS FOR JUDGMENT</u>


The parties consented to proceed before the undersigned and the matter was referred by the district court.  Doc. 113.   After consideration of the testimony and documentary evidence submitted as well as the argument of the parties, we issue the following written reasons for judgment.  To the extent that any finding of fact constitutes a conclusion of law, the court hereby adopts it as such.  Likewise, to the extent that any conclusion of law constitutes a finding of fact, we hereby adopt it as such as well.

## I.
### PROCEDURAL HISTORY

The original complaint in this matter was filed January 29, 2016, [Doc. 1] by IFG Port Holdings, LLC, ("IFG") against the Lake Charles Harbor & Terminal District ("the Port").  The initial complaint alleges IFG entered into a Ground Lease Agreement ("GLA") with the Port on which it was to build a grain export terminal.  That facility was completed and opened for business on July 15, 2015, at the cost of over $50,000,000 according to IFG.  *Id.* p. 2, ¶ 9. Speaking broadly, particulars to follow, IFG complained that the Port had failed to secure appropriate permitting from

the United States Army Corps of Engineers ("USACE") that would allow for dredging it was obligated to perform (initially) by the lease agreement.

IFG also complained that the Port issued a default letter on September 30, 2015, a formal action that would precipitate various portions of the lease allowing for cure by the Port or eviction of IFG.  IFG complained the Port then engaged in a course of conduct seeking to extract agreements from IFG not previously contemplated or required by the lease agreement, also discussed in more detail below, which conduct IFG alleges was made in bad faith, was an abuse of power, and was designed to intimidate.  *Id.* p. 14, ¶ 48.  The original complaint also complained of the issuance of a second default notice related to the damage of an electrical transformer pad. That notice was ultimately withdrawn.  IFG's claims against the Port in that original complaint were that the Port breached the lease in various particulars, that it was negligent in handling certain matters, that its actions constituted a violation of the Louisiana Unfair Trade Practices Act ("LUTPA", La. R.S. 51:1401, *et seq.*, the Port committed an "Abuse of Rights," and that the Port fraudulently induced IFG to enter into the lease and that IFG relied to its detriment on assertions made by the Port when entering the agreement.  In the initial complaint IFG sought declaratory relief that it had not breached the agreement nor was in default, various injunctive relief, and monetary damages, including treble damages and attorney fees, to be proved at trial.

The Port answered the original complaint and raised its own claims seeking declaratory relief that it had not breached the lease and that its default notices were validly issued.  Doc. 37.[1] That answer was later amended to add a request for attorney fees, costs, and expenses due under

---

[1] There was much activity in the early phases of the litigation with IFG seeking temporary and preliminary injunctive relief, each party filing various motions requesting expedited consideration, etc.  The temporary and preliminary injunctive issues were resolved without hearing and are mentioned no further.

the lease, under the Federal Declaratory Judgment Act, 28 U.S.C. §2201, *et seq*., and for IFG's groundless claim under LUTPA.  Doc. 84, pp.15-16, ¶¶ XVII and XVIII.

The controversy between these litigants was far from static.  IFG amended its complaint for the first time on August 22, 2016.  The lease between the parties also provided for a Minimum Annual Guarantee ("MAG") for throughput charges.  This complaint sought relief through the *force majeure* clause of the lease, asking it be relieved of obligations imposed on IFG for the MAG payments.  MAG payments were made under protest by IFG under threat of yet another default notice being issued.[2]  This issue was ultimately resolved in favor of the Port on Motion for Summary Judgment.  *See* Doc. 370, Memorandum Ruling, pp. 15-19.

On May 4, 2017, the Port amended its counterclaims against IFG.  Doc. 131.  Through this pleading the Port seeks to hold IFG liable for payment of sums mandated by USACE for elevation of containment dikes at the site designated for use by IFG to deposit spoils of its dredge required under the lease.  IFG answered the new counterclaim and then amended its complaint again, this time alleging it was not responsible for the charges imposed by USACE.  Docs. 132, 136.  IFG alleged it was the Port's responsibility to supply IFG with a location to deposit the spoils of its dredge and the Port was to do so "at no cost to IFG."  In its third complaint IFG alleges that, but for the delays caused by the Port's action, this charge by USACE could have been avoided.  Doc. 136, p. 5, ¶ 147.  IFG alleged it ultimately paid the costs demanded by the Port to allegedly cover the USACE charges but did so under protest so that the necessary dredging work could be completed.  It now seeks to be refunded that payment as not being due under the contract.

_____

[2] The threat of another default notice being issued and that it did make payment under protest was alleged by IFG in its Second Amended Complaint filed February 14, 2017.  Doc. 121.  IFG sought recovery of that payment through this complaint.

To clarify exactly what issues remained viable in the then two years this litigation had proceeded, IFG filed an Amended, Supplemental, and Restated Complaint on June 27, 2018. Doc. 236. As restated therein, IFG's claims were/are as follows:

    (1) Compensatory damages arising from the Port's breach of contract related to "the Intended Depth of Berth 8";

    (2) The Port's liability for fraudulently inducing IFG to enter the lease;

    (3) The Port's liability for not timely securing the necessary dredge permit;

    (4) The Port's liability for misleading IFG to believe it was timely handling the permitting role;

    (5) The Port's liability to IFG for violating LUTPA;

    (6) A declaration that it did not owe the MAG payment;

    (7) Reimbursement for cost imposed by USACE for improvement to the dredge spoil deposit site made available for use by IFG.

    (8) Entitlement to declaratory and injunctive relief as follows:

        a. A declaration that the default letters issued by the Port were issued in bad faith to gain unwarranted leverage on IFG and to force it to concede to unrelated demands;

        b. A mandatory injunction ordering the Port to withdraw outstanding default notices filed against IFG and its lender;

        c. Injunctive relief prohibiting the Port from:

            i. Issuing factually inaccurate default notices;
           ii. Issuing default notices where the alleged default was "caused, totally or in part, by the Port's own actions, representations, failures to perform, negligence of bad faith";
         iii. Failing to withdraw default notices or recognize the alleged defaults were cured;
         iv. Using default notices to create duress or gain leverage on IFG for issues unrelated to the defaults;
          v. Threatening to terminate the lease or evict IFG with use of faulty default notices;
         vi. Preventing IFG from curing alleged defaults;
        vii. Disturbing IFG's quiet enjoyment of the leased premises; and

> > viii.   Hindering or interfering with IFG's operations.

> (9)  A declaration that IFG is not in breach or default under the lease.

*Id.*[3]   This pleading added nothing to IFG's complaints but rather was offered to clarify and simplify.  The Port answered the restated complaint and reurged its affirmative defenses but did not restate its counterclaims.  Doc. 254.  The Port's counterclaims remain viable, however, and are summarized as follows:

> (1)  Declaration that it did not breach the lease agreement and that its default notices were valid;

> (2)  Entitlement to costs and attorney fees under various theories; and

> (3)  Declaration that IFG is responsible for the charges imposed by USACE for the waste disposal site.

Docs. 37, 84, 131.

There are three main but related issues that lay at the core of this litigation and those are

> (1)  who was responsible for proper permitting with USACE so that Contraband Bayou adjacent to Berth 8 could be dredged to a depth sufficiently deep to allow use of larger vessels for the IFG facility;

> (2)  who was responsible for the cost of replacing dredge capacity at the dredge spoil area designated for use for this dredge; and

> (3)  who was responsible for assuring that the stability of the structures along the dredging area would not be adversely compromised by the anticipated deepening of Contraband Bayou.[4]

Other peripheral issues are involved but it is helpful to keep these main issues in mind when reviewing the findings of fact as those findings are given in chronological order.

---

[3] Also on June 27, 2018, IFG filed a Motion for Sanctions pursuant to F.R.C.P. rules 11 and 26(g).  Doc. 237.  This motion remains outstanding.
[4] Stability was an issue for the Berth 8 area but also for the south bottom of Berth 7 (to the west of Berth 8) and the west 100' of Berth 9 which is to the east of Berth 8 which constitutes the entire area to have been dredged for the benefit of IFG.

Perusal of the record evidences a multitude of discovery, dispositive, and other motions that were filed before trial began.  All motions for summary judgment were denied save the Port's motion concerning the MAG payment.  Doc. 370.  The matter then proceeded to trial, twenty-one days of testimony were had, hundreds of documents were introduced into evidence, and post-trial memoranda have been filed.

Considering all the above we reach the following conclusions of fact and conclusions of law.

## II.
### FINDINGS OF FACT

Based upon the testimony and documentary evidence produced at the trial of this matter we reach the following conclusions of fact:

**A.**  On or about October 31, 2003, the Port filed an application with USACE for a permit for maintenance dredging along the Calcasieu Ship Channel and Contraband Bayou located at the Port's City Docks.  P2,[5] Doc. 418, Att. 39.

**B.**  On June 2, 2004, USACE wrote the Port about its application (MVN-2004-455-WY).  P8, Doc. 416, Att. 16.  The cover letter notes that the application had been reviewed by elements of the District and it instructed the Port that "[i]t will be necessary to comply with their comments and submit, in writing and/or revised drawings incorporating their recommendations" before processing could be complete.  Attached is a comment from the Engineering Division that states "[a]ll sections shown in cross-section display proposed cuts with side slopes . . . .  *These side slopes are considered steep for this area.  . . . Recommend the applicant get the design reviewed by a qualified geotechnical engineer*."  *Id.* at p. 10 (emphasis added).

**C.**  On August 8, 2004, Ronald H. Jones with CBK Soils Engineering, Inc. issued a report addressing the USACE concern about stability.  P13, Doc. 416, Att. 21.

**D.**  On or about August 24, 2004, the USACE issued Permit No. MVN-2004-455-WY (referred to throughout this litigation as "the dredging permit") authorizing the port to "[d]redge to maintain the required draft depths for marine access" including Contraband Bayou as project location.  See Exhibit P16, Doc. 416,

---

[5] All numbers preceded by "P" and "D" are Exhibit numbers located where indicated on the docket at the designated attachment and/or page number.

Att. 25, p. 3.  "The time limit for completing the work authorized ends on **SEPTEMBER 30, 2009**," *Id.*, (emphasis in original).

The permit refers to drawings attached which reflect the Port is authorized to dredge to a depth of -37' MSL, equivalent to 35.2' MLG.[6]

E.  The permit issued pertained strictly to the right of the Port to dredge the area to a certain depth.

As Port dredging expert Christopher Accardo, Jr., made clear in his testimony, although USACE has no interest in Contraband Bayou *per se*, i.e. it is not a Federal waterway, nevertheless its dredging must be authorized by USACE permit.

F.  Additional geotechnical studies were done and on June 24, 2005, and May 2, 2006, Messrs. Dan Brown and Ronald Jones with CBK Soils issued two new reports for Meyer & Associates, Engineers, in preparation for improvements to be made in the area of Berth 8 at the Port.  P69, Doc. 418, Att. 49.  The first report "addressed the design of driven piling for the replacement of a portion of Berth 8 outboard of the existing sheet pile wall" and the second addressed "the replacement of the sheet pile wall." *Id.*, p. 21.

Mr. Jones testified at trial that he was not asked to perform nor did he perform any sort of testing to address stability issues of the structures if Contraband Bayou were to be dredged to a deeper depth of -40.  He was never asked by the Port for any assessment of any stability issue for a dredge lower than -37 MSL as approved by the 2004 USACE permit until December of 2017 discussed following finding **GGG** below.

G.  Certain upgrades to Berth 8 were engineered and supervised by Meyer & Associates starting in 2007 and completed in early 2008.  According to information provided at that time by Meyer & Associates, "[t]he dock is designed to accommodate a dredge depth of 40 feet." P24, Doc. 416, Att. 26.

---

[6]Over the years and depending on who was providing information, the "datum" references varied between MSL, MLG, NGVD, and perhaps others.  We will not attempt to understand the difference or how one converts to the other because it does not matter for purposes of our findings.  We will note, however, that use of different datum did create a problem, particularly for Channing Hayden who was the Director of Navigation for the Port in charge of permitting.  Throughout his writings and his testimony at trial he clearly had great difficulty keeping these issues in order, which in turn caused some of the difficulties and delays experienced through the permitting phase of the process.

**H.** In late summer, early Fall of 2007, IFG and the Port began discussions about a project whereby IFG would lease property from the Port upon which it would construct a facility for use to export grain through the Port of Lake Charles.

**I.** On January 16, 2008, the parties executed a Letter of Intent ("LOI") that memorialized their as-of-yet formalized agreements to proceed.  See Exhibit P25, Doc. 416, Att. 3.

The LOI indicates the intent of IFG was to develop an export grain terminal that would use Berth 8 located at the Port's City Docks for loading ships for export.  The LOI states "[t]he water depth alongside Berth 8 was 37 feet when it was dredged in 2004 and must be re-verified.  The Port agrees to take reasonable steps to work with [USACE] to deepen and thereafter maintain the depth alongside and approaching Berth 8 to 40 feet or more."  *Id.* at p. 2.

**J.** Between January 16, 2008, and March 29, 2011, the parties engaged in their respective due diligence and continued to negotiate the terms and conditions of the agreement they proposed would allow for a thirty-year lease of Port property by IFG to construct and maintain its facility to export grain through the Port of Lake Charles.  From information provided, particularly P28, Doc. 416, Att. 31, it does not appear as though the Port made IFG particularly aware of the slope stability issues raised by USACE during the 2004 permitting process.

**K.** On March 28 or 29, 2011, the Port and IFG executed a document entitled "Ground Lease Agreement," a precursor to the final agreement effective August 15, 2011.  Exhibit P59, Doc. 416, Att. 2.

Each party signed its own copy of the agreement and counsel for each party retained the copy signed its client in escrow.

**L.** In May of 2011, the Port retained the services of HVJ Associates, in particular Michael Hasen ("Hasen") to perform geotechnical engineering services in Contraband Bayou.

That geotechnical work was never performed.  Ultimately Mr. Hasen was retained by the Port to act as an expert in the field of geotechnical engineering in this litigation.  See discussion at **III** below.

**M.** From December of 2010 (before execution of the precursor to the final GLA noted above) through August of 2011, Gahagan & Bryant Associates, Inc., ("GBA"), an engineering group, conducted an analysis for the Port of the scope

of work necessary and estimate of costs to dredge Contraband Bayou to a depth of -40' MLG with 2 feet of advance maintenance and 2 feet of allowable over-depth. GBA produced:

1. A March 16, 2011, "Opinion of Probable Cost to Deepen Contraband Bayou Navigation Channel DRAFT," Ex. P55, Doc. 417, Att. 3; and

2. An August 9, 2011, "Opinion of Probable Cost to Deepen Contraband Bayou Navigation Channel REVISED from March 16, 2011." Ex. P90, Doc. 416, Att. 14.

The opinions indicate that permitting and slope stability would be issues related to the dredge.

N. In April of 2011, Port Director of Navigation Channing Hayden ("Hayden") wrote Port Engineer Donald Brinkman ("Brinkman"), copy to GBA representative Dana Cheney ("Cheney") forwarding an email from Blaine Johnson ("Johnson") with Arabie Environmental that one of the items needed for permit modification for the proposed dredging in "Contraband Bayou at the City Docks" included "[d]ocumentation *from a geotechnical Engineer that shows the new proposed contours are stable*." P64, Doc. 416, Att. 10 (emphasis added).

This supports our conclusion below that the Port was responsible for permitting for the dredging required for the IFG project and that stability to that depth was an issue.

O. On May 6, 2011, Cheney wrote Hayden asking for plans and specifications for when the channel was dredged "as well as the as-built drawings of the docks. The as-builts and the geotechnical data are essential for this task because the usace will require that we show not only the stability of the channel *but of the docks themselves due to the deepening of the channel and berthing areas*." P66, Doc. 416, Att. 11 (emphasis added).

Here is yet another clear indication that stability of the adjacent structures was a real concern that would have to be addressed and the Port knew this to be the case. On May 9, 2011, Cheney again wrote responding to the information that was provided in response to the above and commented "[t]hese plans do not provide any geotechnical data. . . . [Data provided] states that the design dredge depth is -40 and the actual depth may vary. If the design depth for the structure is only -40 feet then we may have some issues here." P68, Doc. 416, Att. 12.

P. One of the recommendations made by GBA with respect to this project was to "[o]btain existing information and as-builts on the docks and wharves along

contraband bayou [sic] ***and conduct geotechnical stability analysis on those docks***." P90, Doc. 416, Att. 14, p. 8 (emphasis added).

The Port submitted evidence at trial and argues post-trial that this activity by GBA was "related to a **wholly separate and ultimately abandoned plan** to dredge the entirety of Contraband Bayou," attempting to imply that this activity should not be construed as evidence that it intended at that time to be responsible for acquiring the appropriate dredging permit for this project. See Doc. 444, p. 25. We reject this position in its entirety. This position is belied by the GBA opinion itself where it states that "costs associated with dredging the flare and 750 feet to the west of the flare intersection with Contraband Bayou will be borne by IFG and the remaining channel to the end of Transit Shed 9a will be born by" the Port. P90, *supra* at p. 3. Clearly this work was intended to prepare for permitting for the dredge required by the contract.[7]

We find this GBA document to be persuasive on the issue of who was responsible for obtaining the appropriate permitting for the dredge but also establishes there were concerns known by the Port with respect to slope stability on the north side of Contraband Bayou where the IFG facility was to be located if the waterway was to be dredged to the desired depth.

**Q.** The Port never produced a full copy of this GBA report. Ahmad testified he was not aware of the complete report until October or November of 2017 and discovered it while reviewing third-party discovery.

**R.** If the Port had followed through with plans for amendment to its existing permit as suggested by GBA in 2011 and gone forward with recommendations to address concerns about slope stability on the north side of Contraband Bayou where the IFG facility was to be located then everything would have been in

---

[7] GBA employee Dana Cheney testified none too happily at trial and was hostile toward IFG. At trial she testified that, shortly after August 10, 2011, the day after her final report, she was informed via telephone conference with Hayden that the Port had negotiated with IFG to handle permitting and dredging themselves. This alleged conversation is documented nowhere and no time was billed to the Port during this period. Cheney's testimony at trial was that the only documentation existing of the conversation was a timeline created by her some six years after the alleged conversation while preparing to be deposed in this matter. We do not believe any such conversation ever occurred. Because we are dealing with engineers who document everything in general and further considering the amount of documentation memorializing each aspect of this project, this lack of documentation renders the assertion incredible. Her testimony also belies the Port's post-trial argument that this exercise was related to a **wholly separate and ultimately abandoned plan** to dredge the entirety of Contraband Bayou . . . ." Doc. 444, p. 25

place for IFG to conduct its initial dredge as required under the lease agreement well in time for opening of the new facility.

**S.** Ultimately the parties executed a "Ground Lease Agreement" ("GLA") effective August 15, 2011.  Exhibit P91, Doc. 419, att. 70.  This is the document that encompassed all agreements related to this project as of that time.  Of interest to this litigation are the following provisions:

1. The "Facility" is defined as land owned by the Port and leased by IFG "for the construction and development of a terminal as described in Exhibit 2 (the 'Facility')" *Id.* at p. 1;

2. "Impositions" means (i) all . . . taxes on the improvements to be constructed on the **Project Site** . . . (ii) water and sewer rents, charges for public utilities, governmental excises, levies, license, impact, ***permit and Governmental Approval fees***, and (iii) other governmental charges . . . imposed upon or become due and payable in respect of or become a Lien ***on the Improvements to be constructed on the Project Site*** . . . . *Id.* at pp. 4-5 (emphasis added).

3. "'Project Site' means the real (immovable) property described more specifically by the survey attached as Exhibit 1-A and the legal description set forth on Exhibit 1 to this Ground Lease upon which the Facility and other Improvements will be located and which real (immovable) property is owned by the District and leased by the District to the Tenant pursuant to this Ground Lease." *Id* at p. 6;

4. Paragraph 5 of the GLA is entitled "Net Lease; Taxes and Utility Expenses."  We do not recall this Section of the GLA being raised by the Port previously as evidence of IFG's permitting responsibility but the Port raises it in its Post-Trial Brief so we address it here.  The sections deemed applicable by the Port are:

   i. "Section 5.1 Net Lease.  This Ground lease is a net lease and it is agreed and intended that the Tenant shall pay or cause to be paid all operating costs and Impositions of every kind and nature whatsoever relating to **the Project Site** . . . ." *Id.* at p.10 (emphasis added).

   ii. "Section 5.2 Taxes and Utility Expenses. . . . [IFG] shall pay or cause to be paid . . . all **Impositions"** ["Impositions" defined above].  *Id.*

We do not find paragraph 5 to be applicable to the issues at hand and neither did either party until the Port filed its Post-Trial Brief.  Doc. 444.  We have scanned every substantive document filed by the Port as well as the testimony at trial for any mention of Section 5 and have uncovered no

utterance of it until the Port's Post-Trial Brief.  The Port now argues, for the first time, that the language of this section imposes the permitting obligation on IFG.

Section 5 and "Impositions" as defined in the contract pertain to **the Project Site** as defined in the contract, i.e. the leased property on which IFG constructed its facility and has nothing to do with Contraband Bayou.  We find this exercise in throwing spaghetti at the wall undermines the certitude of the Port's other arguments in attempting to avoid responsibility.

5.   Paragraph 8 of the GLA is entitled "Use."   Of importance to this litigation are the following provisions:

i.   "8.2   Permitted Uses; Compliance with Laws; Permits; Security. The Project Site shall be used by the Tenant to construct, operate and maintain the Facility for purposes of operating a Grain Terminal. . . . The Tenant's use of the Facility shall at all times be in compliance with all Applicable Laws and the Tenant shall obtain and maintain, at is cost, all applicable Governmental Approvals for the construction and maintenance of the Improvements or for the Tenant's use or activities on the Project Site. . . ." *Id* at p. 13.

ii.   "8.9   Dredging.  ***The Tenant will arrange for and complete the initial dredging of the marine area alongside the Berth No. 8 Servitude Area and the vicinity connecting the Calcasieu ship channel to this area*** (see the map attached as Exhibit 6 which shows the specific areas to be dredged) to a depth of no less than forty-two (42') feet below the low water line as measured at mean low Gulf tide.  The Tenant will only arrange for and complete this dredging one (1) time prior to the Expected Completion Date.  To offset the cost of this initial dredging the District will pay the Tenant one-half of the cost of this initial dredging up to a maximum payment of two hundred and fifty thousand dollars ($250,000).  The District will pay the Tenant this amount immediately upon completion of the dredging and the Tenant reasonably documenting the amount paid for such dredging work and upon the Tenant giving the District an invoice from the contractor performing the dredging work.  ***The Tenant or its contractor will deposit the spoil from the initial dredging, subject to the guidelines and requirements of the United States Corps of Engineers and all applicable laws, rules and regulations, at the District's dredge spoil site that is closest in proximity to the area dredged and which is available for use. The District will not assess or charge Tenant any fee for use of***

-12-

> ***the District's disposal sites***.   After this initial dredging is
> complete, the District will at its sole cost, arrange for and
> complete the dredging of the areas indicated in <u>Exhibit 6</u> for the
> entire Initial and Extended Terms of the Ground Lease to ensure
> that the depth is maintained at forty-two (42) feet and provide
> semi-annual surveys to the Tenant to show that the required
> depth is being maintained; provided, however, at any time the
> depth is forty-one (41) feet or less, the Port will promptly
> commence and diligently pursue the process to maintenance
> dredge to return the depth back to forty-two (42) feet within a
> reasonable time.   After the initial dredging, all future dredging
> and surveys of the areas indicated in Exhibit 6 will be at no cost
> to the Tenant."   *Id* at p.15 (emphasis added).

This provision is silent as to who was responsible for dredge permitting.   There is no clear

provision in either of these sections as to who is responsible for appropriate USACE permitting

that would allow IFG to perform the dredging it obligated itself to perform under the contract.

The Port has repeatedly argued that the language found in Section 8.9 "[t]he Tenant will

arrange for and complete the initial dredging" required IFG to obtain appropriate permitting from

the USACE.   We find no such thing.   If this issue was as clear as the Port suggests we would not

be in this litigation.   Conduct of both parties before and after the signing of the lease does not

comport with a conclusion that the language "arrange for and complete the initial dredging"

required IFG to secure the appropriate permitting as argued by the Port.   We therefore conclude it

was not the responsibility of IFG to secure appropriate permitting.

Also with respect to permitting responsibilities the Port also points to the language in

Section 8.2 that "use of **the Facility** shall at all times be in compliance with all Applicable Laws

and the Tenant shall obtain and maintain, at is cost, all applicable Governmental Approvals for the

construction and maintenance of the Improvements or for the Tenant's use or activities on the

Project Site" and suggests this imposes permitting responsibility on the Port.   We have concluded

elsewhere and repeat here – Section 8.2 applies only the "**the Facility**" that is defined in the

agreement as the leased property and its improvements.   It has nothing to do with Contraband

Bayou, the servitude over Berth 8, or anything else besides **the Facility.**  IFG contract counsel Mack Gregorie testified that 8.2 applied only to the project site and had nothing to do with dredging.  Even Port Director Rase admitted at trial that Section 8.2 had nothing to do with permitting.  Yet the Port continues to make this argument.

Likewise, the language "[t]he District will not assess or charge Tenant any fee for use of the District's disposal sites" means exactly what it says – the Port was to provide a disposal site at no cost to IFG and we so find.

6. Paragraph 15 of the GLA defines events of default of Tenant.

  i. Paragraph 15.1(b) defines one "Event of Default" as:

  "Breach of Covenant.  If default shall be made by the Tenant in the performance of or compliance with in a material respect of the covenants, agreements, terms, or conditions contained in this Ground Lease . . . and such default shall continue for a period of sixty (60) days after written notice thereof from District to the Tenant specifying the nature of such default and the acts required to cure the same, or, in the case of a default which cannot with due diligence be cured within such period of sixty (60) days, the Tenant fails to proceed with all due diligence within such period of sixty (60) days, to commence cure of the same and thereafter to prosecute the curing such default with all due diligence (it being intended that in connection with a default not susceptible of being cured with due diligence within sixty (60) days that the time of the Tenant within which to cure same shall be extended for such period as may be necessary to complete the same with all due diligence)."  *Id* at pp. 23-24;

  ii. Paragraph 15.3, "District's Remedies; Cure," includes under subparagraph (b) the following:

  "Right to Cure.  Upon the occurrence of an Event of Default, the District may, after an additional fifteen (15) days written notice to the Tenant, take whatever actions as are reasonably necessary to cure such Event of Default, including the hiring of attorneys, contractors, consultants, architects, engineers, or laborers, purchasing the required goods or services and procuring necessary insurance. The Tenant shall be responsible for all costs, including attorney's fees and the fees of other professionals, reasonably incurred by the District pursuant to

-14-

this Section and such costs shall be billed to the Tenant in addition to any and all rent due hereunder. The District shall provide to the Tenant an itemization of such costs and the reasons therefor. The Tenant shall pay all such additional costs and charges within thirty (30) days after billing by the District." *Id* at p. 24;

7. Found under Section 24 of the GLA, which is entitled "Miscellaneous," is included the following:

    i. "24.7 <u>No Oral Change or Termination.</u> This Ground Lease and the exhibits appended hereto and incorporated herein by reference contain the entire agreement between the Parties hereto with respect to the subject matter hereof, supersede any prior agreements or understandings between the Parties with respect to the subject matter hereof, and no change, modification, or discharge hereof in whole or in part shall be effective unless such change, modification, or discharge is in writing and signed by the Party against whom enforcement of the change, modification, or discharge is sought. This Ground Lease cannot be changed or terminated orally." *Id* at p. 30;

    ii. "24.10 <u>Litigation.</u> In case of any litigation between the Parties hereto regarding the subject matter hereof, the losing Party shall pay all reasonable costs and expenses (including reasonable attorneys' fees) of the prevailing Party." *Id* at p. 31.

Based upon the totality of the evidence adduced at trial through testimony and documents, nothing in the lease required IFG to obtain a dredging permit from USACE to complete its obligation to dredge Contraband Bayou as required by the contract.[8] We further find that at no time prior to execution of the lease did either party anticipate that it would be the responsibility of IFG to obtain USACE permitting for dredging.

    **T.** At some point shortly after execution of the GLA the parties agreed that it would be premature to begin dredging contemplated by the GLA until some

---

[8]Daniel B. Loughney, Director of Marketing and Trade Development for the Port, was instrumental in obtaining IFG's business. He was involved in discussions leading up to execution of the GLA. He also dealt with IFG until he was instructed to stop by Port general counsel who further instructed him to go through Port litigation counsel to deal with IFG. Loughney testified that permitting for the dredge was the responsibility of the Port. In an effort to impeach his damaging testimony, Port litigation counsel belittled Loughney, suggesting his job was one of "cheerleader." Counsel further attempted to suggest that Loughney's testimony was biased in favor of IFG from whom he was currying favor. Loughney was understandably insulted by the line of questioning that purported to impugn his integrity. The Port's attempt to marginalize Loughney was not successful. We found his testimony to be credible.

time closer to completion of the project as premature dredging would only require maintenance dredging before the entire project, including completion of the facility, would come to fruition.  P227, Doc. 419, Att. 14[9].

**U.** On December 18, 2013, the parties entered into a First Amendment To Ground Lease.  P109, Doc. 416, Att. 4.

According to William J. Rase, III, ("Rase"), Executive Director of the Port, the purpose of this amendment was to narrow the channel from 300' wide to 250'.  According to IFG principle Kabir Ahmad ("Ahmad"), this narrowing addressed concerns raised by the river pilots over structures proposed to shore up a road located on the south side of Contraband Bayou necessitated by the greater width.  This document confirms that modification of the lease was to be in writing as required by Section 24.7 of the lease.  Nothing was changed from the original lease that pertained to obligations related to a dredging permit or obligation to pay any USACE charges for rendering a disposal site available for use by IFG.[10]

**V.** The parties returned to the issue of dredging and permitting for that dredging in or around April of 2014.

Communications between the parties during this time period indicate clearly that, from that point through January 21, 2015, IFG and the Port were anticipating the dredging would be allowed under the existing permit, Permit No. MVN-2004-455-WY.  Whether the Port simply forgot it had already commissioned GBA in 2011 to perform work preparatory to obtaining an amended permit

---

[9] The exhibit listed is correspondence from IFG to the Port dated October 9, 2015, wherein Ahmad corrects falsehoods contained in the Default Notice issued by the Port and discussed in greater detail below.  In that correspondence, which we conclude in finding **LL** below is an accurate recitation of the events that occurred, IFG states that in meetings between IFG and the Port before 2014 "one of the key items we agreed on was the fact that it was imprudent to dredge the relevant area too soon in advance of regular vessel traffic relating to the new IFG Export Grain Terminal because without regular vessel traffic the berth areas at City Docks will 'silt-up' again." *Id.*, p. 1.  Although Port Director Rase never admitted at trial that the parties agreed to this delay, he did finally (and only after intervention of the court in questioning to compel him to answer the question), begrudgingly, admit that delay would make sense because the channel would silt up during the construction process and the Port would be required to perform a maintenance dredge.

[10] Recall at fn. 7 we discuss the implausible testimony of Dana Cheney who claims that shortly after August 10, 2011, she was informed via telephone conference with Port employee Hayden that the Port had negotiated with IFG to handle permitting and dredging issues themselves.  If there had been such a change in arrangements, why would that information have not been included in this written amendment to the lease?  It would have been included.  No such change in arrangements was made.

or whether, for some reason, it now believed its existing permit would suffice to allow IFG to dredge was never explained and is really of no moment to considerations here.  Actions and communications of the parties from inception of the project discussion up to this time period make clear the Port was responsible for obtaining approval from USACE for the dredge which would include having the appropriate permitting.[11]  Communications between IFG and the Port during this time show clearly that IFG was timely and appropriately asking about permitting and was being assured that the Port was handling the issue of renewal of the existing permit.  *See*, for example, P436, Doc. 416, Att. 75.[12]

And no communication during this time indicates that the Port was concerned about stability issues involving dredging to deeper depths and nothing indicates that the Port at this time suggested to IFG that it should be concerned about stability issues.

> **W.** On April 17, 2014, Ahmad wrote to Rase and stated "[o]nce I get the Port's approval, I'll get to work finalizing the initial dredging, permitting, scheduling, etc."  P124, Doc. 463, Att. 2.

The Port refers to this e-mail repeatedly in post-trial memorandum as proof that IFG knew it was to obtain permitting.  At trial Ahmad acknowledged the words he wrote but stated this was no alteration of the responsibility for permitting and he never heard a suggestion that it was until the parties were in litigation.  We find that this isolated correspondence does not interrupt the flow of all previous and subsequent communications showing clearly that the Port it was responsible for believed appropriate permitting.

> **X.** On December 5, 2014, the Port's existing permit was extended to November 30, 2019.

---

[11] The sole exception to this statement is the email discussed in finding **W.**
[12] IFG dredging expert Daniel McDougal also testified at trial that his review from the various communications throughout this period gave the impression that the Port was handling the matter of obtaining the appropriate dredging permit.

That permit was forwarded to Port personnel and IFG by Hayden, the Port's Director of Navigation, by e-mail dated the same date with the notation "dredging can begin."  P161, Doc. 416, Att. 48.  The permit mentions nothing about any additional steps that must be taken with USACE to allow for dredging deeper than the previously approved level or for disposing spoil material from any dredge to a USACE controlled placement facility.

> **Y.**  In early January of 2015, IFG contacted the Port to determine what spoil areas would be available for use by IFG for the initial dredge.  P165, Doc. 422, Att. 16.

As noted above, Section 8.9 of the GLA requires IFG to

> deposit the spoil from the initial dredging, subject to the guidelines and requirements of the United States Corps of Engineers and all applicable laws, rules and regulations, at the District's dredge spoil site that is closest in proximity to the area dredged and which is available for use.  The District will not assess or charge Tenant any fee for use of the District's disposal sites.

According to the Port, after conferring with USACE, the sites available were "DA 1, DA 2 and DA 3 (Cloony Island)."  P168, Doc. 422, Att. 18.  Nowhere in any of these communications is there any suggestion that IFG would be required to make improvements to these areas or pay the Port to pay USACE to be allowed to use those sites to deposit dredge spoil.

> **Z.**  On January 21, 2015, a conference was had between the Port and USACE.  In that meeting or shortly thereafter USACE stated definitively the existing permit was not adequate to allow for dredging required under the GLA.

Just following the January 21, 2015, USACE conference, IFG and the Port continued to work collaboratively and cooperatively to attempt to address the issue of dredging.  At this point the IFG facility was nearing completion and would be ready to begin shipping.  An e-mail dated January 26, 2015, from Hayden to Ahmad, copies to Rase and other Port personnel, evidences chagrin of Port personnel that this unfortunate event occurred.  See P182, Doc. 416, att. 49.  In it, Hayden says "please know that the Port is quickly gathering the information needed to amend the dredging

permit." *Id.*  After detailing the multiple tasks necessary to have the permit amended, Hayden concludes "the information you have concerning the dredging project (engineering, design, sampling, testing, etc.) will be very helpful in expediting the permit amendment process."  *Id.* Neither the tone nor the content of this communication comports with bold assertions made later by Port general counsel as to what were the undisputed (to him) obligations between the parties. To this communique' Ahmad responds:  "This is all a helpful yet discouraging update. . . . In the interest of time and to make sure we are not incrementally adding additional hurdles, it is important to establish a unified game plan and move forward.  I am concerned that if we are not on the same page at this stage any missteps could cost us many more months."  P183, Doc. 419, Att. 12, p. 1.

Not long after the January 21, 2015, USACE conference and these missives, however, the position of the Port regarding the respective responsibilities for permitting began to change.

**AA.**  From the time of the January 21, 2015, USACE conference through the summer of 2015, the Port was engaging its engineers, GBA, to address the issue of permitting.  For reasons unknown and again difficult to imagine, the Port did not share its correspondences with IFG during this time.

**BB.**  On January 27, 2015, Hayden communicated with Ahmad and transmitted the results of his (Hayden's) consultation with GBA (by cutting and pasting the into his own document) on the steps necessary to obtain the requisite permit. P186, Doc. 417, Att. 12.

It is clear from this communication that it is the Port itself that is attending to the permitting problem.  In it Hayden states "[t]he Port has authorized GBA to begin work on amending our permit and we will keep you updated as the process continues.  *Id.*, pp. 1-2.

Also, at item number 6 the Port states "Stability analysis of Berth 8 – available through the Port."  *Id.* at p. 1.  No such stability analysis was available through the Port or otherwise as one had yet to be conducted, a fact supported by testimony as well as an e-mail communication between Hayden and other Port personnel dated July 16, 2015, in which he states "[t]hough we are

requesting a permit to dredge to -42 feet MLG, we do not yet know if Berth 8 will structurally accommodate that depth." P212, Doc. 416, Att. 32, p. 1.

The work begun by GBA at this time was a call back to and refinement of the work they had done previously when the GLA was being drafted.  See discussion at finding **M** above.  The missive concludes with "[t]he Port has authorized GBA to begin work on amending our permit and we will keep you updated as the process continues."  *Id.*, pp. 1-2.  This language hardly comports with the assertions made later by the Port that permitting was always the responsibility of IFG.

> **CC.**   On March 4, 2015, Michael K. Dees ("Dees"), general counsel for the Port of Lake Charles, wrote to Ahmad setting forth a plan for amending the existing permit.  P198, Doc. 419, Att. 13.

Ahmad testified at trial that it is at this point the Port began its efforts to shift the cost of permit amendment to IFG.  Part of the Port's plan for IFG was for IFG to retain the services of "URS/AECOM (or other entity you want to choose)" to conduct core sampling necessary as a preliminary part of the permitting process.  *Id.*  This would be the initial phase of the permitting plan formulated by GBA which, according to Hayden in his January 27, 2015, missive to IFG (discussed in **BB** above) was to be performed by GBA.

> **DD.**   On April 20, 2015, the Port entered into a Project Partnership Agreement ("PPA") with USACE.  P201A, Doc. 447, Att. 16.

According to Tracy Falk ("Falk"), supervisory civil engineer for USACE overseeing the operation of maintenance of the Calcasieu River Ship Channel, this agreement would require entities other than USACE to replace capacity used when using USACE space to place dredge material.  Falk referred to this as a "new direct retail management plan." P385, Doc. 422, Att. 1, p. 86.  This plan was not in existence when the lease agreement was developed and signed and neither was it in existence when the Port learned that its existing dredging permit would not allow for IFG to dredge

to the agreed-upon depth.  According to Falk, before implementation of the PPA USACE did not require anyone to build additional capacity "because that was done under the old rules . . ." *Id.* at p. 104.  This is also in line with the testimony of Port USACE permitting and use of disposal sites expert Christopher Accardo, Jr., who stated that USACE has become more aggressive in recent years to recoup capacity being taken from disposal areas designated for its use.

In short, prior to the Port's entering into this PPA with USACE on April 20, 2015, there would have been no charge imposed by USACE for improvement to the dredge spoil deposit site made available for use to IFG, a charge sought to be imposed by the Port on IFG as discussed below.

> **EE.**   From January of 2015 and throughout that summer the Port was working internally, with USACE, and with its engineers at GBA to determine what needed to be done and these discussions included questions about the stability on the north side of Contraband Bayou where Berth 8 is located.  None of these internal communications were shared with IFG.

It is unfathomable why the Port would withhold this valuable information from IFG especially when, as the Port later contended, sole responsibility for obtaining the necessary permit belonged to IFG.  IFG dredging expert Daniel McDougal testified he had no idea why the Port would not have involved IFG in these discussions – he could fathom no normal business purpose that would have them handle this matter in this fashion.  If the Port had shared that information, even at this late date, then IFG would have also known there existed a question mark as to whether the facilities adjacent to the dredging area would be stable if Contraband Bayou were dredged to the new depth.

> **FF.** On July 16, 2015, Hayden wrote to Port personnel and Port contracted engineers, GBA, attaching a draft Scope of Work necessary to obtain the permitting needed to dredge to the depth mandated in the contract.  P212, Doc. 416, Att. 32.  In that email Hayden states "[t]hough we are requesting a permit to dredge to -42 feet MLG, we do not yet know if Berth 8 will structurally accommodate that depth."

Attached to that email is a string of emails between Hayden and others, particularly Chuck Stutes with Meyer & Associates, project engineers for the 2007-2008 upgrade to the Berth 8 area discussed in finding **G** above.  In that email Stutes says "[i]n discussing with Larry LeBlanc, the structural engineer on the project, his recommendations are to limit dredging to -40 as the piling lengths were selected for this maximum bottom surface." *Id.* at p. 2.  Again, this information pertaining to stability was not shared with IFG though obviously well known to the Port.

> **GG.**   The IFG facility was completed in July of 2015.  No permit had been issued by USACE that would allow IFG to dredge as it was required to under the GLA.

Tensions between IFG and the Port during this time were escalating.  We make as a specific finding of fact that these tensions were a direct result of the Port acting in a non-transparent manner with IFG on the permitting process, the Port withholding information from IFG which would have allowed it to more fully participate (in an informed manner) in the permitting process, and the inception of the Port's mischaracterization of events leading up to that time as to which entity was responsible for what action.

> **HH.**   Donald J. Brinkman ("Brinkman"), Port Director of Engineering, testified that, at some point between July 16, 2015, and September 30, 2015, he was asked to perform calculations on an erase board ("erase board calculation").  These calculations were subsequently erased with no documentation of the details of the calculation.  Those calculations formed the basis of the Port's subsequent representations that the proposed dredge would not create any stability issues with structures on or near Berth 8.

Brinkman is not a geotechnical engineer and neither did he consult with any geotechnical engineers when he conducted this exercise.  As we see following, the erase board calculation is what the Port relied upon to claim that stability of the structures on the north shore of the proposed dredge area was not an issue.  The fact that the Port's assurance was grounded on the erase board calculation was not known to IFG until Brinkman was deposed July 23, 2018.  Not a single engineer who

testified in this litigation agreed that this type of an exercise would be appropriate to close the issue

of stability of improvements adjacent to Contraband Bayou when dredged to the desired depth.

Brinkman was called as a witness by IFG and testified (evasively and in a hostile manner)

that the evaluation was done for internal purposes.  He also testified that not once during his tenure

with the Port[13] was he ever asked to make a safety calculation involving geotechnical issues in

dredging to a particular depth.  He also stated that his calculation considered dredging only to 42'

related only to the area of Berth 8 (so did not include the entire dredging area), and did not consider

long-term stability.

> **II.** On August 5, 2015, Dees wrote Isaac M. Gregorie, Jr., ("Gregory"), IFG lease
> counsel, and advised "we have the geo-tech engineers that worked to develop
> the details of the upgrade of Berth 8 in the late 1990s re-looking at calculations
> and numbers and there may well be a determination that the 42 mean low gulf
> standard of the lease can be met without a safety concern to the dock."  P215,
> Doc. 416, Att. 53.

Brinkman testified at trial that he did not recall speaking at that time with any geotechnical

engineers "looking" or "re-looking" at calculations and numbers to determine whether there could

be dredging to the desired depths without safety concerns.  This representation made by Port

general counsel was false.

**JJ.** Ahmad testified that he met with Rase on a Saturday near this time period.

According to Ahmad, Rase, in Ahmad's words, wanted to renegotiate certain terms of the lease

such as IFG paying for part of the rail costs being incurred by the Port.  Rase also mentioned

concerns expressed to him by Farmers Rice Milling Company, LLC, ("FRM"), a customer of the

Port that had previously exported rice through the Port and would now, because of the lease, be

required to use the IFG facility.   FRM was complaining to Rase about its inability to come to

terms with IFG on a defined user agreement that would then allow it to export.

---

[13] His employment with the Port began in 2007.

      **KK.**   On September 30, 2015, Rase signed and forwarded correspondence addressed to IFG and IFG lease counsel Gregorie. P225, Doc. 429, Att. 4. This correspondence is referred to hereafter as "the Default Notice."

It is at this point where the Port exhibits its new and improved construct. We find the following statements made in the Default Notice to be false:

      1.   "IFG was free to begin dredging Berth No. 8 pursuant to Section 8.9 and Exhibit 8 of the Ground Lease as of [January 1, 2012, the Ground Lease Commencement Date]; however, IFG chose to take no action or even discuss dredging relative to Berth 8 and Contraband Bayou until January 2015, a mere six months before the Rent Commencement Date. . ." *Id* at p. 1.

We find specifically that IFG was **NOT** free to begin dredging at the specified date because, as of that date, the existing dredging permit would not allow for the dredging required under the contract. This fact was exceedingly well known to the Port and its insertion of this language into this Default Notice is offensive and unscrupulous.

      We further find specifically that the parties agreed early on following the execution of the lease agreement that it would be in the best interests of all, particularly the Port, to delay dredging until closer to the time of completion of the facility as silting would necessitate maintenance dredging (to be paid for by the Port) before the facility opened. See finding at **T** above. The Port omitted this fact from the Default Notice.

      We further find specifically that the statement that "IFG chose to take no action or even discuss dredging relative to Berth 8 . . . until January 2015" is patently false and belied by the electronic communications between the parties. See finding at **V** above.

      2.   The second through fifth paragraphs of the Default Notice misstate events that occurred during the relevant time period and were phrased by the Port, we find, to specifically imply that IFG acted improperly and in bad faith, a characterization we specifically find to be false.

In this portion of the Default Notice the Port implies that IFG agreed to dredge under the current permit on or about February 12, 2015, in a "two phase" approach to addressing the dredging issue.

What actuality occurred was that IFG was attempting to appease the Port's growing hostility and agreed to take certain steps, such as having core sampling performed by an entity recommended by the Port (an entity identified by the Port initially as URS but which had changed its name to AECOM) only to have the Port turn around IFG's agreement as some sort of nefarious conduct by IFG.  The Default Notice states as follows:

> Further, subsequent to February, 2015, IFG selected AECOM to perform required sampling of the area to be dredged and the test results produced for inclusion in a required Corps permit amendment were vastly out of character with prior sampling results performed by others.  In order to not submit what appeared to be erroneous sampling and testing data to the Corps of Engineers, The District, after notice to IFG, secured a [sic] another sampling and testing contractor and, at a cost of $66,000.00, obtained new testing data what shows that the AECOM produced data was in error.  As a result of the error of the [sic] AECOM, the amendment to the permit that IFG is required to obtain through the District under Section 8.9 could not be obtained and the dredging IFG is obligated to undertake has not occurred. In addition, the submission package provided by AECOM to the District to amend the District's dredging permit does not meet Corps requirements and needs additional work to make a suitable presentation to the Corps.

*Id*. at p. 2.  This paragraph and its patent mischaracterizations of events illustrates quite nicely how the Port chose to paint the actions or inactions of IFG in a manner that was false and led directly to the two entities to work at odds with each other.  Since late January of 2015 and up to this point the Port has exhibited no effort to simply resolve this issue collaboratively and in short order for the good of both.  It did just the opposite.

AECOM was selected by IFG from a list of three provided by the Port.  See finding at **CC** above.  Whether AECOM's results were erroneous or not – a fact not established at trial – is not the fault of IFG as the Port suggests in this paragraph.  AECOM was hired as an expert.  Experts perform in their field of expertise.  Why the Port would suggest that IFG's selection of AECOM or AECOM's alleged erroneous results are somehow evidence of malfeasance or bad conduct of IFG is puzzling.   The Port obviously chose to ignore the AECOM results and obtain new

samplings, something perfectly within its rights.  But to use that sequence of events to suggest that IFG was not performing under the contract is unscrupulous.

      3.    Additionally, the claim that "IFG is required to obtain [the dredging permit] under section 8.9 [of the lease agreement]" is false.

As we find specifically at **S** above, section 8.9 of the lease agreement is silent as to responsibility for permitting for the dredge, yet the Port states it as an accepted fact.  As we note throughout this opinion, the communications and actions of the parties from inception of their dealings through January of 2015 indicate the Port was responsible for permitting and at no time prior to this point did IFG contemplate or agree that it would obtain its own, standalone permit as the Port has claimed it did.[14]

      4.    The Default Notice also says "[f]or your information, the District has determined that there are no geotechnical restrictions related to the wharf and dock facilities adjacent to the area to be dredge and, upon issuance of the required Corps permit amendment allowing for dredging to a depth of -42 feet MLG, the dredging IFG is required to perform can proceed." *Id.*

As we note in our discussion at finding **HH** above, IFG learns much later in this litigation that this assurance was a result of the "erase board calculation" made by Port engineer Brinkman.  As we also previously note there was no record kept of that calculation --- no photograph, nothing.  Not a single expert that was asked agreed that such a perfunctory, undocumented exercise would

---

[14] For IFG to have agreed to obtain its own USACE permit to dredge would be nonsensical.  The Port already had a permit – all that was necessary was an amendment.  Wendell Mears with Anchor QEA (that assisted IFG with permitting after IFG succumbed to the will of the Port and agreed to be responsible for paying for the steps necessary to amend the Port's existing permit as discussed following) testified that amendments to existing permits was a more efficient and shorter process than going through a new, independent permit application.  D224, Doc. 452, Att. 1, p. 23.  GBA employee Dana Cheney described applying for an amendment to an existing permit as "the path of least resistance."  She said "a standalone permit application would take longer than amendment."  Further, the Port would still have had to obtain its own permit to fulfill its obligations to maintain the channel depth required by the contract per Hayden's testimony at trial.   The Port provided its own expert Christopher Acardo who testified that it was certainly possible for IFG to have obtained its own permit but that does not mean it would be practical or efficient.

suffice as a credible geotechnical determination supporting a finding of suitable stability for this project.[15]

Not only was the statement false but it was dangerous.  This issue of what impact a dredge might have on adjacent facilities and the extent to which a dredge could undermine that stability is a critical one.  Dredging activity that undermines the stability of adjacent facilities could lead to catastrophic failure which in turn could lead to loss of property or, more importantly, life, or both.  Yet the Port, in quite a whistling past the graveyard fashion, took the position that this critical consideration was satisfied by an off-the-cuff estimation made by one of its in-house engineers for which it retained no documentation.

At this point any question about which entity would have been responsible for assuring stability of the improvements should Contraband Bayou be dredged to its desired depth is moot – from this point forward the Port owned the issue of stability.  It is ludicrous for the Port to suggest that IFG or anyone else had a responsibility to go beyond the clear statement.  At that point anyone had the right to assume the Port handled this issue in a professional manner and should not be concerned about stability of the adjacent structures resulting from the deeper dredge.   When the Port volunteered this information it should have disclosed the entire truth, including the process by which it reached its conclusion.  As we find later the Port vociferously fought production of information on this issue for reasons entirely unknown but for no legitimate business purpose.  See discussion at findings **GGG, HHH,** and **JJJ** below.

In Post-Trial Brief the Port argues (as it suggested during the trial) that this stability issue was a non-issue.  There the Port argues:

---

[15] As IFG dredging expert Daniel McDougal phrased it, "I don't know any engineer in the world that would say that's okay."  Port geotechnical expert Michael Hasen also testified at trial that this is not consistent with good engineering practices.  "I couldn't seal that" he said.

> [IFG] began to claim in November 2017 that it was unable to dredge because of alleged – an unfounded – dredge depth concerns IFG allegedly had about the safety of dredging beyond 40' in front of Berth 8.  Although the Port has always rightly maintained that Berth 8 could safely withstand dredging to 44', and IFG has now begrudgingly agreed with that conclusion, it claims that the delay caused by its apprehension about doing so resulted in more lost profits from more Panamax ships.

Doc. 444, p. 69[16].  There is not a single expert who testified that stability was not an issue.  The November 2017 incident referred to is discussed at **GGG** below was a letter written by IFG counsel after IFG learned the stability issue had been raised by Meyer & Associates near the time it engineered the 2007-2008 improvements to Berth 8 discussed at finding **G**.  There was no "begrudging[] agree[ment]" by IFG that the Port "has always rightly maintained that Berth 8 could safely withstand dredging to 44'" as the Port argues.  What ultimately happened as discussed in finding **LLL** below is that the parties finally stipulated on the last day of trial that the dredging area was sufficiently stable to permit the dredging and even that was only after the Port geotechnical expert completed an assessment of the entire dredge area just prior to the inception of trial.

We reject the Port's argument and innuendo through examination and cross-examination of witnesses that nothing precluded IFG from assuring the stability of the dredge area.  We also specifically reject the "all's well that ends well" approach.  Once again, we are confounded by the Port's actions, why the Port would make this statement in the Default Notice as to stability of the dredge area, a declaration that ultimately delayed the dredging project for a considerable period.[17]

---

[16] This is in the portion of the brief where the Port purportedly was responding to the issue of damages.  Most of that section was a regurgitation of the same arguments the Port has repeatedly made – and that we have rejected here – that it was not responsible for permitting, it was not responsible for assuring stability of the area adjacent to the dredge, etc.

[17] We could surmise the Port acted in this manner to avoid the cost of the analysis and this further substantiates our conclusion that the Port believed itself to be responsible for all but the actual dredge.  But how reckless and foolish this was.  For the sake of saving many thousands of dollars – not that much money in the grand scheme of this project – the Port was willing to roll the dice on whether the facilities adjacent to Contraband Bayou could withstand the deeper dredge.  Alternatively, we could surmise that the Port did this purposefully, to hold this information back to

This statement made by the Port was false and substantially injurious as it further delayed the dredge as we discuss more fully below.

We find factual statements in the Default Notice to be untrue and its issuance unwarranted.

> **LL.**   IFG responded to the Default Notice through correspondence dated October 9, 2015, setting forth its own characterization of events as they occurred leading up to its issuance and specifically refuting the version set forth by the Port in the Default notice.  P227, Doc. 419, Att. 14[18].

After hearing the testimony of the witnesses at trial and considering the documentary evidence submitted, we find IFG's presentation of the events as reflected in this document to be accurate. The facts recited in that correspondence, most of which are found elsewhere in this opinion as true, absolutely refute the ruse attempted by the Port in its Default Notice.

We particularly note IFG's entreaty that the parties "directly engage in good faith discussions to quickly address this matter so that the required dredging can be accomplished."  *Id.* at p. 4.  This simple request went unheeded.  According to the testimony of Ahmad, the Port never responded to his version of events as stated in P227 and shortly thereafter the Port forwarded the Default Notice to IFG's lender creating difficulties between the two.

> **MM.**   On November 3, 2015, Dees wrote Gregorie outlining seven items that the Port "would like to address and mutually resolve by final written agreements." P232, Doc. 416, Att. 39.  ***Only after those issues were "mutually resolved, agreed upon and confirmed by written agreement" would the Port suspend the default notice.*** *Id.*, p. 2.  Only one of the seven items dealt with dredging – the one item for which the Port declared IFG to be in default in its notice.

The seven items the Port demanded be resolved were as follows:

> 1.   Agreement on the rent, dates, CPI adjustment periods, etc. . . .

---

intentionally further delay the project, perhaps in the hopes that IFG would abandon the project, i.e. that this was a furtherance of the Port's effort to run IFG off the premises.  See conclusions reached at Section IV.B below.  This certainly was done for no legitimate business reason.  Regardless of why the Port did this, the fact that it did we find immoral, unethical, oppressive, unscrupulous, and substantially injurious.

[18] This correspondence is also discussed at fn. 9 as evidence that the parties agreed to delay the initial dredge until the IFG was nearing completion.

2.  Full and complete repair and restoration to the same state that existed before IFG began construction of the ground level transformer located adjacent to the IFG lease premises and which was destroyed by IFG contractors during construction. . . .

3.  The IFG ship loader structure extends beyond Berth 8 outside of the current easement area as described in the Ground Lease.  . . .

4.  During construction, IFG requested that it be allowed to construct the ship loader structure at a location closer to the water and vessel berth area.  . . .

5.  IFG (Kabir) and Bill – post signing of the Ground Lease – has [sic] discussions that IFG would contribute to the new Port constructed road that IFG incorporated into the main routing now into the IFG terminal.  . . . After the road was built-IFG changed its plans and layout so that all terminal truck traffic will utilize the new road solely constructed by the Port at a cost exceeding $1.0 million.  Kabir has told Bill he would contribute to this cost.  This needs to be finalized and accomplished.

6.  After the dredging work is accomplished . . . the Port . . . owes IFG a payment of $250,000.00.  Subsequent to the signing of the Ground Lease the Port undertook certain dredging of Contraband Bayou that reduced the amount of Dredging that IFG must do.  Bill and Kabir talked and Kabir advised he would be willing to reduce the $250,000 number because of the dredging assistance provided by the Port after the Ground Lease was signed.

7.  Finalization of a mutually agreeable Defined User agreement/permit arrangement that is also acceptable to the milled rice users and rough rice users who were involved in the negotiation of the Through Put Agreement . . . .

So instead of working collaboratively and with the common goal of obtaining the permit so that dredging could take place, action that would benefit both parties, the Port chose to use this Default Notice and the legal ramifications that flowed therefrom to wring concessions from IFG to which it had never previously agreed.  By Dees' own admission in testimony at trial, the only "item" contained in this list of demands by the Port that in any manner relates to the issue of dredging is item 6.  Gregorie testified at trial that, throughout negotiations to resolve the default issues prior to this suit being filed, the Port was unwilling to separate dredging issues from the extraneous concessions being sought by the Port. In a twisted effort to explain its conduct with respect to this Default Notice and the items that had nothing to do with dredging that, according

-30-

to the Port, must have been addressed before the Port would lift the Default Notice, Port general counsel Dees testified:

> Mr. Gregorie had expressed a concern that the default notice September 30th, 2015, was causing issues with the lender and he wanted to -- the Port to agree to withdraw the notice. My position was withdraw meant the default was cured so in an effort to try to compromise and alleviate the problem I proposed that there be a suspension while we work on those other issues and there was never in the discussions with Mr. Gregorie and I a demand that for instance IFG pay a million dollars for the road. It was just there had been a promise that something would be done and we wanted to try to get that those items addressed and that was true as to each of those items and these items were things that had just arose over the life of the construction of the facility.[19]

This truly clarifies nothing.  After being pointedly questioned by the court during the Port's case in chief, Dees finally admitted that the cost of the road had nothing to do with the dredging issue. So despite having written in its letter the Port stated affirmatively that only after those extraneous issues, including cost of the road, ***"mutually resolved, agreed upon and confirmed by written agreement" would the Port suspend the default notice."***  *Id.*  But then Dees testified at trial that these were "simply issues that we wanted to address" while dredging was being worked on – no big deal.  We reject the Port's characterization of this correspondence and this line of thought given in argument and testimony at trial.  We find this conduct by the Port to be nothing less than extortion which, by definition, offends public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious.

Noteworthy at this juncture is Dees' apparent personal animosity toward IFG, clear from his demeanor during his trial testimony and through documentary evidence produced.  See, for example, an e-mail between Dees and Port personnel where he (Dees) makes clear there would be no extension of the default without full compliance with the terms discussed above (even the ones

---

[19] There has yet to be produced an official transcript of the testimony, but an unofficial transcript was prepared at the request of the court.  It is from that unofficial transcript this quotation is lifted.

having nothing to do with the grounds for issuance of the notice).  He states that he and Gregorie "are very much lined up on most things but [Gregorie] has to 'talk to [Ahmad]'.  On the things like the road and early Port dredging – everything [Ahmad] told you [Rase] was BS.  [Ahmad's] position today is he never agreed to pay anything."  P234, Doc. 417, Att. 1.  See also Dees' response to an e-mail from James Warshaw ("Warshaw"), at the time general manager for Farmers Rice Milling.  P218, Doc. 440, Att. 39.  In this e-mail, which predates the Default Notice, Warshaw seeks to verify the address for Ahmad as he had not received a response to an inquiry.  To this Dees responds that Ahmad "refuses to communicate with me and others at the Port also."  Evidence adduced at trial proves categorically that Port counsel's statement is not true.  In the final e-mail of that chain. Warshaw asks, perhaps rhetorically, perhaps not, "[w]hat leverage do we have to not allow him to become operational until we are able to work through all the issues."[20]

By contrast we have not seen a single discourteous comment made by IFG in writing.  The demeanor of its principal Ahmad at trial was calm and courteous and gave us no basis for doubting his credibility or questioning of his version of events.  It appears that, throughout this most difficult time, Ahmad was doing what he could to cooperate with the Port, to not escalate what was

---

[20] See also a series of emails dated March 9, 2016, between Port counsel and counsel for the firm that represented FRM whose (seemingly) tangential involvement in this litigation is discussed below and in the following footnote 22. P470B, Doc. 419, Att. 6.  The first in the series has Port counsel disdainfully referring to this litigation as IFG asking "Judge – stop the Port from being mean to me" and then claims IFG "refused to repair $250,000 in damages until we put in default" (referring to the transformer issue discussed below which we also determine to be a bogus issue manufactured by the Port).  That first in the series goes on to state "IFG still has not undertaken or even filed for Corps permit to undertake Contraband Bayou dredging required by the Ground Lease.  That was to have [been] completed by July 15."  This is a false characterization of events as we determine above although in line with the construct being perpetuated by the Port at that time.  In response FRM counsel posits "I wonder if his tactics could be made public anonymously via the internet to alert others who might see it during due diligence" and Port counsel responds "[n]umerous liens filed with clerk[.]  Triad Electric - $1.0 million."  Id.  To that information FRM counsel states someone told him Ahmad "paid a number of subs quickly after getting political pressure" to which Port counsel responds "[t]hree or 4 a while back when've [sic] was getting special incentive legislation.  Once he got that – everybody has only gotten the finger."   It is difficult to understand why Port counsel would engage in such a sophomoric whisper campaign against IFG.  This would clearly not qualify as a *fair* business practice.  Additionally, Port counsel appeared to be so invested in this litigation that he attempted to insert himself as trial counsel during questioning of IFG geotechnical expert Stark necessitating admonition by the court.

becoming a volatile situation, and was willing to consider whatever options the Port proposed (within reason) to remedy the situation.  We have also seen repeatedly that these efforts to engender good will with the Port were later used by the Port to excoriate IFG or improperly attempt to prove the parties' agreements before January of 2015 when they learned there was a problem with permitting.[21]

> **NN.**   A meeting of the Board of Commissioners of the Lake Charles Harbor and Terminal District was held November 16, 2015.  P243, Doc. 418, Att. 62.

At that meeting, with general counsel present and no notice having been given to IFG and no motion having been made to allow the commissioners to take up any matter not listed on the agenda, the Port allowed FRM executive Jamie Warshaw ("Warshaw") to speak.[22]  This is a direct violation of the Louisiana Open Meetings Law which offends established public policy.  La. R.S. 42:11, *et. seq.*[23]  The commissioners allowed Warshaw to berate IFG in public without IFG being

---

[21] A perfect example of this point is found in Appendix A to the Port's Post-Trial Memorandum.  In the following finding **OO** we note that IFG agreed to pay the cost of obtaining the amended permit, not because it felt it owed the money but because it was trying to avoid being evicted from the Port.  The agreement was literally extorted from it.  However, in Appendix A to the Port's post-trial brief, a section titled "Facts Confirming that IFG Always Understood its Obligation to Obtain the USACE Permit," the Port states as fact (actually poses a question) in paragraph 28 "why would IFG . . . contact and ultimately retain Anchor QEA directly, at its cost, in December of 2015 to perform the work necessary to amend the Port's permit," the unspoken portion of the question being "if IFG did not think it was responsible for obtaining the permit."  Doc. 444, Att. 1, p. 6.  IFG has suggested that, contrary to jurisprudence suggesting otherwise, activity in litigation could itself be considered a practice prohibited by LUTPA.  The Port, in its Post-Trial Memorandum, cites *Thibaut, Thibaut, Garrett and Bacot v. Smith and Loveless, Inc.,* 576 So.2d 532, 537 (La. App. 1st Cir. 1990), and suggests we cannot apply LUTPA to regulate or define the practice of law, including conduct of attorneys.  Doc. 444, p. 44, fn. 90.  Given our ultimate conclusions about the Port's pervasive misconduct giving rise to application of LUTPA damages we need not make an *Erie* guess as to whether Louisiana courts would find differently that *Thibaut* when counsel uses an extorted promise as evidence of the victim's pre-extortion beliefs.  These types of litigation tactics are unscrupulous and would be considered by this writer as violative of LUTPA if LUTPA did apply.

[22] Farmers Rice Milling was tangentially involved in this litigation in that IFG attempted to suggest that it somehow was behind the Port's treatment of IFG.  We would not allow IFG to go forward with that line and we remain comfortable with that position as it would have created yet another trial within this already contentious and complicated trial.  Nevertheless, it is clear from Warshaw's behavior at this meeting and his testimony at trial that there was no love lost between him and IFG, a situation affirmed by Ahmad in his testimony.  How or why that animosity existed is of no moment, but it was obvious.   Warshaw is now employed by the Port.

[23] La. R.S. 42:19 prohibits public bodies from taking up matters not previously approved on its agenda without "unanimous approval of the members present" at the meeting.  In order to raise a new item the "matter shall be identified in the motion to take up the matter not on the agenda with reasonable specificity . . . .  Prior to any vote on the motion . . . there shall be opportunity for public comment on such motion . . . .  ***The public body shall not use its***

able to participate and defend itself.[24] This *in abstentia* attack offends established public policy and was unscrupulous.[25]

The Port argues in its Post-Trial Memorandum that no evidence was adduced by IFG proving what damage it sustained as a result of this activity and we agree. Doc. 444, p. 52. Whatever damages IFG may have sustained as a result of that untoward event is unknowable – it obviously was designed to inflame the opinions of the Port commissioners to the disadvantage of IFG. Even though IFG proved no damages flowing specifically from that event, we do find it to be conduct violative of LUTPA and worthy of reflection when considering the totality of the Port's behavior toward IFG throughout this time.

**OO.** Gregorie engaged directly with Dees to focus only on the dredging issue, ignoring the extraneous issues raised by Port counsel in his e-mail of November 3, 2015, discussed at **MM** above.

By e-mail dated November 19, 2015, Gregorie forwarded proposed lease amendment language to address the dredging issue, omitting refence to any of the other, extraneous points raised by the Port in its November 3, 2015, communication. P464, Doc. 419, Att. 28. Nevertheless in the preamble to the proposed agreement, IFG made these offers as a compromise and an alternative to litigation:

---

*authority to take up a matter not on the agenda as a subterfuge to defeat the purposes of this Chapter.*" La. R.S. 42:19 (emphasis added).

[24]Responding at the meeting to Warshaw's complaints, Port Director Rase stated that "the process that they have underway, probably close to a month or six weeks ago [issuance of the Default Notice], is going to bring some of this to the front burner." Doc. 418, Att. 62, p. 3. Recalling that point 7 of the Port's list of demands was to finalize a "mutually agreeable Defined User agreement," we can see that the Port is inserting itself into an area where it has no business. The Defined User Agreement required IFG to negotiate with potential users of the facility. By making "[f]inalization of a mutually agreeable Defined User agreement" a requirement for cure of the default, the Port is using its Default Notice hammer in favor of one Port customer to the detriment of IFG. This behavior is unscrupulous and unfair.

[25] Daniel Loughney, the Port employee whose involvement in this project is discussed previously at footnote 8 and the only Port employee who testified without exhibiting animosity toward IFG (which, as noted earlier in footnote 8, earned him the privilege of being insulted by Port litigation counsel) was present at the meeting and testified at trial that, in all of the years (twenty or so) he had worked for ports (three in all), he had never seen conduct similar to that exhibited in this meeting – including one commissioner pounding on a table demanding that a tenant appear before the board – and further it did not appear to him that Warshaw's presence came as any surprise to the commissioners.

    1. Pay the Port $66,000 to cover the cost of core sampling done by Anchor QEA for the Port after the less-favorable AECOM sampling;

    2. Pay all costs directly associated with amending the existing dredging permit.

According to Ahmad the Port rejected the offer in approximately ten minutes.  The Port refused to separate the issues and was emphatic that the Default Notice would not be lifted unless IFG agreed to the unrelated lease demands.  This was followed by correspondence dated November 30, 2015, from IFG lease counsel Gregorie to Port Director Rase by which he transmitted payment of $66,000 demanded by the Port "incurred [according to the Port] to disprove the erroneous AECOM test results" and agreed to "pay all costs associated with amending the existing dredging permit, per the Lease."  P253, Doc. 445, att. 15.  Neither of these concessions was made because IFG truly felt they were owed under the agreement.  In the words of Ahmad, "[a]t this point my view is the Port had the boot on our neck.  They were threatening to evict us from our premises."  The concessions were made so that the Port would withdraw the Default Notice, which it has yet to do. Most regrettably (as we mention in footnote 21 above) the Port relies on this coerced concession in its Post-Trial Brief as proof that IFG knew all along that permitting was the responsibility of IFG.  Doc. 444, p. 23.

    **PP.** There were other actions by the Port during the period leading up to the filing of this litigation, actions we determine to be vexatious, unnecessary, and designed to injure IFG.

Examples are the Port's insistence that IFG pay for sediment testing services performed by Anchor QEA, the group hired by the Port to perform sediment testing following the testing performed by AECOM discussed above.  P251, Doc. 419, Att. 30.   As noted previously AECOM was suggested by the Port as one of three Port-acceptable service providers.  There is no evidence that AECOM ever had an opportunity to defend its work or retest should it have performed inadequately; rather, the Port retained Anchor QEA and retested on its own.  The Port continued to insist IFG pay for

this (and, as noted above, IFG did ultimately pay) even though the Port's action in hiring Anchor

QEA was unilateral and possibly premature.[26]

Then on December 2, 2015, the Port issued a second Notice of Tenant Default, this time

pertaining to damage caused to a transformer pad on Port property.  P255, Doc. 416, Att. 59.[27]

The damage resulted from IFG's construction of its facility.  We find issuance of that notice was

absolutely not necessary.  IFG was addressing the problem when the Notice was issued.

According to the uncontradicted testimony of Ahmad, Leo Hicks, a civil contractor

performing work for IFG on the transformer pad and an individual who had performed work for

many years at the Port, was escorted from Port property by two Harbor Patrol units.  He was also

required to remove his equipment.  This was after the Default Notice was issued for the transformer

pad.  The Port then imposed additional conditions on IFG's repair of the pad, such as requiring an

indemnity agreement from IFG and requiring a written plan of work from Entergy for what was a

relatively minor operation.  Ahmad characterized this, accurately we find, as the Port "turning up

the heat on IFG."

> **QQ.**   At this point in the process, the Port was taking the position that the
> permitting problem was one that belonged solely to IFG and was requiring it to
> take responsibility for the process.

At the same time, however, the Port was creating obstacles to IFG's efforts to get the permitting

by (a) failing to share information in its possession that would assist IFG in the process, particularly

the worked performed in 2011 and 2015 by GBA, (b) creating a hostile environment for IFG by

painting it as a recalcitrant tenant and its face at the Port, Ahmad, as an abject liar, and (c)

attempting to interpose requirements for continuing at the Port that were never previously

---

[26] Ultimately Anchor QEA was retained by IFG to act as its agent in the dredge permit amending process.
[27] As we note previously, that notice was withdrawn and does not remain part of this litigation except to the extent to which it is evidence of the Port's continued maltreatment of IFG.

contemplated between the parties, such as assistance for payment of road construction and similarly onerous requirements.

     **RR.**       On December 2, 2015, IFG entered into an agreement with Anchor QEA to act as its agent in the permitting process. P 255A, Doc. 426, Att. 9.

Of course, much of the work preparatory to the project had been done by GBA for the Port in 2011 but, again, that was not shared. At this point it is nearly a year since the Port learned that its existing permit would not allow for the dredge and now Anchor QEA is beginning its assignment from scratch. Why this process was not begun before this time has everything to do with the nefarious activity of the Port discussed above – it promised IFG on January 27, 2015, that had authorized GBA "to begin work on amending our permit" [see finding **BB** above] yet it did not. As we discuss above, despite its clear understanding of its responsibility for permitting and its promise as late as January 27, 2015, that it would "begin work on amending [its] permit," the Port chose instead to rewrite the parties' agreement, hide its interactions with GBA that might have assisted IFG in its new role as the party responsible for permitting, and act as though it was to have been this way all along.

In a November 18, 2015, correspondence from Anchor QEA to IFG, Anchor defines its scope of work to be performed for IFG "conduct[ing] regulatory coordination and obtain[ing] required permits and approvals in support of the planned Berth 8 Vicinity Deepening Project at the Port of Lake Charles (Port), Louisiana." *Id.* at p. 5. According to the testimony of Ahmad, the Port was given access to everything Anchor QEA was doing.

     **SS.** On December 29, 2015, the Port wrote IFG and its counsel confirming it would take no adverse action in relation to the issues raised in its September 2015 Notice of Default. P267, Doc. 419, Att. 32.

Rather than simply state it would be taking no action, however, the Port once again engaged in sanctimonious, gratuitous, and inaccurate discourse attempting to rewrite the obligations of the

parties as they had all contemplated leading up to the execution of the GLA, the construction of

the facility, and the overall conduct between the parties until that fateful date in January of 2015

when they all learned that the Port's existing dredging permit would not allow IFG to dredge to

the desired depth.

      **TT.**    On January 5, 2016, William B. Monk ("Monk"), IFG litigation counsel,
wrote the Port and proposed a schedule for addressing the permitting process.
P269, Doc. 419, Att. 33.

      **UU.**    On January 19, 2016, Port litigation counsel responded to the January 5,
2016, correspondence from IFG counsel.  P270, Doc. 419, att. 39.

In this correspondence the Port holds fast to the narrative it had developed since learning the Port's

existing dredging permit was not adequate for use by IFG to fulfill its dredging obligations under

the contract.  The litigation lines were therefor drawn.

      **VV.**    IFG files suit on January 29, 2016.  Doc. 1.

According to Ahmad, suit was filed because the sixty-day period for curing default provided in the

lease agreement was coming to a close and the Port had affirmatively stated to IFG's lender that it

would pursue legal action against IFG that could include IFG's being evicted from the Port of Lake

Charles.

      Ahmad also expressed long-term concerns about the prospect of being in an acrimonious

relationship with the Port and felt as though not acting would only invite the Port to repeat this

behavior when it next wished to renegotiate terms of the lease.  In his words:

> if we did nothing, if we, you know, any time the Port would want to modify
> the lease or change the lease or make a demand all they had to do was issue
> a default letter whether it made sense or not and then force us or bring us to
> our knees and force us to make changes to the lease.  That was certainly a
> concern.  So it was a balancing of one against the other.

Or, stated another way, it was time to stare down the bully.

      **WW.**    On February 15, 2016, the Port and IFG entered into a Cooperative
Endeavor Agreement ("CEA").  D91, Doc. 439, Att. 62.

The Port argues this document was an ultimate confirmation of IFG's understanding that "the Port was assisting IFG in name only . . . ."  Doc. 444, p. 30.  According to the testimony of Ahmad, the Port insisted the parties enter into this agreement so that they could rely on the Port's "214 Agreement" with USACE.  The purpose of this was to (supposedly) expedite USACE's consideration of the proposal.  We do not find this document alters any findings of fact set forth above.

>    **XX.**    On March 14, 2016, the Port issued notice to IFG, copies to IFG's lenders, that it "shall not issue the second notice of default pursuant to Section 15.3 of the Lease at this time or hereafter so long as IFG continues to work diligently in arranging for and/or completing the Initial Dredging. . . ."  D94, Doc. 462, att. 62. p. 2.

>    **YY.**    Also on March 14, 2016, the Port submits application to USACE to modify its existing Permit MVN-2004-00455-WMM "to deepen and maintain . . . the existing commercial access channel to -40 feet Mean Low Gulf (MLG), plus 2 feet advance maintenance, plus 2 fee of allowable (tolerance) overdepth (OD) . . . ."  P273, Doc. 452, Att. 9, p. 2.

>    **ZZ.**    Anchor QEA continues to work for IFG in the permitting process but without the benefit of transparent and helpful assistance from the Port.

Tension between IFG and the Port does not abate during this time period.  Discussed in finding **RR** above is the fact that IFG was forced to retain Anchor QEA to perform the steps necessary for permitting (basically, reperforming what GBA had already done in 2011) without the benefit of GBA's work product and having GBA act as the overseer of Anchor QEA progress.  Once again there is no legitimate business reason to be found for the Port's taking this position or acting in this manner that served only to delay the process, thus delay IFG's ability to bring in larger, more profitable, vessels, and to increase the cost of the permitting effort.

A prime example of the difficulties experienced by IFG at this time is found in a series of emails between IFG principal Ahmad and the Anchor QEA personnel.  P270B, Doc. 451, Att. 9. The subject was what would be the depth of the dredge.  This chain begins with an email from

Ahmad to Jason Kase ("Kase") with Anchor QEA quoting the section of the GLA allowing dredging "of no less than forty-two (42') feet below the water line as measured at mean low Gulf tide."  Kase and co-employee Wendell Mears ("Mears") are commiserating in this chain over the apparent paranoia of Ahmad about going below forty-two feet and allowing for a two foot over-dredge ("OD"), customary in the industry.  In their intra-office communication Kase tells his co-employees:

> I spoke to [Ahmad] today.  I reiterated all the points in the email about why we want to leave the OD in there but he is extremely concerned (almost paranoid by his own admission) that the Port will use that 2 ft of OD as an excuse to claim that this could cause stability issues with the wharf.  He has this letter from the Port (apparently) [the Default Notice] stating that there are no structural issues going to -42 feet and he does not want to give them an excuse to back off that.  I tried to talk him off the ledge . . . .  There is some serious lack of trust between the Port and IFG.

Given the treatment of Ahmad and IFG at the hands of the Port as detailed above, neither his paranoia nor his desire to stay strictly within the lanes imposed by the GLA is unreasonable.  We interpret this behavior as preferring to not give the Port yet another ground to seek yet another concession not contemplated by the agreements in effect or to evict IFG.

> **AAA.**  On April 29, 2016, the State of Louisiana, Office of Attorney General, issued notice to the Port that a formal complaint had been filed by IFG alleging violations of LUTPA, La. R.S. 51:1401, *et. seq.*.  Doc. 341, Att. 9., p. 213.  The Port received that notice.[28]

> **BBB.**   On October 20, 2016, Anchor QEA produced a report on the stability of the of the southern slope of Contraband Bayou when considering the proposed new dredge.  P289A, Doc. 454, Att. 4.

Had IFG known that stability of the northern slope was an issue it could have had that analysis conducted as well.  But insofar as the Port had assured there was no stability issue in its Default Notice, no such analysis was done until two years later.

---

[28]Though not formally placed into evidence this issue is not in dispute as the Port admitted receipt of the notice in its answer to IFG's Amended, Supplemental and Restated Complaint (Doc. 236).  See Doc. 254, p. 10, ¶ 24.

      **CCC.**  On February 16, 2017, USACE issues MVN-2004-00455-MG approving the Port's request for a modification to "deepen and maintain an existing commercial access channel to -40 feet mean Low Gulf, plus 2 feet advanced maintenance, plus 2 feet of allowable over depth, and dispose of the material in the Dredged Material Placement Facility (DMPF) 3, located along the Contraband Bayou . . . ."  P301, Doc. 427, att. 12, p. 1.

In Post-Trial Brief, we surmise to suggest somehow IFG failed to mitigate its damages, the Port claimed that "IFG . . . held the permit for nine months" before officially raising the issue of slope stability in November of 2017.  Doc. 444, p. 69.  In essence the Port suggests IFG was merely twitting its thumbs, whiling away the hours as it continued to lose profit from loading larger vessels that required the deeper channel.  As we see below, the next phase of activity brought its own set of problems and nefarious conduct by the Port.

      **DDD.**  On February 23, 2017, the Port issued correspondence to IFG offering two "options" for IFG to consider when determining how to conduct the actual dredge now approved.  P304, Doc. 416, Att. 46.  Option 1 was for IFG to use the USACE contractor to raise the DMPF 3 containment dikes to accommodate material dredged from Contraband Bayou with payment for that service (building the dikes) with "funds provided by IFG to the Port for dike construction" to be paid to USACE.  Option 2 was for IFG to wait until the USACE contractor completed its work.  The Port completes its correspondence thus:  "Please note that if IFG chooses Option 2, the dredging project will be significantly delayed per the [USACE's] anticipated time frame set out in the attached."

This was sent in response to a memo from Anchor QEA to the Port suggesting steps to be taken to complete the dredge.  P312, Doc. 419, Att. 40, p. 7-8.  As Ahmad testified at trial, there truly was no option at all considering timeliness obligations and the dredging Default Notice which, in his words, "continued to hang over our head."

      The need to raise the DMPF 3 containment dikes to accommodate material dredged from Contraband Bayou sprang from the Project Partnership Agreement ("PPA") entered into between the Port and USACE on April 20, 2015, discussed in finding **DD** above.   As we noted in that finding, this agreement between the Port and USACE arose well after this contract was entered

and it was a new approach being taken by USACE to allow it to recover capacity of its sites.  We also already concluded in finding **S** above that IFG was not responsible for any cost related to disposal of dredge spoils.[29]  These "options" are setting the stage for the Port's next exercise in shifting responsibility for an obligation it entered into with USACE after this contract was written on to IFG, now claiming it was always the responsibility of IFG to do so.  And while the Port is saying so, the sword of eviction (found in the inappropriately issued Default Notice) continued to hang over IFG's head.

In official response to the "options," Ahmad notes on February 27, 2017:

> In an effort to save time and move forward as quickly as possible I've asked Anchor QEA to continue working with the Port and the USACE to ascertain the earliest availability of the [USACE] contractor and the cost charged to perform the dike work which is a prerequisite to using the dredge spoil disposal site.
>
> The Port's emails below [containing the "options"] also seek to set forth legal positions and argue about Lease terms in an apparent attempt to gain some advantage in the forthcoming trial.  However in the interest of moving forward quickly to mitigate damages and accomplish the dredging, I will leave these matters to our outside counsel.

P 312, Doc. 419, Att. 40, p. 4.

**EEE.**   On March 24, 2017, USACE provided Anchor QEA the estimate of costs prepared by Mike Hooks, the USACE contractor raising the DMPF 3 containment dikes to accommodate material dredged from Contraband Bayou. P313, Doc. 462, Att. 23.  The contractor estimated the cost to be $510,000.

**FFF.**   On April 6, 2017, IFG litigation counsel forwarded correspondence to Port litigation counsel enclosing a check for $510,000 but stating quite clearly that the payment was being made under protest.  D113, Doc. 462, Att. 56.  The correspondence goes on to state:

> As we have previously advised, the obligation to provide a usable dredge spoil area is solely an obligation of the Port under the Ground Lease. However, in the interest of mitigating damages and halting the Port's delay

---

[29] Anchor QEA appears to agree with our finding.  Through February 2017 intracompany email discussing the GLA provisions on this topic, Renee Robertson with Anchor QEA states "[t]o me it sounds like the Port is responsible for the disposal area & any fees associated."  P302A, Doc. 426, Att. 25.  Wendell Mears with Anchor QEA agrees.  *Id.*

> tactics IFG is being forced to advance these funds to allow for the initial
> dredging to occur.  IFG reserves all its rights and will pursue legal action
> against the Port to recover the full amount of the funds advanced to the Port
> as well as damages, expenses and judicial interest.

> *Id.* at p. 1.

IFG did not owe this money and we so find.  This payment was the result of a culmination of

measures that we can describe best as gaslighting by the Port, an activity at which it was improving

with each IFG-related event.  This payment was exacted by the Port by extortion, plain and simple.

There was another bout of activity in October and November of 2017 between the Port and

IFG where IFG appears to be attempting to ascertain exactly how much of the area it paid to build

for dredge disposal was actually used by IFG.  P330, Doc. 460, Att. 3.  At that point and despite

IFG's having paid for the site it was still not available for use.  Considering our determination that

none of the $510,00 was owed we need make no determinations over that issue and cover it no

more.  We do note, however, that the Port asserts during that time that the continued delay in

dredging was the result of a misinformation campaign by IFG and not because of any misconduct

of the Port.  We do not agree with that assessment.

> **GGG.** On November 15, 2017, IFG counsel sends a formal notice to the Port
> concerning stability of the Berth 8 area when dredging Contraband Bayou to
> the new depth allowed under the new permit.  P337, Doc. 440, Att. 8.  IFG
> claims to have discovered emails between Hayden with the Port and Charles
> Stutes[30] ("Stutes") of the engineering firm Meyer & Associates, information
> produced as the result of a public records request made by IFG between April
> and May of 2017.  The correspondence references the assurance made by the
> Port in its Default Notice that "there are no geotechnical restrictions relating to
> the wharf and dock facilities adjacent to the area to be dredged and, upon
> issuance of the required Corps permit allowing for dredging to a depth of -42
> feet, the dredging IFG is required to perform can proceed" and notes that the
> Port, as of that date, had "not provided the basis for the statement and
> assurances" as set forth in the Notice.  "***Please provide us with any
> documentation as to the basis for the Port's assurances, as soon as possible,
> so that this does not further delay any dredging***."  *Id.* p. 2 (emphasis added).

---

[30] Stutes was discussed previously in finding **FF**.

This began a flood of activity at the Port between December 12 and 20 of 2017.  Stutes of Meyer & Associates contacted Mr. Ronald Jones ("Jones") of CBK Soils (who had conducted the original 2004 stability analysis discussed in finding **F** discussed above).  Stutes was contacting Jones at the request of Port Engineer Brinkman.  According to Jones's testimony, Stutes told him "he was having problems with a New York guy named [Ahmad]"[31] who was claiming that the Port told him (Ahmad) that they (IFG) could dredge to -43' MSL, roughly the equivalent of -42 MLG.[32]  He also spoke with Brinkman directly who also expressed urgency and wished to retain him to perform a geotechnical analysis of stability if they were to dredge 7' lower than the study he conducted in 2004.  He understood that Larry LeBlanc with Meyers and Associates had concluded after the 2006-2007 construction of the improvements of Berth 8[33] that dredging should be limited to -40 but opined it would not be prudent to move forward with a dredge any deeper than that without a geotechnical assessment conducted by a geotechnical engineer who would document his or her findings  in a report that would contain the engineer's signature and stamp.  This, of course, would exclude Brinkman's erase board calculation as an appropriate evaluation of the advisability of dredging below 40' from a geotechnical standpoint.  Jones was not retained to perform that evaluation.

So one would assume that, at this juncture after being asked point blank to provide the documentation, the Port would simply confess that its assurance made two years prior in its Default Notice, that "there are no geotechnical restrictions relating to the wharf and dock facilities adjacent to the area to be dredged" was supported by nothing that any professional involved in this operation

---

[31] Obviously the disdain for IFG continued.
[32] Of course the Port indeed had told IFG it could safely dredge to that level in its Default Notice.
[33] See conclusion **G**.

would have considered acceptable, i.e. the erase board calculation.  If one were to so assume, however, one would be wrong!

> **HHH.**       On December 13, 2017, during the Port's feverish discussions with Jones attempting to retain him to perform the geotechnical assessment needed to support the Port's assurance of "no geotechnical restrictions related to the wharf and dock facilities," Port litigation counsel wrote IFG litigation counsel a most disrespectful response, firstly accusing IFG counsel of unethical conduct in addressing its formal request to the Port directly when it was being represented by counsel and then continuing to **NOT** produce the document requested.  P340, Doc. 416, Att. 47.

The hubris exhibited by Port counsel in this correspondence is stunning.  After chastising IFG counsel for his alleged unethical behavior, Port counsel asserts the lease itself makes it "self-evident that the Port approves IFG dredging to the depth specified," that Hayden had approved IFG's dredging plan in 2014 (before they had a permit that would allow for it), and that the Default Notice "expressly provides that there are no geotechnical issues with dredging to the 42 foot depth."  *Id.*, p. 2.  Of course IFG knew all of the above – it was asking for a copy of the report that proved it.  But the blustering continued.

> As evidenced by the February 17, 2011 email also attached to your 11/17/2017 letter, Donald Brinkman had previously inquired about this very issue prior to the Lease being finalized.  In applying the appropriate engineering justifications, Mr. Brinkman determined in 2011[34] and, again, in 2015[35] that the deepening of the dredge area to the depth set forth in the Lease is acceptable.

*Id.*  In its best wizard-like manner, the Port tries desperately to keep IFG from finding that there is a man behind that curtain performing an erase board calculation.  And then, again whistling right past that same graveyard noted earlier, counsel excoriatingly states:

> Regardless of the foregoing, the fact remains that the Port is not responsible for undertaking due diligence inquiries with respect to matters which IFG is contractually obligated to undertake under the Lease.  Beginning in 2007 upon the completion of the dock rehabilitation at Berth

---

[34] In testimony at trial Brinkman denied ever having performed any type of evaluation of stability in 2011.
[35] The erase board calculation.

No. 8, IFG had ample opportunities to confirm whether there were any geotechnical concerns prior to contractually obligating itself to dredge to the -42 foot depth under the Lease or at any [time] thereafter when arranging for the dredging.

*Id.* at p. 3. If the Port had shared with IFG the information it had from the reports produced by GBA in 2011 when the parties were negotiating their lease agreement, then IFG would most certainly have known there likely would be stability issues dredging to that depth. But the report was not shared we believe, as we find above, because the Port knew it was the Port's responsibility to deal with issues raised in that report involving stability and permitting. If the Port had shared that information in November of 2015 when it extorted the concession from IFG to perform all steps necessary to amend the Port's permit to allow it to dredge to the desired depth, then IFG could have made appropriate inquiry then. But that which allowed the successful extortion, the September 2015 Default Notice, provided an assurance that stability was not an issue. As we stated earlier, the Port owns this issue.

**III.** In January of 2018 Port litigation counsel retained the services of Michael Hasen with HJV to act as a geotechnical expert in this litigation.

Hasen had previously consulted with GBA in May of 2011 and November of 2015 about possibly performing geotechnical work for the proposed dredge of Contraband Bayou.[36]   At this point, however, he had been retained by Port counsel to act as an expert in this litigation. His initial role was simply to critique the work of IFG geotechnical expert Timothy Stark ("Stark") and his initial report, prepared in December of 2018, was simply that. When preparing his initial report, he was not allowed to consider any of the work he had done previously for GBA on this same project and neither was he allowed to consider additional borings that had been performed in 2018. When he was initially deposed in October of 2018 the Port allowed him only to testify as a fact witness –

---

[36]See finding **L**. This would have been before the Port took the position that IFG, and IFG alone, was responsible for obtaining the permit to dredge Contraband Bayou.

IFG was precluded (by the Port) from asking about any analysis he may have performed with respect to the stability of the dredge area, the Port taking the position that IFG was not allowed to have the benefit of any of his technical information until after IFG expert Stark was deposed.

Spoiler alert:  In December of 2018 he did finally produce a report that indicated there would be no problem with safety at Berths 8 and 9 if dredged to the desired depth but the report was silent as to the area at the bottom of Berth 7.  He prepared a final report in March of 2019, just as the trial of this matter was to start, that gave the "all clear" from a safety standpoint for the entire dredging area.  D258, Doc. 420, Att. 48.  The parties stipulated at trial, on the final day of trial and during the testimony of Mr. Hasen, that safety concerns for dredging area had finally been put to rest.

> **JJJ.**    By email dated January 15, 2018, the Port finally confesses there exists no documentation to support the assertions made by the Port in the Default Notice that there are no stability issues related to Berth 8 and the dredge to be performed.  P342, Doc. 427, Att.25.

As we note in finding **HH**, IFG was unaware that the assurance provided in the Default Notice until port engineer Brinkman was deposed July 23, 2018.

> **KKK.**  On December 24, 2018, the Port filed a Motion to Issue Notice Under Section 15.3(b) of Ground Lease.  Doc. 316.

With the filing of this motion the Port was, in essence, asking us to "say grace" over its intention to move forward with dredging under Section 15.3(b), the  "District's Remedies; Cure," portion of the contract that is set forth in finding **S.**6.ii. above.  That provision would allow the Port to perform the dredging (which was the responsibility of IFG under the GLA) but would also allow it to impose additional costs and fees related to the Port's performance of IFG's obligation.  The Port's ability to proceed under that section presupposes issuance of a valid Default Notice and, since the validity of that notice formed the basis of much of this litigation and would not be

determined until trial, the Port's request was denied.  Doc. 335.  We have now determined that the

Default Notice was not validly issued.

    **LLL.**  On March 7, 2019, Hasen issues a report containing his final conclusions on stability of the areas adjacent to Contraband Bayou when dredged to the level provided for in the contract.  D258, Doc. 420, Att. 48

During Hasen's testimony on the last day of trial the parties finally stipulate that as of that date,

April 30, 2019, the dredging area was sufficiently stable for the dredging proposed.   Why it took

so long for the Port to complete this stability study is very difficult to decipher from the testimony

of Hasen or Stark but it seems to be yet another example of gamesmanship by the Port, where it

refused to allow IFG to depose Hasen except for a factual deposition until after Stark had been

deposed and then there seems to have been some sort of a litigation-related impasse.  Regardless

of why it occurred we attribute no fault in the delay to IFG.

### III.
### CONCLUSIONS OF LAW

    We find the following statements of law to be applicable to the circumstances of this case:

    **A.**  Because our subject matter is based on diversity of citizenship as found in 29 U.S.C. § 1332, we must apply the substantive law of the state in which we sit.

*Erie v. Thompkins,* 58 S.Ct. 817 (1938).

    **B.**  A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished.

La. Civ. Code art.1906.

    **C.**  An obligation is a legal relationship whereby a person, called the obligor, is bound to render a performance in favor of another, called the obligee. Performance consists of giving, doing, or not doing something. Thus, a contract is a source of obligations.

La. Civ. Code Art.1757.  See also  *Favrot v. Favrot*, 68 So.3d 1099, 1107 (La.App. 4 Cir. 2/9/11)

(internal citations omitted).

    **D.**  The words of a contract must be given their generally prevailing meaning.

La. Civ. Code art. 2047.  *See also Cadwallader v. Allstate Ins. Co.,* 848 So.2d 577, 580 (La. 6/2/03) ("Words and phrases used in [a contract] are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning.").

    **E.**  When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.

La. Civ. Code art. 2046.

    **F.**  When parties to a contract make no provision for a particular situation, "it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose."

La. Civ.Code art. 2054.  Louisiana Civil Code article 2054 "applies in circumstances where the contract is not ambiguous or doubtful, but simply fails to address a particular question." *Ellwood Oil Co. v. Anderson*, 655 So.2d 694, 697 (La.App. 2 Cir. 1995) (citing La. Civ.Code art. 2054, revision comment (b)) (incorrectly cited in original as revision comment (c)).

    **G.**  When interpreting provisions of a contract about which there exists some doubt, "a court must seek the true intention of the parties, even if to do so necessitates departure from the literal meaning of the terms of the agreement."

*Pelican Plumbing Supply, Inc. v. J.O.H. Constr. Co., Inc.,* 653 So.2d 699, 702 (La.App. 5 Cir. 3/28/95).

    **H.**  "In ascertaining the intention of the parties to a contract, where it cannot be adequately discerned from the contract or agreement as a whole, the facts and circumstances surrounding the parties at the time of contracting are a relevant subject of inquiry. Determining the intent of the parties becomes, in part, a question of fact."

*United Investors Life Ins. Co. v. Alexander,* 662 So.2d 831, 834 (La.App.2 Cir.11/1/95)(citations omitted).

    **I.**  The judiciary's role in interpreting a contract is "to ascertain the common intent of the parties to the contract."

*Carbon v. Allstate Ins. Co.*, 719 So.2d 437, 439 (La. 10/20/98) (citing La. Civ.Code art. 2045).

      **J.** Louisiana substantive law applies to plaintiff's claim for damages.

*Aucoin v. C.N.I. Girdler, Inc.*, 1995 WL 155653, at *1 (E.D. La. Mar. 31, 1995)(citing *Erie R.R.*

*Co. v. Tompkins,* 304 U.S. 64, 78 (1938)).

      **K.** An obligor is liable for the damages caused by his failure to perform a conventional obligation.  A failure to perform results from nonperformance, defective performance, or delay in performance.

La. Civ. Code art. 1994.

      **L.** Under Louisiana law, "[d]amages are measured by the loss sustained by the obligee and the profit of which he has been deprived."

La. Civ. Code art. 1995.

      **M.** The court has much discretion in determining the reasonableness of damages "[w]hen damages are insusceptible of precise measurement."

La. Civ. Code art. 1999

      **N.** "Under Louisiana law, damages for loss of profits may not be based on speculation and conjecture. However, as Louisiana courts have held, such damages need be proven only within *reasonable certainty* ... [b]road latitude is given in proving lost profits because this element of damages is often difficult to prove and *mathematical certainty or precision is not required.* Accordingly, where it is not possible to state or prove a perfect measure of lost earnings, courts have reasonable discretion to assess damages based upon all the facts and circumstances of the case.  Proof of such losses need only be as precise as circumstances in a particular situation allow."

*Ochsner Clinic Found. v. Lexington Ins. Co.*, 226 F. Supp. 3d 658, 673–74 (E.D. La. Jan. 3,

2017)(internal citations and quotations omitted).

      **O.** Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

La. R.S. 51:1405(A).

      **P.** "LUTPA was modeled after the Federal Trade Commission Act ["FTCA"] and the two acts share the same goals: to protect consumers and to foster competition."

*Quality Envtl. Processes, Inc. v. I.P. Petroleum Co.*, *Inc.,* 144 So. 3d 1011, 1025 (La. 5/7/14).

**Q.** The goals of LUTPA and the FTCA "include halting unfair business practices and sanctioning the businesses which commit them, preserving and promoting effective and fair competition, and curbing business practices that lead to a monopoly and unfair restraint of trade within a certain industry."

*Quality, supra,* at 1025.

**R.** Any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405, may bring an action individually but not in a representative capacity to recover actual damages.

La. R.S. 51:1409(A).

**S.** LUTPA grants a right of action to any person, natural or juridical, who suffers an ascertainable loss as a result of another person's use of unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

*Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.,* 35 So.3d 1053, 1057 (La. 4/23/10).

**T.** Although business consumers and competitors are included in the group afforded this private right of action, they are not its exclusive members.

*Chermie*, supra.

**U.** If the court finds the unfair or deceptive method, act, or practice was knowingly used, after being put on notice by the attorney general, the court shall award three times the actual damages sustained. In the event that damages are awarded under this Section, the court shall award to the person bringing such action reasonable attorney fees and costs.

La. R.S. 51:1409 (A).

**V.** LUPTA does not specifically identify any prohibited types of conduct and the Louisiana Supreme Court has stated that "[i]t has been left to the courts to decide, on a case-by-case basis, what conduct falls within the statute's prohibition."

*Cheramie, supra,* at 1059.

**W.** In order to establish a LUPTA claim the plaintiff must show that "the alleged conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious."

*Cheramie, supra,* at 1059 (internal quotations omitted).

**X.**   "Fraud, misrepresentation, deception, and similar conduct is prohibited, mere negligence is not."

*Turner v. Purina Mills, Inc.*, 989 F.2d 1419, 1422 (5th Cir.1993), *citing Marshall v. Citicorp*, 601 So.2d 669, 670 (La.App. 5 Cir.1992).

**Y.**   Fraud under Louisiana law entails a "misrepresentation or suppression of the truth made with the intention to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other.  Fraud may also result from silence or inaction."

La. Civ. Code art. 1953.

**Z.**   Louisiana law "'recognizes that the refusal to speak, in the face of an obligation to do so, is not merely unfair, but is fraudulent.'"

*Lomont v. Myer–Bennett*, 172 So.3d 620, 629 (La. 06/30/15), *quoting Bunge Corp. v. GATX Corp.*, 557 So.2d 1376, 1383 (La.1990).

**AA.**   Further, in Louisiana, " '[a]lthough a party may keep absolute silence and violate no rule of law or equity...if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to [disclose] the whole truth.'"

*Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs.*, 527 F.3d 412, 419 (5th Cir. La.2008) *quoting American Guaranty Co. v. Sunset Realty & Planting Co.*, 208 La. 772, 23 So.2d 409, 455–56 (1944).

**BB.**   LUTPA does not prohibit "sound business practices, the exercise of permissible business judgment, or appropriate free enterprise transactions."

*Turner*, supra.

**CC.**   Additionally, LUTPA is not an alternative remedy for simple breach of contract claims.

*Turner*, supra.

**DD.**   "There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes."

*Turner*, supra.

**EE.**   However, there is case law that actions that are in breach of a contract can have deceptive and unethical "undertones" that would allow a LUTPA claim to stand in addition to the breach of contract claims.

*See Tubos de Acero de Mex. SA v. Am. Int'l Inv. Corp,* 292 F.3d 471, 482 (5 Cir. 6/10/02).

**FF.** Under LUTPA, "'actual damages' for any person who suffers a loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice, do not require a precise measurement of the damage, only an ascertainable loss."

*Wilson v. T & T Auto Repair & Towing, LLC,* 180 So. 3d 437, 442 (La. App. 2 Cir. 9/30/15).

**GG.**   The notice by the attorney general required in La. R.S. 51:1409(A) is to serve "the specific purpose of a 'cease and desist' notice to the defendants that they may be subject *civilly* to a treble damage claim."

*B & G Crane Service, L.L.C. v. Duvic,* 935 So.2d 164, 170 (La.App. 1 Cir. 5/5/06)(emphasis

original).

**HH.**   "In order to recover treble damages, [plaintiff] must prove that [defendant] was put on notice of the potential for treble damages by the attorney general and thereafter continued its use of unfair or deceptive trade practices.

*Ricon v. Owens Collision and Repair Services Center, LLC*, ___ So.3d ___, 2018 WL 4520384

*6, 2018-0383, p. 11, (La. App. 1 Cir. 9/21/18).

**II.**   "[F]ailure to conform" with the subsection of LUTPA that requires a plaintiff to mail a copy of the petition to the attorney general "shall not affect any of plaintiff's rights under this section."

La. R.S. 51:1409(B).

**JJ.** "[T]he failure to prove that the director or attorney general put the defendants on notice does not defeat the claim for actual damages and attorney fees, but only defeats the claim for treble damanges."

*Laurents v. Louisiana Mobile Homes, Inc.*, 689 So.2d 536, 542 (La. App. 3 Cir. 2/5/97).

## IV.
### APPLICATION OF FINDINGS OF FACT AND
### CONCLUSIONS OF LAW TO THE RELIEF REQUESTED BY IFG

In Section I above we recapitulated the request for relief by IFG as follows:

(1) Compensatory damages arising from the Port's breach of contract related to "the Intended Depth of Berth 8";

(2) The Port's liability for fraudulently inducing IFG to enter the lease;

(3) The Port's liability for not timely securing the necessary dredge permit;

(4) The Port's liability for misleading IFG to believe it was timely handling the permitting role;

(5) The Port's liability to IFG for violating LUTPA;

(6) A declaration that it did not owe the MAG payment;

(7) Reimbursement for cost imposed by USACE for improvement to the dredge spoil deposit site made available for use by IFG.

(8) Entitlement to declaratory and injunctive relief as follows:

   a. A declaration that the default letters issued by the Port were issued in bad faith to gain unwarranted leverage on IFG and to force it to concede to unrelated demands;

   b. A mandatory injunction ordering the Port to withdraw outstanding default notices filed against IFG and its lender;

   c. Injunctive relief prohibiting the Port from:

      i. Issuing factually inaccurate default notices;
      ii. Issuing default notices where the alleged default was "caused, totally or in part, by the Port's own actions, representations, failures to perform, negligence of bad faith";
      iii. Failing to withdraw default notices or recognize the alleged defaults were cured;
      iv. Using default notices to create duress or gain leverage on IFG for issues unrelated to the defaults;
      v. Threatening to terminate the lease or evict IFG with use of faulty default notices;
      vi. Preventing IFG from curing alleged defaults;
      vii. Disturbing IFG's quiet enjoyment of the leased premises; and
      viii. Hindering or interfering with IFG's operations.

(9) A declaration that IFG is not in breach or default under the lease.

IFG has conceded that its claim for fraudulent inducement (item (2) above) is now moot as the Port has indicated the dredge would take place.  We address items (1), (3), and (4) collectively as "Damages for Port's Breach of Contract to have Contraband Bayou Dredged to Desired Depth by July 15, 2015."

**A.** Damages for Port's Breach of Contract to have Contraband Bayou Dredged to Desired Depth by July 15, 2015.

There was a contract between these parties.  We have already concluded that it was the responsibility of the Port of Lake Charles to have Contraband Bayou ready to be dredged by IFG to the desired depth when prior to opening of its facility so that the facility would be fully functional for its desired purpose at opening.  The duties of the Port included appropriate permitting through USACE and proper assurance of slope stability along the proposed dredging area.  Although the GLA was silent as to the specific responsibilities, the actions of the parties before execution of the GLA and after execution show clearly the Port knew this was its responsibility and we have so stated in our conclusions of fact.  Also and with respect to the stability issue, the Port's assurance this issue had been properly resolved in its Default Notice of September of 2015 when no reputable consideration of the stability had actually been performed further added to the delay in the dredge which, in turn, added to the delay in IFG participating in the profits it anticipated at inception of the contract.

Accordingly, we find the Port liable to IFG for losses attributable to IFG's inability to market itself as a fully operational terminal and to load larger, deeper draft cargo vessels as was intended by its original business plan.  Because Contraband Bayou was not able to be dredged to the desired depth, IFG missed substantial business opportunities to load larger vessels that would allow IFG to take advantage of economies of scale and the world's largest and most profitable

markets such as Asia.  These conclusions are supported by the testimony of Ahmad as well as experts provided by IFG at trial.

John Theriot testified for IFG as to the loss of profit per vessel "lost" or unable to be loaded for lack of proper depth at the IFG facility.  The Port offered its own expert, Charles Theriot.  Charles Theriot offered critiques of John Theriot's analysis but also offered a comparative calculation of damages.[37]

The most glaring factor separating the two projections was revenue which IFG claims it lost and should recover for the vessel's overtime use of the facility while loading.  The Port's approach to this issue was to review historical overtime charged by IFG to existing customers and simply average the overtime charged per metric ton for these smaller shipments.  IFG argues, and we agree, that this methodology in no manner would compensate IFG for what would be a very significant portion of its income if it were able to load the larger vessels.  The amount of overtime revenue established at trial was reasonable.

The next matter to be considered is how many opportunities IFG lost to load these larger vessels.  IFG maintains it should be compensated for two vessels per month (with the exception of one month, July of 2018, when IFG suffered an explosion in one of its elevators) until completion of dredging in May of 2019 plus two vessels per month for one year to allow IFG to recover from the "black eye" it has suffered in the market from its inability to accept large vessels as a result of the Port's conduct.

---

[37] IFG was not given the benefit of this analysis until Charles Theriot was on the stand in the courtroom even though, according to the witness, it had been prepared some three weeks prior.  At that moment we expressed our extreme displeasure with the Port for engaging in such unprofessional and inappropriate conduct.  The final word has not been had on this subject as we will be issuing a rule for the Port and its litigation counsel to show cause why there should not be some sanction imposed for this flagrant violation of court rules and procedures.  So that this litigation could finally be completed IFG waived the opportunity offered by the court for it to have its own expert review the evaluation and return to testify.  Nevertheless we cannot allow this type of conduct to go unnoticed.  The Port similarly attempted to have this witness testify about other litigation in which IFG principal Ahmad was allegedly involved having given IFG zero advance notice of its intention to do so.  That line of testimony was not allowed.

IFG experts testified that its facility and the Port in general are capable of handling two large capacity vessels per month.  While we accept that this as probably the case, we cannot accept that from the very first month of operation IFG would go into full capacity and operate at that capacity without exception except for the one month where it suffered an explosion.  The vicissitudes in the maritime industry noted by several of the experts (weather, mechanical issues, governmental inspections, clogged traffic at the Port) would not lend itself to such a smooth calculation.  What we do find would be appropriate would be to consider IFG of being capable of handling 1.5 vessels per month beginning September of 2015 (allowing for a month or so after completion of the facility to gear up), less the month for the explosion, until May of 2019 when dredging was to have been completed.[38]  We also do not accept that an entire year would be needed for IFG to recover from its "black eye" so instead would allow an additional 1.5 vessels through August of 2019.

We wholly disregard the testimony of the Port's expert Erik Eriksen.  Hearing his testimony at trial caused us to ponder "if this man is correct, what reasonable businessperson would ever have invested in this project?"  He denigrated not just the IFG facility but the Port facility as well suggesting there would be very little market for IFG's services.  We agree with the point made by IFG in its Post-Trial Memorandum:

> . . . it is clear that [C. Theriot and Erikson] had no qualms disregarding reality and common sense to arrive at the Port's preferred conclusion, which is that the IFG facility is supposedly an inferior terminal and could not have been more profitable even with a deeper draft.  Of course, this conclusion is without foundation and implies that IFG, the Port, Union Pacific, and the State of Louisiana made a huge mistake in investing in the IFG terminal located at the Port of Lake Charles.  Most importantly, this same faulty rationale is completely inconsistent with the Port's recent decision to reinforce its investment by proceeding with the dredging.

---

[38] All parties acknowledge there was a change in the tariff charged effective March of 2017.  So the months of August of 2015 through February of 2017 will be calculated with use of the "Tariff No. 1" amount and the months of March of 2017 through to the end would be calculated with use of the "Tariff No. 2" amount.

Doc. 443, p. 56.

We will charge IFG with the task of calculating the loss based on the findings we make herein.  It is to use the calculations prepared by Charles Theriot in his Exhibit D594 [Doc. 420, Att. 28] but it is to include 100% of the overtime charges attributable to each vessel as calculated by its own expert.  It is to use that per-vessel rate for 27 vessels (1.5 vessels for the 18 months from September of 2015 through February of 2017) at the Tariff No. 1 rate and 43 vessels (1.5 vessels for the months from March of 2017 through August of 2019 less two vessels to allow for the IFG explosion) at the Tariff No. 2 rate.  This will constitute the damages suffered by IFG for the Port's failure to have permitting available for Contraband Bayou to be dredged to its contracted-for depth by the time the IFG facility opened in July of 2015.

**B.**  The Port's Liability to IFG for violating LUTPA and Treble Damages

We also find that IFG has suffered ascertainable loss of money as a result of the Port's use of unfair and deceptive methods, acts, and practices.  We find these acts were knowingly and intentionally used by the Port against IFG for inappropriate purposes, authorizing IFG to bring this action.  We believe that imposing LUTPA damages against the Port in this matter would effectively sanction the Port for committing them and hopefully preserve and promote effective and fair competition and curb these business practices by the Port in the future, keeping it from unfairly restraining trade in this grain export business.

We find the following acts of conduct by the Port to be offensive to established public policy and to be immoral, unethical, oppressive, and unscrupulous resulting in substantial injuries to IFG:

- Improper issuance of the Default Notice on September 29, 2015.  See Finding of Fact **KK** above.

- Stating in the Default Notice that there were "no geotechnical restrictions relating to the wharf and dock facilities adjacent to the area to be dredged" when it had not had that issue properly evaluated by the proper experts. Even though at the end of the day (in March of 2019) the Port finally completed the geotechnical assessments necessary to conclude that safety of the adjoining structures was not an issue, that does not excuse the Port's deliberate obfuscation of the issue to the extreme prejudice of IFG, lengthening the time before the dredge could take place by many months.

- Using the existence of the Default Notice and the threat of eviction from the Port to exact concessions not owed to the Port, including but not limited to:

   - IFG's agreement to pay to the Port $66,000 to cover the cost of core sampling done by Anchor QEA for the Port after less-than-favorable sampling by AECOM and

   - IFG's agreement to pay all costs directly associated with amending the existing dredging permit.

- Using the existence of the Default Notice and the threat of eviction from the Port to ***attempt*** to extort other concessions not owed to the Port. These are discussed in finding **NN** above. We do find this behavior to have contributed to IFG's damages insofar as this behavior prolonged the effort to simply have the existing dredging permit amended thus delaying the dredge.

- Ignoring the mandates of the Louisiana Open Meetings Law, La. R.S. 42:11, by allowing an individual to speak at a meeting without giving prior notice to the public, including IFG, and attack IFG before its board of commissioners. We do note in finding **OO** that IFG was unable to establish any damages related to this activity but we do find it to be against public policy and immoral, unethical, oppressive, and unscrupulous and worthy of inclusion in this discussion.

- Issuing a second and totally bogus Default Notice related to damage caused to a transformer pad on Port property. See finding **PP**.

- Failing to deliver to IFG or Anchor QEA, IFG's agent in assisting the Port in amending its permit, the work product performed by the Port's engineers GBA from December of 2010 to August of 2011 outlining the steps and procedures that would be necessary to have the permit amended. Rather than just hand over the file or even simply having GBA continue with its project started in 2010, the Port required IFG to pay Anchor QEA to reinvent the wheel that had already been made by GBA. If the Port had shared that information no doubt months could

have been shaved from the application process, but the Port chose not to.

- Forcing IFG to pay (under protest) $510,000 toward the cost of using a waste disposal site that was to have been provided to IFG at no cost under the clear terms of the contract between the parties.

- Engaging in some sort of indescribable song and dance between Port and IFG experts on the stability issue once the Port finally admitted there was no analysis that would pass any engineering muster.   See finding **LLL**.  This unexplainable behavior resulted in there being no formal report completed until March of 2019 so that dredging could finally begin.

We have ruminated throughout this opinion why the Port would act in the way it did.  The Port's deliberate actions only further delayed resolution of their initial breach of contract, i.e. not having the area dredged to proper depth at the time of the terminal's opening, by several years.  The Port's actions were deliberate.  They were not a mistake.  They were not the result of clerical error or misstep.  And they were all conducted while IFG was under constant threat of eviction through issuance of a bogus Default Notice.

We believe these unscrupulous activities were engaged in purposely by the Port to cause IFG to abandon its project and leave the Port of Lake Charles.   Unfortunately for the Port it selected a victim that apparently is capitalized well enough to withstand these unfair trade practices.

In its post-trial memorandum the Port argues it should not be held liable for treble damages because it "never received any notice that supposed concealment of slope stability concern emails or the Port's earlier project to dredge all of Contraband Bayou were allegedly in violation of LUTPA . . . ."  Doc. 444, p. 70.  The Port correctly shows these particular claims were not made until IFG filed its restated complaint [Doc. 236] and that was after the Attorney General's Notice was issued on April 19, 2016.  *Id*.  Of course the reason those claims were not made until then is because IFG only learned of those issues through discovery and Freedom of Information Act

-60-

requests related to this litigation.  We have no indication that IFG forwarded the restated complaint to the Attorney General or that the Attorney General issued notice to the Port about that complaint. These facts, however, do not preclude an award of treble damages.

IFG's original complaint was centered on the Default Notice issued by the Port and was very detailed about the unscrupulous conduct of the Port with respect to the improper issuance of that notice and how the Port was using it as a cudgel to batter IFG into making concessions it was not obligated to make under the contract.  IFG could only complain of the conduct of the Port up to the date of filing and would not include information it had yet to discover.  Despite having been put on notice that this extortionary conduct (using a fraudulently issued Default Notice to exact concessions) was claimed by IFG to be violative of LUTPA and continuation of the conduct could subject the Port to treble damages, the Port continued with the conduct.  Through this litigation we have determined the Default Letter was not valid.  We also conclude it is unscrupulous as it is based upon untruths and fabrications.  Yet the Port continued to use the improperly issued Default Notice, after receiving notice from the Attorney General, to extort IFG and we have so found in our Findings of Fact detailed above.  Subsequently discovered concealment of slope stability concerns only added to the pile of information already provided that the Default Notice was improperly issued.  It also serves to relieve IFG from any claims that it should have dredged as soon as the waste disposal site was readied.  Subsequently discovered concealment of the Port's earlier project to dredge all of Contraband Bayou only adds further substantiates our conclusion that it was the Port that was responsible for permitting and also that delays in dredging were a direct result of the Port's inexplicable conduct.

Because the Port issued a false Default Notice and thereafter used it to extort IFG offends public policy and is immoral, unethical, oppressive, unscrupulous, and it caused substantial injury.

We find that the Port is responsible for treble damages owed to IFG for loss of profit related to shipments on larger vessels from the date of notice to the Louisiana Attorney General, April 29, 2016, to August of 2019.

**C.**  The MAG Payment

We granted summary judgment on that issue and that ruling has not changed.   We do not address it again here.

**D.**  Reimbursement for Cost Imposed by USACE for Improvement to the Dredge
Spoil Deposit Site Made available for Use by IFG

We found in Findings of Fact **S** and **GGG** above that IFG did not owe that money.  IFG is entitled to be reimbursed that amount.

**E.**  Request for Declaratory and Injunctive Relief

In accordance with IFG's request we do grant declaratory relief on the issue of the Default Notices finding both were improvidently issued and we further grant a mandatory injunction that the Port withdraw the outstanding Default Notices filed against IFG and its lender.  We also find that IFG is not in default of its lease with the Port and so declare.

As for the remaining issues for which IFG seeks injunctive relief, we are unable to do so. IFG seeks a blanket injunction prohibiting the Port from repeating what it has already done.  We would hope the imposition of LUTPA damages would accomplish that end.

**V.**
**APPLICATION OF FINDINGS OF FACT AND
CONCLUSIONS OF LAW TO THE RELIEF REQUESTED BY THE PORT**

The Port seeks the following relief in its counterclaims:

(1) Declaration that it did not breach the lease agreement and that its default notices were valid;

(2) Entitlement to costs and attorney fees under various theories; and

(3) Declaration that IFG is responsible for the charges imposed by USACE.

Given our findings above with respect to the claims of IFG, these counterclaims will be denied and dismissed with prejudice.

## VI.
### ATTORNEY FEES AND COSTS

IFG is entitled to attorney fees and all costs of this proceeding under LUTPA, La. R.S. 51:1409(A) as well as Section 24.10 of the Ground Lease Agreement.   P91, Doc. 419, att. 70, p. 31.  A separate order will issue setting forth a schedule for establishing this claim.

## VII.
### CONCLUSION

For the foregoing reasons we do find that the Lake Charles Harbor & Terminal District breached its contract with IFG Port Holdings, LLC, by failing to secure the appropriate permits that would allow IFG to complete its obligation to dredge to the depth designated in the contract by the time the facility opened in July of 2015.  As a result of that breach the Lake Charles Harbor & Terminal District owes damages to IFG Port Holdings, LLC, in an amount to be determined as set forth in this opinion above.

If the Port had simply behaved as a responsible business entity and worked with IFG (as IFG showed a willingness to do) to address the permitting problem quickly, these issues could have been resolved much sooner than they were.  Judging by the correspondences from IFG it is possible there may never have been litigation if the Port had been reasonable in its handling of the situation.  Even if IFG had claimed damages though, reasonable reaction of the Port would have resulted in the damages being far less than that being awarded to IFG today.

Instead the Port chose to engage in a course of conduct that we have concluded to be offensive to established public policy and to be immoral, unethical, oppressive, and unscrupulous. And we further conclude the course of conduct was engaged in deliberately by the Port for

improper reasons, particularly to run IFG off the Port property.  For that we have awarded treble damages to IFG for the period set forth herein.  This finding further entitles IFG to an award of attorney fees and costs yet to be determined.

Finally, we find in favor of IFG for the declaratory and injunctive relief sought, namely that the Default Notices were improvidently issued, and we grant a mandatory injunction that the Port withdraw the outstanding Default Notices filed against IFG and its lender.  We also find that IFG is not in default of its lease with the Port and so declare.  The counter claims of the Port are all denied and will be dismissed with prejudice.

Formal judgment will be signed when the appropriate damages have been calculated and attorney fees and costs determined.  A separate order will issue detailing further proceedings for establishing these matters.

THUS DONE this 31st day of July, 2020.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE