UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION


IFG PORT HOLDINGS, LLC    :   CIVIL ACTION NO. 16-cv-146


VERSUS         :

LAKE CHARLES HARBOR &
TERMINAL DISTRICT     :   MAGISTRATE JUDGE KAY
                  (By Consent)


## SUPPLEMENTAL WRITTEN REASONS FOR JUDGMENT


This matter was tried over approximately 20 days in March and April of 2019.  Following trial, the court issued Written Reasons for Judgment finding in favor of the IFG Port Holdings, LLC., ("IFG") and against Lake Charles Harbor & Terminal District ("the Port").  Doc. 464.  The procedural history up to the date of issuance of the written reasons is set forth therein and is not repeated here.  *Id.*

The day following publication of the Written Reasons for Judgment, the court issued an order giving the following instructions to the parties:

1.  IFG Port Holdings, LLC, ("IFG") is to present to the court through electronic filing the damages calculations it has been charged by the court to perform in the Written Reasons for Judgment, Doc. 464, p. 58;

2.  IFG is to present to the court through electronic filing the attorney fees and costs of this proceeding awarded to it by Section VI. Of the Written Reasons for Judgment. *Id.,* p. 63.

3.  Lake Charles Harbor & Terminal District ("the Port") is to present to the court through electronic filing the date it came into possession of D594 in the form it was presented at trial and a list of all Rules of Procedure, Local Rules, and/or orders pending in this matter which would have required it to disclose the existence of that report to IFG prior to Charles Theriot's appearance in open court on April 29, 2019.

Doc. 456.    Much activity ensued following issuance of that order, most of which was unrelated to the issue of damages and attorney fees and is not repeated here.

Hearing was held to determine the appropriate amount of damages and attorney fees attributable to our Written Reasons for Judgment.  Doc. 525.  Exhibits were introduced into evidence at the hearing and the matter was taken under advisement.[1]  The parties were allowed to provide additional briefing and that has now been done.  We have issued an Order Recapitulating Exhibits Placed Into Evidence at Hearing and Admitting New Exhibits.  Doc. 622.  The purpose of the order was two-fold:  (1)  to formally place into evidence documents produced by the parties subsequent to hearing to support their post-hearing memoranda and (2)  to centralize all exhibits considered on the issue of damages and attorney fees whether they were introduced at the hearing or admitted by virtue of the order.  In this Supplemental Written Reasons for Judgment, all citations referencing exhibits relied upon to determine damages and attorney fees are made to that entry regardless of where else found in the record.[2]

We are now able to render final judgment.  Preparatory thereto, we issue the following Supplemental Written Reasons for Judgment.

## I.
### LOST BUSINESS REVENUE

In the Written Reasons for Judgment, we found "the Port liable to IFG for losses attributable to IFG's inability to market itself as a fully operational terminal and to load larger, deeper draft cargo vessels as was intended by its original business plan" for the period running

---

[1] At hearing the Port moved to introduce into evidence an affidavit of the current Executive Director of the Port attesting to shipping activity (or lack thereof) by IFG through the Port since the trial of this matter.   The motion was denied but the Port did proffer the exhibit and it is located in the record at doc. 525, att. 1.

[2] The order does state where else in the record any particular exhibit may be found.

from September 2015 through August 2019.  Doc. 464, p. 55.  Monthly lost profits are calculated for each month of the relevant period using the following formula:

$$Loss_{mo.} = 1.5 \ vessels \ \times \left( \left( \frac{lost \ revenue}{vessel} \right) + \left( \frac{lost \ OT}{vessel} \right) \right)$$

The post-trial briefing raises questions as to how certain aspects of this calculation are to be made, the court now resolves those disputes.  The court uses IFG's damages calculations, with the following modifications:

### A.  Lost Profit Per Vessel

The court instructed the parties to submit briefing on calculation of lost profit per vessel, which the court has reviewed.  Docs. 470, 520, 523.  IFG was charged with the task, using Charles Theriot's work at D594 [doc. 622, att. 4].  *Id.* p. 58.  IFG calculated the lost profit per vessel based on a hypothetical 55,000 ton ("55 megaton" or "55 MT") vessel, which is the vessel size Charles Theriot used in his calculation spreadsheet.  Doc. 622, att. 4.

The Port submitted briefing arguing that, although Charles Theriot based his calculations on a hypothetical 55 MT vessel, the testimony of IFG's agricultural commodities expert Howard J. O'Neil did not support an assumption that *all* of IFG's business losses would consist of vessels of that size.  Doc. 520, p. 5-8.  O'Neil testified that "with a deeper draft" IFG would be able to service vessels ranging from "41,000 tons up to 59 or 60,000 tons."  Doc. 563, pp. 70-71 (March 28, 2019 Trial Transcript, pp. 1485:14 – 1486:12).  The Port argues that O'Neil's testimony and expert report [doc. 622. att. 30] supports a finding that the average per-vessel capacity of the lost business would be no more than 52,000 metric tons.[3]  Doc. 520, p. 7.

---

[3] O'Neil's expert report contains a list of 37 vessels too large for the pre-dredge facility that were unloaded in the U.S. Gulf region between September and November, 2016.  Doc. 622. att. 30, p. 5.  The average load size of these vessels was approximately 55 MT.  O'Neil's expert report also includes spreadsheets for the full 2016-17 crop year, identifying vessels that exported bulk grain from the Texas/Mobile/Lake Charles area, [*id.* at pp. 11-22] and the Mississippi River [*id.* at pp. 23-66]. The Mississippi River spreadsheet shows that in January 2017 twenty-five (25)

The court agrees with the Port's contention.  Using a 52 MT vessel to approximate the average vessel size of the lost business, we determine that the per-vessel lost profit is $365,560 for Tariff Period 1 and $386,360 for Tariff period 2, based on Charles Theriot's determination that the lost profit should be $7.03/MT for Tariff Period 1, and $7.43/MT for Tariff Period 2.

### B.  Lost Overtime Per Vessel

In the Written Reasons for Judgment, the court instructed IFG to calculate lost overtime charges attributable to each vessel using the calculations of its own accounting expert, John Theriot.  Doc. 464, p. 58.  IFG calculated that the overtime profit attributable to each vessel as $208,073 for Tariff period 1 and $245,715 for Tariff period 2.  Doc. 622, att. 1. The Port argues that overtime per vessel should be adjusted downward by 6% because there is approximately 6% less grain in a 52 MT vessel, compared to a 55 MT vessel.  Doc. 520, p. 8.  The court adopts the Port's reasoning and finds that the overtime profit attributable to each vessel is $195,588 for Tariff period 1, and $230,972 for Tariff period 2.

### C.  Total Lost Business Revenue

Adding the lost profits for Tariff Periods 1 and 2, we find that the total business losses associated with IFG's inability to market itself as a fully operational terminal and to load larger, deeper draft cargo vessels between September 2015 and August 2019 is $41,696,272.[4]

---

vessels in the 41,000 to 60,000-ton range loaded 1,285,068 metric tons of grain, for an average of 51,402 metric tons per vessel.  The Texas/Mobile/Lake Charles spreadsheet shows that between September 2016 and January 2017, sixty-eight (68) vessels in the 41,000 to 60,000-ton range loaded 3,541,987 metric tons of grain, for an average of 52,088 metric tons per vessel.

[4] As explained above, for Tariff Period 1, the per-vessel, per-month lost profit is $365,560, and the per-vessel, per-month lost overtime is $195,588.  Adding these figures and multiplying by 1.5 vessels per month, we arrive at the monthly lost business profit figure of  $841,722 for Tariff Period 1.  Over the 18 months covered by Tariff Period 1 (September 2015 to February 2017), the total lost profit comes to $ 15,150,996.

For Tariff Period 2, the per-vessel lost profit is $386,360 and the per-vessel lost overtime is $230,972.  Adding these figures and multiplying by 1.5 vessels per month, we arrive at the monthly lost business profit figure of $925,998.  During Tariff Period 2, there was an explosion at the IFG facility, temporarily reducing capacity.  We estimate the total lost profits for the two-month period June-July 2018 as $617,332, based on the prior finding that the IFG facility could have processed a single Panamax vessel during that 2-month period.  Adding the remaining 28 months (at

## II.
### TREBLED DAMAGES

The Written Reasons for Judgment found the Port responsible for treble damages owed to IFG for lost profit related to shipments on larger vessels from the date of notice to the Louisiana Attorney General, April 29, 2016, to August of 2019.  Doc. 464, pp. 61-62.   Trebling the monthly lost profits for each month from May 2016 to August 2019, the total trebled damages award is $104,887,488.  Including the damages not subject to trebling (awarded for the 8 months preceding April 29, 2016) the total damages award, inclusive of trebled damages, is $111,621,264.

## III.
### PREJUDGMENT INTEREST

IFG is entitled to both prejudgment and postjudgment interest.  *See Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 7 F.3d 1203, 1208 (5th Cir. 1993)("Situations should be recognized in which a wronged party can be afforded full relief only if awarded interest from the date payment should have been received rather than from the date of judgment alone.").  "Prejudgment interest is governed by state law in diversity cases."  *Id.*

The parties agree that Louisiana law should govern the calculation of prejudgment interest though they disagree as to the calculation.  Prejudgment interest "is meant to fully compensate the injured party for the use of funds to which he is entitled but does not enjoy because the defendant has maintained control over the funds during the pendency of the action."  *Sharbono v. Steve Lang & Son Loggers*, 696 So. 2d 1382, 1386 (La. 1997).  IFG calculates prejudgment interest from the date of judicial demand, January 29, 2016.  Doc. 470, p. 5.  The Port calculates prejudgment interest from the date of loss, not the date of judicial demand, reasoning for example that the

---

$925,998 per month) to the two-month losses of $617,332,  the total lost profit for Tariff Period 2 is $26,545,276.  The sum for the two Tariff Periods is the total damages figure, $41,696,272.

interest on damages from lost profit in December 2018 should begin as of December 31, 2018, not the petition date of January 29, 2016.  Doc. 520, p. 12-15.

Under Louisiana law, the start date for the computation of prejudgment interest depends on whether the damages sound in contact (ex contractu) or in tort (ex delicto).  *Amoco Prod. Co. v. Texas Meridian Res. Expl. Inc.*, 180 F.3d 664, 672-73 (5th Cir. 1999); *see also Sharbono*, 696 So. 2d at 1388.  Interest on damages ex delicto runs from the date of judicial demand.  "Legal interest shall attach from date of judicial demand, on all judgments, sounding in damages, 'ex delicto', which may be rendered by any of the courts."  La. R.S. § 13:4203.  When the rule for legal interest on ex delicto damages was created, it was recognized as an exception to the general rule that legal interest runs from the due date of the obligation in question, "calling for a more restrictive approach to legal interest where the damages arise ex delicto."  *Am. Cyanamid Co. v. Elec. Indus., Inc.*, 630 F.2d 1123, 1129 (5th Cir. 1980) (citing former La. Civ. Code art. 1938 (1870), since repealed and replaced).[5]  "The classical distinction between 'damages ex contractu' and 'damages ex delicto' is that the former flow from the breach of a special obligation contractually assumed by the obligor, whereas the latter flow from the violation of a general duty owed to all persons."  *Davis v. LeBlanc*, 149 So. 2d 252, 254 (La. App. 3 Cir. 1963).  To determine whether "the action springs ex contractu or ex delicto [ . . . ] the entire petition must be examined [ . . . ]."  *Id.* (omissions added)(noting that breach of contract may give rise to actions both 'ex contractu' and 'ex delicto' and that, when such occurs, the party injured may elect which action to be pursued).

---

[5] Until the 1984 revision, Louisiana Civil Code art. 1938 provided that, "all debts shall bear interest 'from the time they become due, unless otherwise stipulated.'" *Hill v. Hill*, 434 So. 2d 1078, 1082 (La. 1983)(quoting La. Civ. Code art. 1938 (1870)); *see also* revision comments to La. Civ. Code art. 2000 (1984).  The law now similarly provides, "When the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due [ . . . ]." La. Civ. Code art. 2000.

The allegations here are rooted in violations of a Ground Lease Agreement, suggestive of damages ex contractu arising from a breach of special obligations to IFG contractually assumed by the Port, rather than breach of a general duty owed to all persons.  IFG argues, however, that "[a] claim under the Louisiana Unfair Trade Practice Act" ("LUTPA") is a cause of action in tort. Doc. 523, p. 15.  In support, IFG cites LUTPA cases in which the court discusses or applies tort law principles, but neither case holds or supposes that all LUTPA actions are actions ex delicto for the purpose of computing judicial interest.[6]  IFG also notes that in this case the court found that the Port had engaged in deceptive methods, acts, and practices violative of LUTPA, essentially tortious conduct.  Doc. 523, p. 15-16 (citing doc. 464).

Although the conduct giving rise to the LUTPA trebled damages is essentially tortious in nature, the underlying the award of damages stems the Port's breach of its contractual obligation to dredge Contraband Bayou to the desired depth in a timely fashion.  Doc. 464, p. 55.  Bearing in mind the purpose of prejudgment interest to compensate injured parties for funds they are not able to use because of the defendant's conduct, and that IFG's damages grew over time as the Port's delay caused IFG increasing lost profits, the court finds that this action arises ex contractu for the purpose of computing judicial interest.  The court therefore finds that interest should be calculated from the date of loss per the Port's submissions, not the date of judicial demand.

Finally, IFG's submissions calculate judicial interest based on the trebled award.  The court rejects this approach.  The Port argues that LUTPA does not allow pre-judgment interest on the

---

[6] IFG cites to *Harris v. Poche*, 930 So. 2d 165, 172 (La. App. 4 Cir. 2006), *writ denied*, 938 So. 2d 74 (La. 2006) (noting that "cases cited by Defendants address breach of contract damages and do not address a cause of action in tort, under the Louisiana Unfair Trade Practices Act."); *Capitol House Pres. Co. v. Perryman Consultants, Inc.*, 745 So. 2d 1194, 1196 (La. App. 1 Cir. 1999), *writ denied*, 754 So. 2d 937 (applying the continuing tort doctrine to allegations of ongoing misrepresentation to find suit not perempted under LUTPA).  *See* doc. 523, p. 15.

trebled award.  The court agrees with the Port that trebled damages only begin to accrue interest from the date of judgment.  "Both federal and state jurisprudence is nearly uniform in holding that penalty interest is entirely of the post-judgment variety, and thus is calculated only from the date the penalties are awarded until the date they are paid."  *Sharbono*, 696 So. 2d at 1389.  "The LUTPA is penal in nature in that it allows the recovery of treble damages and attorney's fees."  *Cantu v. C.B. Fleet Holding Co.*, No. 2:06 CV 2168, 2007 WL 689566, at *2 (W.D. La. Mar. 1, 2007); *see also Glod v. Baker*, 899 So. 2d 642, 646 (La. App. 3 Cir. 2005), *writ denied*, 920 So. 2d 238 (La. 2006) ("LUTPA is essentially penal in nature, as demonstrated by its provisions for attorney fees and treble damages.").  Under Louisiana law, a party is not entitled to recover prejudgment interest on penalty awards. *See, e.g.*, *Lester v. Exxon Mobil Corp.*, 120 So. 3d 767, 784-85 (La. App. 4 Cir. 2013) (a plaintiff is only entitled to legal interest on punitive damages from the date of judgment). Instead, interest on penalty awards – like the treble damages awarded here – is "calculated only from the date the penalties are awarded until the date they are paid." *Overton v. Shell Oil Co.*, 937 So. 2d 404, 418 (La. App. 4 Cir. 2006) (citing *Sharbono*, 696 So. 2d at 1389).

In accordance with the findings above, the court awards prejudgment interest in the amount of $9,020,859.  Doc. 622, att. 32.

## IV.
### ATTORNEY FEES

The Court's Written Reasons for Judgement provide that "IFG is entitled to attorney fees and all costs of this proceeding under LUTPA, La. R.S. § 51:1409(A) as well as Section 24.10 of the Ground Lease Agreement." Doc. 464 at 63 (referencing Doc. 419, att. 70, p. 31).  Plaintiff IFG seeks to have the Court fix the amount of attorney's fees IFG is entitled to recover. The parties submitted briefing on attorneys' fees.  Docs. 469, 480, 519, 523.

### A.  Governing Law

When a federal court awards an attorneys' fees under state law, that state's law governs the calculation of the fee award.  *Mathis v. Exxon Corp.*, 302 F. 3d 448, 461 (5th Cir. 2002) ("State law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision.").  LUTPA provides for attorneys' fees upon the following finding:

> If the court finds the unfair or deceptive method, act, or practice was knowingly used, after being put on notice by the attorney general, the court shall award three times the actual damages sustained. In the event that damages are awarded under this Section, the court shall award to the person bringing such action reasonable attorney fees and costs.

La. R.S. § 51:1409(A).  This mandatory award of attorneys' fees is penal in nature, which means that the value of the attorney fee does not need to be proven, but still must be reasonable as judged by the 10 factors set forth by the Louisiana Supreme Court.  *Rincon v. Owens Collision & Repair Serv. Ctr., LLC*, 2018-0383, 2018 WL 4520384 at *14 (La. App. 1 Cir. 9/21/18).  The ten factors are:

> (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) amount of money involved; (5) extent and character of the work performed; (6) legal knowledge, attainment, and skill of the attorneys; (7) number of appearances made; (8) intricacies of the facts involved; (9) diligence and skill of counsel; and (10) the court's own knowledge.

*State, Dep't of Transp. & Dev. v. Williamson*, 597 So. 2d 439, 442 (La. 1992).

### B.  Reasonableness of Fees

The Final Judgment in this matter awards $2,115,509 in attorneys' fees to outside counsel for IFG for legal work performed Kean Miller, LLP ("KM"), Stockwell, Sievert, Viccellio, Clements & Shaddock ("SSVCS") and current counsel Mahtook & Lafleur LLC ("M&L").

In considering the reasonableness of this award, as to factors (5), (6), (7), and (9), the court presided over a 20-day trial and had ample opportunity to become familiar with the skill of the

attorneys involved, their extensive work, and diligence and with which it was undertaken.  The court's consideration of these factors is intertwined with a consideration of factors (1) through (4), concerning the ultimate result obtained, the importance of the litigation, and the amount of money involved.  The ultimate outcome—a trial award of over $41 million in damages against a commercial port, trebled pursuant to LUTPA, is an award of significant public importance.  IFG had an uphill battle in proving up the facts needed to convince the court of the justice of this award.  Counsel would not have achieved that feat without high-quality work and sustained diligence.

As to factor (8), the Written Reasons for Judgment support the court's conclusion that the facts involved were sufficiently intricate to support this award.  Doc. 464.  The Written Reasons for Judgment is sixty-four pages long, much of it single-spaced, and includes sixty-four discreet Findings of Fact made about activity that began in October of 2003 and continued past the date suit was filed and ended only when trial started.  *Id.*, pp. 6-48.  These conclusions were reached after consideration of the testimony elicited at trial by IFG counsel and much documentation presented in as concise a method as possible under the circumstances.  We know from our own experience in handling this matter that accumulation of information by IFG was burdensome in that the Port was not always forthcoming, a factor discussed in our Written Reasons for Judgment.  The greatest example of this point was the fact that IFG was unaware of one of the most significant issues ultimately considered by the court, i.e. whether dredging to the depth provided in the contract would compromise stability of the structures adjacent to the dredging area, until it found reference to the issue in documents produced as the result of a Freedom of Information Act request, not as the result of ordinary discovery to the Port.[7]  *Id.* p. 60.  Ferreting through information

---

[7] The issue of slope stability was one that arose while the parties were in litigation.  It is well discussed in our original Written Reasons for Judgment that the Port's improper issuance a Default Notice on September 30, 2015, and its refusal to withdraw that notice was the catalyst for this litigation.  That notice states that there were "no geotechnical restrictions related to the wharf and dock facilities adjacent to the area to be dredged . . ."  Doc. 464, p. 26.  IFG had

provided and extraordinary effort to obtain additional information was only possible through extraordinary time and effort expended by IFG counsel.

In short, we have no difficulty accepting that a great deal of time and effort was spent by IFG counsel in discovering information relevant to IFG's treatment by the Port as well as preparation of information for logical presentation at trial. Not in the record but presented to the court to assist in synthesizing information were multiple spreadsheets prepared by IFG counsel to assist the court. Additionally, IFG prepared and presented a flash drive for each witness testifying that would allow the court and the parties to easily access and review documents being discussed or testified to by that witness, saving the court the difficulty of culling through hundreds of documents produced.[8]

IFG's trial attorneys billed over 8,000 hours over a 41-month period [doc. 469, p. 4], at hourly rates that the Port acknowledges are roughly reasonable for the region. Doc. 519, pp. 11-12 (agreeing with the rates charged by SSVCS but requesting a modest reduction to $320/hour for KM's Baton Rouge attorneys). The court finds that these factors justify the number of hours billed and the rates charged.

At evidentiary hearing, court received into evidence attachments to IFG's Memorandum Accounting for All Recoverable Damages, Pre-Judgment Interest, Attorney Fees and Other Recoverable Costs [Doc. 622, att. 1-5], which includes a damages calculation spreadsheet setting

---

no indication it could not rely on this assertion by the Port until it culled through the information provided following the FOIA request, information that slope stability had been an issue since 2003. It was not until the deposition of a Port engineer in July of 2018, some two years after suit was filed, that IFG was told the basis for the Port's assurance of stability in the Default Notice was grounded on an "erase board calculation" performed by the Port engineer, not as the result of an actual engineering study. "Not a single engineer who testified in this litigation agreed that this type of an exercise would be appropriate to close the issue of stability of improvements adjacent" to the dredge area. Doc. 464, p. 22.

[8] This is not to say that the Port did not produce spreadsheets and flash drives as well. It did. But we are not considering time and effort spent by Port counsel.

forth the legal expenses incurred by IFG.  Doc. 622, att. 1.  The invoices for legal work performed on IFG's behalf are attached to Memorandum Regarding IFG's Submittal of Billing Records to Support Award of Reasonable Attorney Fees and Costs [Doc. 622, att. 16-22].

In the damages calculation spreadsheet [doc. 622, att. 1], IFG includes estimates of final unbilled amounts by previous counsel SSVCS and current counsel M&L.  IFG submitted the final M&L bill with its Memorandum Regarding IFG's Submittal of Billing Records to Support Award of Reasonable Attorney Fees and Costs.  Doc. 622, att. 22.  Non-party SSVCS submitted its final bill in connection with its Opposed Motion for Leave to File Motion Asserting Claim for Attorney Fees, and, Alternatively, Motion for Intervention.  Doc. 622, att. 23-24.  Although the court has denied SSVCS's motion for leave and motion to intervene [doc. 623], the court admitted into evidence the final SSVCS invoice [doc. 622, att. 23] and the affidavit concerning its accuracy [doc. 622, att. 24].

Based on the items received into evidence, the final judgment awards attorneys' fees to IFG in accordance with LUTPA, La. R.S. § 51:1409(A) as well as Section 24.10 of the Ground Lease Agreement, in the following amounts and for the following reasons:

### 1.      *Kean Miller LLP – $30,673.*[9]

The Port argues that the rates for Baton Rouge counsel from Kean Miller should be reduced from $325-$370 per hour to $320 per hour, the average rate in the Western District of Louisiana identified in a survey conducted in connection with another matter.  Doc. 519, p. 12 (referencing Norman affidavit from *Fontentot v. Safety Council of La.*, No. 2:16-cv-84 (W.D. La.) docs. 183, att. 3 & 195).  The affidavit of Merrick Norman in that matter states that in a 2017 survey of

---

[9] *See* Doc. 622, att. 16, p. 3 (legal fees and expenses spreadsheet); doc. 622, att. 17 (KM 12/15/15 invoice); doc. 622, att. 18, pp. 15-17 (KM 2/22/16 invoice); *id*, pp. 32-38 (KM 4/11/16 invoice); doc. 622, att. 20, pp. 79-81 (KM 10/19/17 invoice).

attorneys in Southwest Louisiana, those with 20+ years' experience reported billing between $450-$175 per hour; those with 10-20 years' experience reported billing between $275-$225 per hour, and those with less than 10 years' experience reported billing between $300-$155 per hour.  The rates for the Kean Miller timekeepers fall roughly within these ranges of billing rates charged in this area and will not be reduced.

       2.       **Stockwell, Sievert, Viccellio, Clements & Shaddock - $2,058,212.**[10]

The SSVCS fee submissions by IFG totaled $2,012,520.68, inclusive of the SSVCS 7/13/2020 invoice.  *See* Doc. 622, att. 16, p. 3 (spreadsheet summary of legal fees and expenses paid); doc. 622 atts. 18-22 (SSVCS invoices).  When making the initial submittal of attorneys' fees on 8/21/2020, IFG estimated that at the time approximately $37,185 in unbilled SSVCS fees remained.  Doc. 470, att. 1, p. 2.  The court will not make a fee award based on an estimate; however, the court has admitted into evidence SSVCS's final bill dated 9/15/2020, reflecting $45,691.21 in hourly fees and expenses.  Doc. 622, att. 23. At the evidentiary hearing on this matter, SSVCS confirmed that IFG paid all hourly billing on the SSVCS invoices.  Doc. 529, p. 82.  The fee award for SSVCS legal fees and expenses is therefore the sum of $2,012,520.68 and $45,691.21, or $2,058,212.

The Port argues that the SSVCS fee bill submissions show lack of billing judgment as that term is described in *Walker v. U.S. Dep't of Hous. and Urban Development*, 99 F.3d 761, 769 (5th Cir.1996), and that IFG has failed to bear the burden of demonstrating the reasonableness of its fee.  Doc. 519, p. 9.  The Port identifies items not exhibiting sound billing judgment on color-

---

[10] The SSVCS fee submissions by IFG totaled $2,012,520.68, inclusive of the SSVCS 7/13/2020 invoice.  *See* Doc. 622, att. 16, (spreadsheet summary of legal fees and expenses paid); doc. 622 atts. 18-22 (SSVCS invoices); doc. 622, att. 23.  At the evidentiary hearing on this matter, SSVCS confirmed that IFG paid all hourly billing on the SSVCS invoices.  Doc. 529, p. 82.  The fee award for SSVCS legal fees and expenses is therefore the sum of $2,012,520.68 and $45,691.21 (final bill).

coded invoices introduced into evidence.  Doc. 622, att. 6-8.  For the reasons discussed above, the court disagrees that IFG's fee submissions should be reduced as the Port suggests.  In doing so, the court notes that this fee award is made pursuant to both contractual[11] and statutory provisions, making this matter distinguishable from cases cited by the Port for the proposition that IFG cannot recover for billings that reflect "vague, excessive, redundant or duplicative, unproductive, improper block billings, or devoted to issues on which the party did not prevail or did not ultimately pursue."  Doc. 519, p. 9 (citing, *e.g.*, *Rodney v. Elliott Sec. Sols., LLC*, No. CV 19-11890, 2020 WL 4756490, at *16 (E.D. La. July 30, 2020), *report and recommendation adopted*, 2020 WL 4747666 (E.D. La. Aug. 17, 2020), *aff'd* 853 Fed. Appx. 922 (5th Cir. 2021) (where defendants' acceptance of offer of judgment agreed to pay "reasonable attorneys' fees" recoverable under the Fair Labor Standards Act, the court applied reduced a $41,335 proposed fee award to $22,003 in part because the requested fee award was not proportional to plaintiffs' total recovery of $17,750); *Walker*, 99 F.3d at 768-774 (after finding that plaintiffs were not the prevailing party on a certain issue and that fee awards under 42 U.S.C. § 1988(b) are limited to issues on which plaintiff was the prevailing party, recalculating fee award to eliminate time spent on issues for which plaintiffs did not prevail, "woefully inadequate" vague entries, and clerical time)).

### 3.     *Mahtook & Lafleur LLC - $26,624.[12]*

The Port does not challenge the fee award to M&L for reasons specific to M&L, therefore the award is made in the amount of the final M&L invoice.  Doc. 622, att. 22, p. 8-17.

---

[11] The Written Reasons determined that, "IFG is entitled to attorney fees and all costs of this proceeding under LUTPA, La. R.S. § 51:1409(A) as well as Section 24.10 of the Ground Lease Agreement. P91, Doc. 419, Att. 70, p. 31."  Doc. 464, p. 63.

[12] Doc. 622, att. 22, pp. 8-18 (M&L invoice).

Combining the awards for KM, SSVCS, and M&L, the final judgment in this matter awards a total of $2,115,509 in attorney fees to outside counsel.  We have reviewed the billing statements and find them to be reasonable, including the expenses reimbursed to the firms.  The SSVCS statements do include expenses such as a $7,350 payment to Stark Consultants, Inc. (for which an invoice was included) and a $4,500 retention amount to expert Theriot (responsibility for which was established by the retention letter submitted).  Doc. 622, att. 20, pp. 156-62.  Those amounts would otherwise be awardable separately, but there is nothing that precludes us from allowing them through an award of what IFG paid to SSVCS.  The court knows that they both acted as experts as they both testified.  With the exception of expenses reimbursed via the fee bill submissions, IFG will not be otherwise reimbursed the $167,788 expert fee claimed, as IFG did not submit an accounting for that figure or invoices to support.  *See* Section V, *infra*.

### 4.      General Counsel - 1,085,000.[13]

IFG requests the award of attorney's fees for participation by its CEO and General Counsel, Mr. Kabir Ahmad, in the amount of $ 1,085,000.  Doc. 469, pp. 4-8; doc. 622, att. 31.  Ahmad attested that he has been an attorney for 25 years, with experience both as outside and in-house counsel prior to becoming General Counsel for IFG.  Doc. 622, att. 31, ¶ 2.  Ahmad attested that he was "extensively involved in the litigation strategy" and in the drafting of "all significant pleadings and filings" and preparation for hearings and trial since the outset of this action.  *Id.* at ¶ 4-5.  He prepared a 4-page spreadsheet showing those submissions on which he made key contributions.  Doc. 622, att. 31, pp. 4-7.  He also listed 11 deponents and 15 trial witnesses for which he played an active role in developing the examination and/or cross examination outlines [Doc. 622, att. 31,  p. 14], explaining that he contributed knowledge of the material facts related

---

[13] Docs. 622, att. 31; 469, pp. 4-8.

to IFG's business, the industry, dredge permitting issues, and other personal knowledge of pertinent facts. *Id.*, ¶ 12-17.

Although Mr. Ahmad did not keep a contemporaneous record of his time as in-house counsel, he estimated that he "expended in excess of 3,500 hours" working on this litigation [d]uring the 41-month period, from January 2016 when IFG prepared and filed its initial Complaint through filing of IFG's Post Trial Brief in early June 2019 [ . . . ]" which equates to approximately 85 hours per month. *Id.*, ¶ 19.   The requested fee award applies an hourly rate of $310 to the estimated 3,500 hours expended, which is consistent with the market rates identified in Mr. Norman's report, discussed above.

For the proposition that attorneys' fees are recoverable when a party is represented by in-house counsel, IFG cites first to a case from the Southern District of Texas, where the federal court applied a Texas statutory provision allowing attorneys' fees to a prevailing party in a contract action. *Healix Infusion Therapy, Inc. v. Smith, M.D., P.C.*, No. H-09-2776, 2011 WL 4526551, at *1 (S.D. Tex. July 7, 2011), *report and recommendation adopted*, No. H-09-2776, 2011 WL 4526671 (S.D. Tex. July 28, 2011).   In that case, the court held, "Plaintiff is represented by in-house counsel. A corporation may recover fees for in-house counsel." *Id.*

In its reply, IFG also cites to a case from the United States Court of Appeals, Seventh Circuit, which devotes sustained attention to the question of whether a fee award can encompass the work of in-house counsel. *Textor v. Bd. of Regents of N. Illinois Univ.*, 711 F.2d 1387, 1396–97 (7th Cir. 1983).   In that case, the court considered the propriety of awarding attorneys' fees as sanctions for alleged willful abuse of the judicial process. *Id.* at 1395-96.   In remanding the case to the district court for further findings, the appellate court reversed the district court's prior determination that defendants employing salaried in-house counsel were not entitled to a share in

the fee award because they had incurred no additional litigation expenses because they had employed in-house attorneys with fixed salaries. *Id.* at 1396. Discussing precedent in that circuit, the reasoned that a defendant's use of salaried in-house counsel should not affect the size of the fee award because for every hour worked by in-house counsel on litigation, the client lost the value of that time that could have been spent on other legal matters:

> Thus, a prevailing party's decision as to how to engage counsel should have no bearing upon the court's decision to punish malfeasant counsel. The amount of fees actually incurred by the wronged party is a rational starting point for determining the size of the award, but it is no more than a guidepost.
>
> [ . . . ]
>
> Defendants chose to hire in-house counsel because that was the most efficient means of handling a large amount of legal work. The conclusion that plaintiff's suit did not harm these defendants rests upon the faulty assumption that in-house counsel would do nothing that would benefit defendants had they not been involved in this litigation, and that defendants therefore suffered no detriment. A more realistic assessment of the situation would indicate that for every hour in-house counsel spent on this case defendants lost an hour of legal services that could have been spent on other matters. The value to defendants of this lost time is, of course, the amount it would require to hire additional counsel to do the neglected work. Whether defendants actually hired additional counsel or went without legal advice on some matters is irrelevant as the value of the loss is the same. An award of reasonable fees will compensate defendants for this loss. To hold otherwise would either force these defendants to abandon in-house counsel for a more inefficient system or leave them open to frivolous suits by unscrupulous counsel undeterred by the threat of a fee award.

*Id.* at 1396-97 (omission added). We find this reasoning applicable here.

The Port responds that IFG's request to be compensated for the work of its general counsel is novel in Louisiana and the Fifth Circuit, and that the only relevant Fifth Circuit precedents do not provide a basis for a fee award for general counsel under Louisiana law. The Port cites to *Campbell, Athey & Zukowski v. Thomasson*, 863 F. 2d 398 (5th Cir. 1989), which it distinguishes as a diversity case based on inapplicable Texas law. In *Campbell*, the Fifth circuit reversed a

district court decision which held that a law firm represented by one of its own attorneys was not

entitled to a fee award under the relevant Texas statute.  *Id.* at 399, 403.  In doing so, the Fifth

Circuit focused on a statutory requirement that the successful litigant be "represented by an

attorney."  *Id.* at 399-400.  After a fruitless search for legislative history, the Fifth Circuit turned

to relevant Texas jurisprudence, where it found and quoted reasoning similar to that applied by the

Seventh Circuit above:

> Although we find no Texas cases on point, we are persuaded by other
> authority that a successful claimant may recover attorney's fees for in-house
> counsel. These courts have found that the award of reasonable attorney's
> fees for services performed by in-house counsel compensates the prevailing
> party for time counsel could have spent on other corporate matters.... The
> reasoning of these cases is in keeping with the rationale of section 38.001."

*Id.* at 400 (quoting *Tesoro Petroleum Corp. v. Coastal Ref. & Mktg., Inc.*, 754 S.W.2d 764, 766-

67 (Tex. App. 1988), *writ denied* (Nov. 23, 1988)). [14]  Although the Port also cites to a Bankruptcy

decision from this Circuit that conflicts with the reasoning of *Textor*, neither party cited to

Louisiana law conflicting with the reasoning of *Textor* and *Campbell*.

Because we find the reasoning of *Textor* and *Campbell* both persuasive and sufficiently

universal to allow the award to compensation IFG for the time of its general counsel over a 41-

month period, the court awards additional fees for general counsel in the amount of $1,085,000.

The final judgment also includes an award of $51,090.23, the amount of Mr. Ahmad's travel

expenses.  These are itemized, and the attached affidavit attests that the travel is related to litigation

and not purely for other business purposes.   Doc. 622, att. 31.

---

[14] *Tesoro* cites, *inter alia*, to *Textor*, the Seventh Circuit case discussed above.  754 S.W.2d at 767.

### C. Fee enhancement

Plaintiff seeks a fee enhancement under the reasoning of *Walker v. U.S. Department of Housing & Urban Development*, 99 F. 3d 761, 771-72 (5th Cir. 1996).  Doc. 469, pp. 7-8.  The court declines to award IFG an enhanced attorneys' fee, finding the fees charged and the hours worked during this multi-year litigation reasonable.  This case is not marked by any of the extraordinary circumstances that have justified an upward departure from billed amounts in other matters.

Caselaw differs with respect to whether an award of attorneys' fees under LUTPA should exceed the actual amount charged.  *Compare Thibaut v. Thibaut*, 607 So. 2d 587, 610 (La. App. 1 Cir. 1992)  (holding that the trial court erred in awarding fees in excess of amount actually paid for services) *and Volentine v. Raeford Farms of Louisiana, LLC*, 201 So. 3d 325, 357-58 (La. App. 2 Cir. 2016), *writs denied*, 212 So. 3d 1171 (on rehearing, declining plaintiffs' request to increase attorneys' fee award to a 40% contingency fee, where trial court awarded fees based on actual hours worked and a "substantial" $250/hour rate for senior partners); *with Cupp Drug Store, Inc. v. Blue Cross*, 201 So. 3d 319, 323 (La. App. 2 Cir. 2016); (holding that attorneys fee award was not limited to discounted $130/hr rate charged by plaintiff's attorney, where litigation was protracted and expert gave evidence that regional customary rate would be $250 to $300/hr).

The United States Supreme Court has suggested that fee enhancement should be seen as "rare" and "exceptional." *Perdue v. Kenny A. ex rel. Winn*, 130 S. Ct. 1662, 1674 (2010).  The most common circumstance for enhancement appears to occur when fee charged does not adequately reflect the attorney's true market value.  *See id.*; *see also Cupp Drug Store, Inc. v. Blue Cross*, 201 So. 3d 319, 322-23 (La. App. 2 Cir. 2016)(awarding plaintiff attorney's fees based on market rate, rather than discounted hourly rate); *Olivier Plantation, L.L.C. v. Par. of St. Bernard*,

151 So. 3d 965, 971 (La. App. 4 Cir. 2014) (same).  There is no evidence that IFG's counsel billed this matter below the regional customary rate [doc. 519, pp. 11-12], and no other rare or exceptional circumstances warrant a fee enhancement.  The court therefore declines to award IFG additional attorneys' fees beyond those incurred by counsel based on their hourly work billed at customary rates for this region.

## V.
### EXPERT FEES

IFG states that it has incurred expert fees and costs in the amount of $167,788.  Doc. 470, p. 7; doc. 622, att. 1, p. 2.  The Port responds that IFG provides only a vague description of these fees and expenses, unsupported by documentation.  Doc. 519, p. 20.  Except for two expert invoices included in the legal billing submitted by IFG and discussed above, the court finds that IFG has not itemized the expert fees or costs or provided documentation supporting the $167,788 figure.

The Written Reasons provide that, "IFG is entitled to attorney fees and all costs of this proceeding under LUTPA, La. R.S. § 51:1409(A) as well as Section 24.10 of the Ground Lease Agreement."  LUTPA provides in relevant part "In the event that damages are awarded under this Section, the court shall award to the person bringing such action reasonable attorney fees and costs." La. Stat. Ann. § 51:1409(A).  As quoted in the Written Reasons, Section 24.10 of the Ground Lease Agreement states, "[i]n case of any litigation between the Parties hereto regarding the subject matter hereof, the losing Party shall pay all reasonable costs and expenses (including reasonable attorneys' fees) of the prevailing Party." *See* doc. 464, p. 15.

Federal law generally governs the award of expert fees in federal diversity cases.  *See Chevalier v. Reliance Ins. Co. of Illinois*, 953 F.2d 877, 886 (5th Cir. 1992)("absent an express indication from the Louisiana legislature, or its courts, of Louisiana's special interest in providing litigants with recovery of expert witness fees in personal injury actions, federal law controls the

award of such fees as costs."); *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 689 (5th Cir. 1991) ("Absent an express indication from the Louisiana legislature, or its courts, of Louisiana's special interest in providing litigants with recovery of expert witness fees in redhibition cases, the trial court did not err in declining to exceed the statutory witness compensation provisions of section 1821."). Where, however, the Louisiana courts have held that state substantive policy is implicated in the award of expert witness fees as costs, such as in eminent domain proceedings, expert witness fees may be awardable under La. R.S. § 13:3666. *Chevalier v. Reliance Ins. Co. of Illinois*, 953 F.2d 877, 886 (5th Cir. 1992) (discussing *Henning v. Lake Charles Harbor and Terminal District*, 387 F.2d 264, 267 (5th Cir. 1968)). Whether federal or state law applies to the award of costs is relevant here because under La. R.S. § 13:3666, "Louisiana courts routinely allow additional compensation beyond the federal" daily limit set by 28 U.S.C. § 1821. *Chevalier v. Reliance Ins. Co. of Illinois*, 953 F.2d 877, 885 (5th Cir. 1992).

Neither federal nor Louisiana state courts have explicitly determined that an award of expert witness fees as costs under LUTPA is a matter of state substantive policy. The court has already determined that LUTPA provides for a mandatory award of costs here. A Louisiana state court awarding mandatory costs under LUTPA has determined that "[e]xpert witness fees are to be taxed as costs." *Rincon v. Owens Collision & Repair Serv. Ctr., LLC*, 2018-0383 2018 WL 4520384, at *9 (La. App. 1 Cir. 9/21/18) (citing La. R.S. § 13:4533). This court concludes that, given the deterrent intent of LUTPA and the potential size of expert fees in matters alleging unfair trade practices, the award of expert witness fees as costs may be substantive state policy in Louisiana. Here, the contract also awards "fees and costs," and its interpretation is governed by Louisiana law, further indication that Louisiana law should govern the award of costs in this matter.

The relevance of this conclusion is limited here because, under Louisiana law, expert fees are not awardable as costs absent written documentation or explanatory testimony. La. R.S. § 13:3666; *Rincon,* 2018 WL 4520384 at *16. "[T]he party seeking costs has the burden of proving the reasonable value of the expert's out-of-court work." *Id.*; *see also Roach v. State through Dep't of Transportation & Dev.*, 329 So. 3d 974, 1026-29 , (La. App. 3 Cir. 21), *writ denied*, 330 So. 3d 621 (La. 1/12/22), (discussing constraints on court's discretion in awarding expert witness fees under Louisiana law).

To the extent that IFG has summitted items awardable as costs as part of its legal fee submissions, the court determines that it is appropriate to award those items as costs for the reasons above. This includes the $4,500 Theriot retainer (which IFG reimbursed to SSVCS via its legal billing), [doc. 622, att. 20, p. 156] and the Stark Consulting bill for $7,350 [doc. 622, att. 20, p. 159-60]. The latter is supported by invoices attached to the legal fee bill, and the responsibility for the former is evidenced by the retention agreement incorporated into the fee bill. *Id.*

With the exception of invoices included in the legal billing invoices submitted by IFG (discussed above), the court agrees with the Port's contention that IFG's claimed expert fees in the amount of $167,788 are unsupported by documentation and therefore not awardable because their reasonableness cannot be determined.

## VI.
### OTHER AWARDS

### A. Dredge spoil payment made under protest:  $510,000

The court has already determined that IFG did not owe the $510,000 dredge spoil payment made to the Port on April 5, 2017, under protest. Doc. 464, pp. 42-43, 62. This is included as an additional item of damage in the final judgment.

**B.  Engineer consultants: $50,470**

IFG claims $50,471 for reimbursements of payments made to engineer consultants.  Doc. 622, att. 1.  In supplemental briefing [doc. 532], IFG explains that this payment was among the costs associated with the $510,000 payment IFG made to the Port to build additional capacity in DMPF 3 (the Port's dredge spoil area), on or about April 7, 2017, and that these costs were prayed for in the Amended Complaint. Doc. 532, p. 9 (quoting doc. 136, ¶ 160).  IFG attaches LJA invoices in the amount of $50,471, [doc. 622, att. 29] which IFG paid after representations by Channing Hayden that pre-survey work was required by USACE.  Doc. 532, p. 9.

The court finds that IFG is entitled to reimbursement of these funds these payments made to engineer consultants in connection with the $510,000 dredge spoil payment.

**C.  Port dredge consultant payments: $77,460**

The November 24, 2015, payment of $66,000 and the December 15, 2015, payment of $11,460 listed in IFG's calculation of damages [doc. 622, att. 1] are referenced in IFG's Amended, Supplemental and Restated Complaint:

> E. Regardless of the factual inaccuracies contained in the Port's default letter and the speciousness of the Port's claims and defenses, which are directly contradicted by the Port's own records, IFG has satisfied all of the Port's demands set forth in the Port's September [30], 2015 letter by: (1) Paying the Port for the cost of retesting AECOM sampling of $66,000.00 under duress; (2) Paying the Port an additional $11,460.74, under duress, which it demanded before it would allow results of the second sampling and testing results to be used for the Port's own dredging permit amendment; (3) Agreeing to pay all costs associated with amending the Port's existing dredging permit; and (4) Engaging a consultant at the behest of the Port to assist the Port with the dredging permit amendment.

Doc. 236 at 21.

The Court has found that the Port's default notice "was not validly issued." [doc. 464,  pp. 48, 60], and that IFG did not owe the costs imposed by USACE for improvement to the dredge

spoil deposit site made available to IFG.  Doc. 464, p. 62.  Although not explicitly made under protest, the $66,000 and $11,460 payments were not made voluntarily, because they were made under duress in connection with the Port's demands in the default notice.  The Court concludes therefore that IFG therefore entitled to reimbursement of these funds.

## VII.
### CONCLUSION

For the foregoing reason, the Final Judgment entered contemporaneously herewith makes the following awards in favor of IFG Port Holdings, LLC and against Lake Charles Harbor & Terminal District:

|  |  |
|---|---:|
| Total Damages[15] | $ 111,621,264 |
| Pre-Judgment Interest | 9,020,859 |
| Outside Counsel Attorney Fees | 2,115,509 |
| General Counsel Fees | 1,085,000 |
| General Counsel Travel Expenses | 51,090 |
| Port Dredge Consultant Payments | 77,460 |
| Engineer Consultants | 50,470 |
| Dredge Spoil Payment | 510,000 |
| **Total Award** | **$ 124,531,652** |

A final judgment incorporating this award is being issued forthwith.

THUS DONE AND SIGNED in Chambers this 14th day of March, 2022.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE

---

[15] This figure includes regular damages of $41,696,727 plus trebled damages for the months of April 2016 through August of 2019 in the amount of $104,877,488.