# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 21, 2023

Lyle W. Cayce
Clerk

No. 22-30398

I F G Port Holdings, L.L.C.,

*Plaintiff—Appellee,*

*versus*

Lake Charles Harbor & Terminal District, *doing business as* Port of Lake Charles,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 2:16-CV-146

Before Graves, Higginson, and Douglas, *Circuit Judges.*

Stephen A. Higginson, *Circuit Judge*:

In 1979, Congress authorized Article III judges to refer civil cases to non-Article III magistrate judges "[u]pon consent of the parties." Federal Magistrate Act of 1979, Pub. L. No. 96-82, 93 Stat. 643, 643. Five years later, then-Judge Anthony Kennedy explained, writing for the *en banc* Ninth Circuit, that "consent of the parties is essential to the constitutionality of the Act." *Pacemaker Diagnostic Clinic of Am., Inc. v. Instromedix, Inc.*, 725 F.2d 537, 546 (9th Cir. 1984) (en banc). Shortly after, our court followed the lead of other circuits in upholding the constitutionality of consent-based

No. 22-30398

magistrate-judge referrals. *Puryear v. Ede's Ltd.*, 731 F.2d 1153, 1154 (5th Cir. 1984).

In this case, the parties consented to have their sprawling commercial dispute tried before a United States magistrate judge. But, allegedly unbeknownst to the defendant, the judge was longtime family friends with the lead trial lawyer for the plaintiff. Specifically, the lawyer had been a groomsman in the judge's own wedding, and the judge officiated the wedding of the lawyer's daughter three months before this lawsuit was filed. None of this information was disclosed to the defendant. After a twenty-day bench trial, the magistrate judge rendered judgment for the plaintiff, awarding $124.5 million, including over $100 million in trebled damages.

After the issuance of the judgment and award, the defendant learned about the undisclosed longstanding friendship and sought to have the magistrate-judge referral vacated. The district judge denied the request and denied discovery on the issue. The defendant now appeals.

We conclude that the facts asserted here, if true, raise serious doubts about the validity of the defendant's constitutionally essential consent to have its case tried by this magistrate judge. We therefore VACATE the district court's order. Because the facts are not sufficiently developed for us to decide whether the defendant's consent was validly given or whether vacatur of the referral is otherwise warranted, we REMAND to the district court for an evidentiary inquiry consistent with this opinion.

## I.

This is an appeal from a judgment following a twenty-day bench trial before a magistrate judge. The case involves a years-long contract dispute between a commercial tenant, plaintiff-appellee IFG Port Holdings, LLC

("IFG"), and its commercial landlord, defendant-appellant the Lake Charles Harbor & Terminal District, d/b/a the Port of Lake Charles ("the Port"). Following the trial, the magistrate judge entered judgment in favor of IFG and awarded it more than $124 million. The Port appeals.

## A.

The Port sits on the corner of Contraband Bayou and a federal ship channel in Lake Charles, Louisiana. This dispute involves Berth 8, which sits at the very corner of the intersection of the two waterways. Starting around 2007, IFG and the Port began talks about IFG's desire to use Berth 8 to develop an export grain terminal where vessels would load and unload cargo for shipment. In January 2008, IFG and the Port executed a Letter of Intent ("LOI"), which explained that the waterway alongside Berth 8 would need to be dredged to a lower depth than its current state. The dispute in this case revolves principally around the question of which party, IFG or the Port, had the responsibility to secure the permitting necessary to complete the dredging.

In 2011, IFG and the Port executed the Ground Lease Agreement (the "Lease"), which provided that IFG would "arrange for and complete the initial dredging" to a depth of forty-two feet, but did not specify which party would obtain the necessary permitting from the U.S. Army Corps of Engineers.

IFG's facility was completed in July of 2015. But no permit had been issued for the necessary dredging, so the dredging had not happened. On August 6, 2015, IFG sent a letter to the Port stating that the waterway must be dredged to forty-two feet, and that, short of that depth, IFG's business capabilities would be "substantially limit[ed]." Noting that the Port had informed IFG that certain necessary soil testing and "the subsequent consent and permitting by relevant authorities" would take several months or longer,

IFG asserted that the "circumstances are beyond the control of IFG and are an event of Force Majeure as contemplated by the Lease."

On September 30, 2015, the Port responded with a letter (the "Default Notice") asserting that IFG was in breach of its obligations under the Lease. The Port wrote that "IFG was free to begin dredging Berth No. 8" as of January 1, 2012, and that "IFG chose to take no action or even discuss dredging relative to Berth 8 and Contraband Bayou until January 2015, a mere six months before the Rent Commencement Date." The Port stated that, "upon issuance of the required Corps permit amendment allowing for dredging to a depth of -42 feet MLG [mean low gulf], the dredging IFG is required to perform can proceed." The Port concluded that "the delays in the performance of IFG's dredging obligations . . . are totally within the control of IFG," and gave notice that IFG was in default of the Lease.

On January 29, 2016, IFG sued the Port in the U.S. District Court for the Western District of Louisiana. IFG alleged that the Port had breached the Lease and violated the Louisiana Unfair Trade Practices Act ("LUTPA"). IFG sought, *inter alia*, "[d]eclaratory relief finding that the alleged dredging default . . . [was] issued by the Port to IFG in error," an "injunction ordering the Port to withdraw all outstanding default notices against IFG and IFG's bank," an "injunction ordering the Port to proceed diligently to obtain the required amended dredging permit allowing IFG to dredge to 42 feet as required by the Lease," as well as "[a]ll monetary damages as may be appropriate and proven at trial including treble damages and attorney fees."

On January 27, 2017, the parties consented to have the case tried by a magistrate judge. On February 2, 2017, then-Chief Judge Dee Drell referred the case to Magistrate Judge Kathleen Kay.

No. 22-30398

**B.**

Magistrate Judge Kay held a bench trial consisting of twenty days of trial testimony. Trial started on March 18, 2019 and ended on April 30, 2019. Twenty-three witnesses testified in total. On July 31, 2020, Magistrate Judge Kay issued a lengthy written order containing her findings of fact and conclusions of law.

In her written order, Magistrate Judge Kay found that the Port, *inter alia*, "breached its contract with IFG . . . by failing to secure the appropriate permits that would allow IFG to complete its obligation to dredge to the depth designated in the contract by the time the facility opened in July of 2015." Magistrate Judge Kay found that while the Lease did not specify which party bore the obligation to acquire the permitting necessary for dredging, "the actions of the parties before execution of the [Lease] and after execution show clearly the Port knew these were its responsibilities." Magistrate Judge Kay therefore found the Port "liable to IFG for losses attributable to IFG's inability to market itself as a fully operational terminal and to load larger, deeper draft cargo vessels as was intended by its original business plan."

Magistrate Judge Kay found that IFG was entitled to lost-profits damages for each vessel "lost" by virtue of the Port's breach, *i.e.*, vessels that were "unable to be loaded for lack of proper depth at the IFG facility." Following post-trial briefing based on the appropriate formula for this calculation, Magistrate Judge Kay found that IFG's lost profits attributable to the Port's breach totaled $41,696,272.

Magistrate Judge Kay further found that the Port's conduct violated LUTPA, which proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A). She listed nine "acts of conduct" by the Port

that she found "to be offensive to established public policy and to be immoral, unethical, oppressive, and unscrupulous resulting in substantial injuries to IFG." Magistrate Judge Kay found that the Port's "unscrupulous activities were engaged in purposely by the Port to cause IFG to abandon its project and leave the Port of Lake Charles."

Magistrate Judge Kay further determined that IFG was entitled to treble damages corresponding to IFG's lost profits starting from the date of an April 2016 written notice sent from the Attorney General to the Port, through August of 2019, when the lost-profits window closed. The trebled lost profits, plus the non-trebled lost profits, resulted in a damage award of $111,621,264.

Magistrate Judge Kay also ordered various other awards to IFG, including over $9 million in prejudgment interest and more than $3 million in attorney's fees. The ultimate award in favor of IFG totaled $124,531,652.

## C.

After the issuance of Magistrate Judge Kay's order, the parties engaged in years of post-trial motion practice pertaining primarily to the question of diversity jurisdiction and the referral to the magistrate judge. Specifically, the Port asserted that IFG, as a limited liability company ("LLC"), had not sufficiently alleged the citizenship of its owner members and moved to dismiss for lack of subject-matter jurisdiction on that basis. The Port further alleged that it had uncovered a previously undisclosed relationship between Magistrate Judge Kay and William Monk, IFG's lead trial counsel, and accordingly moved to have the district judge vacate the referral to the magistrate judge. IFG prevailed on both the jurisdictional and magistrate-judge-referral disputes. These two issues, which remain live on appeal, are discussed in further detail *infra* Sections II and III, respectively.

Magistrate Judge Kay entered judgment in favor of IFG on March 14, 2022, and a second judgment, awarding further attorney's fees and costs, on May 19, 2022. She denied the Port's final motion for a new trial on June 13, 2022.

The Port appealed, raising challenges relating to subject-matter jurisdiction, the denial of its motion to vacate the referral to the magistrate judge, and various merits issues arising from the bench trial.

## II.

The Port first raises a series of challenges relating to the district court's management of the parties' dispute regarding whether IFG had established subject-matter jurisdiction.

### A.

While the Port stops short of affirmatively contending that this court lacks subject-matter jurisdiction, it attempts to raise doubts about it. We must first satisfy ourselves that we have jurisdiction before proceeding to the merits of the Port's other challenges. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998). We therefore first address whether IFG has established federal jurisdiction. This court reviews *de novo* the determination that diversity jurisdiction exists. *Bynane v. Bank of N.Y. Mellon for CWMBS, Inc. Asset-Backed Certificates Series 2006-24*, 866 F.3d 351, 356 (5th Cir. 2017) (citation omitted).

IFG invokes diversity jurisdiction under 28 U.S.C. § 1332, which gives district courts jurisdiction over "all civil actions where the matter in controversy exceeds the sum or value of $75,000" and "is between citizens of different States," or "citizens of a State and citizens or subjects of a foreign state." *Id.* § 1332(a)(1)-(2). Diversity jurisdiction requires "complete

diversity," which means that "all persons on one side of the controversy [must] be citizens of different states than all persons on the other side." *McLaughlin v. Miss. Power Co.*, 376 F.3d 344, 353 (5th Cir. 2004) (per curiam) (citation omitted). The burden of establishing complete diversity rests on the party invoking federal jurisdiction. *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 919 (5th Cir. 2001). "In making a jurisdictional assessment, a federal court . . . may look to any record evidence, and may receive affidavits, deposition testimony or live testimony concerning the facts underlying the citizenship of the parties." *Coury v. Prot*, 85 F.3d 244, 249 (5th Cir. 1996). "The court has wide, but not unfettered, discretion to determine what evidence to use in making its determination of jurisdiction." *Id.* (citation omitted).

It is undisputed that the Port is a Louisiana citizen, as it is a political subdivision created by statute. La. Rev. Stat. § 34:201 ("The Lake Charles Harbor and Terminal District is created as a political subdivision of the state . . . ."); *Moor v. Alameda Cnty.*, 411 U.S. 693, 717 (1973) ("[A] political subdivision of a State, unless it is simply 'the arm or alter ego of the State,' is a citizen of the State for diversity purposes." (citations omitted)). IFG is an LLC, and an LLC's citizenship for diversity purposes is determined by the citizenship of all of its members. *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008). Accordingly, for complete diversity to exist, none of IFG's members may be citizens of Louisiana.

The Port first emphasizes that IFG did not adequately allege diversity in its pretrial pleadings. The Port is correct. To meet its burden of establishing complete diversity, a litigant must "distinctly and affirmatively allege the citizenship of the parties." *Smith v. Toyota Motor Corp.*, 978 F.3d 280, 282 (5th Cir. 2020) (cleaned up) (citation omitted). When LLCs are involved, the party invoking jurisdiction must "specifically allege the citizenship of every member of every LLC . . . involved in [the] litigation."

*Id.* (quoting *Settlement Funding, LLC v. Rapid Settlements, Ltd.*, 851 F.3d 530, 536 (5th Cir. 2017)). Here, IFG did not allege the citizenship of its members in its initial complaint, nor in any of its amended or supplemental complaints filed before trial.[1] The jurisdictional allegations were therefore deficient at the pleading stage.

But this deficiency was cured by IFG's post-trial amendment. Under 28 U.S.C. § 1653, "[d]efective allegations of jurisdiction may be amended . . . in the trial or appellate courts." *Id.*; *see Howery*, 243 F.3d at 920 n.39 ("[P]rior to judgment, a party may amend its pleadings to allege omitted jurisdictional facts."). The Port acknowledges this rule but argues that the amended allegations are "generalized" and "remain[] defective." But the Port does not explain why this is so. The amended complaint includes a two-page exhibit fully alleging the citizenship of each owner-member of the LLC, as required by the case law. Nor does the Port otherwise cast doubt on or articulate any substantive challenge to IFG's foreign citizenship, which is supported by an ownership chart,[2] as well as multiple affidavits and their attachments.[3] Put differently, the Port does not seriously argue that diversity

---

[1] IFG alleged merely that the court "has subject matter jurisdiction over the claims made in this matter based on diversity of citizenship," and that "[c]omplete diversity exists because the Plaintiff and the sole Defendant to those claims share no common state of incorporation or principal place of business and Plaintiff's claims in this matter exceed $75,000." IFG's subsequent amendments to the complaint did not modify or add to this jurisdictional allegation.

[2] The chart lists the entities, sub-entities, and individuals that comprise IFG Port Holdings, LLC, and includes residence and citizenship information for each. None of the listed places—of residence, citizenship, or state of organization—is Louisiana.

[3] Before trial, IFG filed into the record two sworn and notarized affidavits from its CEO, attesting that (1) "[n]o individual owner of IFG, directly or indirectly, is a resident or citizen of the State of Louisiana," and (2) "[n]o juridical entity having any ownership interest in IFG Port Holdings LLC, at any level, is a resident of or has its principal place of business located within the State of Louisiana." After trial, IFG filed more affidavits, attesting to the citizenship, domicile, and, as applicable, principal places of business of the

is lacking. Because the record documents indicate that none of IFG's members was a citizen of Louisiana on the date this suit commenced, and because the Port offers no specific reason to doubt that IFG is not a citizen of Louisiana, we conclude that complete diversity exists.

**B.**

The Port relatedly requests that the case be remanded so the Port can take depositions relating to IFG's ownership. We reject this request. The party seeking jurisdictional discovery must "make clear which 'specific facts' he expects discovery to find." *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 326 (5th Cir. 2021) (citation omitted). The Port fails to do so. It seeks to cross-examine IFG's owners who submitted sworn affidavits attesting to IFG's citizenship, but it does not articulate what it expects a deposition of those affiants to uncover. The Port does not raise any credibility concerns regarding IFG's citizenship evidence, *compare Settlement Funding, LLC*, 851 F.3d at 537 (noting that the defendant "brought to this court's attention filings with the [SEC] that cast doubt on the accuracy of the [affidavit]" containing an LLC's citizenship allegations), nor does it contend that the documents are facially deficient to carry IFG's burden to establish jurisdiction. The Port simply asks to continue probing so it can "ascertain" IFG's citizenship. This court has rejected litigants' attempts to conduct "jurisdictional fishing expedition[s]," *Johnson*, 21 F.4th at 326 (citation omitted), and we reject the Port's attempt to do so here.

**C.**

Finally, the Port asserts that IFG may not rely on sealed documents to establish diversity. Specifically, the Port contends that "[t]here is no legal

—————————

people and entities comprising IFG as of January 29, 2016, when IFG filed its lawsuit. Again, the materials contain no evidence of Louisiana citizenship.

basis for a court sealing a complaint or exhibits concerning diversity," and that "[j]urisdiction cannot be asserted based on sealed documents." To the extent the Port contends that, as a general rule, jurisdictional facts cannot be established by material filed under seal, the Port cites no authority for this proposition, and we find none. Suggesting the contrary, district courts have relied on sealed material to find facts supporting diversity jurisdiction. *See, e.g.*, *Madrid v. Galp Waters Ltd. P'ship*, No. 12-3252, 2014 WL 12539253, at *1 n.4 (S.D. Tex. June 6, 2014) (finding diversity jurisdiction based on the defendants' sealed "statement disclosing the citizenship of those persons composing [their] partnerships"); *Brandner v. State Farm Mut. Auto. Ins. Co.*, No. 17-454, 2017 WL 4678486, at *2 (M.D. La. Sept. 7, 2017), *report and recommendation adopted*, 2017 WL 4678217 (M.D. La. Oct. 17, 2017) (finding the amount in controversy required by § 1332 satisfied based on a proof-of-loss document filed under seal); *cf. Payton v. Entergy Corp.*, No. 12-2452, 2013 WL 5722712, at *12 n.7 (E.D. La. Oct. 21, 2013) (making specific citizenship findings in a sealed addendum, in the context of a CAFA diversity dispute under 28 U.S.C. § 1332(d)). Nothing in § 1332 suggests that this practice is a problem. In other words, the existence of jurisdiction is not undermined by the fact that certain supporting evidence is under seal.

However, the Port also argues that Magistrate Judge Kay abused her discretion in sealing the material related to IFG's citizenship. The Port asks us to unseal "[a]ll parts of the sealed record," including "IFG's amended complaint, its exhibit, all related pleadings, and the magistrate's order." In this sense, the Port does not attack the jurisdictional findings themselves and instead seeks only to have the jurisdiction-related materials unsealed. The Port is correct that the materials should be unsealed.

When a party seeks to file material under seal, the judge must "undertake a case-by-case, 'document-by-document,' 'line-by-line' balancing of 'the public's common law right of access against the interests

favoring nondisclosure'" and explain its sealing decision "at 'a level of detail that will allow for this Court's review.'" *Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410, 419 (5th Cir. 2021) (quoting *United States v. Sealed Search Warrants*, 868 F.3d 385, 393, 397 (5th Cir. 2017)). A court errs "if it 'ma[kes] no mention of the presumption in favor of the public's access to judicial records' and fails to 'articulate any reasons that would support sealing.'" *Id.* (alteration in original) (quoting *SEC v. Van Waeyenberghe*, 990 F.2d 845, 849 (5th Cir. 1993)).

The appellate record in this case is 40,705 pages long, and approximately 760 of those pages are sealed. It appears from the record—and the parties do not contend otherwise—that each sealed document filed by the parties was first subject to a motion to seal and a court order granting the motion.[4] The orders—themselves unsealed—are generally either one-sentence text orders on the docket, or simple signoffs on the movants' proposed orders, containing no reasoning. The only reasoned decision regarding the decision to seal is the magistrate judge's March 2, 2022 order denying the Port's motion to unseal IFG's ownership chart.

We recently instructed that "courts should be ungenerous with their discretion to seal judicial records," *id.* at 418, and warned that "we heavily disfavor sealing information placed in the judicial record," *June Med. Servs., LLC v. Phillips*, 22 F.4th 512, 519-20 (5th Cir. 2022) (citation omitted). In light of these admonitions, it is clear that this record was over-sealed. The district judge and magistrate judge permitted sealing of essentially everything related to IFG's ownership, including not only the direct evidence of citizenship (*e.g.*, the affidavits, ownership chart, and identification

---

[4] The apparent exception is Magistrate Judge Kay's own sealed orders, which the court was, of course, able to file under seal with no accompanying motion practice.

No. 22-30398

documents), but also all related motions, memoranda, and court orders. And until the Port sought to unseal the ownership chart, Magistrate Judge Kay's orders permitting sealing were unaccompanied by any explanation. These orders fail to acknowledge the public interest in access to judicial records and "fail[] to 'articulate any reasons that would support sealing.'" *Le*, 990 F.3d at 419 (citation omitted). These orders must be vacated.

One order requires separate treatment. As noted, Magistrate Judge Kay did issue a reasoned decision in denying the Port's motion to unseal IFG's ownership chart. In her order, Magistrate Judge Kay acknowledged the "presumed public interest in the transparency of judicial proceedings and open access to judicial records," and noted that the analysis proceeds case by case. But she concluded that disclosure of the sealed information would "impinge on the privacy interests of [IFG's] members." Magistrate Judge Kay further found that the information is of minimal interest to the public as it is relevant only to IFG's citizenship and not "the larger substantive issues in the case." Magistrate Judge Kay stated that, while she "would not endorse [a] blanket rule that would allow record documents related to citizenship . . . to be placed under seal in all circumstances," the circumstances surrounding this sealed material are "unique" because the Port contested IFG's citizenship after trial, when discovery had already concluded. Had the dispute played out before trial, Magistrate Judge Kay explained, "some or all of the information now placed in the record under seal might have been exchanged via written discovery or deposition, instead of being filed directly into the record." Ultimately, she credited IFG's "legitimate privacy interest" and denied the Port's request to unseal.

This particular ruling, therefore, at least dodges the biggest pitfalls flagged in *Le*: that the lower court must "mention . . . the presumption in favor of the public's access to judicial records" and articulate its reasons in support of sealing. *Id.* But Magistrate Judge Kay nonetheless erred in

concluding that sealing of this chart was warranted. The affidavit from IFG's CEO makes only a conclusory assertion that the chart is "competitively sensitive for IFG" and its owners and makes a vague reference to the chart's reflecting "certain tax considerations." Her order is similarly nonspecific, referring to undefined "privacy interests" of the LLC's owners. It is unclear why the ownership of this LLC is sensitive. There is no suggestion that sealing is necessary, for instance, to "protect[] trade secrets or the identities of confidential informants." *Id.* IFG appears by all counts to be a normal private litigant, and its briefing on appeal does not suggest otherwise. It says in its brief merely that "a court may allow filings of materials containing sensitive business information under seal to prevent the competitive harm that could result from making them public." But IFG does not explain why the information is sensitive nor what "competitive harm" would result from unsealing. IFG's unspecified and unsubstantiated privacy concerns do not amount to "*compelling* countervailing interests" sufficient to warrant nondisclosure of presumptively public judicial records. *Id.* at 421 (emphasis added).

In light of the strong presumption against sealing judicial records, *see June Med.*, 22 F.4th at 519-22; *Le*, 990 F.3d at 421 (noting that sealings are "often unjustified" and "urg[ing] litigants and . . . judicial colleagues to zealously guard the public's right of access to judicial records . . . so 'that justice may not be done in a corner'" (citation omitted)), and finding that the presumption is not rebutted here, we vacate all of the sealing orders in this case, including the denial of the Port's motion to unseal. On remand, the district court shall reevaluate—with specific reasons and determinations as to each document, and with appreciation of the "arduous" standard for sealing, *June Med.*, 22 F.4th at 521—whether the material previously sealed in this case should remain under seal. *See id.* at 521-22 (vacating the district

No. 22-30398

court's sealing orders and issuing a limited remand to the district court to evaluate the orders "under the proper legal standards" within thirty days).[5]

\*       \*       \*

The district court did not err in concluding that it had diversity jurisdiction nor in denying the Port further leave to continue conducting jurisdictional discovery into IFG's citizenship. We affirm as to these issues.

But the record generated throughout the jurisdictional dispute was over-sealed based on inadequate justification. We thus vacate the court's sealing orders and remand to the district court to determine, with appropriate reasons, to what extent the material currently maintained under seal should remain under seal. If no revised order issues within ninety days of issuance of mandate in this case, all sealed material in the case shall be unsealed.

## III.

The Port also contends that the district judge erred in denying its motion to vacate the referral to Magistrate Judge Kay, on the basis that Magistrate Judge Kay did not disclose her longstanding friendship with IFG's lead trial counsel. We take up this issue next.

---

[5] The Port repeatedly suggests that the material should be unsealed in part because jurisdiction is at issue. *See* Gray Br. 4 [ECF 80, 11] ("[B]ecause diversity jurisdiction involving an LLC is based on the citizenship of each of its members, there can be no legitimate claim that the corporate structure of the LLC is 'confidential.'"); *id.* at 5 [ECF 80, 12] (contending that "[t]his Circuit's rulings . . . reject the notion that such information is confidential," and citing a case requiring that citizenship be alleged in detail). But as explained above, we see no reason why the jurisdictional nature of the dispute would bear, in either direction, on the decision to seal. Our vacatur of the sealing orders is based not on the fact that the sealed material goes to jurisdiction, but instead on (1) the complete lack of explanation in the unreasoned orders, and (2) the weakness of the proffered privacy interests invoked in the one reasoned order.

No. 22-30398

**A.**

On January 29, 2016, this case was assigned to District Judge Patricia Minaldi and Magistrate Judge Kathleen Kay. After Judge Minaldi took a leave of absence, the parties discussed with the magistrate judge the possibility of consenting to a trial before her. On January 27, 2017, counsel for the Port and IFG consented to have a magistrate judge "conduct all proceedings . . . including trial, the entry of final judgment, and all post-trial proceedings." The case caption on the consent form specified that the case was assigned to Magistrate Judge Kay. The following week, then-Chief Judge Drell referred the case to Magistrate Judge Kay.

At some unspecified time, Magistrate Judge Kay told the parties that the daughter of William Monk, IFG's lead trial counsel, was one of her law clerks.[6] Magistrate Judge Kay told the parties that the law clerk would be screened off the case.

The bench trial ended on April 30, 2019, and Magistrate Judge Kay issued her reasons for judgment on July 31, 2020. The Port represents that Magistrate Judge Kay's order, ruling against the Port, "contained harsh language," characterizing the Port's conduct as, *inter alia*, "nefarious," "extortionary," and "sanctimonious." The Port asserts that the harshness

---

[6] There is no docket entry memorializing Magistrate Judge Kay's statement that her law clerk was Monk's daughter, so the precise timing and content of the statement are uncertain. The sequence of events as recounted in an affidavit from Matthew Mize (the Port's counsel) suggests that the discussion occurred some time after the parties consented to trial by the magistrate. Specifically, Mize first notes that the parties executed their consent agreement on January 27, 2017 and then states that, at a status conference held in chambers, Magistrate Judge Kay advised that her law clerk was Monk's daughter. The docket reflects that Magistrate Judge Kay held conferences on February 23, 2017 and September 12, 2017. But the minute entries address scheduling and make no mention of Magistrate Judge Kay's current employment of an immediate family member of Monk. That said, there is no dispute that this information was given and unobjected to.

of the order "prompted [it] to investigate." The Port does not specify by what means it conducted this investigation.

On October 21, 2020, the Port filed a motion to vacate the referral to Magistrate Judge Kay. The Port attached an affidavit from its counsel, Matthew Mize, in support of the motion. Mize asserted that the Port's "investigation ultimately revealed that, not only did one of Mr. Monk's daughters work as a law clerk for Magistrate Judge Kay, as was disclosed; but also that:

(a)   Mr. Monk had served as a groomsman in Magistrate Judge Kay's own wedding; and

(b)   Magistrate Judge Kay had officiated the wedding of another of Mr. Monk's daughters approximately three months prior to IFG filing the instant lawsuit on January 29, 2016."

Mize continued, "[T]he above events indicate and create the appearance of there being a longstanding personal relationship between Magistrate Judge Kay, Mr. Monk and his family." He asserted that, "[h]ad the above-listed events, and the complete nature of the relationship between the Monks and Magistrate Judge Kay been disclosed, the Port and its counsel simply would not have consented to the referral of this matter to Magistrate Judge Kay for trial." On November 10, 2020, the Port also moved for leave to conduct discovery to determine "the full extent of that relationship," including a deposition of Monk.

On January 15, 2021, District Judge Terry Doughty denied the Port's motion to vacate and denied discovery into the issue. Judge Doughty noted that the Port consented to the referral, and that it was undisputed that Magistrate Judge Kay "neither coerced, strong-armed, or acted in any way improperly by offering counsel the options available to them once Judge Minaldi took a leave of absence, including the option to consent to proceed

before her." He further noted that Magistrate Judge Kay's rulings over the course of the litigation sometimes favored the Port and sometimes favored IFG, and that the Port had never before alleged that Magistrate Judge Kay's rulings evinced any bias. Judge Doughty explained that Magistrate Judge Kay's recusal list did not include Monk and that "some prior social and/or professional interactions" are common in "relatively small legal communities, such as Lake Charles." Analogizing to the recusal context, Judge Doughty stated that the personal relationship alleged in the affidavit "do[es] not create a mandatory obligation of recusal" and indeed "[is] not even significant enough, standing alone, to require disclosure." The district court further stated that "[t]he fact that the Port is now unhappy with [Magistrate Judge Kay's] factual findings and legal conclusions is not a basis to vacate the reference."

## B.

"Upon the consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case . . . ." 28 U.S.C.A. § 636(c)(1). The court may vacate the referral of a civil matter to a magistrate judge "for good cause shown on its own motion, or under extraordinary circumstances shown by any party." 28 U.S.C. § 636(c)(4). Rule 73(b) of the Federal Rules of Civil Procedure contains an analogous provision. Fed. R. Civ. P. 73(b)(3) ("On its own for good cause—or when a party shows extraordinary circumstances—the district judge may vacate a referral to a magistrate judge under this rule."). We review denials of motions to vacate a magistrate-judge referral for abuse of discretion. *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 171 (5th Cir. 2011) (citing *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 292 (5th Cir. 2002)).

No. 22-30398

In *Carter v. Land Sea Services, Inc.*, we instructed that "a variety of factors" should guide a court's discretion in determining whether to permit withdrawal of consent to a trial by a magistrate. 816 F.2d 1018, 1021 (5th Cir. 1987). The court explained:

> Among the things a court may consider are: undue delay, inconvenience to the court and witnesses, prejudice to the parties, whether the movant is acting *pro se*,[7] whether consent was voluntary and uncoerced, whether the motion is made in good faith or is dilatory and contrived, the possibility of bias or prejudice on the part of the magistrate, and whether the interests of justice would best be served by holding a party to his consent.

*Id.* (internal citations omitted).

Here, although the Port and IFG dispute the conclusion that arises from application of the *Carter* factors, they agree that the factors constitute the appropriate framework for our analysis. We accept that the *Carter* factors guide our inquiry and thus proceed through those factors to assess whether Magistrate Judge Kay's nondisclosure of her longstanding friendship with IFG's trial counsel amounts to "extraordinary circumstances" such that Judge Doughty abused his discretion in denying the Port's motion to vacate the referral. In so doing, we treat the uncontradicted assertions in the Mize affidavit as true but acknowledge the significant factual gaps in the record before us, and, indeed, conclude that this affidavit must be subject to adversarial treatment and district-court verification.

**1.**

---

[7] The Port was represented by counsel. This factor is not relevant here, so we do not address it further.

No. 22-30398

Our court in *Carter* instructs that courts are to assess whether the party's consent to the magistrate-judge referral "was voluntary and uncoerced." *Id.* The Port contends that its consent to have its case tried by Magistrate Judge Kay was vitiated by the nondisclosure of her relationship with Monk. Specifically, the Mize affidavit states that, if "the complete nature of the relationship between the Monks and Magistrate Judge Kay [had] been disclosed, the Port and its counsel simply would not have consented to the referral of this matter to Magistrate Judge Kay for trial."

We emphasize at the outset that party consent is the "touchstone of magistrate judge jurisdiction." *Anderson v. Woodcreek Venture Ltd.*, 351 F.3d 911, 914 (9th Cir. 2003). As courts of appeal across the country observed decades ago, the constitutionality of § 636(c) magistrate-judge referrals depends on the requirement that the parties give their consent.[8] *See Puryear*, 731 F.2d at 1154; Magistrate Judges Div., Admin. Off., U.S. Cts., *A Constitutional Analysis of Magistrate Judge Authority*, 150 F.R.D. 247, 306 n.3 (1993) (collecting cases). Congress, in passing the relevant provisions, agreed. In recommending that the consent-referral provisions pass, the Senate Judiciary Committee explained:

> The bill makes clear that the voluntary consent of the parties is required before any civil action may be referred to a magistrate. In light of this requirement of consent, no witness at the hearings on the bill found any constitutional question that could be raised against the provision.

S. Rep. No. 96-74, at 4 (1979). Consent to magistrate-judge jurisdiction is thus no formality; it is constitutionally essential.

---

[8] The constitutionality of consent-based referrals depends also on the "power of the district court to vacate the reference to the magistrate on its own motion." *Puryear*, 731 F.2d at 1154.

For these reasons, we reject IFG's attempts to downplay the significance of the voluntariness of party consent, which it calls "just one of several factors." Our opinion in *Carter* is clear that "when a party can show his consent was obtained involuntarily or through undue influence, § 636(c) requires the authorization of withdrawal." *Carter*, 816 F.2d at 1021 (citing *Boykin v. Alabama*, 395 U.S. 238 (1969)). This proposition is reinforced by the constitutional backdrop just described. We thus reiterate that, notwithstanding any other "factors," the *absence* of valid party consent to a magistrate-judge referral will end the inquiry. If an Article III court concludes that a party's consent to a trial by a magistrate judge was not validly given, it has no choice but to order that the referral be vacated. *See id.*; *see also Kofoed v. Int'l Bhd. of Elec. Workers, Loc. 48*, 237 F.3d 1001, 1004 (9th Cir. 2001) ("Where the magistrate judge has not received the full consent of the parties, he has no authority to enter judgment in the case, and any purported judgment is a nullity." (citation omitted)).

Having established that party consent under § 636(c) is a constitutional imperative, we turn now to the consent given in this case. IFG contends that the Port's consent here was valid. IFG argues that the Port's consent was voluntarily given, as Magistrate Judge Kay did not "coerce" or "strong-arm" the parties into consenting to the referral. But, although there has been no suggestion that the Port was coerced into consenting to Magistrate Judge Kay's jurisdiction, IFG's argument answers only part of the question. It is of course critical that a party's consent to a magistrate-judge referral be *voluntary*, in that it is free from coercion or undue pressure. Appropriately, § 636 itself provides that a court's rules "for the reference of civil matters to magistrate judges shall include procedures to protect the voluntariness of the parties' consent." 28 U.S.C. § 636(c)(2). And Rule 73 of the Federal Rules of Civil Procedure contains a provision titled "Reminding the Parties About Consenting," which instructs that a "district

judge, magistrate judge, or other court official . . . must . . . advise [the parties] that they are free to withhold consent without adverse substantive consequences." Fed. R. Civ. P. 73(b)(2). Again, here, there has been no suggestion that the Port's consent was induced by coercion or other influences that might compromise voluntariness.

But freedom from coercion alone does not render a party's consent constitutionally sufficient. Consent to a magistrate-judge referral—that is, a waiver of the right to an Article III adjudication—also cannot be valid if it is not given knowingly and intelligently. *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 685 (2015) ("emphasizing" that "a litigant's consent" to a non-Article III adjudication, "whether express or implied[, ]must still be *knowing* and voluntary" (emphasis added)); *see also Norris v. Schotten*, 146 F.3d 314, 326 (6th Cir. 1998) (explaining that, in assessing a party's consent to a magistrate-judge referral, "[t]he record must show that the known right or privilege was waived by voluntary, *knowing*, and *intelligent* action" (emphasis added) (citations omitted)); *United States v. Dobey*, 751 F.2d 1140, 1143 (10th Cir. 1985) (upholding convictions following a jury trial before a magistrate judge because the defendants "consented to trial before a specifically designated magistrate and *knowingly* waived their right to trial before an Article III judge" (emphasis added)). Tellingly, in *Carter* we made repeated reference to the "knowing[ness]" of party consent. *Carter*, 816 F.2d at 1021 ("Once a right, even a fundamental right, is *knowingly* and voluntarily waived, a party has no constitutional right to recant at will." (emphasis added)); *id.* at 1022 (explaining that, there, the litigant's "consent was made *knowingly* and voluntarily" (emphasis added)). We thus make explicit what follows from the constitutional stakes of a party's waiver of his right to an Article III judge: A party's consent under § 636(c) to have its case tried by a non-Article III magistrate judge must be knowing.

It is the Port's lack of knowledge that is at issue here. Neither party directs us to case law addressing whether a magistrate judge's nondisclosure of their longstanding friendship with lead, opposing counsel may undermine a party's consent to have that judge try its case. But we have no difficulty concluding that it may.

Consider even this incomplete record.

When the parties consented to the referral in 2017, the case had already been assigned to Magistrate Judge Kay. Indeed, the record reflects that Magistrate Judge Kay was involved in the consent conversation from the start. But when the parties discussed with Magistrate Judge Kay the possibility of consenting to a trial before her, neither Magistrate Judge Kay nor Monk disclosed to the Port that there was a longstanding friendship between them. Puzzlingly, Magistrate Judge Kay saw it fit to advise counsel that Monk's daughter was her law clerk at the time—and that the daughter would be screened off the case—but she apparently stopped there. We presently must credit IFG's contention that this selective disclosure "left the impression that there was no other personal relationship with lead counsel."

Returning to knowingness, we must ask: Did the Port act knowingly when it agreed to have its multi-million-dollar dispute tried by a non-Article III judge who had an undisclosed longstanding friendship with counsel on the other side of the table? Would the Port have consented to have that non-Article III judge adjudicate this dispute if it knew that opposing counsel was a groomsman in the judge's wedding and that the judge officiated counsel's daughter's wedding mere months before this suit was filed? The Port says no, attesting in the Mize affidavit that, "[h]ad . . . the complete nature of the relationship between the Monks and Magistrate Judge Kay been disclosed, the Port and its counsel *simply would not have consented* to the referral of this matter to Magistrate Judge Kay for trial."

Again, we do not have a complete factual record. Other than the Mize affidavit, the record contains no evidence of *what* disclosures were made, to *whom* they made, or *when*. The parties agree that Magistrate Judge Kay advised them that Monk's daughter was her law clerk, but there is no contemporaneous documentation even of this or when or how she was "walled" off from this case. Furthermore, the record contains no evidence beyond the Mize affidavit confirming the nature or extent of Magistrate Judge Kay's friendship with the Monks. Finally, and critically, although the Mize affidavit suggests that counsel did not learn about this friendship until after Magistrate Judge Kay's order and reasons, this assertion has not been subject to evidentiary testing and cross-examination.

These factual uncertainties preclude us from deciding, on this record, whether the Port's consent was knowingly and validly given. If, for instance, the facts alleged about this friendship (as deep and longstanding) are untrue, or if the friendship is otherwise distant—though it does not seem to be—then the nondisclosure may not render the Port's consent unknowing. Likewise, if the Port learned of the intimacy of the friendship *before* entry of judgment and chose to remain silent, then its consent would remain valid. *Roell v. Withrow*, 538 U.S. 580, 582 (2003) (holding that consent to a magistrate-judge referral "can be inferred from a party's conduct during litigation"). These hypotheticals serve not to exhaust the universe of possibilities but merely to illustrate why our record does not permit our dispositive determination of the issue.

**2.**

The parties also dispute whether these alleged facts demonstrate a "possibility of bias or prejudice on the part of the magistrate." *Carter*, 816 F.2d at 1021. IFG's central argument, echoing the district court, is that "friendships among judges and lawyers are common," especially in small

legal communities like Lake Charles. The Port, on the other hand, argues that Magistrate Judge Kay's friendship with the Monks was "deep" and "personal."

But as reflected by the parties' arguments, this is a highly fact-intensive inquiry. Because the district court conducted no evidentiary inquiry into the Port's assertions and denied the Port discovery on the issue, our appellate record on the friendship consists *only* of the Mize affidavit. And the affidavit contains only those facts that we have now recounted many times: Monk's daughter was a law clerk for Magistrate Judge Kay around the time of consent (disclosed to the Port); Monk was a groomsman in Magistrate Judge Kay's wedding (not disclosed); and Magistrate Judge Kay officiated Monk's other daughter's wedding three months before this case was filed (not disclosed).

IFG would have us believe that the case law governing recusals under 28 U.S.C. § 455(a) sufficiently decides the issue. IFG is right to point out that our court's case law on judicial friendships, under the § 455 recusal standard, recognizes judges' friendships with lawyers. *See, e.g.*, *Henderson v. Dep't of Pub. Safety & Corr.*, 901 F.2d 1288, 1295-96 (5th Cir. 1990) (holding that the disqualification criteria under § 455(a) were not met where the judge had known opposing counsel since counsel was a kid and the judge was friends with counsel's late father); *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d 1404, 1408, 1411-13 (5th Cir. 1994) (holding that a district judge did not abuse its discretion in denying recusal where the judge was a member of a social club where "several attorneys from two law firms representing Travelers . . . as well as the director of its parent company" were also members); *see also United States v. Murphy*, 768 F.2d 1518, 1537 (7th Cir. 1985) ("[I]n today's legal culture friendships among judges and lawyers are common.").

But some authority, on different facts, points the other way. *See, e.g.*, *In re Faulkner*, 856 F.2d 716, 718, 721 (5th Cir. 1988) (per curiam) (granting a petition for mandamus ordering that the district judge recuse himself because the judge was a cousin of a person involved in the transactions giving rise to an indictment, and their relationship was "more like that of 'brother and sister,'" and the cousin was the godmother of one of the judge's children); *United States v. Jordan*, 49 F.3d 152, 157 (5th Cir. 1995) (holding that a district judge abused her discretion in failing to recuse herself from a criminal case in light of an intense dispute between the defendant and a friend of the judge's); *United States v. Rechnitz*, 75 F.4th 131, 143, 148 (2d Cir. 2023) (holding that a district judge abused his discretion in failing to recuse in a criminal matter where the judge had "a close, near-paternal personal relationship" with a person involved in the criminal conduct before the court).

Of course, concerns of judicial impartiality are heightened in the context of bench trials. "When the judge is the actual trier of fact, the need to preserve the appearance of impartiality is especially pronounced." *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 166 (3d Cir. 1993).

Whatever these authorities might instruct, they do not decide this case, for two reasons. First, these cases arise in the separate and distinct legal context of recusals under § 455. The possibility of bias arising from a longstanding friendship, as informed by recusal law, is separate and distinct from the question of whether *nondisclosure* of a friendship casts doubt on the validity of an opposing party's *consent* to magistrate-judge jurisdiction in lieu of an Article III court. Put differently, even if a given friendship would not warrant recusal under § 455, it does not follow that *nondisclosure* of that friendship is constitutionally permissible under § 636(c).

No. 22-30398

Second, these recusal authorities highlight what we have already explained is missing from this case: facts.[9]  With no information beyond the discrete facts alleged in the Mize affidavit, we cannot reasonably assess the Port's contention that Magistrate Judge Kay's friendship with the Monks was, in fact, "deep" and "personal," nor can we dismiss the Port's concerns on the basis that "friendships among judges and lawyers are common."

### 3.

In *Carter*, we also instruct that attention be given to whether there was any "undue delay" in a party's request to have the magistrate-judge referral vacated.  816 F.2d at 1021.  IFG and the district court emphasize that the Port's attempt to vacate the referral came four years after its consent to the referral and after completion of the trial.  IFG notes that courts warn against "the risk of a full and complicated trial wasted at the option of an undeserving and opportunistic litigant."

---

[9]  ABA ethics guidance similarly emphasizes that this inquiry is fact-specific.  As the ABA explained in its relatively recent Formal Opinion 488, addressing judges' social contacts in the judicial-ethics context, "[t]here may be situations . . . in which the judge's friendship with a lawyer or party is so tight that the judge's impartiality might reasonably be questioned."  ABA Standing Comm. on Ethics & Pro. Resp., Formal Op. 488, *Judges' Social or Close Personal Relationships with Lawyers or Parties as Grounds for Disqualification or Disclosure* (2019), https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/aba_formal_opinion_488.pdf.  "Whether a friendship between a judge and a lawyer or party reaches that point and consequently requires the judge's disqualification in the proceeding *is essentially a question of degree.*"  *Id.* at 5-6 (emphasis added).  "The answer," the ABA explained, "depends on the facts of the case."  *Id.* at 6.  And even if disqualification is not warranted, a "judge should disclose to the other lawyers and parties in the proceeding information about a friendship with a lawyer or party 'that the judge believes the parties or their lawyers might reasonably consider relevant to a possible motion for disqualification, even if the judge believes there is no basis for disqualification.'"  *Id.* at 6 (quoting MODEL CODE OF JUD. CONDUCT r. 2.11 cmt. 5).

Factually, IFG is correct in the narrow sense that the Port's motion to vacate the referral long postdates its consent to the referral. But whether that delay is "undue" is a separate question. The basis of the Port's challenge is that it had no idea that IFG's counsel and Magistrate Judge Kay were longstanding friends. We cannot accept IFG's attribution of the years of "delay" to the Port, because both the judge *and IFG's counsel* knew all along of the friendship and its nondisclosure, and also because, again, unknown facts matter. The Port contends in the Mize affidavit that Magistrate Judge Kay's written reasons for judgment "prompted" its investigation, which in turn uncovered the friendship. Finding that there was no "undue" delay here rests critically on that asserted timeline being accurate. If the Port knew about the friendship all along, or even if it discovered it shortly before Magistrate Judge Kay issued her order, the "delay" factor would likely doom its claim now. (Again, those facts would also be fatal to the Port's "consent" arguments. *Roell*, 538 U.S. at 582).

Accepting the Port's timeline as true, the "undue delay" factor does not weigh against vacating the referral for factfinding.

### 4.

In *Carter*, we also asked the related question of whether the party's motion to vacate the referral "is made in good faith or is dilatory and contrived." 816 F.2d at 1021. IFG argues that the Port's challenge to the referral is not brought in good faith. It contends that the Port has raised the issue "simply because it was unhappy with the result of the trial." However, this issue, too, requires factfinding. The record indicates that the Port raised many objections after Magistrate Judge Kay's written reasons issued. The motion to vacate was only one among many post-trial motions either attacking the fundamental power of the court to have heard the case—recall that the Port also moved to dismiss for lack of subject-matter jurisdiction—

or seeking leave to conduct discovery on various issues, which if granted would have had the effect of delaying the entry of final judgment against the Port. Of course, the fact that the Port's challenge emerged only after it lost the trial looms large. *See Sanches*, 647 F.3d at 172 ("Dissatisfaction with a magistrate judge's decision does not constitute 'extraordinary circumstances.'"). But again, if the Port in fact had no idea about Magistrate Judge Kay's longstanding friendship with the Monks and only found out about it once it sought an explanation for her "harsh language," then there is no basis to impugn the Port with bad faith. In this way, the "good faith" factor rises and falls alongside the "undue delay" factor—both depend on further factual development. If the Port's timeline is truthful, then the good-faith factor does not weigh against vacating the referral.

### 5.

We also assess "inconvenience to the court and witnesses." *Carter*, 816 F.2d at 1021. This factor does not require factual development. Vacating the referral would be hugely inconvenient to the parties and the witnesses. The bench trial in this case lasted for twenty days, and the record is north of forty thousand pages. Starting all over would require significant judicial resources. This factor weighs strongly against vacating the referral.

### 6.

The possible "prejudice to the parties," *id.*, quite plainly cuts both ways. Both parties would be prejudiced by the time and resources that would necessarily be spent in having to start all over. But IFG would be prejudiced moreover by the vacatur of the $124 million judgment awarded in its favor. We observe, however, that if the Port's contentions are true, any prejudice to IFG is, in significant regard, the product of its *own* inaction. Magistrate Judge Kay was not the only person in the room who is asserted to have held the undisclosed information; Monk could have easily made the disclosure,

and clarification, himself. IFG can hardly complain that its favorable award is now in jeopardy when IFG itself had the power to ensure disclosure of the friendship and thereby avoid this vulnerability on the back end. If the contentions in the Mize affidavit are true, the risk of starting all over arises, in part, from IFG's own silence. As to the Port, it would be prejudiced if the judgment stands, for the same reason: it is subject to a $124 million adverse judgment whose constitutional soundness it calls into question.

### 7.

Finally, subject to further evidentiary inquiry, the "interests of justice" may favor vacating the referral. Not only would justice be undermined by any undisclosed intimate friendship, but principles of fairness would be further strained if Monk, too, knew of such a relationship and at least acquiesced in its nondisclosure to the Port. In this regard, it is hard to overlook that Magistrate Judge Kay awarded Monk's client—and its lawyers—over $100 million in treble damages, contributing to a grand total of $124.5 million.

\* \* \*

In sum, accepting, at present, the Port's uncontroverted facts as true, we have significant doubts about the knowingness and validity of the Port's consent to have its case tried by Magistrate Judge Kay. Those same doubts compel the conclusion that the other *Carter* factors weigh in favor of vacating the referral. In light of the Port's assertions, we conclude that the district court abused its discretion in denying the Port's motion to vacate the referral and in denying the Port's request for discovery. We therefore VACATE the district court's order in full.

But we emphasize that critical facts remain untested or altogether undeveloped. The facts supporting our analysis thus far are contained only in an affidavit submitted by the Port's counsel. Below, IFG argued that the

affidavit was "legally insufficient," but stopped short of contesting its contents as untrue. On appeal, IFG remains silent as to the truth or falsity of the allegations. To decide whether the Port's consent to the magistrate judge was constitutionally valid, and whether vacatur of the referral is otherwise warranted, these factual gaps must be filled. We accordingly REMAND to the district court for an evidentiary inquiry into the issues we have identified. The district court's inquiry shall seek to determine the following facts, in addition to any other questions the district court deems appropriate in its assessment of this case:

(1) The extent and nature of Magistrate Judge Kay's friendship with Monk and his family;

(2) What information about these relationships Magistrate Judge Kay disclosed to the parties and when these disclosures occurred;

(3) What precise steps the Port took upon its first discovery that a longstanding friendship existed, *i.e.*, what comprised its "investigation"; and

(4) When the Port first knew that Magistrate Judge Kay's relationship to Monk extended beyond her employment of Monk's daughter as her law clerk.

*See United States v. Gemar*, 65 F.4th 777, 781 (5th Cir. 2023) (remanding for an evidentiary hearing regarding possible juror bias in a criminal case where the juror failed to reveal his relationship with the defendant's wife during voir dire and the record was "silent" as to "obvious" questions concerning "what [the defendant] knew regarding [the juror] and when"); *In re Kensington Int'l Ltd.*, 353 F.3d 211, 223-25 (3d Cir. 2003) (remanding to a district judge for evidentiary development regarding a possible conflict of interest so the judge may decide whether to recuse).

No. 22-30398

## IV.

We are satisfied that federal subject-matter jurisdiction exists and the district court's conclusion in that regard is AFFIRMED. We also AFFIRM the district court's denial of the Port's request for jurisdictional discovery. We VACATE all sealing orders entered in this case and REMAND for the district court to decide, within ninety days of the issuance of mandate of this opinion, with specific reasons given, what sealed material, if any, shall remain under seal. If no revised order issues within ninety days of issuance of mandate, all sealed material in the case shall be unsealed.

We further VACATE the district judge's order denying the Port's motion to vacate the referral to the magistrate judge and denying the Port's request for discovery into the issues raised in the motion.[10] We REMAND for factual development and further proceedings consistent with this opinion.

---

[10] The Port also raises a series of issues relating to the liability and damages findings following the bench trial in this case. Because it may be necessary to vacate the referral to the magistrate judge, we do not reach those issues.

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 21, 2023

Lyle W. Cayce
Clerk

No. 22-30398

---

I F G Port Holdings, L.L.C.,

*Plaintiff—Appellee,*

*versus*

Lake Charles Harbor & Terminal District, *doing business as*
Port of Lake Charles,

*Defendant—Appellant.*

---

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 2:16-CV-146

---

Before Graves, Higginson, and Douglas, *Circuit Judges.*

JUDGMENT

This cause was considered on the record on appeal and was argued
by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the
District Court is AFFIRMED IN PART and VACATED IN PART,
and the cause is REMANDED to the District Court for further
proceedings in accordance with the opinion of this Court.

No. 22-30398

IT IS FURTHER ORDERED that each party bear its own costs on appeal.



**Certified as a true copy and issued as the mandate on Oct 13, 2023**

**Attest:**

**Clerk, U.S. Court of Appeals, Fifth Circuit**

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

October 13, 2023

Mr. Tony R. Moore
Western District of Louisiana, Lake Charles
United States District Court
300 Fannin Street
Suite 1167
Shreveport, LA 71101-0000

        No. 22-30398    I F G Port Hold v. Lake Charles Harbor
                        USDC No. 2:16-CV-146

Dear Mr. Moore,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

                        Sincerely,

                        LYLE W. CAYCE, Clerk

                        By: _____
                        Whitney M. Jett, Deputy Clerk
                        504-310-7772

cc:
    Mr. Douglas Jay Cochran
    Mr. Samir Deger-Sen
    Mr. Gregory George Garre
    Ms. Marissa Marandola
    Mr. Michael Wendell McKay
    Mr. Michael H. Rubin
    Mrs. Laura Kay Austin Theunissen
    Mr. Nicholas John Wehlen