# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAKE CHARLES DIVISION

| | |
|---|---|
| **IFG PORT HOLDINGS, LLC** | * |
| | * **CASE NO. 2:16-CV-146** |
| **VERSUS** | * |
| | * |
| **LAKE CHARLES HARBOR &** | * **JUDGE TRUNCALE** |
| **TERMINAL DISTRICT d/b/a** | * |
| **THE PORT OF LAKE CHARLES** | * **MAGISTRATE JUDGE STETSON** |
| | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PRE-TRIAL MEMORANDUM IN SUPPORT OF MOTION TO VACATE REFERRAL TO MAGISTRATE JUDGE PURSUANT TO FED. R. CIV. P. 73(b)(3)

5442107v.1

# TABLE OF CONTENTS

                                                                                                                                                      **Page**

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND .................................................................................................. 1

   A.    The Fifth Circuit Remanded this Case for an Evidentiary Hearing on the Port's Motion to Vacate the Referral. ......................................................................... 1

   B.    Facts Learned in Discovery Provide Substantial Support for the Motion to Vacate. 3

III.   LAW AND ARGUMENT ..................................................................................... 8

IV.   CONCLUSION ................................................................................................... 11

## **TABLE OF AUTHORITY**

**Page(s)**

**Cases**

*Anderson v. Woodcreek Venture Ltd.*, 351 F.3d 911 (9th Cir. 2003) .................................. 2

*Carter v. Sea Land Services, Inc.*, 816 F.2d 1018 (5th Cir. 1987) ........................ 10, 11, 12

**Statutes**

28 U.S.C.A. § 636 ........................................................................................................... 9

**Other Authorities**

Fed. R. Civ. P. 73 ......................................................................................................... 2, 9

5442107v.1

Lake Charles Harbor & Terminal District d/b/a the Port of Lake Charles (the "Port") submits this Pre-Trial Memorandum in Support of Motion To Vacate Referral To Magistrate Judge Pursuant to Fed. R. Civ. P. 73(B)(3) [R. Doc. 483] (the "Motion to Vacate").

## I. INTRODUCTION

This is a case where validity of consent rises to constitutional importance. As the Fifth Circuit emphasized in its remand order to this Court, "consent is the 'touchstone of magistrate judge jurisdiction.'" Fifth Circuit Opinion ("Op.") [R. Doc. 668] at 20 (quoting *Anderson v. Woodcreek Venture Ltd.*, 351 F.3d 911, 914 (9th Cir. 2003)). In fact, because a magistrate-trial requires waiver of a party's right to proceed before an Article III judge, *knowing* consent is "constitutionally essential." *Id*. The Port seeks to vacate the reference to Magistrate Judge Kathleen Kay ("Magistrate Judge Kay") because its consent to trial before her was not knowing and intelligent; neither the magistrate judge nor IFG's counsel disclosed to the Port their close personal relationship before consent was given. After close of the April 22 evidentiary hearing, this Court should grant the Motion to Vacate.

## II. BACKGROUND

### A. The Fifth Circuit Remanded this Case for an Evidentiary Hearing on the Port's Motion to Vacate the Referral.

This case was initially assigned to District Judge Patricia Minaldi, who subsequently due to health concerns stepped down from the bench. The parties consented to a trial before Magistrate Judge Kay. The Port saw no reason not to consent to a magistrate-trial, as Magistrate Judge Kay disclosed only that one of her law clerks was a daughter of the plaintiff's lead trial counsel, William Monk ("Monk"). Magistrate Judge Kay assured the Port that Monk's

daughter would be screened off and not take part in the case.  Neither Magistrate Judge Kay nor Monk disclosed any other personal relationship.

After a merits trial, Magistrate Judge Kay issued Written Reasons that spanned 64 pages and was replete with harsh language about the Port, including calling the Port's conduct "reckless and foolish," "immoral, unethical, oppressive, unscrupulous, and substantially injurious," "nothing less than extortion which, by definition, offends public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious," "[t]he agreement was literally extorted," "extortion plain and simple," "successful extortion," "extortionary conduct," "unscrupulous and unfair," "nefarious activity," "nefarious conduct," and "sanctimonious, gratuitous, and inaccurate discourse." *See, generally,* R. Doc. 464.  This language, along with the amount of the monetary award it suggested,[1] was shocking to the Port's counsel and its executives and board.

Maura Mize, wife of Port counsel Joe Mize, and Leslie Mize, wife of Port counsel Matt Mize, read at least portions of the Written Reasons shortly after it was received by their husbands. Surprised by the language and tone used by the Magistrate Judge, each spouse began an independent "investigation" into whom Judge Kay "was". Both spouses looked up Kathy Kay on Facebook and discovered photographs depicting an undisclosed, longstanding personal relationship between the magistrate judge and Monk.  That discovery prompted the Port and its counsel to investigate.  The Port discovered that neither Magistrate Judge Kay nor Monk had revealed the full extent of their friendship prior to the Port's consent.  In particular, the Port learned that (a) Monk served as a groomsman at the magistrate judge's wedding; and (b) the magistrate judge officiated the wedding of another of Monk's daughters (not her law clerk) approximately

---

[1] The amount of damages awarded to IFG was not specified in the Written Reasons (it was determined later, through post-trial proceedings), though the reasons suggested that the award would exceed $100 million.

three months before this lawsuit was filed. Had the Port known those facts about the relationship between Magistrate Judge Kay and Monk (let alone the numerous *other* facts the Port has learned post-remand), the Port would not have consented to a magistrate-trial.

In October 2020, shortly after undersigned counsel enrolled as the Port's counsel and its trial lawyers withdrew, the Port filed the Motion to Vacate. R. Doc. 483. The Port also sought leave to conduct discovery relating to the Motion to Vacate, including Monk's deposition. R. Doc. 492. Both motions were denied by District Judge Doughty. R. Doc. 510.

On appeal, the Fifth Circuit vacated the order denying the Port's motions to vacate and for discovery. The court explained, *inter alia*, that "accepting, at present, the Port's uncontroverted facts as true, we have significant doubts about the knowingness and validity of the Port's consent to have its case tried by Magistrate Judge Kay." Fifth Circuit Opinion ("Op.") [R. Doc. 668] at 30. The court remanded this case for an evidentiary hearing on four distinct issues:

(i) The extent and nature of Magistrate Judge Kay's friendship with Monk and his family;

(ii) What information about these relationships Magistrate Judge Kay disclosed to the parties and when these disclosures occurred;

(iii) What precise steps the Port took upon its first discovery that a longstanding friendship existed, *i.e.*, what comprised its investigation; and

(iv) When the Port first knew that Magistrate Judge Kay's relationship to Monk extended beyond her employment of Monk's daughter as her law clerk.

*Id.* at 31.

**B.** **Facts Learned in Discovery Provide Substantial Support for the Motion to Vacate.**

Since remand, the parties have participated in more than a dozen depositions and thousands of pages of documents have been produced. That discovery has strengthened the Port's Motion to Vacate. Indeed, the Port is aware of no information detrimental to a finding that the Port's consent to magistrate judge-jurisdiction was not knowing and valid.

3

The first area of inquiry is the extent and nature of Magistrate Judge Kay's relationship with Monk and his family. That the relationship is close and longstanding is obvious to any impartial observer. Standing as a groomsman can mean one thing or another – sometimes you stay in touch and sometimes you don't, or just to a limited degree. The evidence herein shows constant and meaningful contact from prior to 1989 (the judge's wedding) through the time of trial. The testimony will show numerous familial relationships and social interactions between the Monk and Kay families, who obviously have a longstanding, close relationship. Indeed, one does not randomly hire without any "competition" (*i.e.*, interviews of other candidates) the daughter of a non-friend as a judicial law clerk, does not randomly officiate the wedding of a daughter of a non-friend, does not attend a non-friend's surprise 60th birthday party, and does not speak at the wedding reception for the daughter of a non-friend. Each of these things happened here. These and other facts demonstrate the existence of a friendship that should have been disclosed prior to consent.

Both Magistrate Judge Kay and Monk have been deposed and produced documents pertaining to their families' relationship. Monk's deposition testimony, supplemental disclosures made after the deposition, and errata sheet confirm all of the following facts, none of which were known to the Port at the time of consent:

- The Monks (William Monk and his wife, Aimee) and McPhersons (Magistrate Judge Kay and her husband, Scott McPherson) knew each other for decades, participated in couples' game nights, and had dinner together (including a dinner sometime between 2015 and 2017 at the Pioneer Club in Lake Charles);[2]

- Monk was a groomsman in the magistrate's wedding and attended pre-wedding events;

---

[2] *See* Excerpts of Deposition of William Monk, attached as Exhibit A, at pp. 22:21 to 23:19; pp. 52:3 to 53:10. Notably, this case was filed on January 29, 2016.

- Monk arranged for and played golf with the magistrate's husband, father-in-law, and son at different times;[3]

- Monk attended a graduation party for the magistrate's son in 2014 at her house and visited her home for gatherings on other occasions;[4]

- A few weeks before Monk's daughter Lucie was married in 2015, the magistrate and her husband had dinner at the Monk home with the Monk family;

- The magistrate officiated Monk's daughter's wedding in October 2015, a few months before this case was filed;

- Monk attended and spoke at the wedding reception for the magistrate's daughter in 2017, introducing her husband's band on stage, after the parties had consented to trial before the magistrate;[5]

- Monk was invited to and attended the magistrate's surprise 60th birthday party in November 2018, also after consent to a magistrate-trial;[6] and

- Monk attended the magistrate's husband's funeral in 2023 and his wife arranged and paid for a portion of the catering for that event, an act that would not be expected in the absence of a close friendship.[7]

Magistrate Judge Kay's deposition testimony is generally consistent with Monk's. Additionally, she produced a December 27, 2015 text message to Monk stating "Happy Birthday tomorrow, dude!",[8] emails and text messages showing that she had advance knowledge of and helped coordinate Monk's 2017 speech at her daughter's wedding reception, and about sixty pages of text messages with Monk's wife. Further, the language used in at least one text is abrasive, strong language of the sort only used between friends. Stated differently, a sitting magistrate judge would not be expected to use such language unless the text was being sent to a trusted friend, who

---

[3] *See, e.g., id.* at pp. 30:14 to 31:6.

[4] *Id.* at pp. 28:22 to 29:7.

[5] *Id.* at pp. 83:4 to 84:15.

[6] *Id.* at pp. 50:11 to 51:4.

[7] *Id.* at pp. 48:6 to 49:9.

[8] *See* Exhibit B.

the magistrate judge knew would not share it. While Monk and the magistrate judge may seek to downplay their family friendship, the facts speak for themselves.[9]

The second area of inquiry directed by the Fifth Circuit is what disclosures were made by Magistrate Judge Kay regarding her relationship with Monk and his family at the time of consent. Former Port counsel Matthew Mize testified that the magistrate judge only disclosed that one of Monk's daughters was her law clerk. Magistrate Judge Kay agreed in her deposition:

> Q. …Did you say anything about it to them, or did they say something about it to you?
>
> A. About consenting?
>
> Q. Yes, ma'am.
>
> A. I think whatever I said was along the lines of, "if you want to get it tried any time soon, that's going to be the way to do it," --
>
> Q. Okay.
>
> A. -- okay, but then I also, as everybody knows, because I've seen it in the paperwork, I let them know that Mr. Monk's daughter was my clerk at the time --
>
> Q. Right.
>
> A. -- you know, and we were going to have to create the proverbial Chinese wall for if they – if they wanted to consent, but, you know, that was going to be their call.
>
> Q. Okay. Did you make any further disclosures --
>
> A. No.
>
> Q. -- about your relationship with the Monk family?
>
> A. No.[10]

---

[9] Further, the magistrate judge's appreciation of the significance of her relationship with Monk and his family is not determinative. The right to knowingly and intelligently consent belongs to the parties, not the Magistrate Judge. The issue is whether the parties could give knowing and intelligent consent without disclosure of the material facts relating to the Monk/Kay relationship.

[10] Deposition of Magistrate Judge Kay, excerpts of which are attached as Exhibit C, at 18:3-19:1.

Monk similarly does not recall any other formal disclosures,[11] and he separately confirmed that *he* did not disclose to Port counsel that he was a groomsman in the magistrate's wedding or that the magistrate officiated his daughter's wedding.[12] Thus, the non-disclosure of those and other facts at the time the parties consented to magistrate judge-jurisdiction is undisputed.

The third and fourth inquiries are related: When did the Port discover the longstanding relationship between Magistrate Judge Kay and the Monk family and what did it do after the discovery? Neither the Port nor Port counsel knew sufficient facts to put the Port on notice of the longstanding Monk-Kay relationship until a day or two after the Written Reasons were issued. At that time, Maura Mize, Port counsel Joe Mize's wife, went to Facebook to learn about the magistrate judge who had just issued Written Reasons excoriating the Port. Maura Mize testified:

> And so I remember in my mind thinking, Who wrote this? And so I went on Facebook. And I cannot tell you if it was that night or the next day, but somewhere soon thereafter, I went on Facebook to just see who is this person that wrote this.
>
> And so I scrolled and scrolled through the pictures. And I remember she had tons of posts. She must have posted all the time. And I kept scrolling down, looking at pictures. And all of a sudden, I see a picture of her wedding, and Bill Monk is in that picture, in a tuxedo or whatever, as a groomsman.
>
> And I walked out -- I mean, I walked back on the screen porch, because that's where Joe was every day, all day at that point in time. And I walked out there and said, Look at this. And I remember seeing the shock on his face.[13]

---

[11] Exhibit A at pp. 56:19 to 57:4 (Q. Following up on previous questions trying to wrap things up, regarding the consent, other than the -- Margaret was a law clerk, but she would be segregated from the case and questions to you and your questions to her about the kids, was there any other discussion of whatever your relationship was with Judge Kay with the other lawyers at that time? Did she ever disclose anything else? A. I don't remember her disclosing anything else.).

[12] *Id*. at pp. 98:4 to 99:6.

[13] *See* Deposition of Maura Mize, excerpts of which are attached as Exhibit D, at 36:22-37:14.

About the same time, Leslie Mize, Port counsel Matt Mize's wife, separately discovered Facebook photographs showing Monk participating in the magistrate judge's wedding as a groomsman and the magistrate judge officiating Monk's daughter's wedding, with a Facebook post by Monk's wife stating "Kathy Kay did an awesome job."[14]

Because of pending sanctions motions filed by IFG, the Port's trial counsel – the Robichaux Mize law firm and Rick Norman (then with the law firm Taylor Porter) – determined after issuance of the Written Reasons that the Port should engage new counsel. The Port retained Mike McKay and the Stone Pigman law firm. The transition of the Port's defense to Stone Pigman and the devastation of Lake Charles by Hurricane Laura on August 27, 2020, and then by Hurricane Delta on October 9, 2020, inhibited the investigation of the Monk-Kay relationship and delayed the filing of the Motion to Vacate until October 21, 2020, a few days prior to the first post-trial status conference set by the Magistrate Judge on October 23, 2020. The Port requested discovery on the Motion to Vacate contemporaneously with its filing, including Monk's deposition, but IFG objected and discovery was denied by the district court. Now, having had the opportunity to conduct discovery, the Port has learned far more about the Monk-Kay relationship, as detailed above.

### III. LAW AND ARGUMENT

"Upon the consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case . . . ." 28 U.S.C.A. § 636(c)(1). Under 28 U.S.C. § 636(c)(4), the court may vacate the referral of a civil matter to a magistrate judge "for good cause shown on its own motion, or under extraordinary circumstances shown by any party." Fed. R. Civ. P. 73(b)(3) similarly provides that

---

[14] *See* Exhibit 6 to the deposition of Leslie Mize, attached hereto as Exhibit E.

8

"[o]n its own for good cause—or when a party shows extraordinary circumstances—the district judge may vacate a referral to a magistrate judge under this rule." The Port moves to vacate the referral of this case to the magistrate judge because extraordinary circumstances exist. Indeed, the Port's "constitutionally essential" consent to a magistrate-trial – which must be "knowingly and intelligently" given – was invalid. *See generally* Op. [R. Doc. 668] at 20-22.

The factors discussed in *Carter v. Sea Land Services, Inc.*, 816 F.2d 1018 (5th Cir. 1987), guide the analysis here. Op. at 19. The most important of those factors is the validity of the Port's consent to magistrate judge-jurisdiction. Indeed, the Fifth Circuit stated that "notwithstanding any other 'factors,' the absence of valid party consent to a magistrate-judge referral will end the inquiry. If an Article III court concludes that a party's consent to a trial by a magistrate judge was not validly given, it has no choice but to order that the referral be vacated." Op. at 21 (citations omitted). The Fifth Circuit further explained that a party's consent "must be knowing," and the court had "no difficulty concluding that" the nondisclosure of a longstanding friendship between a magistrate judge and an opposing party's counsel may undermine consent. The Port submits that the facts cited above regarding the Monk-Kay relationship, which go far beyond those presented to the Fifth Circuit on appeal, compel the conclusion that the Port's consent was neither knowing nor valid, mandating that the reference of this case to Magistrate Judge Kay be vacated.

Another *Carter* factor, the subject of extensive discovery by IFG, is "the possibility of bias or prejudice on the part of the magistrate." *Carter*, 816 F.2d at 1021 (citations omitted). Bias is not at issue in this case. The Fifth Circuit explained: "The possibility of bias arising from a longstanding friendship, as informed by recusal law, is separate and distinct from the question of whether *nondisclosure* of a friendship casts doubt on the validity of an opposing party's *consent*

9

to magistrate-judge jurisdiction in lieu of an Article III court. Put differently, even if a given friendship would not warrant recusal under § 455, it does not follow that *nondisclosure* of that friendship is constitutionally permissible under § 636(c)." Op. at 26 (emphasis in original). Thus, while bias is relevant in some cases, no showing of bias is needed where a party's initial consent to a magistrate-trial was invalid due to a nondisclosure like the one at issue here. The Port is not seeking recusal and has made clear in its Motion to Vacate that it is not alleging bias.[15]

Other *Carter* factors, whether (i) there was undue delay in seeking to vacate the referral, and (ii) the motion to vacate is made in good faith and not dilatory or contrived, rise and fall together. Op. at 29. As the Fifth Circuit explained, if the timeline the Port presented on appeal is truthful – and it is – these factors do not weigh against vacating the referral. *Id*. at 28-29.

Finally, the *Carter* factors of "prejudice to the parties" and the "interests of justice" weigh heavily in favor of vacating the referral. Indeed, the Fifth Circuit recognized that any prejudice to IFG is of its own making given that its counsel Monk remained silent at the time of consent, failing to ensure disclosure of his personal relationship with Magistrate Judge Kay and her family. Op. at 29-30. The Port, meanwhile, has suffered severe prejudice consisting of an over $124 million total judgment rendered by a magistrate judge that did not have valid jurisdiction due to a nondisclosure of significant information. The Port's consent was neither knowing nor intelligent; the Port would not have consented to a magistrate-trial had it known the breadth of the magistrate judge's relationship with the Monk family.

The Fifth Circuit assessed the *Carter* factors based on the few facts available to the Port when it filed the Motion to Vacate. The court expressed its "significant doubts about the knowingness and validity of the Port's consent to have its case tried by Magistrate Judge Kay" and

---

[15] *See* Memo. in Support of Motion to Vacate, R. Doc. 483-1, at 8 ("To be clear, this Motion is not based on any intentional acts of fraud, bias, or undue influence by the Magistrate Judge.").

stated that those "same doubts compel the conclusion that **the other *Carter* factors weigh in favor of vacating the referral**." Op. at 30 (emphasis added). In light of the additional evidence obtained by the Port in discovery, the same conclusion is warranted now.

## IV.   CONCLUSION

The issue here is "the validity of defendant's constitutionally essential consent to have its case tried by a magistrate judge". Op. [R. Doc. 688] at 2. This consent is the "touchstone of magistrate judge jurisdiction," *id.* at 20, and a "constitutional imperative." *Id*. at 21. "Freedom from coercion alone does not render a party's consent constitutionally sufficient. Consent to a magistrate judge referral – that is, waiver of the right to an Art. III adjudication – also cannot be valid if not given knowingly and intelligently." *Id.* at 22. Consent here was not knowingly and intelligently given.

Discovery allowed by the remand has proven not only the allegations included in the affidavit regarding the wedding; but also revealed a lifetime of events and interactions between the Monks and the McPhersons. It has likewise confirmed that no disclosure of these events or interactions was made by Magistrate Judge Kay (excepting the employment of Margaret Monk as a law clerk). Magistrate Judge Kay explained in her deposition that making additional disclosures "honestly did not occur to me."[16] Finally, discovery has revealed how and when the initial discovery of the wedding pictures was made and what steps the Port took to investigate further, while dealing with the effects of two hurricanes in six weeks.

The Port will meet its burden of proof regarding the evidentiary inquiry and the four factors listed by the Fifth Circuit in its remand order. Given the high bar for the consent

---

[16] *See*, Deposition of Kathy Kay, Magistrate Judge, attached as Ex. C, p. 114.

required for constitutionally-valid magistrate judge referral jurisdiction, and the undisputed lack of disclosure here, this motion to vacate should be granted.

        Respectfully submitted,

        */s/ Nicholas J. Wehlen*
        Douglas J. Cochran, La. Bar No. 20751
        Nicholas J. Wehlen, La. Bar No. 29476
        Monette M. Davis, La. Bar No. 38715
        Stone Pigman Walther Wittmann L.L.C.
        One American Place, Suite 1150
        301 Main Street
        Baton Rouge, Louisiana 70825
        Telephone: (225) 490-8900
        Facsimile: (504) 581-3361
        Email: dcochran@stonepigman.com
              nwehlen@stonepigman.com
              mdavis@stonepigman.com

        Michael W. McKay, La. Bar. No. 9362
        1800 City Farm Drive, Building 6
        Baton Rouge, Louisiana 70806
        Telephone: (225) 922-5110
        Facsimile: (225) 922-5105
        Email: mwm@longlaw.com

        and

        Michael H. Rubin, La. Bar. No. 10833
        McGlinchey Stafford PLLC
        301 Main Street, Suite 1400
        Baton Rouge, Louisiana 70801
        Telephone: (225) 382-3617
        Facsimile: (225) 343-3076
        Email: mrubin@mcglinchey.com

        *Attorneys for Lake Charles Harbor &*
            *Terminal District*