UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| IFG PORT HOLDINGS LLC | § | |
| | § | |
| VERSUS | § | CIVIL ACTION NO. 2:16-CV-00146 |
| | § | JUDGE MICHAEL J. TRUNCALE |
| LAKE CHARLES HARBOR & | § | |
| TERMINAL DISTRICT D/B/A | § | |
| THE PORT OF LAKE CHARLES | § | |

## ORDER DENYING IFG'S MOTION FOR RELIEF FROM PROCEEDING AND, IN THE ALTERNATIVE, MOTION FOR DISCOVERY

Before the Court is Plaintiff IFG Port Holdings LLC ("IFG")'s Motion for Relief from Proceeding and, in the Alternative, Motion for Discovery. [Dkt. 772]. For the following reasons, IFG's Motion is **DENIED**.

## I.   BACKGROUND

### A.  The Underlying Case, the Port's Motion to Vacate, and the Fifth Circuit's Opinion[1]

This case stems from a years-long contract dispute between a commercial tenant, IFG, and its commercial landlord, Defendant the Lake Charles Harbor & Terminal District, d/b/a the Port of Lake Charles ("the Port"). *IFG Port Holdings, L.L.C. v. Lake Charles Harbor & Terminal Dist.*, 82 F.4th 402, 405 (5th Cir. 2023). Although this case was initially assigned to U.S. District Judge Patricia Minaldi, on January 27, 2017, the parties consented to having the case tried by Magistrate Judge Kathleen Kay. *Id.* at 406, 412. Before the parties consented, Judge Kay disclosed that the daughter of William Monk ("Monk"), IFG's lead trial counsel, was one of her law clerks and assured the parties that she would be screened of the case. *Id.* at 413. This case culminated in a

---

[1] This description of the underlying case, the Port's Motion to Vacate, and the Fifth Circuit's opinion is provided purely for context and has been exclusively drawn from the Fifth Circuit's opinion. It should not be interpretated as representing this Court's findings after the April 2024 evidentiary hearing.

lengthy bench trial before Judge Kay and, ultimately, in a ruling in IFG's favor and a damage award against the Port totaling $124,531,652. *Id.* at 406–07.

The alleged harshness of Judge Kay's order prompted the Port to investigate. *Id.* at 413. Its investigation revealed additional contacts between Judge Kay and Monk, namely that Monk served as a groomsman in Judge Kay's wedding and that Judge Kay officiated Monk's other daughter's wedding. *Id.* As a result, on October 21, 2020, the Port filed a motion to vacate the referral to Judge Kay. *Id.* The Port also filed a motion for leave to conduct discovery regarding the relationship between Judge Kay and Monk on November 10, 2020. *Id.* On January 15, 2021, these motions were denied by U.S. District Judge Terry Doughty. *Id.* The Port appealed these rulings. *Id.* at 412.

On September 21, 2023, the Fifth Circuit vacated Judge Doughty's denials of the Port's motion to vacate the referral to Judge Kay and motion for leave to conduct discovery on account of "its significant doubts about the knowingness and validity of the Port's consent" to have the case tried by Judge Kay. *Id.* at 420–21. Because "critical facts remain[ed] untested or altogether undeveloped," however, the Fifth Circuit remanded the Port's motion to vacate the referral "to the district court for an evidentiary inquiry." *Id.* at 421. The Fifth Circuit specified that the district court's inquiry must determine the following facts: (1) "[t]he extent and nature of Magistrate Judge Kay's friendship with Monk and his family"; (2) "[w]hat information about these relationships Magistrate Judge Kay disclosed to the parties and when these disclosures occurred"; (3) "[w]hat precise steps the Port took upon its first discovery that a longstanding friendship existed, *i.e.*, what comprised its 'investigation'"; and (4) "[w]hen the Port first knew that Magistrate Judge Kay's relationship to Monk extended beyond her employment of Monk's daughter as her law clerk." *Id.*

On November 1, 2023, Judge Doughty—who had become the Chief Judge of the Western District of Louisiana—issued an En Banc Order recusing all District and Magistrate Judges in the Western District of Louisiana from this case. [Dkt. 672]. Pursuant to a Fifth Circuit designation,

Judge Doughty's Order also transferred this case to the undersigned judge and Magistrate Judge Christine L. Stetson. *Id.*

## B.  The Proceedings Before This Court

### 1.  The Status Conference

On November 16, 2023, this Court held a status conference with the parties in Beaumont, Texas to determine the contours of the evidentiary inquiry mandated by the Fifth Circuit. During this status conference, the Court spoke at length about the efforts it was taking to ensure transparency for the parties and separation from the Western District of Louisiana. Specifically, the Court announced that it would solely be using its own people, including its own courtroom reporter, courtroom deputy, and law clerk.[2]

Even so, the Court expressed that it might be beneficial to conduct the evidentiary inquiry at the federal courthouse in Lake Charles as that would be more convenient for the parties, the attorneys, and the witnesses and beneficial if any witnesses needed to be subpoenaed. When the Court asked the parties if their preferred setting would be the federal courthouse in Lake Charles, both parties emphatically said yes.[3] Accordingly, after the status conference concluded, the Court arranged[4] to utilize a spare courtroom at the federal courthouse in Lake Charles and, as discussed with the parties, set the evidentiary hearing for April 22, 2024.

---

[2] The undersigned did not specifically mention that he was using his own law clerk that day, but believes this was implied in his statement that he would be using his own people. The law clerk in question was also in attendance that day. To the extent this was unclear, however, the undersigned includes his law clerk now.

[3] Although the Court did not discuss this with the parties at the status conference, given the underlying motion, it feels compelled to mention that conducting the evidentiary inquiry in Lake Charles was quite inconvenient and at times complicated for the undersigned and his staff, who stayed in a hotel for nearly a week and could not use the computers in the courtroom throughout the hearing. The undersigned and his staff were more than happy to shoulder these inconveniences and complications, however, if they made the parties more comfortable with the way this sensitive matter was being handled.

[4] The Court arranged to use the spare courtroom through communications between the undersigned, his staff, and other personnel at the Beaumont Division of the U.S. District Court for the Eastern District of Texas and U.S. District Judge James D. Cain, Jr., his staff, and other personnel at the Lake Charles Division of the U.S. District Court for the Western District of Louisiana. Nothing other than the logistics of using the spare courtroom was discussed.

## 2.  The Pretrial Conference

After several months of discovery,[5] the Court held a Pretrial Conference with the parties in Beaumont on April 16, 2024. At the start of the Pretrial Conference, the Court told the parties on the record that it had "taken steps to make sure this [proceeding] [was] completely sanitized and that [the Court was] looking at this with a fresh set of eyes in accordance with the Fifth Circuit's opinion."[6] Transcript of Pretrial Conference at 3–4, *IFG Port Holdings LLC v. Lake Charles Harbor & Terminal Dist.*, No. 2-16-cv-00146 (W.D. La. Apr. 16, 2024). The Court then went through the parties' exhibits, preadmitting some and excluding others, and ruled on the Port's Motion in Limine [Dkt. 743]. Notably, the Court denied all but one aspect of the Port's Motion in Limine, meaning that IFG would be permitted to put on a broad swath of evidence regarding Judge Kay's relationships with people other than Monk. *See* [Dkt. 753]. Although the Court recognized this could vastly increase the scope and length of the evidentiary hearing, it felt that allowing IFG to proffer this evidence was the best course given the sensitivity and seriousness of this matter.

As IFG discusses in the underlying Motion, the undersigned also mentioned his friendship with U.S. District Judge James D. Cain, Jr. of the Western District of Louisiana during the Pretrial Conference. Given IFG's allegations, the undersigned will provide additional context on his comments during the Pretrial Conference.[7] Sunlight, after all, is the best disinfectant. First, while

---

[5] The Court notes that the parties' discovery efforts were particularly vigorous, involving thousands of pages of production, numerous motions, and several hearings in Beaumont before Judge Stetson. Notably, when the undersigned was designated by the Fifth Circuit to conduct this inquiry, the undersigned specifically asked that Judge Stetson be designated as well so that the parties could have a non-Western District of Louisiana Magistrate Judge work on any discovery motions the undersigned needed to refer. This is yet another example of the efforts this Court took to sanitize these proceedings.

[6] The undersigned also assured the parties that the only individuals handling the case since it had been assigned to him were employees of the Beaumont Division of the U.S. District Court of the Eastern District of Texas. Indeed, the undersigned went so far as to explicitly state on the record that no one in any way associated with the Western District of Louisiana had in any way touched the file. It should clarify, however, that the Court sends its completed and signed orders to the Western District of Louisiana Clerk's Office to docket.

[7] The Court assumes that IFG's failure to contextualize his statements were a happy accident and not at all intentional.

4

explaining the importance of attorneys using the courtroom's microphones when speaking, the undersigned stated:

> For 34 years in this courthouse, I had federal district judges ask me to stay on the microphone and I often wondered why. And then when I became a federal judge, about the same time Judge Cain became a federal judge over in Lake Charles, my friend, that the -- I realized why. And the acoustics are not good and -- so it's -- it is important -- not just for my benefit, but also for the court reporter.

Transcript of Pretrial Conference at 5. Second, while discussing whether information about other cases involving the parties or their attorneys should be admitted into evidence and whether Judge Kay was biased, the Court stated the following:

> Well, let me say that I don't know Judge Kay unless maybe I have perhaps said hello to her in an elevator at a Fifth Circuit conference or something like that. I do know Judge Cain. I have the highest regard for Judge Cain, but I've never heard anything bad about Judge Kay at all.

Transcript of Pretrial Conference at 39–40.

These were certainly positive comments about Judge Cain, but they were rather brief and unremarkable. In fact, the undersigned considers most, if not all, judges he knows to be friends and holds most, if not all, judges in the highest regard. The undersigned's statements hinted that the friendship was a recent, work-related one. They also reflected the truth—that Judge Cain and the undersigned met approximately five years ago when we were appointed to the bench and became friendly while very occasionally socializing at judiciary-related functions with our wives. Although the undersigned does hold Judge Cain in the highest regard, Judge Cain (respectfully) is not among the undersigned's closest friends and the undersigned does not see or speak to Judge Cain regularly. Interestingly, properly contextualized, the second comment reads like a disclosure. The undersigned was clearly not hiding anything from IFG or the Port.

IFG was allegedly perturbed by these statements, but did not bring its concerns to the Court's attention during the Pretrial Conference. IFG also failed to bring its concerns about these

comments to the Court's attention during the evidentiary hearing. In fact, the Court first learned of IFG's concerns upon receiving the underlying motion.

### 3. The Evidentiary Hearing

The evidentiary hearing was scheduled to begin at 10:00 A.M. on Monday, April 22, 2024. The undersigned and his staff arrived early that day to get settled in the spare courtroom and chambers. As IFG describes in its Motion, at some point during the nine o'clock hour,[8] Judge Cain entered the courtroom and greeted the undersigned in a "fond" manner.[9] [Dkt. 772-1 at 6]. Although IFG fails to mention this in its rendition of events, Judge Cain was accompanied by Magistrate Judge Thomas P. LeBlanc of the Western District of Louisiana. Notably, the evidentiary hearing had not started yet. Judge Cain, Judge LeBlanc, and the undersigned talked in the courtroom in plain view and within earshot of the parties[10] and members of the undersigned's team for several minutes. The undersigned does not recall every topic discussed in the courtroom, but remembers the conversation revolving around general pleasantries, whether the undersigned and his team had everything we needed, how nice the undersigned thought the spare courtroom and chambers were, and Judge Cain's dislike of the carpet and wall color in the spare courtroom. Judge Cain and Judge LeBlanc were simply being good hosts to the undersigned and his team. Absolutely nothing inappropriate or at all related to this case was discussed in the courtroom, something that would have been clear to anyone there.[11]

---

[8] IFG asserts that it was at approximately 9:35 A.M., but the Court is not sure whether this is correct or incorrect. Given that IFG failed to raise its concerns at all during the evidentiary hearing, the Court finds it curious that it seemingly recorded the exact time of this interaction.

[9] Although the undersigned remembers Judge Cain's greeting as friendly, the undersigned does not recall Judge Cain's greeting being overly familiar or remarkable in any fashion. In any case, the undersigned was raised to greet people kindly and judges within the Eastern District of Texas are known for their collegiality. *See generally* Mark Barringer, *Collegiality and the Constitution: The United States District Court for the Eastern District of Texas* (2020).

[10] The Court recalls IFG's attorneys being in the courtroom at this time, but is unsure whether the Port's attorneys were present. Nonetheless, this conversation would have been in full view and within earshot of the Port's attorneys had they been present.

[11] The undersigned does not recall this, but Judge Cain allegedly greeted IFG's attorneys while in the courtroom.

At some point during the courtroom conversation, Judge Cain and Judge LeBlanc offered to give the undersigned a tour of the courthouse. The undersigned accepted and invited his law clerk to come along.[12] For approximately thirty minutes, Judge Cain and Judge LeBlanc showed the undersigned and his clerk the courthouse, specifically Judge Cain's chambers and courtroom,[13] and introduced us to various courthouse employees. We discussed a variety of things, such as the hurricane that destroyed the last courthouse, the upcoming Fifth Circuit conference, Judge Cain's plans to give a commencement address, Judge LeBlanc's time on the bench, the subject of Judge Cain's jury trial, and the welfare of our wives, children, and grandchildren. At no point did we discuss the underlying case. After the tour ended, the undersigned and his law clerk returned to chambers, confirmed that everyone, including the parties, were ready to begin the hearing, and gaveled in.[14] When the evidentiary hearing began, Judge Cain and Judge LeBlanc were not in the courtroom, which was open to the public. At no point that day did IFG express any concerns regarding the undersigned's conversing with Judge Cain or Judge Cain's presence in the courtroom prior to the hearing.[15]

On Wednesday, June 24, 2024, the evidentiary hearing was scheduled to begin at 8:30 A.M. Although the undersigned was not at the courthouse yet, at some point during the eight o'clock hour,[16] Judge Cain entered the courtroom and told the undersigned's law clerk that he was simply saying hello and checking to see whether we needed anything. The undersigned's law clerk told Judge Cain that we had everything we needed, that the undersigned had not arrived yet, and

---

[12] Curiously, although IFG remembers the exact time Judge Cain entered the courtroom, it does not remember Judge Cain and Judge LeBlanc inviting the undersigned on a tour of the courthouse, only that we left the courtroom and went in chambers.

[13] Although not directly relevant, the undersigned can attest that Judge Cain's courtroom's wall color and carpet are superior to those in the spare courtroom.

[14] According to the Minutes for Day 1 of the evidentiary hearing, the Court gaveled in at 10:16 A.M. [Dkt. 754].

[15] Interestingly, IFG's Motion does not state that it is concerned that Judge LeBlanc, who is also recused, was in the courtroom or that Judge LeBlanc and the undersigned spoke.

[16] IFG asserts that it was at approximately 8:20 A.M., but the Court does not know whether this is correct or incorrect.

that she would let him know when the undersigned arrived. As was the case on April 22, 2024, this conversation took place before the hearing started for the day and would have been in full view and within earshot of both parties.[17]

Shortly after this, though not necessarily simultaneously, the undersigned entered chambers and IFG entered the courtroom. The undersigned's law clerk told him that Judge Cain was in the courtroom and wanted to say hello. The undersigned asked his law clerk to send Judge Cain into chambers. His law clerk entered the courtroom, where Judge Cain was apparently chatting with the Port's attorneys and Merrick J. Norman, Jr. ("Norman"), one of the Port's witnesses.[18] According to affidavits provided by the Port, Norman and all but one of the Port's attorneys had not previously met Judge Cain, but out of respect introduced themselves to Judge Cain that morning. [Dkt. 774-1; Dkt. 774-2; Dkt. 774-3; Dkt. 774-4; Dkt. 774-5]. In what would have been  in full view and within earshot of IFG's attorneys, the Port's attorneys and Norman chatted with Judge Cain about whether the courtroom was satisfactory, the damage sustained by the courthouse during a hurricane, the wall color of the spare courtroom,[19] and how Judge Cain and Douglas J. Cochran ("Cochran"), one of the Port's attorneys, had played basketball against each other in high school.[20] [Dkt. 774-1; Dkt. 774-2; Dkt. 774-3; Dkt. 774-4; Dkt. 774-5]. When the undersigned's law clerk entered the courtroom, she interrupted this conversation and told Judge Cain that the undersigned was ready to speak with him. Judge Cain then entered chambers and—

---

[17] Although the Port had already assembled in the courtroom, IFG seemingly had not arrived yet.
[18] IFG argues that "[the undersigned's] personal friendship with Judge Cain calls into question the role [the undersigned] may have played in creating the circumstances in which Judge Cain had one-sided communications with the Port, its counsel, and a mid-testimony Port witness." [Dkt. 772-1 at 12]. To the extent that IFG is asserting that the undersigned invited Judge Cain to the courtroom generally or to come speak with the Port specifically, the undersigned denies this. The undersigned played no role in Judge Cain entering the courtroom or speaking with the Port at any point.
[19] If it has not been made clear, Judge Cain really did not like the wall color of the spare courtroom. Although the undersigned did not particularly dislike the muddy taupe color of the walls, he agrees that it was not the most aesthetically pleasing color.
[20] Apparently, these basketball games took place sometime in between 1980 and 1983. Cochran asserts that he and Judge Cain had no interactions in high school outside of these games and that, prior to April 24, 2024, he had not seen or spoken to Judge Cain, even in a professional context, since 1983. [Dkt. 774-3].

8

as fellow judges are wont to do—chatted with the undersigned about various mundane things, such as how the spare chambers and courtroom were working out, whether the undersigned and his team needed anything, Judge Minaldi's illness,[21] restaurants in Lake Charles, and how Judge Cain's jury trial had settled at the last minute. In other words, Judge Cain was once again being an excellent host to an out-of-state judge and his team. At no point did Judge Cain and the undersigned discuss the underlying case or how the evidentiary hearing was going. Although no one was in the room with Judge Cain and the undersigned, the door was open and there was a courtroom security officer standing outside the room within earshot. Once the conversation ended and Judge Cain left, the undersigned's law clerk informed him that everyone in the courtroom was ready and the undersigned gaveled in at 9:25 A.M.

The evidentiary hearing ended on the following day, April 25, 2024. IFG never raised its concerns about Judge Cain's presence in the courtroom or conversations with the undersigned during the week the evidentiary hearing took place. On June 4, 2024, over a month after the evidentiary hearing ended and after filing several other briefs and motions,[22] IFG filed the underlying Motion. [Dkt. 772]. The Port filed a Response [Dkt. 774] and IFG filed a Reply [Dkt. 775]. IFG's Motion is therefore ripe and ready for the Court's ruling.

### C.  The *Louisiana Record* Article

On June 13, 2024, the *Louisiana Record* published an article entitled "Attorneys Question Louisiana Federal Judge's Conduct After Recusal in Port Contractor's Lawsuit." The Court was entirely unaware of this article until IFG attached it to and referenced it throughout its Reply. *See*

---

[21] Although Judge Minaldi's illness was discussed briefly during the evidentiary hearing because it provided context for the parties' decision to consent to Judge Kay, the nature and timing of Judge Minaldi's illness and passing—which the undersigned had not previously heard about—is not at all relevant or related to the inquiry this Court is tasked with.

[22] In addition to submitting briefing on the knowledge requirement [Dkt. 764; Dkt. 768] and bench trail transcript excerpts [Dkt. 765], IGH filed a Motion to Reopen Discovery to Obtain Facebook Evidence [Dkt. 766] on May 10, 2024.

[Dkt. 775; Dkt. 775-1]. For the purposes of ruling on the underlying Motion, the Court takes judicial notice of this article.

In addition to summarizing the underlying Motion, the article includes several quotes from Judge Cain. [Dkt. 775-1]. Judge Cain acknowledged speaking to the undersigned in chambers and to attorneys present in the courtroom, but denied any wrongdoing. *Id.* In fact, he reportedly stated that the undersigned and he did not discuss the underlying case. *Id.* Additionally, like the undersigned, he characterized his interactions with the undersigned as simply being courteous to an out-of-state judge and seeing if the undersigned needed anything. *Id.* Finally, Judge Cain was quoted as saying, "This allegation is personally ridiculous, and I'm shocked that these lawyers would file something like that." *Id.*

## II.    DISCUSSION

IFG's Rule 60(b)(6) Motion argues that under 28 U.S.C. § 455(a), the undersigned should not rule on the Port's Motion to Vacate, this matter should be referred to another judge, and the evidentiary hearing should be redone because (1) Judge Cain was recused from this case and should not have been in the courtroom conversing with the undersigned and the parties and (2) the undersigned is friends with Judge Cain and spoke with Judge Cain outside of IFG's presence during the evidentiary hearing. [Dkt. 772-1; Dkt. 775]. Although IFG requests that a different judge rule on this Motion, judges traditionally rule on Federal Rule of Civil Procedure 60(b) motions and motions to recuse that implicate them or their rulings. *See* [Dkt. 775 at 9–10]; *Rocha v. Thaler*, 619 F.3d 387, 400 (5th Cir. 2010) (reiterating that "the decision to grant or deny relief under Rule 60(b) lies within the sound discretion of the district court"); *Thurmond v. Compaq Comput. Corp.*, No. 1:99CV0711, 2000 WL 33795081, at *2 (E.D. Tex. Feb. 28, 2000) ("The trial judge to whom a motion to recuse is directed is the proper judge to rule on the motion and generally should not refer the motion to another judge." (citing *In Corrugated Container Antitrust Litig.*,

614 F.2d 958, 963 n.9 (5th Cir. 1980))). *See generally Cheney v. U.S. Dist. Ct. for D.C.*, 541 U.S. 913 (2004) (outlining U.S. Supreme Court Justice Antonin Scalia's reasoning for not recusing himself); *Tango Transp., L.L.C. v. Transp. Int'l Pool, L.L.C.*, No. 08-559, 2011 WL 1298858 (W.D. La. Apr. 4, 2011) (detailing U.S. District Judge Maurice Hick's reasoning for denying a recusal-related Federal Rule of Civil Procedure 60(b)(6) motion and referencing Judge Hick's previous order denying a motion to recuse). The Court sees no reason to deviate from standard operating procedure and will, therefore, rule on IFG's Motion.

### A. IFG's Rule 60(b)(6) Motion

Federal Rule of Civil Procedure 60(b)(6) states that "the court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). "Rule 60(b)(6) is a grand reservoir of equitable power to do justice in a particular case." *Yesh Music v. Lakewood Church*, 727 F.3d 356, 363 (5th Cir. 2013) (quoting *Batts v. Tow–Motor Forklift Co.*, 66 F.3d 743, 747 (5th Cir.1995)). Even so, the Fifth Circuit has "narrowly circumscribed its availability, holding that Rule 60(b)(6) relief 'will be granted only if extraordinary circumstances are present.'" *Id.* (quoting *Batts*, 66 F.3d at 747). "Accordingly, Rule 60(b)(6) requires a showing of 'manifest injustice' and will not be used to relieve a party from the 'free, calculated, and deliberate choices he has made.'" *Id.* (quoting *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350 (5th Cir.1993)).

Crucially, Rule 60(b)(6) relief is only available after a *final* judgement, order, or proceeding. Fed. R. Civ. P. 60(b)(6); *Nat'l City Golf Fin., a Div. of Nat'l City Com. Cap. Co. v. Scott*, 899 F.3d 412, 417–18 (5th Cir. 2018) (stating that Rule 60(b) allows a district court to offer relief from a final judgment, order, or proceeding and later referencing the requirement for a "final proceeding"); *Yesh*, 727 F.3d at 360–63 (analyzing the contours of Rule 60(b)(6)'s requirement for a final judgement, order, or proceeding and indicating that the adjective "final" applies to

judgment, order, and proceeding). Here, the Court has not entered a final judgment or order, so whether IFG can properly bring a Rule 60(b)(6) motion at this time turns on whether there has been a final proceeding in this case. IFG contends that the April 2024 evidentiary hearing constitutes a final proceeding. The Port contests this.

Although case law regarding what qualifies as a final proceeding under Rule 60(b)(6) is admittedly sparse, the Fifth Circuit considered whether a voluntary dismissal without prejudice qualified as a final proceeding in *Yesh Music v. Lakewood Church*. *See* 727, F.3d at 360–63. In determining that a voluntary dismissal without prejudice did constitute a final proceeding, the Fifth Circuit noted that Rule 60(b)'s finality requirement "does not necessarily mandate that [a case] have been irrevocably judicially resolved." *Id.* at 360 (citing *Bell v. New Jersey*, 461 U.S. 773, 779 (1983)). Rather, it found that a plain reading of "final" in Rule 60(b) "support[ed] defining it as something which is practically 'finished,' 'closed,' or 'completed.'" *Id.* (citing *Gillespie v. U.S. Steel Corp.*, 379 U.S. 148, 152 (1964)). Turning to the meaning of proceeding, the Fifth Circuit stated that "[w]hile judgments and orders might imply the involvement of a judicial action, a 'proceeding' does not necessarily require any such action." *Id.* "Rather, the term proceeding is indeterminate, and may be used to describe the entire course of a cause of action or any act or step taken in the cause by either party." *Id.* (cleaned up) (citing *Reid v. Angelone*, 369, F.3d 363, 368 (4th Cir. 2004)).[23]

The Court holds that the April 2024 evidentiary hearing was not a final proceeding for purposes of Rule 60(b). While the evidentiary hearing was certainly a proceeding in that it was an "act or step taken" in this litigation, it lacks finality because it did not "practically 'finish[],'

---

[23] The Port cites *Waetzig v. Halliburton Energy Services, Inc.*, 82 F.4th 918 (10th Cir. 2023) in support of its position that IFG's Rule 60(b)(6) motion is untimely. Although this case is compelling and analyzes the meaning of final proceeding in depth, it directly contradicts *Yesh*, which is binding precedent on this Court. The Court therefore will not utilize *Waetzig*'s reasoning.

'close[],' or 'complete[]'" the evidentiary inquiry mandated by the Fifth Circuit or the Port's Motion to Vacate. *See Yesh*, 727 F.3d at 360. When the evidentiary hearing ended, the parties still had to submit briefing and bench trial excerpts and the Court still had to determine its findings of fact, research the applicable law, and draft its decision. Furthermore, the completion of an evidentiary hearing pales in comparison to the voluntary dismissal without prejudice, which ended the litigation altogether, in *Yesh*. *See id.* at 360–63. Finally, there is nothing for the Court to relieve IFG from at this point. *See* Fed. R. Civ. P. 60(b) (permitting the Court to "relieve" a party from a final proceeding). Accordingly, IFG's Rule 60(b)(6) Motion must be **DENIED** on procedural grounds as untimely.[24]

### B.  IFG's Construed Motion for Recusal Pursuant to 28 U.S.C. § 455(a)

The Court could end its analysis with its finding that IFG's Rule 60(b)(6) motion is untimely, but in the interest of putting out fires before they start,[25] the Court construes IFG's motion as a motion to recuse under Section § 455(a) and proceeds to consider its merits. Because a reasonable person advised of all the underlying facts and circumstances would not question the undersigned's impartiality and because IFG did not timely move for recusal, IFG's Construed Motion to Recuse must also be denied.

Section 455(a) provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be

---

[24] IFG argues that the three-factor test from *Liljeberg v. Health Services Acquisition Corp.* should be used to analyze its Motion, but this test is only used to determine whether a judgment should be vacated due to a 28 U.S.C. § 455(a) violation. *See* 486 U.S. 847, 864 (1988) (holding that the necessity of Rule 60(b)(6) vacatur due to violations of Section 455(a) should be determined by looking at (1) "the risk of injustice to the parties in the particular case," (2) the risk that the denial of relief will produce injustice in other cases," and (3) "the risk of undermining the public's confidence in the judicial process"); *Roberts v. Wal-Mart La., L.L.C.*, 54 F.4th 852, 854 (5th Cir. 2022) (stating that failures to recuse under Sections 455(a) and (b) are evaluated for harmless error using the *Liljeberg* factors). Here, there is nothing for the Court to vacate. And, even if the Court were to perform this analysis, the Court would not find IFG entitled to relief because, as discussed *infra*, there has not been a Section 455(a) violation. *See Tango Transp., L.L.C. v. Transp. Int'l Pool, L.L.C.*, No. 08-559, 2011 WL 1298858; at *2 (W.D. La. Apr. 4, 2011) (discerning from *Travelers Ins. Co. v. Liljeberg Enterprises, Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994) that a Section 445(a) violation is required for vacatur under Rule 60(b)(6)); *infra* Section II.B.

[25] After all, IFG has promised to refile its Rule 60(b)(6) motion if the Court denies it as untimely. [Dkt. 775 at 3].

questioned." 28 U.S.C. § 455(a). "The decision whether a judge's impartiality can 'reasonably be questioned' is to be made in light of the facts as they existed, and not as they were surmised or reported." *Cheney*, 541 U.S. at 914 (citing *Microsoft Corp. v. United States*, 530 U.S. 1301, 1302 (2000)). Moreover, "the recusal inquiry must be 'made from the perspective of a *reasonable* observer who is *informed of all the surrounding facts and circumstances*.'" *Id.* at 924 (quoting *Microsoft Corp.*, 530 U.S. at 1302 (emphases added)). "The Fifth Circuit has interpreted this mandate to mean that '[courts] ask how things appear to the well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person,' while remaining 'mindful that an observer of our judicial system is less likely to credit judges' impartiality than the judiciary' would be." *Snarr v. United States*, No. 1:13-CV-724, 2023 WL 4237095, at *4 (E.D. Tex. June 28, 2023) (alteration in original) (quoting *United States v. Jordan*, 49 F.3d 152, 156–57 (5th Cir. 1995)). This analysis "must be guided, not by comparison to similar situations addressed by prior jurisprudence, but rather by an independent examination of the facts and circumstances of the particular claim." *Republic of Panama v. Am. Tobacco Co.*, 217 F.3d 343, 346 (5th Cir. 2000).

The party moving for recusal "carries a heavy burden of proof" because "a judge is presumed to be impartial" and the party seeking recusal "bears the substantial burden of proving otherwise." *United States v. Reggie*, No. 13-111, 2014 WL 1664256, at *2 (M.D. La. Apr. 25, 2014) (quoting *Fletcher v. Conoco Pipe Line Co.*, 323 F.3d 661, 664 (8th Cir.2003)). Recusal inquiries are "extremely fact intensive and fact bound" and require "a close recitation of the factual basis for the . . . recusal motion" by the party seeking recusal. *Jackson v. Valdez*, 852 F. App'x 129, 133 (5th Cir. 2021) (quoting *Republic of Panama*, 217 F.3d at 346). Additionally, the Fifth Circuit "inferred a timeliness requirement from [Section] 455." *United States v. Sanford*, 157 F.3d 987, 988 (5th Cir. 1998) (citing *Hollywood Fantasy Corp. v. Gabor*, 151 F.3d 203, 216 (5th Cir.

14

1998)). Although the Fifth Circuit has not adopted a *per se* timeliness rule, the general rule is that "one seeking disqualification must do so at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification." *Id.* (first citing *Gabor*, 151 F.3d at 216; and then quoting *Travelers Ins. Co. v. Liljeberg, Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994)); *see also In re Pendergraft*, 745 F. App'x 517, 520 (5th Cir. 2018); *Andrade v. Chojnacki*, 338 F.3d 448, 449 n.5 (5th Cir. 2003). Indeed, the Fifth Circuit has rejected recusal challenges as untimely when the party seeking recusal waited to see if it liked an outcome before asserting the recusal issue. *See Sanford*, 157 F.3d at 988–89 ("The most egregious delay—the closest thing to *per se* untimeliness—occurs when a party already knows the facts purportedly showing an appearance of impropriety but waits until after an adverse decision has been made by the judge before raising the issue of recusal.").

Notably, "[a] judge is as much obligated not to recuse himself when it is not called for as he is obligated to when it is." *McClelland v. Gronwaldt*, 942 F. Supp. 297, 302 (E.D. Tex. 1996) (first citing *Maez v. Mountain States Tel. & Tel., Inc.*, 54 F.3d 1488, 1508 (10th Cir. 1995); then citing *In re Am. Ready Mix, Inc.*, 14 F.3d 1497, 1501 (10th Cir. 1994); and then citing *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988)); *see also Laird v. Tatum*, 409 U.S. 824, 837 (1972) (noting that "a federal judge has a duty to sit where not disqualified which is equally as strong as the duty to not sit where disqualified"). "A judge should not recuse himself based upon unsupported, irrational, or highly tenuous speculation." *McClelland*, 942 F. Supp. at 302 (citing *In re Am. Ready Mix, Inc.*, 14 F.3d at 1501)). Furthermore, motions to recuse pursuant to Section 455 are "committed to the sound discretion of the district judge." *Sensley v. Albritton*, 385 F.3d 591, 598 (5th Cir. 2004) (quoting *Chitimacha Tribe v. Harry L. Laws Co.*, 690 F.2d 1157, 1166 (5th Cir. 1982)). Recusal motions "are [also] closely scrutinized to prevent parties from gamesmanship in seeking who they perceive to be a more favorable judge." *Morrison v. Walker*,

No. 1:13-CV-00327, 2016 WL 7637672, at *6 (E.D. Tex. Dec. 7, 2016); *see also Sensley*, 385 F.3d at 598 ("Courts should take special care in reviewing recusal claims so as to prevent parties from 'abus[ing] [Section] 455 for a dilatory and litigious purpose based on little or no substantiated basis.'" (first alteration in original) (quoting *Liljeberg*, 38 F.3d at 1409 n.8)).

Turning to the matter at hand, the Court divides IFG's allegations and arguments into two categories: (1) those involving Judge Cain and (2) those involving the undersigned.

### 1.  Judge Cain's Conduct

IFG asserts that Judge Cain entered the courtroom where the evidentiary hearing was taking place, spoke with the Port's counsel and witness, and spoke with the undersigned in the courtroom and in chambers in violation of Judge Doughty's en banc recusal order. IFG also takes issue with Judge Cain's statements regarding IFG and its underlying Motion in the *Louisiana Record*. The Court fails to see the relevance of Judge Cain's conduct. Judge Cain is—as IFG repeatedly points out and the undersigned is well aware—already recused. He cannot be recused again and, as far as the undersigned knows, cannot be doubly recused.

The Court also disagrees with IFG's assertion that Judge Cain violated the recusal order. Contrary to IFG's aspersions, Judge Cain took no action in the evidentiary hearing—or in the case at large—and has never attempted or been in a position to affect the outcome of the Fifth Circuit's mandated inquiry and the Port's Motion to Vacate. *See* [Dkt. 772-1 at 10 (first quoting *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 457 (5th Cir. 1996); and then citing *Arnold v. E. Air Lines, Inc.*, 712 F.2d 899, 904 (4th Cir. 1983))]. In fact, Judge Cain was not on the bench when this case began, has never been assigned to this case, and did not preside over the evidentiary hearing. He merely entered a *public* courtroom when the evidentiary hearing was *not ongoing* and spoke to the undersigned and his staff, the Port's attorneys and witness, and IFG's attorneys in an effort to be

hospitable.[26] Judge Cain also gave the undersigned and his law clerk a tour of the courthouse and engaged in mundane banter[27] with the undersigned in chambers. There is absolutely no evidence or even reason to suspect that Judge Cain mentioned the underlying case let alone tried to involve himself in or influence this case during the week of the evidentiary hearing. He certainly never said anything to the undersigned about this case.

Judge Cain's allegedly critical statements about IFG and the underlying Motion in the *Louisiana Record* are also not particularly relevant given that Judge Cain is already recused. Whether Judge Cain's decision to comment on IFG's Motion was wise or unwise, proper or improper, is not for the undersigned to decide and really has no bearing on this case. If Judge Cain was assigned to this case, that would be another matter entirely. The fact remains, however, that he is not and never has been. Interestingly, IFG asserts that Judge Cain's comments in the article "are quite likely to have a prejudicial effect on a Court's review of the Motion." [Dkt. 775 at 7]. But the undersigned was totally unaware of this article—and would almost certainly have remained so[28]—if IFG had not implicated the article in its Reply. In any case, let the record reflect that what Judge Cain thinks about this case, the parties, or the underlying Motion has no bearing on the undersigned's evaluation of the underlying facts and application of the law.

Accordingly, because Judge Cain is already recused, the Court need not apply the reasonable person test to determine whether his recusal is required under Section 455(a).

---

[26] Although IFG argues that Judge Cain's discussions with the Port's counsel and witness constitute illicit *ex parte* communications, it glosses over the fact the Judge Cain is not assigned to the case and provides no legal authority supporting its broad and arguably untenable interpretation of the rule against *ex parte* communications.
[27] This may come as a surprise to IFG, but judges are people too and occasionally enjoy chit-chat and small talk. While those conversations occasionally involve the law, more often than not—and as was the case here—they concern boring details about judges' personal lives, mutual acquaintances, restaurants, and the like.
[28] As a resident of Beamont, Texas, the undersigned does not typically read the *Louisiana Record*. Additionally, in keeping with ethical obligations, the undersigned avoids consuming media publications about the cases assigned to him.

### 2.   The Undersigned's Friendship and Conversations with Judge Cain

More pertinently, IFG argues that the undersigned must be recused in light of Judge Cain's conduct because the undersigned stated that he was friends with Judge Cain and conversed with Judge Cain in the courtroom and in chambers. IFG argues that these contacts, coupled with Judge Cain's conduct, taint the evidentiary hearing beyond repair. IFG's inference is based on pure speculation and fails the reasonable person test, though. *See Cheney*, 541 U.S. at 914, 924; *Snarr*, 2023 WL 4237095, at *4; *McClelland*, 942 F. Supp. at 302.

The undersigned's statements about being friends with and having the highest regard for Judge Cain would not convince a reasonable person that the undersigned's friendship with Judge Cain is of such a magnitude that the undersigned cannot act impartially. *See Snarr*, 2023 WL 4237095, at *10 (stating that recusal is only required when "the stated facts establish a personal relationship of such magnitude that the judge cannot be impartial"). Viewed in their proper context, the undersigned's comments about Judge Cain are benign. IFG's assertion that Judge Cain and the undersigned are "close friends[]" based on these comments, a "fond" greeting, and conversations in the courtroom and in chambers is pure speculation. *See* [Dkt. 772-1 at 6; Dkt. 775 at 9]; *Chitimacha*, 690 F.2d at 1167 (finding that a reasonable person would not be convinced that bias exists based upon pure speculation). As detailed *supra*, the undersigned's friendship with Judge Cain is, in fact, recent, work-related, and not particularly close.

IFG also fails to allege facts indicating that the undersigned's relationship with Judge Cain would cause the undersigned to harbor a personal bias against IFG in favor of granting the Port's Motion to Vacate. Judge Cain is not one of the parties, is not an attorney for one of the parties, and is not the magistrate judge whose behavior is implicated in the Port's Motion to Vacate. He is not the assigned judge in the case and never has been. There is absolutely no reason to believe that the

Port prevailing would personally benefit Judge Cain or his family.[29] IFG's assertion that the undersigned's friendship with Judge Cain would cause him to rule against IFG is, once again, pure speculation. Given these realities, a reasonable person would not believe that the undersigned's friendship with Judge Cain would lead him to act impartially in these proceedings to benefit Judge Cain.

Putting aside the nature of the undersigned's friendship with Judge Cain, the undersigned turns now to whether his speaking with Judge Cain requires recusal. IFG's arguments are once again based on pure speculation about what Judge Cain and the undersigned discussed. *See* [Dkt. 775 at 9 (dismissing the Port's arguments against recusal on the grounds that the Port "is unaware of the substance of the communications between [the undersigned] and Judge Cain before, during, or after the proceedings")]; *Chitimacha*, 690 F.2d at 1167. Regarding the undersigned's April 22, 2024 discussion with Judge Cain in the courtroom, the undersigned reiterates that Judge LeBlanc was also present and that the discussion occurred within plain view and within earshot of the parties and members of the undersigned's team. The topics ranged from general pleasantries to the spare courtroom's interior design, but nothing related to this case was discussed. A reasonable person would not question the undersigned's impartiality based on a banal, public conversation between three judges.

IFG next assails the undersigned's decision to engage in "more than one closed-door session" with Judge Cain. [Dkt. 775 at 9]. But as already described, one of these "closed-door session[s]" was actually a courthouse tour during which Judge LeBlanc and the undersigned's law clerk were also present. Although Judge Cain, Judge LeBlanc, the undersigned, and the undersigned's law clerk were not mute during the tour, the conversation did not stray toward this

---

[29] IFG mentions that it believes Judge Cain was previously colleagues with Keith Prudhomme, one of the Port's board members and allegedly a close friend of Norman's. Nothing about being colleagues about with a Port board member who is friends with a Port witness suggests that Judge Cain has a stake in the outcome of the Port's Motion to Vacate.

case and any assertion otherwise is nothing more than baseless conjecture. A reasonable person would not question the undersigned's impartiality based on his receiving a courthouse tour from Judge Cain and Judge LeBlanc and IFG's unsupported assumption that this case must have been discussed.

This leaves one "closed-door session" to tackle. The Court is not entirely sure what a "closed-door session" is, but it certainly—and intentionally the Court suspects—sounds nefarious. Thankfully, the undersigned left the door to his office within chambers open during his April 24, 2024 discussion with Judge Cain. The undersigned is therefore spared from having to ascertain what a "closed-door session" is and need only evaluate whether having a personal conversation with a fellow judge outside of IFG's presence is problematic. A reasonable observer informed of all the surrounding facts and circumstances, namely the size of the award being contested, the alleged issue involving Judge Kay's relationship with Monk, the en banc recusal order, and the significant measures the undersigned took to sanitize these proceedings, would not question the undersigned's impartiality based on the undersigned's private conversation with Judge Cain about matters totally unrelated to this case. *See Cheney*, 541 U.S. at 914, 924. Although the undersigned is friendly with Judge Cain and spoke to him while in Lake Charles for the evidentiary hearing, the undersigned did not initiate these interactions or communicate with Judge Cain while the evidentiary hearing was on the record. Other than arranging to use the spare courtroom in November 2023, the undersigned also never spoke to Judge Cain about this case or the evidentiary hearing. A "hypersensitive, cynical, and suspicious person" might jump to other conclusions, but that is not the standard under Section 455(a). *See Snarr*, 2023 WL 4237095, at *4. A "well-informed, thoughtful and objective observer" would not presume that anything untoward or inappropriate happened merely because the undersigned chatted with a colleague when he stopped by and then "immediately took the bench for the hearing in this case." *See id.*; [Dkt. 775 at 9].

As the allegations underpinning IFG's Construed Motion to Recuse (considered individually and collectively) boil down to rampant speculation and fail the reasonable person test, recusal is not warranted. The undersigned is therefore duty bound not to recuse himself. *See McClelland*, 942 F. Supp. at 302 (stating that a judge is obligated not to recuse himself "when it is not called for" or on the basis of "unsupported, irrational, or highly tenuous speculation"); *see also Laird*, 409 U.S. at 837 (indicating that judges have "a duty to sit where not disqualified").

Furthermore, even if IFG's Motion had merit, it is untimely and bears the marks of gamesmanship. IFG cites the undersigned's statements at the April 16, 2024 Pretrial Conference, the undersigned's interactions with Judge Cain on April 22, 2024, Judge Cain's conversation with the Port's counsel and witness on April 24, 2024, and the undersigned's in chambers discussion with Judge Cain on April 24, 2024 as grounds for the undersigned's recusal. Therefore, to be timely, IFG should have moved for recusal by April 24, 2024—if not sooner. *See Sanford*, 157 F.3d at 988–89 (stating that "one seeking disqualification must do so at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification"). Instead, IFG waited over a month after the evidentiary hearing ended to file the underlying motion. In fact, this Motion was not even the first post-evidentiary hearing motion that IFG filed. *See* [Dkt. 766 (seeking to reopen discovery based on events at the evidentiary hearing)].

Given what is at stake, if IFG was so concerned by these events, why would it wait over a month to move for the undersigned's recusal? If IFG was so concerned that it apparently recorded the exact times that it saw Judge Cain in the courtroom that week, why would it wait until after asking the undersigned if it could conduct additional discovery? *See infra* notes 8, 16. The only logical conclusion is that IFG, encouraged by the Court's ruling in its favor on the Port's Motion in Limine, wanted to see how the evidentiary hearing went before seeking recusal. Based on its desire for further discovery and this Motion, however, IFG seemingly does not think the

evidentiary hearing went well. But the Fifth Circuit does not permit parties to scope out an outcome before raising recusal. *Sanford*, 157 F.3d at 988–89. And courts must "closely scrutinize[]" recusal motions "to prevent parties from gamesmanship in seeking who they perceive to be a more favorable judge." *Morrison*, 2016 WL 7637672, at *6; *see also Sensley*, 385 F.3d at 598). IFG's month-long delay in seeking recusal, the frivolousness of its allegations,[30] and its requests for a new decisionmaker and evidentiary hearing do not pass the smell test and appear geared toward gaining a do-over. IFG's Construed Motion to Recuse is therefore untimely.

Accordingly, the Court **DENIES** IFG's Construed Motion to Recuse as meritless and untimely.

### C. IFG's Motion for Discovery

Alternatively, IFG seeks a stay of the proceedings before the undersigned and discovery before an independent decisionmaker regarding (1) "[t]he nature and extent of the relationship between Judge Cain and the Port and its counsel and witnesses"; (2) [t]he nature and extent of the relationship between [the undersigned] and Judge Cain"; (3) [t]he communications Judge Cain has had with individuals involved in this matter, including [the undersigned] and those associated with the Port"; and (4) "[a]ny other relevant information bearing on the events described above and disclosed in connection with such discovery and disclosure." [Dkt. 772-1 at 16].

Because Judge Cain is recused from and has never played a role in this case, the Court fails to see how discovery into Judge Cain's relationship or communications with the Port, its counsel, and its witnesses is at all relevant. Moreover, given that IFG's recusal effort is untimely and without merit, the undersigned finds that discovery into his relationship and communications with

---

[30] Given IFG's arguments regarding the insignificance of Judge Kay and Monk's relationship in the context of the Port's Motion to Vacate, its efforts to secure the undersigned's recusal due to his shorter and more distant relationship with Judge Cain—who is not even a party in this litigation—are internally inconsistent, if not problematic. *See IFG Port Holdings, L.L.C. v. Lake Charles Harbor & Terminal Dist.*, 82 F.4th 402, 418 (5th Cir. 2023) (referencing IFG's assertion that the relationship between Judge Kay and Monk does not require recusal under Section 455(a)).

Judge Cain is unwarranted. IFG's request for discovery and a stay of these proceedings is therefore **DENIED**.

### III.   CONCLUSION

It is therefore **ORDERED** that Plaintiff IFG Port Holdings LLC's Motion for Relief from Proceeding and, in the Alternative, Motion for Discovery [Dkt. 772] is **DENIED**.

**SIGNED this 26th day of July, 2024.**


_____
Michael J. Truncale
United States District Judge