UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

IFG PORT HOLDINGS LLC                    §
                                         §
VERSUS                                   §          CIVIL ACTION NO. 2:16-CV-00146
                                         §          JUDGE MICHAEL J. TRUNCALE
LAKE CHARLES HARBOR &                     §
TERMINAL DISTRICT D/B/A                   §
THE PORT OF LAKE CHARLES                  §

## ORDER GRANTING DEFENDANT'S MOTION TO VACATE REFERRAL TO MAGISTRATE JUDGE PURSUANT TO FED. R. CIV. P. 73(B)(3)

Before the Court is Defendant Lake Charles Harbor & Terminal District, d/b/a the Port of

Lake Charles ("the Port")'s Motion to Vacate Referral to Magistrate Judge Pursuant to Fed. R.

Civ. P. 73(b)(3). [Dkt. 483]. For the following reasons, the Port's Motion is **GRANTED**.

## I.    BACKGROUND

### A.  Procedural History

This case stems from a years-long contract dispute between a commercial tenant, IFG Port

Holdings LLC ("IFG"), and its commercial landlord, the Port. *IFG Port Holdings, L.L.C. v. Lake*

*Charles Harbor & Terminal Dist.*, 82 F.4th 402, 405 (5th Cir. 2023). Although this case was

initially assigned to U.S. District Judge Patricia Minaldi, on January 27, 2017, the parties

consented to having the case tried by Magistrate Judge Kathleen "Kathy" Kay. *Id.* at 406, 412.

Before the parties consented, Judge Kay disclosed that Margaret, the daughter of William Monk

("Monk"), IFG's lead trial counsel, was one of her law clerks and assured the parties that she

would be screened off the case. *Id.* at 413. After a lengthy bench trial, Judge Kay issued a ruling

in IFG's favor and a damage award against the Port totaling $124,531,652. *Id.* at 406–07.

The alleged harshness of Judge Kay's order prompted the Port to investigate. *Id.* at 413. Its

investigation revealed additional contacts between Judge Kay and Monk, namely that Monk served

as a groomsman in Judge Kay's wedding and that Judge Kay officiated Monk's other daughter

Lucie's wedding. *Id.* As a result, on October 21, 2020, the Port filed a motion to vacate the referral to Judge Kay. *Id.* In support of its Motion, the Port attached an affidavit from Matthew "Matt" Mize ("Matt Mize"), one of the Port's trial attorneys in the underlying dispute. *Id.* The Port also filed a motion for leave to conduct discovery regarding the relationship between Judge Kay and Monk on November 10, 2020. *Id.* After U.S. District Judge Terry Doughty denied both motions, the Port appealed. *Id.* at 412–13.

On September 21, 2023, the Fifth Circuit vacated Chief Judge Doughty's denials of the Port's motion to vacate the referral to Judge Kay and motion for leave to conduct discovery on account of "its significant doubts about the knowingness and validity of the Port's consent" to have the case tried by Judge Kay. *Id.* at 420–21. Because "critical facts remain[ed] untested or altogether undeveloped," however, the Fifth Circuit remanded the Port's motion to vacate the referral "to the district court for an evidentiary inquiry." *Id.* at 421. The Fifth Circuit specified that the district court's inquiry must determine the following facts: (1) "[t]he extent and nature of Magistrate Judge Kay's friendship with Monk and his family"; (2) "[w]hat information about these relationships Magistrate Judge Kay disclosed to the parties and when these disclosures occurred"; (3) "[w]hat precise steps the Port took upon its first discovery that a longstanding friendship existed, *i.e.*, what comprised its 'investigation'"; and (4) "[w]hen the Port first knew that Magistrate Judge Kay's relationship to Monk extended beyond her employment of Monk's daughter as her law clerk." *Id.*

On November 1, 2023, Chief Judge Doughty issued an En Banc Order recusing all District and Magistrate Judges in the Western District of Louisiana from this case. [Dkt. 672]. Pursuant to a Fifth Circuit designation, Chief Judge Doughty's Order also transferred this case to the undersigned judge and Magistrate Judge Christine L. Stetson. *Id.*

## B.  An Overview of the Court's Evidentiary Inquiry

On November 16, 2023, this Court held a status conference with the parties in Beaumont, Texas to determine the contours of the evidentiary inquiry mandated by the Fifth Circuit. Based on the parties' input, the Court entered a Scheduling Order and Order Setting Hearing [Dkt. 681] with a discovery deadline of March 15, 2024 and an evidentiary hearing date of April 22, 2024.

After the status conference, the parties engaged in vigorous discovery. Hundreds of documents were produced, numerous motions to compel and quash were filed, and several hearings were held by Judge Stetson. As a result, and at IFG's request, the Court extended the discovery deadline until April 12, 2024. [Dkt. 726; Dkt. 729].  At the Port's request, the Court also permitted the Port to file (and IFG to respond to) a Pre-Trial Memorandum in Support of Motion to Vacate Referral to Magistrate Judge Pursuant to Fed. R. Civ. P. 73(b)(3). [Dkt. 744; Dkt. 745; Dkt 746; Dkt. 751].

The Court scheduled a Pretrial Conference for April 16, 2024 to facilitate exhibit management and consider any motions in limine. [Dkt. 740]. At the Pretrial Conference, the Court considered the Port's four-part Motion in Limine.[1] [Dkt. 743]. The Port's Motion in Limine was granted in part and denied in part [Dkt. 753], the result being that IFG would be permitted to put on evidence regarding (1) relationships other than the one between Judge Kay and Monk, (2) Judge Kay's bias or lack thereof, and (3) the sufficiency of the Mize Affidavit.[2]

The Court's evidentiary hearing took place from April 22, 2024 to April 25, 2024 in Lake Charles, Louisiana. During the evidentiary hearing, the Court heard opening and closing arguments

---

[1] IFG did not file a Motion in Limine.
[2] Although this evidence arguably goes beyond the four inquiries identified by the Fifth Circuit, the Fifth Circuit noted that the Court's inquiry could extend to "any other questions [it] deems appropriate in its assessment of this case." *IFG Port Holdings, L.L.C. v. Lake Charles Harbor & Terminal Dist.*, 82 F.4th 402, 421 (5th Cir. 2023).

as well as testimony from fifteen different witnesses.[3] The Court also admitted and heard testimony regarding over one hundred exhibits. After the evidentiary hearing, the parties filed briefing on whether the Port's alleged constructive knowledge of a relationship between Judge Kay and Monk would be sufficient to render the Port's consent to Judge Kay knowing. [Dkt. 764; Dkt. 767; Dkt. 768]. At the Court's request, the parties also filed bench trial transcript excerpts relevant to whether Judge Kay was biased against or hostile toward the Port during the bench trial. [Dkt. 763; Dkt. 765].

Having reviewed the parties' evidence and briefing and ruled on IFG's other post-hearing motions,[4] the Court is now prepared to issue findings of fact[5] and rule on the Port's Motion to Vacate.

## II.    FINDINGS OF FACT[6]

### A.  The Underlying Lawsuit and the Parties' Consent to Judge Kay

On January 29, 2016, IFG filed the underlying lawsuit against the Port. [Def.'s Ex.1]. IFG's lead counsel was Monk. The Port was represented by William J. "Joe" Mize ("Joe Mize")[7] and Matt Mize.[8] The case was initially assigned to Judge Minaldi and Judge Kay. Due to Judge Minaldi's health issues, Judge Kay largely interfaced with the parties during the early stages of the lawsuit.

---

[3] Two witnesses testified by deposition read into the record and one witness's Responses to Notice of Deposition Upon Written Questions was admitted as an exhibit in lieu of her testifying.

[4] After the evidentiary hearing, IFG filed a Motion to Reopen Discovery to Obtain Facebook Evidence [Dkt. 766] and a 60(b)(6) Motion for Relief from Proceeding and, in the Alternative, Motion for Discovery [Dkt. 772]. Both motions were denied in separate orders. [Dkt. 776; Dkt. 777].

[5] The Court makes findings of fact in this Order because the Fifth Circuit instructed the Court to conduct an "evidentiary inquiry" and to determine four specific facts. *See IFG Port Holdings*, 82 F.4th at 821.

[6] To the extent that witness testimony and exhibits are not reflected in the Court's findings of fact, the Court has deemed them immaterial to its inquiry.

[7] Joe Mize sadly passed away in 2021. The Court therefore does not have the benefit of his testimony.

[8] Joe Mize and Matt Mize are father and son. Additionally, the Port later added Merrick "Rick" J. Norman, Jr. ("Norman"), Matthew E. Lognion ("Lognion"), and Matthew Bond Pettaway ("Pettaway") to its trial team.

During an April 15, 2016 in-person status conference, Judge Kay and the parties discussed, either explicitly or implicitly, the impact of Judge Minaldi's health issues on getting this case to trial promptly.[9] The gist of this conversation was that if the parties wanted the case resolved sooner, they would need to consent to referring the case to Judge Kay. Either prior to or during this status conference,[10] Judge Kay disclosed that Monk's daughter, Margaret, was her law clerk and assured the parties that she would be walled off the case.[11] Judge Kay made no other disclosures to the parties, including about her relationship with Monk, at this status conference or at any other point in the litigation.[12] After Judge Kay's disclosure, Matt Mize stepped out of the status conference and called the Port's General Counsel, Michael Dees ("Dees").[13] Matt Mize informed Dees that Monk's daughter, Margaret, was Judge Kay's law clerk. Dees did not think this was a big deal since Margaret was going to be walled off.

On April 20, 2016, Joe Mize sent Dees the following email regarding consenting to Judge Kay:

> Mike we have to decide whether we will consent to a trial by the magistrate or not by Friday. The way Magistrate Judge Kay got to the bottom of the issues the other day impressed all of us. It appeared she had read everything and was completely prepared not to put up with IFG's hyperbole and B.S. Your call though. Let us know or call Matt or I to discuss. Thanks[.]

---

[9] Monk alone testifies that consent was not discussed in-person before Judge Kay prior to the parties' consent. The Court finds other witnesses' testimony on this point more credible.

[10] Monk contends that his daughter Margaret's clerkship was disclosed earlier than April 15, 2016. The exact date of Judge Kay's disclosure regarding Margaret is not dispositive since both parties concede it was before the parties consented, but the Court finds it more likely that the disclosure was made on April 15, 2016 given the totality of the evidence.

[11] Based on an email from Joe Mize to Monk on February 11, 2016, Joe Mize was seemingly already aware that Margaret was clerking for Judge Kay when the April 15, 2016 status conference occurred. [Pl.'s Ex. 41].

[12] According to Judge Kay, she did not disclose anything about her relationship with Monk because it never occurred to her since this relationship allegedly would not have required her to recuse herself and since the attorneys were local. Notably, however, she testified that she may have felt compelled to disclose that her son and Monk's son went to school together and were friends if out-of-town attorneys had been involved. While Monk testified that during in-person status conferences he and Judge Kay frequently asked about each other's children, he confirmed that no broader disclosure about the relationship between he and Judge Kay was ever made.

[13] Monk testified that this did not occur, but the Court does not find his version of events credible given other witnesses' testimony.

[Pl.'s Ex. 44]. Dees responded, "We prefer magistrate[.]" *Id.*

In light of Dees' response, on April 21, 2016, Joe Mize sent Monk the following email: "Bill. The [P]ort has no objection to Magistrate Kay trying this case does IFG?" [Pl.'s Ex. 45]. That same day, Monk responded, "For the time being, IFG is undecided on that subject. When we have a deadline for making that decision, we will timely address it through the normal process." *Id.* Matt Mize was copied on both of these emails. *Id.*

On January 27, 2017, the parties filed a signed Notice, Consent, and Reference of a Civil Action to the Magistrate Judge form. [Pl.'s Ex. 73]. According to testimony by Monk and Dees, Judge Minaldi's health issues drove the parties to consent to Judge Kay.[14] Dees testified that he believes he asked around the legal community about Judge Kay prior to the Port's consent.[15] Dees further testified that he did not hear anything about a relationship between Judge Kay and Monk during these inquiries. Matthew Lognion ("Lognion"), who worked at Joe Mize and Matt Mize's firm, represented the Port in this case, and previously clerked for Judge Kay, recalls being asked by either or both Joe Mize or Matt Mize around the time of consent if Judge Kay could be fair and responding that Judge Kay could be fair and impartial.

U.S. District Judge Dee D. Drell of the Western District of Louisiana subsequently referred the case to Judge Kay for all further proceedings and the entry of judgment on February 2, 2017. [Dkt. 113].

---

[14] Judge Minaldi's health issues also seemingly paved the way for the parties to consent even though the deadline had passed.

[15] Dees does not recall who exactly he spoke with about Judge Kay.

6

### B.  Judge Kay's Summary Judgment Ruling[16]

Prior to the bench trial, the Port filed five Motions for Partial Summary Judgment and IFG filed one Motion for Partial Summary Judgment. [Pl.'s Ex. 309]. On March 6, 2019, Judge Kay denied all but one of the Port's Motions for Partial Summary Judgment and denied IFG's single Motion for Partial Summary Judgment. *Id.* Judge Kay's summary judgment order used the word nefarious to describe the conduct the Port had been accused of once,[17] but did not use the words extortionary or sanctimonious. *Id.*; *see also IFG Port Holdings*, 82 F.4th at 413 (describing how Judge Kay's use of words like nefarious, extortionary, and sanctimonious in her reasons for judgment allegedly prompted the Port to investigate). Beyond quoting the standard for claims under the Louisiana Unfair Trade Practices Act (LUTPA),[18] Judge Kay's language throughout the summary judgment order was neutral and uncritical of either party. [Pl.'s Ex. 309].

### C.  Merrick "Rick" J. Norman, Jr.'s Enrollment as Counsel for the Port

On March 8, 2019, the Port moved to enroll Merrick "Rick" J. Norman, Jr. ("Norman") as counsel.[19] [Def.'s Ex. 1]; *see also* [Dkt. 390]. According to Norman and Dees' testimony, Joe Mize asked Norman to enroll as counsel because of the scope of the case, the impact his illness was having on his ability to try the case,[20] and Matt Mize's inexperience.[21] When Norman was asked

---

[16] Judge Kay's summary judgment ruling is relevant because IFG contends that the Port should not have been surprised by her Written Reasons for Judgment because its language mirrored that in her summary judgment ruling and in Louisiana Unfair Trade Practice Act (LUTPA) jurisprudence.

[17] Specifically, Judge Kay's summary judgment order stated, "In Answer to the Amended, Supplemental, and Restated Complaint [doc. 254] the Port acknowledged the existence of the contract but denied or recast much of the nefarious conduct of which it was accused in the original complaint." [Pl.'s Ex. 309 at 2–3].

[18] According to Judge Kay's summary judgment order, "to establish a LUTPA claim the plaintiff must show that 'the alleged conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious.'" [Pl.'s Ex. 309 at 25 (citing *Cheramie Servs., Inc. v. Shell Deepwater Prod. Inc.*, 35 So.3d 1053, 1059 (La. 2010))].

[19] Interestingly, Joe Mize had previously emailed Norman on October 16, 2017 to see whether Norman would represent him and Matt Mize with respect to a sanctions motion filed by Monk "in the event it becomes necessary." [Pl.'s Ex. 103]. Norman responded that he would be "[h]appy to." *Id.*; *see also* [Pl.'s Ex. 105]. Norman testified that he thought he knew the Port had consented to Judge Kay when he received this email.

[20] Joe Mize's health was so poor at the time of the trial that he did not question any witnesses.

[21] Judge Kay testified that she thought the Port hired Norman to sway her in the Port's direction, but the Court did not find her testimony on this subject credible given that Norman had seemingly never tried a case in front of her, the

to join the case, he had no knowledge regarding how the parties ended up consenting to Judge Kay or of any disclosures that Judge Kay had made to the parties.[22] Prior to officially enrolling, Norman called Dees to confirm that he was okay with him enrolling and to discuss his role. [Pl.'s Ex. 117]. During this conversation,[23] Norman and Dees discussed Dees' disappointment with Judge Kay's summary judgment ruling and his hope that Judge Kay would realize she made an error during trial. *Id.* In response, Norman stated the following:

> Well, I don't know just because I've never tried anything in front of her that I can remember. I've always tried in front of Minaldi. But, I would hope so but I don't have enough experience to tell. But, you know her and I know her. I'm friendly enough with her and practiced law with her in the same firm for a while and I was on the committee that had her appointed, twice. I'm not saying she'd do me any favors but she'll listen for sure.[24]

*Id.* at 2. Norman testified that "friendly enough with her" meant that Judge Kay did not hate him or have a grudge against him. Norman also testified that he made these comments to Dee in an effort to show that he was comfortable with Judge Kay and that Judge Kay was comfortable with him.

Although Norman enrolled mere weeks before the bench trial was scheduled to begin and his role was confined to questioning witnesses, Matt Mize testified that Norman was actively involved in the case and participated in nearly around the clock trial preparation.

---

Port's proffered reasons for enrolling Norman, and other evidence regarding the nature of Judge Kay's relationship with Norman. Interestingly, Monk similarly testified that he believed the Port had brought Norman on because of his professional and social connections with Judge Kay. The Court does not find Monk's testimony on this particularly credible either, however, given that nearly all other evidence points toward a closer relationship between Judge Kay and Monk than between Judge Kay and Norman.

[22] Although Norman did not know whether Judge Kay had disclosed that Margaret was her law clerk, Norman had received an unrelated email from Monk in 2015 wherein Monk told Norman that Margaret was clerking for Judge Kay. [Pl.'s Ex. 29 ].

[23] Curiously, Norman records and transcribes many of his phone calls.

[24] Although IFG attempts to use this statement to demonstrate a close relationship between Judge Kay and Norman and Judge Kay and Dees, the Court does not think this statement, especially contextualized by other evidence, supports the existence of anything more than a professional relationship between Judge Kay and either Norman or Dees. Norman's statements that that he and Dees both "know her" and that he is "friendly enough with her" hardly evince a close personal relationship. Additionally, Judge Kay and Norman only practiced law at the same firm for about two years in the late 1980s, went with different portions of the firm during its acrimonious breakup, and almost entirely stopped socializing together after the firm's breakup.

### D.  The Bench Trial

The bench trial before Judge Kay lasted from March 18, 2019 to April 30, 2019. In addition to being incredibly long, the trial was quite contentious. The Port's counsel found the trial incredibly difficult on account of Judge Kay's treatment of them and fatigue with the case.[25] Dees described it in an email as one of his worst trial experiences in forty years and testified that he experienced an unforgettable level of abuse from Judge Kay when he was on the witness stand because of her eyerolling, volume, and facial expressions. [Pl.'s Ex. 120]. While testifying, Norman agreed that it was probably his worst trial experience in forty years, characterized it as "a month long chewing out," and noted that he had tried to forget everything he could about the case (seemingly as a result). Matt Mize testified that Judge Kay seemed mad at Dees and he during the trial for reasons he did not understand. Jonathan Ringo ("Ringo"), who was the Port's Assistant General Counsel at the time of the trial and is now the Port's General Counsel, testified that based on what he saw, Judge Kay was not interested in the Port's side of the case.[26]

Although difficult to fully evaluate without knowing Judge Kay's tone and volume, transcript excerpts from the bench trial reveal that Judge Kay was frustrated by the pace of the trial and with Port counsel. *See generally* [Dkt. 763-1; Dkt. 765-1]. Throughout the trial, Judge Kay challenged Port counsel and witnesses about their questions, tactics, and testimony, including openly criticizing the Port's operations and attorneys at times. [Dkt. 763-1; Dkt. 765-1]. While there were certainly moments of humor and levity, her demeanor toward the Port (and IFG on occasion)[27] was often short and dismissive. [Dkt. 763-1; Dkt. 765-1]. For example, after overruling

---

[25] Even so, the Port did not file any motions or raise any objections related to Judge Kay's conduct during the trial.

[26] Ringo admittedly attended only part of the bench trial.

[27] In response to one of Monk's objections, she told Monk, "Don't be sarcastic." [Dkt. 763-1 at 38]. Additionally, while Monk was questioning a witness, Judge Kay interrupted and stated, "Okay. Mr. Monk. We've gone down this road. . . . I really think that we're just burning daylight here. And I bet you'd rather go away, wouldn't you[?]" [Dkt. 765-1 at 20]. After another of Monk's objections, Judge Kay said, "Stop, Mr. Monk. You're just wasting time here." *Id.* at 24.

one of Matt Mize's objections on the grounds that Dees, who was testifying, could correct any mischaracterizations on his own, Judge Kay immediately refused to let Dees make any corrections "because the record is what the record is and I've got access to it and my own notes of what it said." [Dkt. 763-1 at 18]. In a response to Norman, Judge Kay stated, "The Court is thinking that the Court's really tired of this case, is what the Court's thinking." *Id.* at 33; [Dkt. 765-1 at 59–60]. Also in response to Norman, Judge Kay stated, "[The Court] would most appreciate being out of this room, but that isn't going to happen. So if you want to educate me on how smart he is, you feel free to do that." [Dkt. 763-1 at 36]. Judge Kay also stridently expressed her displeasure with the Port about an allegedly undisclosed report. *Id.* at 41–42. Specifically, she told the parties that she was "disturbed," that IFG not receiving the report until that morning was "absolutely inexcusable," that she was "having a hard time even concentrating . . . because [she was] so irritated," that the Port's "ambush" "baffle[d] [her] mind," and that the incident "says a lot . . . about the Port's conduct in general."[28] *Id.* at 41–42.

### E.  The Port's Reflections on the Bench Trial

After the bench trial's conclusion, the Port anticipated an unfavorable ruling in some form or fashion.[29] In fact, the Port was sufficiently concerned about Judge Kay's prospective ruling that it hired Mike Rubin as appellate counsel in October 2019—nine months before Judge Kay's ruling ultimately came out.[30] Notably, several emails and text messages from after the trial memorialize

---

[28] The Court has limited knowledge concerning this discovery dispute and therefore makes no comment regarding its merits. Its sole purpose in invoking the dispute is to shed light on Judge Kay's demeanor during the trial.

[29] Norman, for example, expected an adverse ruling in terms of liability, but was hopeful that Judge Kay would accept the Port's damage model. Matt Mize did not have a good feeling about the trial, but was hopeful that Judge Kay simply reading and applying the contract might bring about a favorable outcome. Texts from Joe Mize on May 2, 2019 show that he too hoped Judge Kay would just read the contract. [Pl.'s Ex. 278]. Ringo testified that he thought a bad ruling was certainly a possibility, but that everyone was holding out hope for a favorable outcome. Lognion testified that he figured the Port would not succeed on all points. Carl Krielow ("Krielow"), who was President of the Port's Board at the time, testified by deposition that he was concerned about the outcome both before and after the bench trial.

[30] According to Norman's testimony, the Port retained Rubin that early because Judge Kay had given them the impression that the ruling would come out more quickly.

Port counsel's concerns regarding Judge Kay's demeanor and conduct throughout the trial and the possible outcome. There are also some communications demonstrating that attacking or appealing an adverse outcome was on Port counsel's minds in the months leading up to Judge Kay's ruling. Even so, Norman testified—and communications among Port counsel support—that there were no discussions about attempting to recuse or otherwise remove Judge Kay from the case in the immediate aftermath of the trial.[31]

On May 2, 2019, Dees[32] sent Joe Mize, Matt Mize, and Norman the following email:

Matt, Rick and I (maybe all of you to an extent) suffered emotionally charged and underserved beratement form [sic] Judge Kay during the trial. I have seen and experienced worse over the past 40 years—but not by much. The natural reaction when such occurs is to challenge back and defend yourself. Restraint on my part was difficult; as I am sure it was for others.

What all of that means as far the case, no one really knows. She seems mad at the world about something and uses her position to express it in a way and in a place where she will go unchallenged. I have been bothered by her words, tone, implications and actions until recently when I ran across this quote:

From Warren Buffet:

"You will continue to suffer if you have an emotional reaction to everything that is said to you. True power is sitting back and observing things with logic. True power is restraint. If words control you that means everyone else can control you. Breathe and allow things to pass."

Thanks again for all the hard work and let's put together a really good succinct and easy to read brief.

[Pl.'s Ex. 120]. Dees testified that he sent this email to vent because he did not think Judge Kay treated them well, to express appreciation to lawyers who had worked hard for the Port, and to encourage good post-trial briefing. Norman testified that he agreed with Dees' assessment that they had suffered emotionally charged and underserved beratement and stated that it was one of

---

[31] Norman further testified that discussions regarding recusal did not begin until after Judge Kay's ruling came out. The Court found Norman's testimony on this matter extremely credible. As noted, his testimony is also supported by the contents and timing of communications among Port counsel.

[32] Dees attended most, if not all, of the bench trial as the Port's representative.

his worst trial experiences in forty years. Additionally, Norman and Matt Mize both testified that they agreed with Dees' comment that Judge Kay was mad at the world. Matt Mize testified that when Dees sent this email there were no discussions about trying to remove Judge Kay from the case.

Also on May 2, 2019, Norman responded to an email query from his colleague regarding the federal judges and magistrate judges in Lake Charles. [Pl.'s Ex. 121]. In reference to the underlying case and bench trial, Norman stated, "That case I just finished trying before the magistrate was surreal. I would avoid Magistrate Kay at all costs." *Id.* Norman also stated, "We don't know the result yet but all signs point to a disaster." *Id.*

On May 21, 2019, Norman, via his secretary, sent Matt Mize the following email: "If Kathy[33] screws us,[34] we may want to take the gloves off and ask for a new trial[35] based on (i) Facebook posts during trial,[36] (ii) statements during trial that she was 'sick of the case', and (iii) letting Monk ask questions about emails but not letting us." [Pl.'s Ex. 125]. Matt Mize responded, "I completely agree. I can have one of the Matts[37] start putting together a draft just to be ready. Do you have a form motion for new trial for the Western District I can work from? If not I can pull one off of Westlaw." *Id.* Joe Mize subsequently called Norman and shamed him, telling him that

---

[33] Matt Mize testified that Port counsel referred to Judge Kay as "Kathy" at times because it was shorter than "Magistrate Kay."

[34] According to Norman's testimony, the phrase "[i]f Kathy screws us" meant if Judge Kay ended up adopting IFG's damage model and awarding "run away damages."

[35] Norman testified that he used the phrase "take the gloves off and ask for a new trial" because he was suggesting attacking Judge Kay's demeanor and conduct during the bench trial rather than disputing her prospective ruling on its merits—something he had never done before.

[36] According to Matt Mize, during a lunch break from the bench trial, Dees checked Facebook and discovered that Judge Kay had been posting on Facebook from the bench. It is not clear how exactly Dees came to see this post, i.e., because it popped up on his Facebook feed or because he searched for her account. Interestingly, although Dees does not dispute Matt Mize's account, he does not specifically remember looking anything up on Facebook or seeing that she posted on Facebook during trial. Dees does recall a lack of attentiveness and cell phone use by Judge Kay during the trial. Additionally, although he was not directly involved, Ringo remembers hearing "grumblings" about Judge Kay posting on Facebook during the bench trial while one of the Port's witnesses was testifying.

[37] The "Matts" referred to are other attorneys at Matt Mize's firm who went by "Matt" and were working on this case, namely Lognion and Pettaway.

they needed to stand down and that his email statements were hyperbolic. *See id.* Norman, sufficiently embarrassed by this email, testified that the list in it represented any idea he had at the time regarding attacking an adverse verdict[38] and that if he had possessed a better idea he would have included that in that list. Matt Mize testified that he interpreted this email as suggesting that the Port address Judge Kay's conduct during the trial in addition to the substantive issues involved if there was ultimately an adverse ruling. Both Matt Mize and Norman characterized this as an attack on Judge Kay's conduct rather than an attack on her personally.

On June 15, 2019, Judge Kay sent Matt Mize (and the rest of the parties' attorneys as well as court staff through the copy function) the following email regarding an exhibit spreadsheet she requested:

> This absolutely, totally, 100% is not what [I] asked you to do. I don't know how else to explain what I requested. You did not use the spreadsheet I initiated added on to by IFG. I am NOT looking at your spreadsheet. The entire point of the spreadsheet was so that I would know, at a glance, what IDENTICAL exhibits were placed in TWO SEPARATE AREAS OF THE DOCKET because MY INITIAL INSTRUCTIONS TO COORDINATE EXHIBITS so that we could avoid having identical exhibits located in separate areas of the docket sheet WERE IGNORED. I am beyond frustrated with this. What you prepared is of zero assistance to me.

[Pl.'s Ex. 129]. Shortly thereafter, Joe Mize forwarded this email to Norman with the commentary, "This woman is insane." *Id.*

On August 14, 2019, Matt Mize texted Joe Mize the following: "No, is any of it[39] useful to support [a] motion for new trial? By the way, if we moved for and we're granted a motion for new trial could we revoke consent to have Kay try to [sic] the case??"[40] [Pl.'s Ex. 280 at 1]. Joe Mize

---

[38] While testifying, Norman characterized these ideas as "preliminary" and as him "scraping the bottom of the barrel."
[39] It is unclear what "any of it" refers to.
[40] Notably, this is the only Port communication that references vacating the consent to Judge Kay prior to her ruling. Given its content, context, and other evidence, however, the Court finds that it does not support the existence of Port knowledge regarding the Judge Kay-Monk relationship before Judge Kay's ruling. Indeed, although the text message mentions vacating consent, it does not mention vacating consent as grounds for a prospective motion for new trial. Additionally, while the text does not say why Matt Mize was interested in whether consent could be vacated, the Court finds that Matt Mize's interest was almost certainly due to the Port's poor experience trying the case before Judge Kay.

responded, "Nope[.]" *Id.* Matt Mize testified that the motion for new trial discussed in these messages was completely unrelated to the Motion to Vacate later filed by the Port's new counsel.[41]

### F. Judge Kay's Written Reasons for Judgment

On July 31, 2020, Judge Kay finally issued her Written Reasons for Judgment. [Def.'s Ex. 3]. Her Written Reasons for Judgment found the Port liable for breach of contract and for violating LUTPA. *Id.* at 55–64. Judge Kay also largely adopted IFG's damage model for lost profits and held that the Port would be responsible for treble damages. *See id.* at 55–64. Judge Kay's Written Reasons for Judgment used harsh language to describe the Port's conduct.[42] *See generally id.* Although some of the language Judge Kay used, such as "offensive to established public policy," "immoral, unethical, oppressive, and unscrupulous," comes from the LUTPA legal standard[43] and appears in her summary judgment order, other language used does not. For example, Judge Kay described the Port's conduct as "nefarious," "sanctimonious," "gratuitous," "extortionary," "inexplicable," "blustering," and "untruth[ful]." *See id.* at 37, 41, 45, 61. She also characterized the Port's conduct as "gaslighting" and engaging in a "sophomoric whisper campaign against IFG" and described some Port counsel[44] communications as exhibiting "hubris." *Id.* 32 n.20, 43, 45. In a footnote, Judge Kay also addressed the Port's alleged nondisclosure of a report. *Id.* at 56 n.37. Specifically, she stated the following:

> At the moment we expressed our extreme displeasure with the Port for engaging in such unprofessional and inappropriate conduct. The final word has not been had on this subject as we will be issuing a rule for the Port and its litigation counsel to show cause why there should not be some sanction imposed for this flagrant violation of court rules and procedures.

---

[41] The Court found Matt Mize's testimony on this credible.

[42] Because the Court is unfamiliar with the factual and legal specifics of the underlying dispute, it makes no judgment as to whether Judge Kay's use of this language was warranted or not. It simply observes that Judge Kay's order used strong language that does not appear in most court orders and does not appear in Judge Kay's summary judgment ruling.

[43] *See infra* note 18 (quoting the LUTPA legal standard from Judge Kay's summary judgment order).

[44] It is not clear from Judge Kay's Written Reasons for Judgment whether the Port counsel referred to here are Joe Mize, Matt Mize, and Norman.

*Id.*

### G.  The Port's Initial Reaction to Judge Kay's Written Reasons for Judgment

Although the Port and its counsel had anticipated a partially adverse ruling, they were shocked by Judge Kay's Written Reasons for Judgment. They were shocked in part by the implications of her ruling because they quickly realized the damage award could be over $100 million.[45] That the Port and its counsel were facing sanctions added to the shock.[46] Additionally, the Port, its counsel (and their family members), and others in the Lake Charles legal community were surprised by the harsh language that Judge Kay used in reference to the Port throughout her ruling. Indeed, testimony and several communications from after the ruling's release demonstrate the Port's shock and immediate shift in focus toward appeal.[47]

On July 31, 2020, just hours after the ruling was released, Matt Mize texted his wife, Leslie Mize, the following: "Judge Kay [j]ust issued her ruling. It is the worst case scenario." [Def.'s Ex. 34]. Leslie Mize responded with a text message apologizing and another stating, "Just means she'll get slammed on appeal."[48] *Id.* Leslie Mize, who is also a lawyer, testified that she later read part of the ruling and that she "had never seen an opinion that was written that way." She testified that "the language and everything that was in it was so harsh" and that "[Judge Kay's] adjectives and the things that she had said" demonstrated that "she went out of her way to be ugly."

---

[45] Ringo characterized Judge Kay's ruling as a "devastating judgment against the Port." Thomas Lorenzi ("Lorenzi"), a Port Board Member, testified by deposition that he was "pretty horrified" when he saw the ruling because of the extent of the damages, the findings, the language, and the impact it would have in terms of publicity and the Port's bond rating, among other things.

[46] In addition to mentioning sanctions in her ruling, Judge Kay *sua sponte* set a hearing on Monk's Motion for Sanctions (filed earlier in the case, but allegedly not pursued by IFG after trial) and requested briefing regarding the Port's alleged nondisclosure of a report shortly after releasing her ruling.

[47] Monk testified that Norman was not shocked by Judge Kay's ruling based on a congratulatory August 4, 2020 email that Norman sent him. [Pl.'s Ex. 171]. Norman testified that he sent this email because he learned good sportsmanship and thought Monk "did a masterful job in the case" notwithstanding his own issues with the "umpire." The Court finds that this email does not indicate a lack of shock on Norman's part.

[48] Leslie Mize testified that she sent this text message regarding the appeal because she felt bad for Matt Mize and wanted to say something positive to him.

Later that day, Dees[49] texted Matt Mize, "Sorry about the bad ruling. Call me if I can be of any help to you." [Pl.'s Ex. 270]. Matt Mize responded, "Im [sic] sorry as well but that's what appellate courts are for and we're already working on the assignments of error now. I know Joe called you earlier and did not want to bother you over the weekend but feel free to call me anytime this weekend if you'd like to talk." *Id.*

According to testimony from Maura Mize, who is Joe Mize's wife, on July 31, 2020, she discovered Joe Mize sitting with his head in his hands on their screened-in porch. When Maura Mize asked Joe Mize, who was apparently pale, white, and ashen, what was wrong, he told her that Judge Kay's ruling was out and handed it to her to read. Maura Mize was angered by the portions of the ruling she read because "the language was unprofessional" and she "picked up a lot of animosity," "venomous language," and "anger coming through it."

Ringo testified that he read Judge Kay's ruling on the evening of July 31, 2020. He had "never been in a situation where words like that were used in an opinion" and "could not believe the words that were used in th[e] opinion."

Lognion was similarly shocked by the harshness of Judge Kay's ruling. Notably, Lognion testified that he could not recall opinions as harsh as this one from when he clerked for Judge Kay.

Norman testified that he was "upset" when he found out about the ruling and compared it to losing the Super Bowl by eight touchdowns. He further testified that he was surprised by most of the ruling, including Judge Kay's tone, LUTPA ruling, treble damages ruling, adoption of IFG's damage model, and discussion regarding possible sanctions against the Port and its counsel. After receiving the ruling, he quickly sent it to Rubin, among others.

On August 1, 2020, Keith Prudhomme, a Port Board Member, attorney, and friend of Norman's, sent an email to Norman stating, "Wow! Just read the opinion." [Def.'s Ex. 32].

---

[49] Dees, who was retired when the ruling came out, heard about it from Ringo.

Also on August 1, 2020, Mike Veron, another attorney in the community whom Norman had sent Judge Kay's ruling to and asked for advice, sent an email to Norman stating, "Some of the reasons [in the ruling] are not very judicial sounding. But it is, after all, Kathy Kay."[50] [Pl.'s Ex. 148].

In additional emails to Norman on August 2, 2020, Veron stated that the "[t]one of the opinion [was] injudicious," that he "thought a lot of it was over the top," that he would consider seeking recusal based on Judge Kay's employment of Margaret, and that Judge Kay "shouldn't be allowed to address damages."[51] [Def.'s Ex. 27]. Norman testified that when he received these emails from Veron he did not know that Judge Kay had disclosed Margaret's employment to the Port.

Shortly thereafter, Norman, who was "grasping at straws," emailed Matt Mize suggesting a motion to recuse based on Margaret's employment and taking the case away from Judge Kay before she could award damages. [Pl.'s Ex. 152]. According to Norman's testimony, this was the first time he ever discussed recusal with other Port counsel and these initial recusal discussions centered solely around Judge Kay's employment of Margaret.[52] Matt Mize quickly informed Norman that Judge Kay had disclosed Margaret's clerkship to the Port prior to its consent, though. Even so, Norman conducted research on recusal and sent that research to Matt Mize via text message on August 2, 2020 at 4:27 P.M. [Def.'s Ex. 37]. At 4:35 P.M, Norman also sent Matt Mize a text message stating, "I think it would be important to develop information through [an] independent source that could not have been developed prior to trial – not your mom, my wife etc.

---

[50] The Court notes that according to Norman, Veron did not particularly like Judge Kay because he had wanted a different local attorney to become the Magistrate Judge. In fact, Norman characterized it as a "feud." Additionally, Veron apparently disliked Monk, although Norman was not aware of Veron's dislike.

[51] These emails were sent before Judge Kay's Facebook posts and photos were discovered.

[52] Norman testified that these first communications about recusal did not touch on other aspects of the Judge Kay-Monk relationship because he was not aware of those aspects until after Maura Mize and Leslie Mize found Judge Kay's Facebook account. The Court found Norman's testimony regarding the timing and content of recusal discussions very credible, particularly in light of the supporting email and text message evidence.

– new attorney[53] can decide that. If you or Ringo want me to approach Veron, let me know[.]"[54] *Id.*; [Pl.'s Ex. 298]. Norman testified that he was referring to developing information beyond Margaret's clerkship.

### H.  The Port's Investigation and Motion to Vacate

In the days immediately following Judge Kay's ruling, Joe Mize, Matt Mize, Norman, and Ringo discussed the ruling and bringing on new counsel to handle post-trial briefing. As depicted above and described in greater detail below, Norman and Matt Mize initially investigated whether Judge Kay could be recused on account of Margaret's role as her law clerk. Norman and Matt Mize never considered or discussed trying to vacate the Port's consent to Judge Kay because it never occurred to them.[55] Notably, the trajectory of the Port's investigation and plans to challenge Judge Kay's ruling changed dramatically after Maura Mize and Leslie Mize discovered additional contacts between Judge Kay and Monk on Facebook and new counsel came onboard.

### 1.  Maura Mize and Leslie Mize's Discovery of Judge Kay's Facebook Account

On or around August 2, 2020, Maura Mize[56] decided to look Judge Kay up on Facebook. Maura Mize testified that she decided to look Judge Kay up on Facebook because after reading Judge Kay's ruling she was angry on her husband's behalf and kept wondering who wrote the ruling. No one associated with the Port, including Joe Mize and Matt Mize, asked or told Maura Mize to do this. After scrolling through many posts and pictures, Maura Mize discovered several photos from Judge Kay's wedding and noticed that Monk was in those photos as a groomsman. Prior to finding these photos, Maura Mize was not aware that Monk served as a groomsman in

---

[53] As detailed more fully below, the Port planned to hire new counsel to handle post-trial briefing given the trial's outcome and the possibility of sanctions.
[54] This message was sent before Norman or Matt Mize learned about the Facebook posts and photos found by Maura Mize that day.
[55] The Court found Matt Mize and Norman's testimony on this subject very credible.
[56] The Court found Maura Mize's testimony entirely credible.

Judge Kay's wedding or that other contacts existed between Judge Kay, Monk, and Monk's wife, Aimee Monk.[57]

Upon discovering these photos, Maura Mize showed them to Joe Mize. According to Maura Mize, Joe Mize looked shocked and confused when he saw the photos. After this, Maura Mize had no further involvement in investigating the relationship between Judge Kay and Monk.

Subsequently, at 4:36 P.M. on August 2, 2020, Joe Mize texted a screenshot of a Facebook picture depicting Monk as a groomsman in Judge Kay's wedding to Matt Mize along with the message, "Monk in Kay's wedding. Mom found these. She is looking for pictures of [Aimee] Monk and Kay." [Def.'s Ex. 33].

Later that day, Matt Mize called Norman and informed him about the Facebook photos depicting Judge Kay and Monk at her wedding. Prior to hearing from Matt Mize, Norman was not aware that Monk was in Judge Kay's wedding and had never seen Judge Kay's Facebook page. At 7:58 P.M.,[58] Norman texted Matt Mize the following: "I've read some law review articles. I don't see grounds for recusal. Polly[59] says there is no close friendship. I think we would be wasting resources trying to get Kay to sanction Monk.[60] It simply isn't going to happen. My suggestion is to concentrate on appeal[.]" [Def.'s Ex. 37]. Norman testified that before sending this text message he asked his wife Polly Norman, who is friends with Aimee Monk, whether Judge Kay and Monk had a close friendship and that Polly Norman said they did not. He further testified that he was satisfied with Polly Norman's answer and did not ask her any follow up questions. While testifying, Polly Norman stated that she did not recall Norman asking her about Judge Kay and

---

[57] *See infra* Section II.L (describing in greater detail Maura Mize's unawareness of the Judge Kay-Monk relationship).
[58] This text message was sent after Matt Mize told Norman about the Facebook photos of Monk serving as a groomsman in Judge Kay's wedding.
[59] "Polly" is a reference to Norman's wife, Polly Norman.
[60] This refers to brief discussions between Norman and Matt Mize regarding whether they should try to get Judge Kay to sanction Monk for failing to inform her that IFG had, in fact, received discovery that it previously asserted was withheld and sought sanctions on account of.

Monk's relationship, but that it was possible and that she did not dispute Norman's testimony or her alleged response. She also testified that no one asked her for additional information, to sign an affidavit, or to speak with her sister, Patti Palmer Stark, about Judge Kay and Monk's relationship at that time.

According to testimony by Matt Mize and Norman, Polly Norman's assertion that there was not a close friendship between Judge Kay and Monk ended their focus on recusal momentarily. Indeed, based on his research, Norman was not sure whether recusal was worth pursuing at all by the end of August 2, 2020. Norman testified that he was instead looking into whether there was a bias issue based on Judge Kay's tone in the ruling and that he and Matt Mize were preparing to step aside because new counsel would ultimately be deciding how to challenge the ruling.

Leslie Mize[61] was similarly upset on her husband's behalf and, like her mother-in-law, took to Facebook. As was the case with Maura Mize, no one associated with the Port asked or told Leslie Mize to do this. At 8:07 P.M. on August 2, 2020, she texted Matt Mize a photo she found on Facebook depicting Judge Kay, her husband, and Monk at Judge Kay's wedding. [Def.'s Ex. 23]. Because Monk's clothing was blocked in this photo, Leslie Mize did not realize that Monk was a groomsman in the wedding at this point.

Two days later, during the early hours of August 4, 2020, Leslie Mize could not sleep and was ruminating about Judge Kay's ruling. Leslie Mize had recently attended a Continuing Legal Education ("CLE") course regarding efforts to bribe judges and wondered whether something like that could be behind Judge Kay's ruling. After conducting research on judicial misconduct, judicial disqualification, and public corruption, she searched for photos of Judge Kay and Monk on

---

[61] Although Leslie Mize had been told by her father (who had been told by Norman) that Judge Kay hated Matt Mize and joked to a friend before Judge Kay's ruling came out that she had a grudge against Judge Kay for causing her family to miss three days of a vacation to Italy, the Court found Leslie Mize's testimony entirely credible. *See* [Pl.'s Ex. 122]. The Court does not believe that ill-will toward Judge Kay motivated Leslie Mize's research into her.

Facebook and found additional photos of Monk at Judge Kay's wedding. These photos showed Monk's attire, causing Leslie Mize to realize that Monk had not only attended Judge Kay's wedding, but also served as a groomsman. She also discovered photos of Judge Kay officiating Monk's other daughter Lucie's wedding in 2015. At 7:10 A.M. on August 4, 2020, Leslie Mize texted screenshots of these Facebook posts and photos to Matt Mize. [Def.'s Ex. 43]. She texted him that these were "[s]ome early morning research findings" and that "[Monk] was in the wedding[.]" *Id.* She also texted him a link to a website with recusal research.[62] *Id.*

After Matt Mize was made aware of these Facebook posts, he believed—based on Margaret's role as Judge Kay's law clerk, Monk's role as a groomsman in Judge Kay's wedding, and Judge Kay's role as officiant in Lucie's wedding—that there was a longstanding relationship, or at least the appearance of one, between Judge Kay and Monk. Neither Matt Mize nor anyone else associated with the Port conducted independent searches of Judge Kay's Facebook account at this point and an independent investigator was never hired.

Around this time, Ringo was made aware of the Facebook posts and photos at a meeting with Matt Mize and Norman.[63] Anticipating that the Port would need to file a motion for new trial fairly quickly, Ringo told Matt Mize that if there was anything to these Facebook posts and photos Port counsel needed to look into it. Ringo testified that he was not thinking about using the Facebook content to specifically remove Judge Kay from the case, just to support a motion for new trial more generally.

---

[62] That morning, Leslie Mize also texted these Facebook photos and posts to her father (another Lake Charles lawyer) and her mother. [Pl.'s Ex. 8]. Her message stated, "Found all these pics of [Monk] in [Judge Kay's] wedding and also her and [Monk] at [Lucie's] rehearsal dinner and wedding, which she officiated one month before the lawsuit was filed." *Id.* Leslie Mize's mother responded, "OMG! You are the best detective ever and that is SO NOT RIGHT[]. The gloves are off!" *Id.* Leslie Mize's mother also responded, "Any one of those 3 events/connections should be reason for her to excuse herself from such an important case and the fact that the judgment was so inappropriate to me is criminal." *Id.*

[63] Ringo testified that this meeting took place at some point between August 3, 2020 and August 6, 2020.

### 2.  The Port's Initial Focus on Recusal

Emails and text messages sent after Leslie Mize's Facebook discoveries and around the time of the meeting with Ringo indicate that recusing Judge Kay became a topic of discussion among Port counsel again.

On August 5, 2020, Norman, through his secretary, sent Matt Mize an email to the effect that he should let new counsel decide whether to try recusing Judge Kay and that they should not dwell on this when speaking to the Port's Board at an executive session on August 6, 2020. [Pl.'s Ex. 172]. It is not clear whether Norman and Matt Mize ultimately discussed the Facebook photos with the Port Board at its executive session.

On August 6, 2020, Norman sent Prudhomme a blank email with the subject line, "We spoke too soon. We may have waived[.]"[64] [Pl.'s Ex. 241]. Prudhomme responded, "10-4[.]" *Id.* Norman testified that he was unsure what he meant, but the Court finds that this was likely about recusal.

On August 10, 2020, Matt Mize sent Norman an email summarizing a recusal case involving a disclosed law clerk who was related to the defendant. [Pl.'s Ex. 240]. Norman responded, "Put it back on the list. Let Ringo know[.]" *Id.* According to Norman's testimony, he and Matt had developed a list of things that they were going to discuss with Ringo, but recusal was not on that list until after Matt Mize sent this email.

On August 11, 2020, Norman sent Matt Mize a blank email with the subject line, "Did you broach recusal again with Ringo?" [Pl.'s Ex. 237]. Matt Mize responded "Not yet. We're still researching to find similar cases." *Id.*

---

[64] It is not clear whether this email was sent before or after the Port Board's August 6, 2020 executive session.

Later on August 11, 2020, Norman sent Ringo[65] an email containing a secondary source on recusal and stating, "Recusal in a nutshell. Reading highlighted sections will get you up to speed. Looks like she rules on the motion[.]" [Pl.'s Ex. 238]. Norman testified that "she" referred to Judge Kay.

### 3.   The Port's New Counsel Take Over and Change Tactics

On August 13, 2020, Carl Krielow ("Krielow"), who at the time was the President of the Port's Board, contacted Michael McKay ("McKay") about representing the Port in the underlying matter going forward and sent him Judge Kay's ruling. [Pl.'s Ex. 179]. Krielow was shocked by the magnitude of Judge Kay's ruling and took the initiative to contact McKay because he wanted the Port's Board to have greater say in this case and did not want Ringo, who had only recently become General Counsel, to simply hire whoever Joe Mize, Matt Mize, and Norman recommended. After an initial discussion with McKay, Krielow put McKay in touch with Ringo. McKay's firm was ultimately hired in mid-August 2020 by the Port to handle the Port's post-trial motions. Norman and Matt Mize communicated with McKay multiple times after McKay was retained and Norman specifically suggested that McKay look into recusal.

On August 19, 2020, McKay met with the Port's Board. During this meeting, McKay informed the Port Board that he and his team were looking into the relationship between Judge Kay and Monk. McKay disclosed that the basis for this was Margaret's role as Judge Kay's law clerk, Monk's role as groomsman in Judge Kay's wedding, and Judge Kay's role as officiant in Lucie's wedding. McKay asked the Port's Board Members to let him know if they knew anything about the Judge Kay-Monk relationship.[66] Around the time of this meeting, McKay asked Matt Mize for a summary of how they discovered the additional contacts between Judge Kay and Monk.

---

[65] Matt Mize was copied on this email. [Pl.'s Ex. 238].
[66] In response to this, Lorenzi asked his law partner and friend (also an attorney) if they knew anything about a relationship between Judge Kay and Monk, but neither did. Lorenzi's law partner specifically told him that her

On August 23, 2020, Norman sent McKay an email flagging that someone else at McKay's firm was working on a motion to recuse Judge Kay in a separate case and that he might have information useful to McKay. [Pl.'s Ex. 183]. McKay responded, "Thanks[.]" *Id.*

On August 26, 2020, Norman, who had spoken with McKay, emailed Matt Mize, "[McKay] needs your summary on recusal." [Pl.'s Ex. 239].

Around this time, McKay and his team proposed and began to move forward with a motion to vacate the referral to Judge Kay as opposed to a motion to recuse. Matt Mize and Norman both testified that neither of them had ever considered or even thought of trying to vacate the referral,[67] and Port counsel communications confirm that the Port's efforts to vacate the referral did not begin until after McKay was retained. Notably, McKay's efforts to begin working on the Motion to Vacate were derailed by Hurricanes Marco and Laura.[68] Both hurricanes hit Lake Charles and many Port counsel evacuated. Communication between the Port and its counsel was difficult in the days following the hurricane.

On September 4, 2020, McKay followed up with Matt Mize about getting a summary by emailing him the following: "We need all the info on the Monk-Kay relationship to finish the Motion to Vacate Reference. Please let me know at your earliest convenience when we could get this material." [Def.'s Ex. 22].

In response, on September 5, 2020, Matt Mize sent McKay an email summarizing (1) the Port's consent to Judge Kay, including Judge Kay's disclosure that Margaret was her law clerk; (2) the Port's reaction to Judge Kay's ruling; and (3) the Port's discovery after the ruling that Monk

---

impression was that Monk was closer with Judge Kay's husband than with Judge Kay. Lorenzi did not tell McKay about his law partner's impression because it did not seem particularly relevant.

[67] As indicated *infra*, the Court found Matt Mize and Norman's testimony regarding this credible.

[68] Although not specifically discussed at the evidentiary hearing, the Court takes judicial notice of the fact that Hurricane Marco made landfall in Louisiana on or around August 24, 2020 and that Hurricane Laura made landfall in Louisiana on or around August 26, 2020.

was a groomsman in Judge Kay's wedding, that Judge Kay was the officiant at Lucie's wedding just months before the underlying lawsuit was filed, and that Judge Kay was close friends with Aimee Monk. *Id.* Matt Mize also asserted that had the Port known about these contacts it would never have consented to Judge Kay and that some of Judge Kay's pre-trial actions indicated bias in hindsight. *Id.*

Although McKay was already working on the Motion to Vacate, on September 7, 2020, Joe Mize sent Matt Mize texts messages containing research on recusal and judicial-conduct and judicial-disability proceedings. [Pl.'s Ex. 151].

On September 7, 2020, McKay sent Ringo an email stating, "We're still working on the Rule 73 Motion to Vacate Reference to the Magistrate Judge. Matt Mize sent some factual information on Saturday, but we still are looking for some more factual evidence regarding the closeness of the relationship." [Pl.'s Ex. 188]. Ringo testified that he did not provide McKay with additional information and that McKay and his team were tasked with searching for additional information regarding the relationship between Judge Kay and Monk.

On September 10, 2020, Joe Mize texted Matt Mize, "I talked to Mike Dees. Trying to find someone to give [an] affidavit. I am going to talk to Kay [Barnett] also Gigi [Cane] hangs i[n] that crowd if you want to talk to her[.]" [Pl.'s Ex. 151]. Matt Mize did not reach out to either of these individuals. It is not clear whether Joe Mize reached out to them. Dees testified that he could not sign an affidavit regarding Judge Kay and Monk's relationship because he knew nothing about it and was unaware of the Facebook photos.

On September 11, 2020, Joe Mize texted Matt Mize, "Mom said Polly Norman's sister [Patti Palmer Stark] knows all about the [M]onk/Kay relationship why doesn't [Norman] get [an] affidavit from her[?]" *Id.* Matt Mize did not contact Polly Norman or Patti Palmer Stark at any point. Norman likewise testified that he did not speak with Patti Palmer Stark at this point. Patti

Palmer Stark testified that no one asked her about Judge Kay and Monk's relationship in either 2019 or 2020.

On September 15, 2020, Matt Mize emailed a member of McKay's team several photos from Facebook depicting the Judge Kay-Monk relationship. [Pl.'s Ex. 201].

Later on September 15, 2020, McKay emailed Matt Mize and Norman the following: "[W]e still need to flesh out additional factual background regarding the Kay-Monk relationship for the Motion to Vacate. Please let me know at your earliest convenience." [Pl.'s Ex. 193]. Norman testified that when he received this email, he had already disclosed everything he knew about the relationship between Judge Kay and Monk and that he had no further information to provide McKay.

On September 28, 2020, Prudhomme texted Norman, who had COVID-19 at the time, "I guess you're not going to the [P]ort board meeting? [Pl.'s Ex. 246]. Norman responded, "No. I am quarantined. Mike McKay is supposed to be there. I wonder if anyone will alert Kay about what he has planned."[69] *Id.* Norman testified that he was not sure whether "what he has planned" refers to a Motion to Recuse or a Motion to Vacate. As efforts to draft the Motion to Vacate were well underway, the Court finds that this was likely a reference to that.

On October 1, 2020, a member of McKay's team emailed Matt Mize the following: "I am assisting with the Lake Charles matter, and am trying to find Judge Kay's Facebook page but I have been unsuccessful. It does not appear that she allows individuals to search for her Facebook page. Can you tell me how you were able to find her page? Maybe I'm doing something wrong." [Pl.'s Ex. 210]. This email reflects what Judge Kay testified to and Port counsel discovered, namely that on September 11, 2020, her account was taken down by Facebook after a post of hers regarding

---

[69] Interestingly, Norman testified that this was a reference to Port counsel's belief that someone on the Port's Board was feeding information directly to Kabir Ahmad, IFG's Chief Executive Officer and General Counsel.

the 9/11 terrorist attacks was mistakenly flagged as violating Facebook policy. Judge Kay never regained access to her account. *See* [Pl.'s Ex. 318].

Later on October 1, 2020, McKay sent Ringo an email stating, "We're still checking on additional possibilities to further establish a close personal relationship between Judge Kay and the Monk family. Also, we are running down some emails from the Mize firm regarding the referral (which turned up by reference in Stockwell Sievert's billing records[).]" [Pl.'s Ex. 211]. Ringo testified that after receiving this email he asked the Port's previous general counsel and trial counsel[70] whether they were aware that Monk was a groomsman in Judge Kay's wedding and that Judge Kay was the officiant of Lucie's wedding, but that no one was aware.

According to Norman's billing records, on October 14, 2020, Norman and McKay spoke by phone "regarding filing motions and affidavit necessary." [Pl.'s Ex. 223]. Norman could not recall which post-trial motion this conversation was about since all of the motions they were working on required an affidavit.

Ultimately, Port counsel could never find anyone who knew about the relationship between Judge Kay and Monk to sign an affidavit. As a result, it was decided that Matt Mize would sign an affidavit based on screenshots of the Facebook content located by Maura Mize and Leslie Mize. Matt Mize was originally going to write the first draft, but McKay's team ended up writing the first draft because of the hurricanes. Matt Mize received the first draft of the Mize Affidavit on October 20, 2020. After making edits, Matt Mize sent it to Joe Mize and Norman for input on October 21, 2020. *See* [Pl.'s Ex. 215]. Based on their input,[71] Matt Mize revised the affidavit and

---

[70] Its unclear whether this means that Ringo asked Dees, Matt Mize, Joe Mize, and Norman about this, although that is the most logical conclusion.

[71] Norman testified that he merely proofread the affidavit. His revisions were sent to Matt Mize via an email from his assistant on October 21, 2020. [Pl.'s Ex. 289].

sent it to McKay. Matt Mize testified that the final version of the Mize Affidavit was true and correct to his knowledge. The Court found his testimony on this to be credible.

On October 21, 2020, McKay's team filed the Port's Motion to Vacate with the Mize Affidavit attached. [Def.'s Ex. 1]; *see also* [Dkt. 483]. The affidavit described Judge Kay's disclosure of Margaret's clerkship, but nothing else; noted that the Port and its counsel were surprised and shocked by some of the language and findings in Judge Kay's ruling; stated that Port counsel investigated and discovered that Monk served as a groomsman in Judge Kay's wedding and that Judge Kay officiated Lucie's wedding three months before the underlying lawsuit was filed; and indicated that the Port and its counsel would never have consented to Judge Kay trying the case had these contacts and the complete nature of the Judge Kay-Monk relationship been disclosed. [Def.'s Ex. 5].

### I.   The Relationship Between Judge Kay, William Monk, and the Monk Family

After Judge Kay graduated from law school in 1985, she returned to Lake Charles, where she was born and raised, to clerk for a U.S. District Judge for the Western District of Louisiana. Soon after returning, Judge Kay met and began dating her future husband, Scott McPherson ("McPherson"). Not long after they started dating, McPherson introduced Judge Kay to his friend, Monk. Judge Kay quickly learned that Monk was married to Aimee Monk, who she had grown up, gone to school, and attended church with throughout her childhood.[72] Additionally, while Judge Kay was still clerking, she began developing a professional relationship with Monk.[73] Around this time, Judge Kay, McPherson, Monk, and Aimee Monk also began to hang out as couples and as

---

[72] Judge Kay testified that she and Aimee Monk have known each other their entire lives. Aimee Monk's Responses to Notice of Deposition Upon Written Questions states that Judge Kay was a grade ahead of her and that she does not recall them being close friends.

[73] Monk was involved in a big trial before the judge that Judge Kay clerked for and Judge Kay watched the trial.

part of a bigger group of young couples in Lake Charles who would get together, play Trivial Pursuit, and go out to dinner, among other things.

In 1987, Judge Kay and McPherson attended Monk's thirtieth birthday party at the Monk's home. [Def.'s Ex. 47].

In preparation for Judge Kay and McPherson's July 1, 1989 wedding, McPherson asked Monk to serve as an usher in their wedding. However, a week before the wedding, McPherson ended up asking Monk to serve as a groomsman because one of his original groomsmen had dropped out. Monk accepted. After joining Facebook years later, Judge Kay began annually posting wedding pictures, including some depicting Monk as a groomsman, on July 1 to commemorate her wedding anniversary. *See* [Pl.'s Ex. 3; Pl.'s Ex. 6; Pl.'s Ex. 21; Pl.'s Ex. 22; Pl.'s Ex. 163; Pl.'s Ex. 164; Pl.'s Ex. 167].

In 1992, Judge Kay, McPherson, and the Monks attended Patti Palmer Stark's pre-wedding events and wedding.

Although there were fewer Trivial Pursuit get togethers and dinners out as children entered the picture, the two couples continued to have close contact between the late 1980s and the present. The Monks hosted periodic happy hours that Judge Kay and McPherson attended every now and then. Monk and McPherson also played golf sometimes when McPherson was in town.[74] Monk periodically offered McPherson concert tickets that his law firm had access to. Additionally, every Christmas Eve, Judge Kay, McPherson, Monk, and Aimee Monk attended the same Christmas party.[75] Notably, after the parties in the underlying case consented, Judge Kay stopped attending

---

[74] McPherson's work required a fair amount of travel outside Lake Charles. Judge Kay and Monk seem to disagree about how often Monk and McPherson played golf, with Judge Kay saying it was "quite a bit" when McPherson was in town and Monk insisting that they were not regular golf partners.

[75] Monk testified that he only attended this party a few times and that his wife and children attended more often than him. The Court does not find Monk's testimony on this credible in light of Judge Kay's conflicting testimony.

this party because she did not think it was appropriate and thought she should distance herself from Monk. Over the years, each couple also got to know the other's parents to some extent.

Judge Kay, McPherson, and the Monks were also connected through their sons, Robbie and Jack.[76] Robbie and Jack were in the same grade at the same school from kindergarten until twelfth grade and were close friends who hung out quite a bit in their younger years.[77] Specifically, Robbie spent the night at the Monk's home a few times and went golfing with Monk and Jack a few times. In approximately 2009, Judge Kay and Aimee Monk drove both boys and some of their friends to camp. Additionally, at some point in 2010, the Monks included Robbie in their family vacation to Sandestin.

Communications between Judge Kay and Monk and Judge Kay and Aimee Monk provide further proof that these friendships remained close decades later. [Def.'s Ex. 11; Def.'s Ex. 12]. Texts between Judge Kay and Monk, which there are admittedly only a few of, show that Judge Kay wished Monk happy birthday, asked Monk for someone's contact information, and reminisced about a case Monk had tried in front of the judge she clerked for. [Def.'s Ex. 11]. Facebook messages between them from after the parties' consent demonstrate that they conversed about concerts, music festivals, their children and grandchildren, and, seemingly, childhood memories. [Def.'s Ex. 15; Def.'s Ex. 16]. The content and tone of some of these messages indicates a familiarity and lack of formality more at home in a personal friendship than in a professional relationship. For example, in a September 21, 2017 Facebook message, Monk described a music festival lineup as "aimed more for post-summer, pre-fall relaxation than drunken debauchery." [Def.'s Ex. 16]. Judge Kay responded, "What's wrong with drunken debauchery??" *Id.* In response, Monk messaged, "not a damn thing[.]" *Id.* Additionally, according to Judge Kay, at some

---

[76] Robbie is Judge Kay's son and Jack is Monk's son.
[77] Although Robbie and Jack remain friends today, their interests began diverging around the end of elementary school or beginning of middle school and their friendship cooled slightly.

point in recent years, Monk reached out to her for insight on how to become a federal judge.[78] This demonstrates quite a bit of trust on Monk's part.

Similarly, texts between Judge Kay and Aimee Monk show that they checked in on each other, talked about seeing at least one movie together, attempted to meet up for drinks in New Orleans, conversed about their children and grandchildren, gossiped about news within the community, shared their plans to attend church, and discussed details regarding upcoming social plans between the couples. [Def.'s Ex. 12]. Notably, some of the language used in Judge Kay's texts with Aimee Monk indicates significant familiarity. For example, on May 4, 2015, while both couples were in New Orleans and talking about meeting up, Judge Kay texted Aimee Monk, "Scott says: 'Pussy'. I don't talk like that." [Def.'s Ex. 12]. Similarly, on March 23, 2016, after learning that Aimee Monk's new car was going to be a truck, Judge Kay texted her, "That's pretty butch of you, girl!" *Id.* In response, Aimee Monk texted, "You think I might have some latent lesbian tendencies? I will be wearing Lilly Pulitzer and pearls[.]" *Id.* Judge Kay responded, "Oh the irony! Love it!! You can say 'pardon me' after you kick someone's ass[.]" *Id.*

Notably, in the years immediately preceding and coinciding with the underlying lawsuit, the couples came together for multiple dinners and significant life events. Regarding the dinners, testimony reveals that Judge Kay, McPherson, and the Monks got dinner just the four of them in August 2015 to celebrate Margaret coming to work for Judge Kay. In advance of Lucie's wedding, there was also a dinner at the Monk's home in September 2015 involving the Monks (including Margaret, Lucie, and their significant others), Judge Kay, and McPherson. Additionally, although

---

[78] Judge Kay apparently did not want Monk to be her "Article III judge" and disclosed Monk's interest to Norman, who she believed would also not want Monk to become an "Article III judge." IFG seemingly contends that this supports its claim that no close friendship exists between Judge Kay and Monk, but that one did exist between Judge Kay and Norman. It appears more likely to the Court that Judge Kay was simply not interested in Monk being her boss and that Judge Kay was engaging in her normal gossip about the Lake Charles legal community with Norman. Additionally, even the best of friends are occasionally not very good friends to one another, so the fact that Judge Kay gossiped about Monk's ambitions does not mean they were not friends.

no one is sure of the exact dates, in approximately 2016 or 2017, there was one dinner involving the four of them, a second involving a third couple, and a third where they sat together at a fundraising dinner. According to Judge Kay, at some point there was also a dinner involving her, McPherson, her daughter Sally, Sally's significant other, and the Monks. Finally, in April 2023, Judge Kay, McPherson, the Monks, and various other family members had dinner and played a game together.

Turning to significant life events, in 2014, Judge Kay and McPherson hosted a party at their home to celebrate their twenty-fifth wedding anniversary, Robbie's high-school graduation, Sally's college graduation, and the completed remodel of their home in the wake of Hurricane Rita. Monk attended.

At some point in 2015, the Monks asked Judge Kay if she would officiate Lucie's wedding.[79] Judge Kay agreed to do so. Judge Kay and her daughter Sally were also invited to Lucie's shower. [Def.'s Ex. 12]. Although Judge Kay could not attend, Sally seemingly did. *Id.* In advance of Lucie's wedding, Judge Kay spoke with Lucie and her now husband about the ceremony's script. She also exchanged emails with Monk about marriage advice for the couple.[80] [Def.'s Ex. 13]. In the days leading up to Lucie's wedding, Judge Kay texted Aimee Monk about the beautiful weather forecasted for the wedding day. [Def.'s Ex. 12]. In addition to officiating and attending the wedding, Judge Kay was invited to and attended the rehearsal dinner. *Id.*; [Def.'s Ex. 10].

---

[79] Monk testified that asking Judge Kay to officiate Lucie's wedding was not a big deal or representative of anything, but the Court does not find this particularly credible given that Lucie is Monk's *daughter*, not a stranger, and given that Lucie's decision to have a non-religious wedding was seemingly a sensitive, controversial one. Judge Kay also told Aimee Monk after the wedding that she was "honored" they thought of her, so it clearly meant something to at least Judge Kay. [Def.'s Ex. 12].

[80] She also reached out to Lucie's future mother- and father-in-law for advice.

In 2017, Judge Kay's daughter Sally got married. Leading up to the wedding, Aimee Monk was invited to and attended Sally's bridal shower. [Def.'s Ex. 47]. At Judge Kay's request, McPherson's band, the Raw Dogs, reunited and opened for the official wedding band at the reception. McPherson thought that someone needed to introduce the Raw Dogs and specifically asked Monk, who was apparently an ardent Raw Dogs fan, to give the introduction. Monk's introduction was written, at least in part, by the members of the Raw Dogs and sent to him by Judge Kay. [Def.'s Ex. 11].

In 2018, Sally threw Judge Kay a surprise birthday party. The Monks attended. [Def.'s Ex. 18].

In September 2023, McPherson sadly passed away. Aimee Monk texted her condolences to Judge Kay. [Def.'s Ex. 12]. The Monks attended McPherson's funeral. Although Aimee Monk prepared a salad and cookies for the post-funeral reception, Aimee Monk's Responses to Notice of Deposition Upon Written Questions indicate that she and Monk did not attend the post-funeral reception.[81] [Def.'s Ex. 47].

Both Judge Kay and Monk dispute the existence of a close friendship between each other and their families. Specifically, Judge Kay testified that she did not consider Monk to be a friend of hers, just a friend of her husband's, and that she did not often join when Monk and her husband spent time together. Additionally, Judge Kay testified that she and Aimee Monk were not very close friends because Aimee Monk is a "girly girl," "junior league type." Monk testified similarly, asserting that they were not close because they were not in the same Mardi Gras krewe, did not belong to the same country club, did not take joint vacations, and were not selected as godparents

---

[81] Judge Kay testified that Aimee Monk did not coordinate the post-funeral reception. Aimee Monk confirmed this. [Def.'s Ex. 47]. Judge Kay also testified that a lot of other people brought food to the post-funeral reception. The Court found Judge Kay and Aimee Monk's testimony regarding the post-funeral reception credible.

for each other's children. They do, however, concede that no disclosures beyond Margaret's clerkship were made.

The Court does not find Judge Kay and Monk's self-assessments of their friendship and the friendship between their families credible. Although Judge Kay, Monk, and Aimee Monk may not share all the same club memberships or socialize on every possible occasion, the evidence— including their own testimony—demonstrates the existence of a close, family friendship spanning nearly forty years. Notwithstanding any gaps in their socializing, the quantity and quality of their social ties are significant, particularly in recent years.[82] The familiarity—and trust—evidenced in their communications is unquestionable given their content and tenor. And Judge Kay's decision to stop attending the Christmas Eve party she traditionally attended with McPherson and the Monks in the wake of the parties' consent to appropriately distance herself from Monk speaks for itself.

Accordingly, the Court finds that a close, enduring friendship existed between Judge Kay, Monk, and their families. The Court also finds that neither Judge Kay nor Monk disclosed anything about their friendship beyond Judge Kay's employment of Margaret at any point prior to the parties' consent or during this litigation more generally.

### J.  Merrick "Rick" J. Norman, Jr.'s Relationship with Judge Kay and Knowledge of the Judge Kay-Monk Relationship

In 1986, after her clerkship ended, Judge Kay joined the Woodley Williams law firm. Norman was an associate and later a partner at that firm. Both Judge Kay and Norman testified that during the approximately two years they both worked at Woodley Williams, they socialized

---

[82] Monk's testimony that he, Aimee Monk, McPherson, and Judge Kay did not have significant contact for about fifteen years after their sons stopped hanging out as much is undermined by the extent of contact before and after this fifteen-year period and both couples' annual attendance of the same Christmas Eve party. The Court also does not find it particularly surprising, unusual, or consequential that these couples spent less time together while navigating their children's busiest years.

during at least one[83] CLE-related ski trip and firm retreat.[84] According to Judge Kay, the Normans invited her and McPherson to dinner once around this time, but Judge Kay did not reciprocate. Judge Kay also testified that she, Norman, and another attorney would frequently get lunch together while still at the firm. Norman disputed this, however, asserting that he only went out eat with his father-in-law, who was a partner at the firm, and that his interactions with Judge Kay during their joint tenure at Woodley Williams resembled his interactions with anyone else in the firm.

In 1988, Woodley Williams went through an acrimonious breakup.[85] Norman and Judge Kay went with different sides of the firm and their contact became intermittent going forward.

Although Judge Kay testified that she invited Norman and Polly Norman to her 1989 wedding, Norman disputed this because of how contentious the Woodley Williams breakup was.[86] In any case, the Normans did not attend Judge Kay's wedding. Norman's sister-in-law, Patti Palmer Stark, was one of Judge Kay's bridesmaids, but there is no evidence that she told Norman or Polly Norman anything about the wedding, including that Monk was a groomsman. In fact, both Norman and Polly Norman testified that they did not know Monk was groomsman until the events

---

[83] Although Judge Kay testified that there were "several" ski trips and firm retreats, Norman testified that he recalls one ski trip and one firm retreat. Norman's testimony about these events contained substantially more detail. For example, he testified that the ski trip took place in Colorado and was put on by the Louisiana Association of Defense Counsel. He also testified that he and Judge Kay traveled in the same rental car during the ski trip. Regarding the firm retreat, he testified that it was at a golf resort in Saint Francisville, Louisiana right around when Judge Kay was hired. Given that they only worked at Woodley Williams together for two years and that any ski trips and firm retreats only took place during that time period, the Court finds it more likely that there were merely one or possibly two ski trips and firm retreats.

[84] Curiously, although Norman testified that he did not know Monk at this point in time, Monk testified that he had a discussion around this time with Norman about Paul Palmer—Norman's father-in-law and Monk's Sunday-school teacher—being nervous while playing golf at a firm retreat with McPherson due to McPherson's golf swing. Because the Court does not think this is indicative of Norman being aware of the full extent of Judge Kay and Monk's friendship, the Court makes no finding as to credibility and whether and when this alleged conversation took place.

[85] Indeed, there was even litigation between the two factions over which got to keep the office.

[86] Although Polly Norman stopped short of disputing Judge Kay's testimony that they were invited to her wedding and acknowledged not recalling whether they were invited, she testified that she does not believe they would have been included in Judge Kay's wedding because Norman went with a different side of the Woodley Williams firm.

underlying the Port's Motion to Vacate. Additionally, Patti Palmer Stark testified that she did not speak to Norman about the Judge Kay-Monk relationship until October 2023.

In 1992, Judge Kay served as a bridesmaid in Patti Palmer Stark's wedding. Polly Norman, as Patti Palmer Stark's sister, was maid of honor and Norman was a groomsman. Judge Kay, McPherson, the Normans, and the Monks all attended this wedding and pre-wedding parties, but there is no evidence regarding how much these couples interacted or learned about each other's respective relationships while at these events.

According to Judge Kay, most of her contact with Norman after the Woodley Williams breakup was professional and consisted of humorous banter about things going on in the Lake Charles legal community.[87] She and Norman did cross paths professionally, though. At some point, Judge Kay asked Norman to represent her in contempt proceedings. Norman ultimately did not represent Judge Kay due to a conflict with her opposing counsel, though. In 2007 and 2015, Norman chaired the committee that recommended Judge Kay as a prospective Magistrate Judge.[88] [Pl.'s Ex. 20; Pl.'s Ex. 29]. And in approximately 2016 or 2017, Norman intervened for the local newspapers in an action against Judge Kay geared toward unsealing records regarding Judge Minaldi's health issues.

Emails between the two before and during the pendency of this case support the existence of a friendly, professional relationship, but nothing more. Specifically, the emails concern Judge Kay's daughter's plans to marry to a British man,[89] jokes about whether they could speak again after a legal proceeding related to Judge Minaldi, an ethics opinion regarding another local attorney, gossip regarding another judge and attorney, whether Norman would go to a Louisiana

---

[87] Judge Kay testified that she and Norman have similar senses of humor and described their interactions as, "hey, did you hear about blah blah blah."
[88] In June 2015, Norman and Judge Kay corresponded via email about scheduling a meeting with the committee as part of its recommendation process. [Pl.'s Ex. 28].
[89] This was relevant to Norman because his daughter also married a British man.

36

State University ("LSU") game with another local attorney, Norman's plans to attend an LSU game and ride on a bus to the game arranged by Judge Kay,[90] whether Norman could represent Judge Kay's plumber in a lawsuit, whether Norman told Veron something that Norman told Judge Kay, whether Judge Kay was aware of any federal court lists that Norman's son could be added to, what language Judge Kay needed to use in a business's resolution, and whether Judge Kay knew of a military divorce lawyer. [Pl.'s Ex. 48; Pl.'s Ex. 50; Pl.'s Ex. 51; Pl.'s Ex. 62; Pl.'s Ex. 64; Pl.'s Ex. 67; Pl.'s Ex. 86; Pl.'s Ex. 90; Pl.'s Ex. 94; Pl.'s Ex. 99; Pl.'s Ex. 104]. Notably, on May 11, 2016, in response to an email from Judge Kay about a mutual friend of theirs, Norman stated, "Joe Mize said you saved him from getting 'monked'—which is now a recognized verb in the lexicon of the local legal community[.]" [Pl.'s Ex. 49]. Both Judge Kay and Norman testified that this email referred to an interaction involving Monk in the underlying case. Additionally, at some point, Judge Kay told Norman that Monk had asked her about the U.S. District Judge application process and planned to apply. Judge Kay testified that she told Norman about this because she knew that he had negative feelings about Monk and suspected that he would not be thrilled by the prospect of Monk becoming a federal judge. She was also seemingly driven by her desire not to work under Monk. *See infra* note 78. While certainly curious, this communication is consistent with other communications between Judge Kay and Norman wherein they gossiped about the Lake Charles legal scene.

In 2013, Norman arranged for one of his sons to extern for Judge Kay. According to Judge Kay, it was very common for Lake Charles natives to extern for her, though.

In 2015, the Normans were invited to Lucie's wedding. Polly Norman testified that she was aware prior to the wedding that Judge Kay would be the officiant. Although she does not recall whether she told Norman that Judge Kay would be officiating, she testified that she does not

---

[90] This game seemingly took place in November 2016.

believe she told him "[b]ecause it wasn't that important" and because "[i]f he didn't go, he didn't care." Norman testified that he did not know Judge Kay officiated Lucie's wedding until August 2020. According to Monk, Polly Norman also co-hosted a "pretty party" for Lucie and her bridesmaids. Ultimately, Polly Norman attended Sally's wedding, but Norman did not.[91] Patti Palmer Stark also attended this wedding.

In 2017, Judge Kay invited the Normans to her daughter Sally's wedding. Norman testified that he believed they had been invited because he helped Judge Kay rent a parking lot from one of his clients for the wedding. Norman, who apparently hates weddings, attended the wedding ceremony because he lost this battle with Polly Norman, but testified that he did not think he attended the reception based upon his and Polly Norman's recollections. Polly Norman's testimony is that she believes she and Norman attended the wedding ceremony, but that she does not have any recollection of them attending the reception. She further testified that she has no recollection of Monk introducing the Raw Dogs. Patti Palmer Stark attended, but does not recall if Norman or Polly Norman attended. Monk testified that he and Aimee Monk ran into the Normans in the parking lot and that they all walked to the ceremony together, but that he does not recall whether the Normans walked to the reception venue or, if they did, whether the Normans stayed at the reception until he introduced the Raw Dogs. Based on this evidence, the Court finds that Norman neither attended the reception nor witnessed Monk introducing the Raw Dogs. Additionally, although Judge Kay testified that Norman offered to let any British wedding guests stay at his home, Norman contested this and Polly Norman testified that she knew nothing about it, making Judge Kay's testimony on this point difficult to credit.[92]

---

[91] Norman testified that he has no recollection of attending and believes he did not. Polly Norman does not recall whether Norman attended the wedding, but testified that she would not have insisted he attend and that she believes he did not because only she signed the guest book and because friends do not recall seeing him there.

[92] In evaluating this testimony, the Court finds it extremely unlikely that a man would offer up his home to strangers without first clearing it with his wife.

Although Judge Kay testified that she was closer to Norman than to Monk, her other testimony significantly undermines this assertion. Indeed, Judge Kay testified that after the Woodley Williams breakup, she and Norman's interactions were intermittent and largely limited to banter. She also testified that she did not socialize with the Normans much going forward and that she socialized more with the Monks. Norman's testimony confirms this and puts his and Monk's connections with Judge Kay in stark contrast.[93] Norman testified that other than one bus trip to an LSU game that Judge Kay organized, after the Woodley Williams breakup, he attended no dinners, lunches, happy hours, parties, or non-wedding-related events with Judge Kay or McPherson. Notably, unlike Monk, he did not attend Judge Kay and McPherson's party in 2014 and did not attend or receive an invitation to Judge Kay's surprise birthday party in 2018. Norman also never offered concert tickets to Judge Kay or McPherson, golfed with McPherson, or met McPherson's parents. Although Norman emailed and seemingly spoke by phone with Judge Kay occasionally, he never sent text messages or Facebook messages to Judge Kay or McPherson and was not Facebook friends with them either. Unlike Monk, he had no interactions with Judge Kay and McPherson's children and did not receive birthday wishes from Judge Kay. Testimony from Patti Palmer Stark, who is friends with Judge Kay and the Monks, also undermines Judge Kay's self-assessment of her relationships with Norman and Monk. Specifically, Patti Palmer Stark testified that while Judge Kay and Monk "have been close friends for a long time," she would not characterize Norman or Polly Norman as close with Judge Kay or McPherson. She also testified that she has never really heard Norman talk about Judge Kay.

---

[93] According to Monk, a few days after the Port filed its Motion to Vacate, he and Norman were on the phone and Norman admitted that he would win in a competition as to which of them had more social connections with Judge Kay. Norman testified that he had no recollection of this conversation and that he did not know what Monk's connections with Judge Kay were anyway. Given the ample evidence demonstrating that a closer relationship existed between Judge Kay and Monk and given Norman's role in the Port's investigation, the Court does not find Monk's statement credible.

Norman did not attend Judge Kay's 1989 wedding or Lucie's 2015 wedding. He therefore did not have first-hand knowledge that Monk was a groomsman in Judge Kay's wedding or that Judge Kay officiated Lucie's wedding prior to August 2020. Norman's absence at other events, such as Sally's 2017 wedding reception; limited socialization with Judge Kay and Monk;[94] and predominantly law-related communications and professional relationship with Judge Kay also resulted in Norman lacking knowledge about the closeness between Judge Kay, Monk, and Monk's family before August 2020. Additionally, although Polly Norman and Aimee Monk are friends and Polly Norman attended Lucie's wedding, Polly Norman testified that she was unaware of a friendship between Judge Kay and Aimee Monk and that she does not think she told Norman about Judge Kay officiating Lucie's wedding. Norman testified that his wife never told him about Judge Kay's role at Lucie's wedding. There is also no evidence that Norman learned about Judge Kay and Monk's close friendship from Patti Palmer Stark.

Accordingly, the Court finds that Norman did not know that Judge Kay's relationship to Monk extended beyond her employment of Margaret as her law clerk until after Judge Kay's ruling.

### K. Michael Dees' Relationship with Judge Kay and Knowledge of the Judge Kay-Monk Relationship

Judge Kay testified that she knew Dees "[j]ust professionally really" through their work as attorneys in Lake Charles. She also testified that they were both big LSU fans and would interact at LSU events. Dees testified that he "was certainly not a social friend with [Judge] Kay," but confirmed their interactions at a handful of LSU events.

---

[94] Testimony indicates that Norman and Monk socialized during at least one school fundraiser and that they discussed Judge Kay seeking advice from both of them, but these limited interactions do not support a finding that Norman knew about the true nature and extent of the Judge Kay-Monk relationship.

According to Judge Kay, she and Dees were Facebook friends before her account was shut down in 2020. Dees conducted a search of his Facebook account in advance of the evidentiary hearing. That search indicated that he is not Facebook friends with Judge Kay. Dees testified that it is "quite possible" he was Facebook friends with Judge Kay at some point, but that he did not know and did not think he ever had been.[95] Regardless of whether Judge Kay and Dees were Facebook friends,[96] witness testimony and emails reveal that Dees viewed posts from Judge Kay's Facebook account, which was seemingly public, on at least two occasions and messaged with Judge Kay through Facebook occasionally. [Pl.'s Ex. 18; Pl.'s Ex. 85; Pl.'s Ex. 125]. For example, on March 28, 2017, Dees emailed Matt Mize and Joe Mize, "From Facebook, it appears that Judge Kay is in Bath, England." [Pl.'s Ex. 85]. Additionally, an email from Norman to Matt Mize and testimony from Matt Mize and Ringo indicate that Dees noticed Judge Kay was posting on Facebook from the bench during the bench trial.[97] [Pl.'s Ex. 125]; *see infra* note 36.

Email and Facebook communications between Judge Kay and Dees around the time of this litigation depict nothing beyond a friendly, professional relationship. For example, after Judge Kay reached out to Dees via Facebook for his daughter-in-law's contact information, Dees emailed her his daughter-in-law's contact information.[98] [Pl.'s Ex. 18; Pl.'s Ex. 52]. Judge Kay was also

---

[95] The Court found Dees' testimony regarding his Facebook usage and knowledge of these Facebook photos credible, particularly given other available evidence.

[96] The Court takes judicial notice of the fact that people can view a person's Facebook account or individual posts, subject to that person's privacy settings, and send a person Facebook messages without being Facebook friends with that person.

[97] As noted above, Dees does not specifically recall looking anything up on Facebook or finding a Judge Kay post, but does not dispute that he may have. *See infra* note 36.

[98] Judge Kay wanted Dees' daughter-in-law's contact information because she is an immigration attorney and Judge Kay was seeking advice on her British son-in-law's upcoming move to the United States. Although Judge Kay and Dees engaged in some banter about Dees' daughter-in-law in their Facebook and email exchange, many people talk about their family and the Court does not find this particularly significant in light of other evidence. [Pl.'s Ex. 18; Pl.'s Ex. 52].

President of a local LSU alumni association and corresponded with Dees[99] about various LSU games, events, and fundraisers.[100] [Pl.'s Ex. 18; Pl.'s Ex. 57; Pl.'s Ex. 58; Pl.'s Ex. 87].

Judge Kay and Dees are seemingly in agreement that they did not have a close, personal friendship. Dees testified that he had never socialized with Judge Kay and Monk simultaneously and that he had no knowledge regarding any social connections or relationship between Judge Kay and Monk. He also testified that he seldom used Facebook while he was still working and that he had never seen any photos of Judge Kay's wedding or Lucie's wedding on Facebook. While Dees had some interactions with Judge Kay's Facebook account, the occasions on which Dees viewed or messaged Judge Kay's Facebook account were nearly a year or more after Lucie's 2015 wedding and always months after July 30, when Judge Kay annually updated her account to feature photos from her wedding. [Pl.'s Ex. 18; Pl.'s Ex. 85; Pl.'s Ex. 125]. There are also no emails or text messages between Dees and Port counsel or among Port counsel indicating that Dees had seen and reported these Facebook photos to Port counsel.[101] The Court therefore finds Dees' testimony that he never saw photos of Judge Kay or Lucie's weddings on Facebook and that he had no knowledge regarding the Judge Kay-Monk relationship credible.

Because there is no evidence that Dees saw Facebook photos of Judge Kay's wedding or Lucie's wedding or that he was otherwise aware of the friendship between Judge Kay and Monk, the Court finds that Dees did not know that Judge Kay's relationship to Monk extended beyond her employment of Margaret as her law clerk until after Judge Kay's ruling.

---

[99] Some of the LSU-related emails that Judge Kay sent to Dees were group emails addressed to dozens of other people and came from an email address associated with the LSU alumni group.

[100] Curiously, although Judge Kay testified and noted in her communications that as a Magistrate Judge she cannot solicit donations, her communications with Dees seem to depict frequent fundraising activity on her part. [Pl.'s Ex. 18; Pl.'s Ex. 58].

[101] Given the shockingly honest nature of Port counsel's communications, the Court finds the total absence of emails and text messages before the ruling regarding the Facebook photos of Judge Kay and Lucie's weddings or regarding the relationship between Judge Kay and Monk more generally very compelling.

**L. Joe Mize and Matt Mize's Knowledge of the Judge Kay-Monk Relationship Through Maura Mize and Leslie Mize**

Maura Mize became friends with Aimee Monk in approximately 2013 after their respective friend groups started spending time with each other.[102] Maura Mize and Aimee Monk were part of the same book club, garden club, and travel group. During two travel group trips, Maura Mize and Aimee Monk were assigned the same hotel room based on their wake-up times. They were also Facebook friends.

Although Maura Mize and Joe Mize were seemingly invited to Lucie's wedding, they did not attend.[103] [Pl.'s Ex. 264]. After the wedding, Maura Mize, as was her standard Facebook practice, liked and commented on Facebook photos of Lucie's wedding that Aimee Monk posted. [Pl.'s Ex. 31, Pl.'s Ex. 35; Pl.'s Ex. 36]. At least one photo liked by Maura Mize showed Judge Kay in the background as an officiant. [Pl.'s Ex. 31]. Maura Mize testified, however, that she did not know what Judge Kay looked like when she liked that photo in 2015.[104] The Court found Maura Mize's testimony regarding this credible. Additionally, there is no evidence that Maura Mize ever showed these photos to Joe Mize or Matt Mize back in 2015. There is also no evidence that Maura Mize realized that Judge Kay officiated Lucie's wedding and told Joe Mize or Matt Mize about it before Judge Kay's ruling came out.

Matt Mize and Leslie Mize also did not attend Lucie's wedding. Leslie Mize testified that she did not know what Judge Kay looked like in 2015 and that she therefore would not have recognized Judge Kay as the officiant of Lucie's wedding had she seen the photo when it was

---

[102] Maura Mize, a speech pathologist, had previously met Aimee Monk while working with Aimee Monk's children in the 1990s.

[103] Maura Mize has no recollection of receiving a formal, written invitation to Lucie's wedding, but in a Facebook comment said, "so sorry we missed-I know it was lovely-babysitting duties in Austin called[.]" [Pl.'s Ex. 264]. Maura Mize testified that her "causal comment" expressing regrets on Facebook led her to believe that she received a verbal invitation in a group setting because had she received a formal, written invitation she would have notified Aimee Monk of her inability to attend with an RSVP card before the wedding took place.

[104] Maura Mize testified that she did not know what Judge Kay looked like until someone pointed her out at a wedding in 2019.

posted in 2015. There is no evidence suggesting otherwise and the Court found Leslie Mize's testimony on this point credible.

Although the Court does not have the benefit of Joe Mize's testimony due to his passing, there is no evidence that he knew about Judge Kay and Monk's relationship or about the Facebook photos and the events they depict.

Matt Mize testified that he had no knowledge of Judge Kay and Monk's relationship or of the events depicted in the Facebook photos until he saw the Facebook photos discovered by Maura Mize and Leslie Mize.

The Court therefore finds that neither Joe Mize nor Matt Mize knew that Judge Kay's relationship to Monk extended beyond her employment of Margaret as her law clerk until after Judge Kay's ruling.

### M. Summary

In closing and pursuant to the Fifth Circuit's instructions, the Court makes the following findings:

(1) Judge Kay, Monk, and their families enjoyed a close, multifaceted, and personal friendship spanning nearly forty years;

(2) Other than Judge Kay's disclosure that Margaret was her law clerk either before or during the April 15, 2016 in-person status conference and some non-descript banter between Judge Kay and Monk about their children on a few other occasions, no disclosures were made about the friendship between Judge Kay, Monk, and their families at any point during this litigation;

(3) The Port's investigation began after Judge Kay's Written Reasons for Judgment came out and, among other things, consisted of (a) Joe Mize, Matt Mize, and Norman's discovery of the Facebook photos through Maura Mize and Leslie Mize; (b) Norman's questioning of

Polly Norman regarding the Judge Kay-Monk relationship; (c) Matt Mize and Norman's recusal research after the Facebook photos were discovered; (d) McKay's questioning of Matt Mize, Norman, Ringo, and the Port Board regarding what they knew and how they found out about the Judge Kay-Monk relationship; and (e) Port counsel's efforts to locate someone capable of providing an affidavit regarding the Judge Kay-Monk relationship; and

(4) The Port first learned that Judge Kay's relationship to Monk extended beyond her employment of Margaret as her law clerk on August 2, 2020 when Maura Mize discovered a Facebook photograph depicting Monk as a groomsman in Judge Kay's wedding and showed that photo to Joe Mize, who in turn ensured that Matt Mize and Norman learned of the photo.

## III.   DISCUSSION

The Court now evaluates whether the Port is legally entitled to vacate its consent to Judge Kay in light of these facts. Because there was an extensive relationship between Judge Kay, Monk, and Monk's family which was not disclosed to or known by the Port or its counsel at any point before Judge Kay's ruling, the Court grants the Port's Motion to Vacate.

### A.  The Sufficiency of the Mize Affidavit

Out of an abundance of caution, the Court first addresses the sufficiency of the Mize Affidavit. IFG maintains that the Mize Affidavit is legally insufficient and put on evidence regarding this during the evidentiary hearing. *See* [Dkt. 749 at 20–25].

The Fifth Circuit noted IFG's arguments "below" that the affidavit was "legally insufficient," but seemed far more concerned with unknown facts about the Judge Kay-Monk relationship, any disclosures made, the Port's investigation, and the Port's knowledge than it did with the legal sufficiency of the Mize Affidavit. *See IFG Port Holdings*, 82 F.4th at 421. Although

the Fifth Circuit "conclude[d] that this affidavit must be subject to adversarial treatment and district-court verification," it directed this Court to conduct an evidentiary inquiry to "decide whether the Port's consent to the magistrate judge was constitutionally valid, and whether vacatur of the referral [was] otherwise warranted"—not to determine the sufficiency of the Mize Affidavit. *See id.* at 415, 421. It therefore seems to the Court that its role is not to determine the legal sufficiency of the Mize Affidavit, but to determine whether the facts alleged in and underlying the Mize Affidavit are true and warrant vacatur. In any case, the role of the affidavit is to support the Port's Motion to Vacate. After the evidentiary inquiry, there is ample evidence—even without the Mize Affidavit—to fully evaluate the Port's Motion to Vacate and the circumstances underlying it. Therefore, the evidentiary inquiry arguably mooted the legal sufficiency of the affidavit.

Even so, the Court finds that the Mize Affidavit is legally sufficient. Neither 28 U.S.C. § 636 or Federal Rule of Civil Procedure 73 indicate whether an affidavit must be filed in support of a motion to vacate a reference to a magistrate judge or what legal requirements exist for such an affidavit. 28 U.S.C. § 626(c)(4) (stating only that "[t]he court may, for good cause shown on its own motion, or under extraordinary circumstances shown by any party, vacate a reference of a civil matter to a magistrate judge"); Fed. R. Civ. P. 73(b)(3) (providing only that "[o]n its own for good cause—or when a party shows extraordinary circumstances—the district judge may vacate a referral to a magistrate judge"). As a result, the Court must look elsewhere for guidance on what makes an affidavit legally sufficient.

Federal Rule of Civil Procedure 56, which governs summary judgment, indicates that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). According to the Fifth Circuit, in the summary judgment context, "[a]ffidavits asserting personal knowledge

must include enough factual support to show that the affiant possesses that knowledge." *Amie v. El Paso Indep. Sch. Dist.*, 253 F. App'x 447, 451 (5th Cir. 2007) (quoting *El Deeb v. Univ. of Minn.*, 60 F.3d 423, 428 (8th Cir. 1995)).

In the context of recusal under 28 U.S.C. § 144, "[a] legally sufficient affidavit must meet the following requirements: (1) the facts must be material and stated with particularity; (2) the facts must be such that if true they would convince a reasonable man that a bias exists; and (3) the facts must show the bias is personal, as opposed to judicial, in nature." *Henderson v. Dep't of Pub. Safety & Corr.*, 901 F.2d 1288, 1296 (5th Cir. 1990) (citing *Parrish v. Bd. of Comm'rs of Ala. State Bar*, 524 F.2d 98, 100 (5th Cir. 1975)). The Fifth Circuit also requires that affidavits used to support recusal under § 144 be based on personal knowledge. *Id.* (stating that the district court correctly found an affidavit legally insufficient because it was not based on personal knowledge).

Whether the Court applies the summary judgment or § 144 recusal standard for affidavits,[105] the Mize Affidavit is legally sufficient given its contents and the evidence presented in connection with the evidentiary inquiry. First, as the affidavit indicates, Matt Mize represented the Port in this litigation from its inception until a few months after Judge Kay's ruling. By definition, this means he would possess personal knowledge as to the Port's consent, any disclosures made by Judge Kay, the Port and its counsel's reactions to Judge Kay's ruling, the Port's investigation into the Judge Kay-Monk relationship and its results, and whether the Port would have consented had the true nature of the Judge Kay-Monk relationship been disclosed. *See* Fed. R. Civ. P. 56(c)(4); *Henderson*, 901 F.2d at 1296. The evidence presented at the evidentiary hearing also confirms Matt Mize's personal knowledge as to everything he asserts in his affidavit.

---

[105] The Court confines itself to considering the summary judgment and § 144 recusal standards for affidavits because those are the standards invoked in IFG's arguments that the Mize Affidavit is legally insufficient. *See* [Dkt. 498 at 2–4; Dkt. 749 at 21–22].

Second, the affidavit sets out facts that are admissible in evidence. *See* Fed. R. Civ. P. 56(c)(4). In fact, during the evidentiary hearing, the Court heard evidence pertinent to each paragraph of the Mize Affidavit.

Third, as Port counsel, Matt Mize is certainly competent to testify as to the matters outlined in his affidavit. Indeed, he testified about these matters for hours before the Court. *See id.*

Fourth, the facts asserted in the affidavit are certainly material to whether the Port's consent was constitutionally valid. *See Henderson*, 901 F.2d at 1296. They were also stated with sufficient particularity. *See id.* The affidavit provides specific details about the consent process, Judge Kay's disclosure regarding Margaret, why the Port began investigating, when the Port began investigating, and what the Port's investigation found. Although the affidavit certainly could have provided greater detail regarding the Port's investigation, such as Facebook's role and the involvement of Port counsel's family members, this alone is not fatal because the Port's investigation was broader than Maura Mize and Leslie Mize searching Facebook. Evidence demonstrates that the Port's investigation included, among other things, Norman and Matt Mize's research into recusal, Norman's single question to Polly Norman about the Judge Kay-Monk relationship after the Facebook photos were found, and McKay's communications with Matt Mize, Norman, Ringo, and Port Board Members regarding the Judge Kay-Monk relationship after the Facebook photos were found.

Fifth, the facts attested to by Matt Mize, namely the Port's surprise and shock with respect to Judge Kay's ruling and the existence of an undisclosed longstanding personal relationship between Judge Kay and Monk, would convince a reasonable person that a bias exists if they were true. *See id.* Notably, in its opinion, the Fifth Circuit assumed that the assertions in the Mize Affidavit were true and, in turn, stated that it had "significant doubts about the knowingness and

validity of the Port's consent" and determined that a full evidentiary inquiry was necessary. *IFG Port Holdings*, 82 F.4th at 415, 420–21.

Finally, the bias alleged in the Mize Affidavit is personal rather than judicial because it is based on the relationship between Judge Kay and Monk rather than a ruling by Judge Kay. *See Henderson*, 901 F.2d at 1296.

Accordingly, the Court holds that the Mize Affidavit is legally sufficient and turns to evaluating the merits of the Port's Motion to Vacate.

### B.  Application of the *Carter* Factors

The Fifth Circuit provided significant guidance in its opinion as to how the Court should evaluate the Port's Motion. *IFG Port Holdings*, 82 F.4th at 414–22 (discussing the *Carter v. Land Sea Services, Inc.*, 816 F.2d 1018 (5th Cir. 1987), factors at length and remanding the case "for factual development and further proceedings *consistent with this opinion*" (emphasis added)). The Court will therefore hew closely to the Fifth Circuit's opinion in its analysis.

"Upon the consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case." 28 U.S.C. § 636(c)(1). Under 28 U.S.C. § 636(c)(4) and Federal Rule of Civil Procedure 73(b)(3), a court may vacate the referral of a civil matter to a magistrate judge when a party demonstrates the existence of "extraordinary circumstances." 28 U.S.C. § 636(c)(4); Fed. R. Civ. P. 73(b)(3).

In *Carter*, the Fifth Circuit held that a court should consider the following factors in determining whether to exercise its discretion and permit withdrawal of consent to trial by a magistrate judge: (1) "undue delay," (2) "inconvenience to the court and witnesses," (3) "prejudice to the parties," (4) "whether the movant is acting *pro se*," (5) "whether consent was voluntary and uncoerced," (6) "whether the motion is made in good faith or is dilatory and contrived," (7) "the

possibility of bias or prejudice on the part of the magistrate [judge]," and (8) "whether the interests of justice would best be served by holding a party to his consent." 816 F.2d at 1021; *see also IFG Port Holdings*, 82 F.4th at 414–15 (accepting that the *Carter* factors apply to this determination). The Court will address each of these factors in turn. Because whether the Port's consent was voluntary and uncoerced is dispositive and dictates the outcomes of other *Carter* factors, the Court will address this factor first. *See IFG Port Holdings*, 82 F.4th at 419–20 (stating that vacatur of consent to a magistrate judge is required when consent was obtained involuntarily or through coercion, and noting that the outcomes of the undue delay and good faith factors depend on when the Port first knew about the relationship between Judge Kay and Monk).

## 1.  Whether Consent Was Voluntary and Uncoerced

Under *Carter*, courts evaluating consent to a magistrate judge must "assess whether the party's consent to the magistrate-judge referral 'was voluntary and uncoerced.'" *Id.* at 415 (quoting *Carter*, 816 F.2d at 1021). In evaluating this factor in the preceding appeal, the Fifth Circuit emphasized "that party consent is the 'touchstone of magistrate judge jurisdiction'" and a "constitutional imperative." *Id.* (quoting *Anderson v. Woodcreek Venture Ltd.*, 351 F.3d 911, 914 (9th Cir. 2003)). It also stated that "the constitutionality of § 636(c) magistrate-judge referrals depends on the requirement that the parties give their consent." *Id.* Accordingly, the Fifth Circuit held that "notwithstanding any other 'factors,' the absence of valid party consent to a magistrate-judge referral will end the inquiry." *Id.* (emphasis omitted). It further held that, "[i]f an Article III court concludes that a party's consent to a trial by a magistrate judge was not validly given, it has *no choice* but to order that the referral be vacated." *Id.* (emphasis added).

Crucially, in the underlying appeal, the Fifth Circuit expanded on *Carter*'s requirement for voluntary and uncoerced consent. *Id.* at 416. Specifically, it held that "[c]onsent to a magistrate-judge referral—that is, a waiver of the right to an Article III adjudication—also cannot be valid if

it is not given knowingly and intelligently." *Id.* (collecting cases); *see also Carter*, 816 F.2d at 1021 (indicating that "[o]nce a right, even a fundamental right, is knowingly and voluntarily waived, a party has no constitutional right to recant at will").

The Fifth Circuit explicitly stated that a magistrate judge's failure to disclose a longstanding friendship with lead, opposing counsel may undermine a party's consent to have that magistrate judge try its case. *IFG Port Holdings*, 82 F.4th at 416. It refrained from determining whether the Port's consent to Judge Kay was knowingly and validly given, however, because of "factual gaps" and the "need for evidentiary testing and cross-examination" regarding the exact nature of Judge Kay and Monk's relationship and when precisely the Port learned of their relationship. *Id.* Perhaps most pertinently, the Fifth Circuit indicated that "if the Port learned of the intimacy of the friendship before entry of judgment and chose to remain silent, then its consent would remain valid." *Id.* (citing *Roell v. Withrow*, 538 U.S. 580, 582 (2003)).

As outlined in its findings of fact, the Court finds that there was a close, longstanding relationship between Judge Kay, Monk, and Monk's family. There is also no question that Judge Kay and Monk did not disclose anything about their friendship beyond Margaret's role as Judge Kay's clerk. Whether the Port's consent to Judge Kay was "knowingly and intelligently" given therefore turns on when the Port became aware of their friendship.

The parties dispute whether the Port's constructive knowledge of a relationship between Judge Kay and Monk would be sufficient to render the Port's consent knowing and voluntary. The Court permitted the parties to brief this topic after the evidentiary hearing's conclusion. [Dkt. 764; Dkt. 767; Dkt. 768]. After reviewing the cases invoked by IFG in support of their constructive knowledge argument, examining the Fifth Circuit's underlying opinion, and conducting independent research, the Court holds that only actual knowledge of a relationship suffices for knowing and voluntary consent to a magistrate judge. All of the cases cited by IFG were factually

and contextually distinct. *See generally Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122 (2023) (finding that an out-of-state corporation's registration in a state where state law provides its state courts with personal jurisdiction over registered foreign corporations was sufficient for personal jurisdiction to exist over that out-of-state corporation); *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178 (2020) (discussing the requirement for actual versus constructive knowledge in the context of the Employee Retirement Income Security Act of 1974, which explicitly requires actual knowledge, and merely noting that the law, generally speaking, will "sometimes" only require constructive knowledge); *Roell v. Withrow*, 538 U.S. 580 (2003) (holding that a party can impliedly consent to magistrate jurisdiction by proceeding in front of a magistrate judge); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986) (finding that a party's election to proceed before the Commodity Futures Trading Commission (CFTC) constituted an effective waiver of that party's right to proceed before a state or federal court where case law and regulations made the party's options and CFTC's jurisdiction clear); *Echeverry v. Jazz Casino Co.*, 988 F.3d 221 (5th Cir. 2021) (deciding to use a constructive knowledge standard in reviewing a Louisiana negligence verdict); *Light-Age, Inc. v. Ashcroft-Smith*, 922 F.3d 320 (5th Cir. 2019) (holding that a party waived its objection to an arbitrator's participation in an arbitration panel because it had constructive knowledge that the arbitrator in question worked for a law firm); *Wanless v. Gen. Elec. Co.*, 148 F.3d 1334 (Fed. Cir. 1998) (stating that constructive knowledge of patent infringement is sufficient to prove laches); *United States v. Dobey*, 751 F.2d 1140, 1141 (10th Cir. 1985) (addressing magistrate referrals under 28 U.S.C. § 636(a)(3) and 18 U.S.C. § 3401).

*United States v. Dobey*, a Tenth Circuit case, is arguably the closest fit, so the Court will discuss it briefly. *See generally* 751 F.2d at 1141. In *Dobey*, the Dobeys consented to proceed before a magistrate judge under 28 U.S.C. § 636(a)(3) and 18 U.S.C. § 3401 rather than 28 U.S.C. § 636(c)(1). 751 F.2d at 1141. IFG asserts that *Dobey* endorses the idea of knowing consent to a

magistrate judge through constructive knowledge, but the Court finds this to be a stretch given that the knowledge requirement was not addressed in depth and that the court did not explicitly evaluate the Dobeys' contention "that neither they nor their counsel were aware that magistrates lacked the attributes of Article III judges." *See generally id.* Additionally, knowledge of a magistrate judge's personal relationship with opposing counsel is radically different and more difficult to ascertain than knowledge of a magistrate judge's "attributes" relative to an Article III judge. The differences between a magistrate judge and Article III judge are set out in statutes and case law and any decent attorney should either already know those differences or be able to determine them through basic legal research. *Dobey* is also not binding on this Court.

The language used throughout the Fifth Circuit's underlying opinion also supports a requirement of actual knowledge here. Specifically, the Fifth Circuit repeatedly asks and emphasizes what the Port "knew," "learned," "discovered," and "found out." *IFG Port Holdings*, 82 F.4th at 417, 419, 421. The Fifth Circuit also discusses and asks what was "disclosed" and remained "undisclosed" to the Port. *Id.* at 417, 421. Indeed, this Court is specifically tasked with determining "[w]hat information about these relationships Magistrate Judge Kay *disclosed* to the parties and when these *disclosures* occurred" and "[w]hen the Port first *knew* that Magistrate Judge Kay's relationship to Monk extended beyond her employment of Monk's daughter as her law clerk." *Id.* at 421 (emphasis added). Nowhere in the Fifth Circuit opinion is there discussion of what the Port should have known. And the Fifth Circuit does not ask this Court what the Port should have known. The Fifth Circuit's failure to state or even allude to the fact that constructive knowledge would suffice is particularly notable given that it added the knowingness requirement to this *Carter* factor.

As demonstrated by IFG's arguments, the practical implications of adopting a constructive knowledge standard in this context are also staggering and, frankly, concerning. If a party's

consent to proceed before a magistrate judge could be deemed knowing because it is conceivable that its general counsel may have seen a Facebook photo despite evidence suggesting otherwise; because one of its outside counsel occasionally engages in professional banter with the magistrate judge about the legal community; because one of its outside counsel's wives attended a wedding without her husband and saw some evidence of a friendship, but never thought to or in fact told her husband about it; or because one of its outside counsel's wives liked a Facebook photo, but did not realize its significance or ever inform her husband of that photo, the Court is unclear when a party's consent would ever not be knowing.

For these reasons, the Court is unwilling to take this leap.[106] It will therefore analyze the knowingness of the Port's consent to Judge Kay based on whether the Port possessed actual knowledge of the Judge Kay-Monk relationship. As indicated in the Court's findings, there is no evidence that the Port or its counsel had actual knowledge regarding the extent and nature of the friendship between Judge Kay and Monk before Judge Kay's ruling came out. The Port's witnesses were all credible on the witness stand and unequivocally denied any knowledge of this friendship before the ruling came out. Communications among Port counsel leading up to Judge Kay's ruling also never mention this friendship or any plans to recuse Judge Kay or vacate the consent to Judge Kay. Given the frank nature of the Port's communications, if Port counsel had been aware of the relationship before the ruling, it almost certainly would have featured in the Port's communications. Additionally, Matt Mize, Monk, and Judge Kay all testified that no disclosures beyond Margaret's clerkship were made.

Accordingly, the Court finds that the Port did not know about the Judge Kay-Monk relationship when it consented or at any point before the ruling came out. Because the Port lacked

---

[106] Even if the Court was willing to take this leap, it is not convinced the Port would have constructive knowledge of the Judge Kay-Monk relationship given the tenuous facts.

crucial information about the extensive ties between Judge Kay and Monk, its consent to Judge Kay was not knowingly and intelligently given. The Court therefore must vacate the referral to Judge Kay. *See id.* at 415.

### 2. Undue Delay

Although the Court could stop its analysis with its finding that the Port's consent was not knowing, it will address the remaining factors in an effort to be thorough. The Fifth Circuit stated that a "[f]inding that there was no 'undue' delay here rests critically on [the Port's] asserted timeline being accurate." *Id.* at 419. More specifically, it counseled that "[i]f the Port knew about the friendship all along, or even if it discovered it shortly before Magistrate Judge Kay issued her order, the 'delay' factor would likely doom its claim now." *Id.*

As discussed above, the Court found that the Port and its counsel had no knowledge about the Judge Kay-Monk relationship before Judge Kay issued her ruling. Additionally, to the extent there was a delay between the Port's discovery of the relationship in early August 2020 and the filing of its Motion to Vacate in October 2020, the Court finds that this delay was not "undue" because it resulted from the Port's efforts to ascertain further information about the relationship and complications associated with Hurricanes Marco and Laura. The undue delay factor therefore weighs in favor of vacating the referral to Judge Kay.

### 3. Inconvenience to the Court and Witnesses

As discussed by the Fifth Circuit, vacating the referral would be "hugely inconvenient" to the parties, witnesses, and the judiciary. *Id.* at 420. Vacating the referral would mean a redo of a lengthy bench trial in what appears to be an extremely complex case. This factor, while insufficient to counter the lack of knowing consent, weighs against vacating the referral.

### 4.  Prejudice to the Parties

Following the Fifth Circuit's lead, the Court notes that both parties would be prejudiced to some extent by vacating the referral. *See id.* Both would be prejudiced by the time and resources required to retry this case. IFG would be prejudiced by losing the $124 million judgment that Judge Kay awarded it. The Port, however, would be prejudiced if the $124 million judgment against it stands. Because IFG, which possessed the benefit of Monk's knowledge regarding his relationship with Judge Kay, stayed silent and because the judgment resulted from an unconstitutional referral to Judge Kay, the Port's prejudice ultimately has greater weight. The prejudice factor therefore also weighs in favor of vacating the referral.

### 5.  Whether the Movant Is Acting *Pro Se*

Because the Port is represented by counsel and, thus, not acting *pro se*, this factor is irrelevant. It weighs neither in favor nor against granting the Port's Motion to Vacate.

### 6.  Whether the Motion Is Made in Good Faith

The Fifth Circuit instructed that if the Port did not know about the Judge Kay-Monk relationship until after Judge Kay's ruling and only discovered it after seeking an explanation for the ruling's harsh language, there is no reason to find that the Port filed its Motion to Vacate in bad faith. *Id.* It further noted that if the Port's alleged timeline regarding its discovery of the relationship is accurate, the good-faith factor does not weigh against vacating the referral. *Id.*

As outlined at length above, the Court finds that the Port did not, in fact, know about the relationship between Judge Kay and Monk until after Judge Kay issued her ruling. This militates any appearance of bad faith on account of the Port filing this Motion after an undisputedly adverse verdict against it. The Port filed other post-trial motions in an effort to challenge Judge Kay's ruling, but that does not mean that it filed its Motion to Vacate in bad faith either. The evidence shows that the Port was legitimately surprised by the ruling's tenor and the existence of a

relationship between Judge Kay and Monk. And the Court is not aware of any other evidence suggesting that this Motion was not filed in good faith. The Court therefore finds that this factor weighs in favor of vacating the referral.

### 7.  The Possibility of Bias or Prejudice on the Part of the Magistrate

During the evidentiary hearing, IFG asserted that the absence of bias by Judge Kay would weigh against vacating the referral even if the Port's consent was not knowing. The Port, however, argued that its lack of knowing consent rendered an evaluation of Judge Kay's bias or prejudice unnecessary. It also argued that its Motion to Vacate was not based on any bias or prejudice by Judge Kay, arguably conceding this factor.

The Fifth Circuit made it abundantly clear that if the Port's consent was not knowing, this Court must vacate the referral to Judge Kay "notwithstanding any other 'factors.'" *Id.* at 415. Thus, this factor's outcome does not—and cannot—change the Court's decision here. *See id.* In any case, the Court briefly addresses it.

In analyzing this factor, the Fifth Circuit made clear that "even if a given friendship would not warrant recusal under [28 U.S.C.] § 455, it does not follow that nondisclosure of that friendship is constitutionally permissible under § 636(c)." *Id.* at 418. Notably, it framed the question as "whether nondisclosure of a friendship casts doubt on the validity of an opposing party's consent to magistrate-judge jurisdiction in lieu of an Article III court." *Id.* (emphasis omitted). Although the Fifth Circuit does not specify whether this is an objective or subjective inquiry, the Court has no difficulty concluding that this should be an objective inquiry given the Fifth Circuit's commentary on the enhanced "need to preserve the *appearance of impartiality*" in the context of bench trials and given that the recusal inquiry is an objective one. *Id.* (emphasis added) (quoting *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 166 (3d Cir. 1993)); 28 U.S.C § 455(a)

(providing that a judge must recuse himself "in any proceeding in which his impartiality might reasonably be questioned").

Given the duration and closeness of the relationship between Judge Kay, Monk, and their families, the Court holds that Judge Kay and Monk's nondisclosure of that relationship reasonably casts doubt on the validity of the Port's consent to Judge Kay. *See IFG Port Holdings*, 82 F.4th at 418. Although friendships among judges and lawyers may be common, particularly in small communities like Lake Charles, there is a difference between a collegial professional relationship and a truly close friendship that involves family members, goes beyond work, and spans decades. This factor therefore also weighs in favor of vacating the referral.

### 8. Whether the Interests of Justice Would Be Best Served by Holding a Party to His Consent

Because the close relationship between Judge Kay, Monk, and their families was undisclosed and unknown by the Port, the Port's consent was unknowing and the interests of justice favor vacating the referral. *See id.* at 420.The specter of Judge Kay's close, undisclosed relationship with Monk and her large $124 million damage award to Monk's client undoubtedly raises questions regarding the justice and fairness of these proceedings.

***

Accordingly, based on its evidentiary inquiry and application of the Fifth Circuit's underlying opinion and the *Carter* factors, the Court concludes that the Port's consent to refer this matter to Judge Kay was unknowing and, in turn, constitutionally unsound. Although lack of knowing consent alone requires this Court to grant the Port's Motion to Vacate, it is notable that all but two of the other *Carter* factors likewise weigh in favor of vacating the Port's consent.

## IV.    CONCLUSION

It is therefore **ORDERED** that Defendant Lake Charles Harbor & Terminal District, d/b/a the Port of Lake Charles ("the Port")'s Motion to Vacate Referral to Magistrate Judge Pursuant to Fed. R. Civ. P. 73(b)(3) [Dkt. 483] is **GRANTED**.

It is further **ORDERED** that U.S. Magistrate Judge Kathleen Kay's Written Reasons for Judgment [Dkt. 464], Supplemental Written Reasons for Judgment [Dkt. 626], and Judgment [Dkt. 627] are **VACATED**.

It is further **ORDERED** that Plaintiff IFG Port Holdings LLC's Petition for Writ of Execution and Other Proceedings Supplemental to Judgment [Dkt. 649] is **DENIED AS MOOT**.

It is further **ORDERED** that Plaintiff IFG Port Holdings LLC's Request for Writ of Fieri Facias [Dkt. 650] is **DENIED AS MOOT**.

It is further **ORDERED** that Defendant the Port's Motion for Leave to Take Discovery Regarding Plaintiff's Agreement(s) with Legalist Fund II, LP [Dkt. 669] is **DENIED AS MOOT** subject to the Port's reurging in due course.

**SIGNED this 26th day of July, 2024.**

*Michael J. Truncale*

Michael J. Truncale
United States District Judge